No. 23-6054

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

SPEECH FIRST, INC.,

*Plaintiff-Appellant*,

v.

KAYSE SHRUM, in her official capacity
as President of Oklahoma State University,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Oklahoma, No. 5:23-cv-29 (Jones, J.)

## APPELLANT'S APPENDIX, VOLUME I: App.1 - App.213

Ryan Haynie, OBA No. 32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

J. Michael Connolly
Cameron T. Norris
James F. Hasson
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Appellant*

Dated: May 23, 2023

## TABLE OF CONTENTS

### VOLUME I

District Court Docket Sheet.................................................................................................4

Verified Amended Complaint (Doc. 27) .............................................................................21

Defendant Kayse Shrum's FRCP 12(B)(1) Motion To Dismiss Plaintiff's Amended
Complaint Based On Lack Of Standing (Doc. 29) ............................................................54

Ex. 1 Do No Harm Slip Copy (Doc. 29-1) .......................................................................84

Ex. 2 Declaration of Hallenbeck (Doc. 29-2) ................................................................. 105

Ex. 3 Declaration of Aleigha Mariott (Doc. 29-3) ......................................................... 117

Ex. 4 Declaration of Adam Barnes (Doc. 29-4) ............................................................. 123

Plaintiff's Oppposition To Defendant's Motion To Dismiss The Amended Complaint
(Doc. 32) ........................................................................................................................ 126

Declaration of Cherise Trump (Doc. 32-1).................................................................... 160

Declaration of Student A (Doc. 32-2)............................................................................ 167

Declaration of Student B (Doc. 32-3) ........................................................................... 172

Declaration of Student C (Doc. 32-4)............................................................................ 178

Declaration of James F. Hasson (Doc. 32-5) ................................................................ 184

Ex. 1: Student Code of Conduct (Doc. 32-6) ................................................................ 189

Certificate of Service ..................................................................................................... 213

### VOLUME II

Ex. 2: General Incident Report (Doc. 32-7) ................................................................... 217

Ex. 3: Report a Concern Page (Doc. 32-8)..................................................................... 223

Ex. 4: Reporting Forms (Doc. 32-9) ............................................................................. 227

Ex. 5: FIRE BIRT Report (Doc. 32-10)......................................................................... 229

Ex. 6: New Republic Article (Doc. 32-11) ..................................................................... 265

Ex. 7: Computer Policy (Doc. 32-12)............................................................................. 277

Ex. 8: FIRE No Comment Report (Doc. 32-13) ............................................................ 287

Ex. 9: Bias Incident Policy (Doc. 32-14) ...................................................................... 323

Ex. 10: Bias Report Form (Doc. 32-15)......................................................................... 327

Ex. 11: SF BRS Report (Doc. 32-16) ............................................................................ 334

Ex. 12: Board of Regents Policy (Doc. 32-17)................................................. 355

Ex. 13: Interim TIX Policy (Doc. 32-18) ....................................................... 365

Ex. 14: FIRE Spotlight 2021 (Doc. 32-19)..................................................... 390

## **VOLUME III**

Ex. 15: FIRE Using Spotlight (Doc. 32-20)..................................................... 434

Ex. 16: FIRE Spotlight Code of Conduct (Doc. 32-21) ................................. 448

Ex. 17 FIRE Spotlight Bias Policy (Doc. 32-22)............................................ 450

Ex. 18: FIRE Spotlight Computer Policy (Doc. 32-23) ................................. 454

Ex. 19: FIRE Davis Part I (Doc. 32-24)......................................................... 458

Ex. 20: FIRE Davis Part II (Doc. 32-25) ....................................................... 478

Ex. 21: Oklahoma State University Offending Speech Page (Doc. 32-26)................. 507

Ex. 22 University of Texas at Austin Policy (Doc. 32-27)............................. 511

Ex. 23 University of Central Florida Policy (Doc. 32-28)............................. 543

Ex. 24 University of Houston Policy (Doc. 32-29)........................................ 574

Ex. 25 Newspaper EIC Article (Doc. 32-30)................................................. 614

Defendant Kayse Shrum's Reply To Plaintiff's Response To Defendant's 12(B)(1) Motion To Dismiss (Doc. 33) ....................................................................... 619

Order (Doc. 35) .............................................................................................. 631

Judgment (Doc. 36)......................................................................................... 636

Notice of Appeal (Doc. 37) ............................................................................ 637

APPEAL,CLOSED,PURCELL,_TLC

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:23−cv−00029−J

Speech First Inc v. Shrum et al
Assigned to: Judge Bernard M. Jones
 Case in other court:  Tenth Circuit, 23−06054
Cause: 28:1983 Civil Rights

Date Filed: 01/10/2023
Date Terminated: 04/10/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Speech First Inc**                                    represented by    **Cameron Thomas Norris**
Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209
703−243−9423
Email: cam@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan A Haynie**
Oklahoma Council of Public Affairs
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
405−590−6070
Email: ryan@ocpathink.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Hasson**
Consovoy McCarthy PLLC
1600 Wilson Blvd.
Suite 700
Arlington, VA 22209
703−243−9423
Email: james@consovoymccarthy.com
*ATTORNEY TO BE NOTICED*

**John Michael Connolly**
Consovoy McCarthy PLLC
1600 Wilson Blvd
Suite 700
Arlington, VA 22209
703−243−9423
Fax: 703−243−9423
Email: mike@consovoymccarthy.com
*ATTORNEY TO BE NOTICED*

**App.4**

**Thomas Samuel Vaseliou**
Consovoy McCarthy PLLC
1600 Wilson Blvd
Ste 700
22209
Arlington, VA 22209
321–223–3092
Email: tvaseliou@consovoymccarthy.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kayse Shrum**                    represented by    **Austin R Vance**
*individual capacity*                                Whitten Burrage
                                                    512 N Broadway Ave
                                                    Suite 300
                                                    Oklahoma City, OK 73102
                                                    405–516–7800
                                                    Fax: 405–516–7859
                                                    Email: avance@whittenburragelaw.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jordan R Dennis**
                                                    Whitten Burrage
                                                    512 N Broadway Ave
                                                    Suite 300
                                                    Oklahoma City, OK 73102
                                                    405–516–7800
                                                    Fax: 405–516–7859
                                                    Email: jdennis@whittenburragelaw.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Michael Burrage**
                                                    Whitten Burrage
                                                    512 N Broadway Ave
                                                    Suite 300
                                                    Oklahoma City, OK 73102
                                                    405–516–7800
                                                    Fax: 405–516–7859
                                                    Email: mburrage@whittenburragelaw.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Reggie N Whitten**
                                                    Whitten Burrage
                                                    512 N Broadway Ave
                                                    Suite 300
                                                    Oklahoma City, OK 73102
                                                    405–516–7800
                                                    Fax: 405–516–7859
                                                    Email: rwhitten@whittenburragelaw.com

*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
Board of Regents for the Oklahoma A&M
Colleges
5th Flr
Student Union
Stillwater, OK 74078
405–744–6494
Fax: 405–744–7998
Email: steve.stephens@okstate.edu
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kayse Shrum**                    represented by  **Clinton W Pratt**
*official capacity as President of*              Board of Regents for the Oklahoma A&M
*Oklahoma State University*                      Colleges
                                                 5th Flr
                                                 Student Union
                                                 Stillwater, OK 74078
                                                 405–744–4432
                                                 Fax: 405–744–7998
                                                 Email: clint.pratt@okstate.edu
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Gaylan Ray Towle , II**
                                                 Board of Regents for the Oklahoma A&M
                                                 Colleges
                                                 5th Flr
                                                 Student Union
                                                 Stillwater, OK 74078
                                                 405–744–6494
                                                 Fax: 405–744–7998
                                                 Email: gaylan.towle@okstate.edu
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Kinsey C Wyatt**
                                                 Office of Legal Counsel
                                                 Osu Center For Health Sciences
                                                 1111 W. 17th Street
                                                 Ste 426
                                                 Tulsa, OK 74107
                                                 918–561–8205
                                                 Email: kinsey.wyatt@okstate.edu
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Lyman G Lenker , IV**
                                                 Miller & Johnson PLLC
                                                 1221 N Francis Ave
                                                 Suite B
                                                 Oklahoma City, OK 73106
                                                 405–896–4388

Email: lyman.lenker@okstate.edu
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Aleigha Mariott**                    represented by   **Clinton W Pratt**
*individual capacity*                                   (See above for address)
*TERMINATED: 01/18/2023*                                *ATTORNEY TO BE NOTICED*

                                                        **Gaylan Ray Towle , II**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Stephen R Stephens**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Aleigha Mariott**                    represented by   **Clinton W Pratt**
*official capacity as Director of Student*              (See above for address)
*Support and Conduct for Oklahoma State*                *ATTORNEY TO BE NOTICED*
*University*
*TERMINATED: 01/18/2023*                                **Gaylan Ray Towle , II**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Stephen R Stephens**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Hallenbeck**                    represented by   **Clinton W Pratt**
*individual capacity*                                   (See above for address)
*TERMINATED: 01/18/2023*                                *ATTORNEY TO BE NOTICED*

                                                        **Gaylan Ray Towle , II**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Stephen R Stephens**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Hallenbeck**                    represented by   **Clinton W Pratt**
*official capacity as Vice President of*                (See above for address)
*Student Affairs for Oklahoma State*                    *ATTORNEY TO BE NOTICED*

*University*
*TERMINATED: 01/18/2023*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Raj Murthy**                                    represented by   **Clinton W Pratt**
*individual capacity*                                              (See above for address)
*TERMINATED: 01/18/2023*                                          *ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Raj Murthy**                                    represented by   **Clinton W Pratt**
*official capacity as Chief Information*                           (See above for address)
*Officer for Oklahoma State University*                            *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jackson Landrum**                               represented by   **Clinton W Pratt**
*individual capacity*                                              (See above for address)
*TERMINATED: 01/18/2023*                                          *ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

represented by

**App.8**

**Jackson Landrum**
*official capacity as Director of Equal*
*Opportunity for Oklahoma State*
*University*
*TERMINATED: 01/18/2023*

**Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Billy G Taylor**                              represented by   **Clinton W Pratt**
*individual capacity*                                           (See above for address)
*TERMINATED: 01/18/2023*                                       *ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Rick Davis**                                 represented by   **Clinton W Pratt**
*individual capacity*                                          (See above for address)
*TERMINATED: 01/18/2023*                                      *ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Jimmy Harrel**                               represented by   **Clinton W Pratt**
*individual capacity*                                          (See above for address)
*TERMINATED: 01/18/2023*                                      *ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**App.9**

**Defendant**

**Joe Hall**
*individual capacity*
*TERMINATED: 01/18/2023*

represented by **Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cary Baetz**
*individual capacity*
*TERMINATED: 01/18/2023*

represented by **Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Blayne Arthur**
*individual capacity*
*TERMINATED: 01/18/2023*

represented by **Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Walker**
*individual capacity*
*TERMINATED: 01/18/2023*

represented by **Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)

**App.10**

*ATTORNEY TO BE NOTICED*

**Defendant**

**Jason Ramsey**                      represented by    **Clinton W Pratt**
*individual capacity*                                 (See above for address)
*TERMINATED: 01/18/2023*                             *ATTORNEY TO BE NOTICED*

                                                     **Gaylan Ray Towle , II**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stephen R Stephens**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Jarold Callahan**                   represented by    **Clinton W Pratt**
*individual capacity*                                 (See above for address)
*TERMINATED: 01/18/2023*                             *ATTORNEY TO BE NOTICED*

                                                     **Gaylan Ray Towle , II**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stephen R Stephens**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Trudy Milner**                      represented by    **Clinton W Pratt**
*individual capacity*                                 (See above for address)
*TERMINATED: 01/18/2023*                             *ATTORNEY TO BE NOTICED*

                                                     **Gaylan Ray Towle , II**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stephen R Stephens**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Trudy Milner**                      represented by    **Clinton W Pratt**
*official capacities as members of the*              (See above for address)
*OSU/A&M Board of Regents*                           *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*
                                                     **Gaylan Ray Towle , II**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**App.11**

|  |  | **Stephen R Stephens**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|

**Defendant**

**Billy G Taylor**
*official capacity as members of the*
*OSU/A&M Board of Regents*
*TERMINATED: 01/18/2023*

represented by

**Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Davis**
*official capacity as members of the*
*OSU/A&M Board of Regents*
*TERMINATED: 01/18/2023*

represented by

**Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jimmy Harrel**
*official capacity as members of the*
*OSU/A&M Board of Regents*
*TERMINATED: 01/18/2023*

represented by

**Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joe Hall**
*official capacity as members of the*
*OSU/A&M Board of Regents*
*TERMINATED: 01/18/2023*

represented by

**Clinton W Pratt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gaylan Ray Towle , II**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cary Baetz**                                   represented by     **Clinton W Pratt**
*official capacity as members of the*                             (See above for address)
*OSU/A&M Board of Regents*                                        *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

                                                                  **Gaylan Ray Towle , II**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Stephen R Stephens**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Blayne Arthur**                                represented by     **Clinton W Pratt**
*official capacity as members of the*                             (See above for address)
*OSU/A&M Board of Regents*                                        *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

                                                                  **Gaylan Ray Towle , II**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Stephen R Stephens**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Walker**                                  represented by     **Clinton W Pratt**
*official capacity as members of the*                             (See above for address)
*OSU/A&M Board of Regents*                                        *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

                                                                  **Gaylan Ray Towle , II**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Stephen R Stephens**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Jason Ramsey**                                 represented by     **Clinton W Pratt**
*official capacity as members of the*                             (See above for address)
*OSU/A&M Board of Regents*                                        *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

**App.13**

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jarold Callahan**                          represented by  **Clinton W Pratt**
*official capacity as members of the*                        (See above for address)
*OSU/A&M Board of Regents*                                   *ATTORNEY TO BE NOTICED*
*TERMINATED: 01/18/2023*

**Gaylan Ray Towle , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen R Stephens**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2023 | 1 | COMPLAINT against Blayne Arthur (official capacity as members of the OSU/A&M Board of Regents), Blayne Arthur (individual capacity), Cary Baetz(individual capacity), Cary Baetz(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(individual capacity), Rick Davis(official capacity as members of the OSU/A&M Board of Regents), Rick Davis(individual capacity), Joe Hall(individual capacity), Joe Hall(official capacity as members of the OSU/A&M Board of Regents), Doug Hallenbeck(official capacity as Vice President of Student Affairs for Oklahoma State University), Doug Hallenbeck(individual capacity), Jimmy Harrel(individual capacity), Jimmy Harrel(official capacity as members of the OSU/A&M Board of Regents), Jackson Landrum(official capacity as Director of Equal Opportunity for Oklahoma State University), Jackson Landrum(individual capacity), Aleigha Mariott(official capacity as Director of Student Support and Conduct for Oklahoma State University), Aleigha Mariott(individual capacity), Trudy Milner(individual capacity), Trudy Milner(official capacities as members of the OSU/A&M Board of Regents), Raj Murthy(official capacity as Chief Information Officer for Oklahoma State University), Raj Murthy(individual capacity), Jason Ramsey(official capacity as members of the OSU/A&M Board of Regents), Jason Ramsey(individual capacity), Kayse Shrum(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University), Billy G Taylor(official capacity as members of the OSU/A&M Board of Regents), Billy G Taylor(individual capacity), Rick Walker(individual capacity), Rick Walker(official capacity as members of the OSU/A&M Board of Regents) filed by Speech First Inc. (Attachments: # 1 Civil Cover Sheet)(rr) (Entered: 01/10/2023) |
| 01/10/2023 | 2 | Summons Issued Electronically as to Blayne Arthur (official capacity as members of the OSU/A&M Board of Regents), Blayne Arthur (individual capacity), Cary Baetz(individual capacity), Cary Baetz(official capacity as members of the OSU/A&M |

| | | |
|---|---|---|
| | | Board of Regents), Jarold Callahan(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(individual capacity), Rick Davis(official capacity as members of the OSU/A&M Board of Regents), Rick Davis(individual capacity), Joe Hall(individual capacity), Joe Hall(official capacity as members of the OSU/A&M Board of Regents), Doug Hallenbeck(official capacity as Vice President of Student Affairs for Oklahoma State University), Doug Hallenbeck(individual capacity), Jimmy Harrel(individual capacity), Jimmy Harrel(official capacity as members of the OSU/A&M Board of Regents), Jackson Landrum(official capacity as Director of Equal Opportunity for Oklahoma State University), Jackson Landrum(individual capacity), Aleigha Mariott(official capacity as Director of Student Support and Conduct for Oklahoma State University), Aleigha Mariott(individual capacity), Trudy Milner(individual capacity), Trudy Milner(official capacities as members of the OSU/A&M Board of Regents), Raj Murthy(official capacity as Chief Information Officer for Oklahoma State University), Raj Murthy(individual capacity), Jason Ramsey(official capacity as members of the OSU/A&M Board of Regents), Jason Ramsey(individual capacity), Kayse Shrum(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University), Billy G Taylor(official capacity as members of the OSU/A&M Board of Regents), Billy G Taylor(individual capacity), Rick Walker(individual capacity), Rick Walker(official capacity as members of the OSU/A&M Board of Regents). (rr) (Entered: 01/10/2023) |
| 01/10/2023 | | PAYMENT FOR A CIVIL CASE Filing fee $ 402, receipt number AOKWDC–4066588. (Norris, Cameron) (Entered: 01/10/2023) |
| 01/10/2023 | 3 | MOTION for Preliminary Injunction by Speech First Inc. (Attachments: # 1 Brief in Support, # 2 Hasson Declaration (w attachments), # 3 Trump Declaration, # 4 Student A Declaration, # 5 Student B Declaration, # 6 Student C Declaration, # 7 Proposed Order)(Norris, Cameron) (Entered: 01/10/2023) |
| 01/18/2023 | 4 | WAIVER OF SERVICE Returned Executed by Defendants Blayne Arthur, Blayne Arthur, Cary Baetz, Cary Baetz, Jarold Callahan, Jarold Callahan, Rick Davis, Rick Davis, Joe Hall, Joe Hall, Doug Hallenbeck, Doug Hallenbeck, Jimmy Harrel, Jimmy Harrel, Jackson Landrum, Jackson Landrum, Aleigha Mariott, Aleigha Mariott, Trudy Milner, Trudy Milner, Raj Murthy, Raj Murthy, Jason Ramsey, Jason Ramsey, Kayse Shrum, Kayse Shrum, Billy G Taylor, Billy G Taylor, Rick Walker, Rick Walker. All Defendants. (Norris, Cameron) (Entered: 01/18/2023) |
| 01/18/2023 | 5 | STIPULATION of Dismissal *of All Defendants but Schrum* by Speech First Inc. (Norris, Cameron) (Entered: 01/18/2023) |
| 01/18/2023 | 6 | ENTRY of Appearance by Stephen R Stephens on behalf of Blayne Arthur (official capacity as members of the OSU/A&M Board of Regents), Blayne Arthur (individual capacity), Cary Baetz(individual capacity), Cary Baetz(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(individual capacity), Rick Davis(official capacity as members of the OSU/A&M Board of Regents), Rick Davis(individual capacity), Joe Hall(individual capacity), Joe Hall(official capacity as members of the OSU/A&M Board of Regents), Doug Hallenbeck(official capacity as Vice President of Student Affairs for Oklahoma State University), Doug Hallenbeck(individual capacity), Jimmy Harrel(individual capacity), Jimmy Harrel(official capacity as members of the OSU/A&M Board of Regents), Jackson Landrum(official capacity as Director of Equal Opportunity for Oklahoma State University), Jackson Landrum(individual capacity), Aleigha Mariott(official capacity |

**App.15**

| | | |
|---|---|---|
| | | as Director of Student Support and Conduct for Oklahoma State University), Aleigha Mariott(individual capacity), Trudy Milner(individual capacity), Trudy Milner(official capacities as members of the OSU/A&M Board of Regents), Raj Murthy(official capacity as Chief Information Officer for Oklahoma State University), Raj Murthy(individual capacity), Jason Ramsey(official capacity as members of the OSU/A&M Board of Regents), Jason Ramsey(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University), Billy G Taylor(official capacity as members of the OSU/A&M Board of Regents), Billy G Taylor(individual capacity), Rick Walker(individual capacity), Rick Walker(official capacity as members of the OSU/A&M Board of Regents) (Stephens, Stephen) (Entered: 01/18/2023) |
| 01/18/2023 | 7 | ENTRY of Appearance by Clinton W Pratt on behalf of Blayne Arthur (official capacity as members of the OSU/A&M Board of Regents), Blayne Arthur (individual capacity), Cary Baetz(individual capacity), Cary Baetz(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(individual capacity), Rick Davis(official capacity as members of the OSU/A&M Board of Regents), Rick Davis(individual capacity), Joe Hall(individual capacity), Joe Hall(official capacity as members of the OSU/A&M Board of Regents), Doug Hallenbeck(official capacity as Vice President of Student Affairs for Oklahoma State University), Doug Hallenbeck(individual capacity), Jimmy Harrel(individual capacity), Jimmy Harrel(official capacity as members of the OSU/A&M Board of Regents), Jackson Landrum(official capacity as Director of Equal Opportunity for Oklahoma State University), Jackson Landrum(individual capacity), Aleigha Mariott(official capacity as Director of Student Support and Conduct for Oklahoma State University), Aleigha Mariott(individual capacity), Trudy Milner(individual capacity), Trudy Milner(official capacities as members of the OSU/A&M Board of Regents), Raj Murthy(official capacity as Chief Information Officer for Oklahoma State University), Raj Murthy(individual capacity), Jason Ramsey(official capacity as members of the OSU/A&M Board of Regents), Jason Ramsey(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University), Billy G Taylor(official capacity as members of the OSU/A&M Board of Regents), Billy G Taylor(individual capacity), Rick Walker(individual capacity), Rick Walker(official capacity as members of the OSU/A&M Board of Regents) (Pratt, Clinton) (Entered: 01/18/2023) |
| 01/18/2023 | 8 | ENTRY of Appearance by Gaylan R Towle, II on behalf of Blayne Arthur (official capacity as members of the OSU/A&M Board of Regents), Blayne Arthur (individual capacity), Cary Baetz(individual capacity), Cary Baetz(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(official capacity as members of the OSU/A&M Board of Regents), Jarold Callahan(individual capacity), Rick Davis(official capacity as members of the OSU/A&M Board of Regents), Rick Davis(individual capacity), Joe Hall(individual capacity), Joe Hall(official capacity as members of the OSU/A&M Board of Regents), Doug Hallenbeck(official capacity as Vice President of Student Affairs for Oklahoma State University), Doug Hallenbeck(individual capacity), Jimmy Harrel(individual capacity), Jimmy Harrel(official capacity as members of the OSU/A&M Board of Regents), Jackson Landrum(official capacity as Director of Equal Opportunity for Oklahoma State University), Jackson Landrum(individual capacity), Aleigha Mariott(official capacity as Director of Student Support and Conduct for Oklahoma State University), Aleigha Mariott(individual capacity), Trudy Milner(individual capacity), Trudy Milner(official |

**App.16**

| | | |
|---|---|---|
| | | capacities as members of the OSU/A&M Board of Regents), Raj Murthy(official capacity as Chief Information Officer for Oklahoma State University), Raj Murthy(individual capacity), Jason Ramsey(official capacity as members of the OSU/A&M Board of Regents), Jason Ramsey(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University), Billy G Taylor(official capacity as members of the OSU/A&M Board of Regents), Billy G Taylor(individual capacity), Rick Walker(individual capacity), Rick Walker(official capacity as members of the OSU/A&M Board of Regents) (Towle, Gaylan) (Entered: 01/18/2023) |
| 01/18/2023 | 9 | ENTRY of Appearance by Ryan A Haynie on behalf of Speech First Inc (Haynie, Ryan) (Entered: 01/18/2023) |
| 01/18/2023 | 10 | MOTION for Leave to Appear Pro Hac Vice *of J. Michael Connolly* Filing fee $ 50, receipt number AOKWDC–4072245 by Speech First Inc. (Attachments: # 1 Exhibit Connolly's Request for Admission Pro Hac Vice)(Haynie, Ryan) Modified on 1/23/2023 to flatten attached document (rr). (Entered: 01/18/2023) |
| 01/18/2023 | 11 | MOTION for Leave to Appear Pro Hac Vice *of James F. Hasson* Filing fee $ 50, receipt number AOKWDC–4072255 by Speech First Inc. (Attachments: # 1 Exhibit Hasson's Request for Admission Pro Hac Vice)(Haynie, Ryan) (Entered: 01/18/2023) |
| 01/18/2023 | 12 | MOTION for Leave to Appear Pro Hac Vice *of Thomas S. Vaseliou* Filing fee $ 50, receipt number AOKWDC–4072257 by Speech First Inc. (Attachments: # 1 Exhibit Vaseliou's Request for Admission Pro Hac Vice)(Haynie, Ryan) (Entered: 01/18/2023) |
| 01/19/2023 | 13 | **ORDER** ~ Granting 10 , 11 , and 12 Motions to Appear Pro Hac Vice. J. Michael Connolly, James F. Hasson, and Thomas S. Vaseliou are hereby admitted to practice before this Court for the limited purpose of participating in this case. Signed by Judge Bernard M. Jones on 1/19/2023. (dwl) (Entered: 01/19/2023) |
| 01/23/2023 | 14 | ENTRY of Appearance by Thomas Samuel Vaseliou on behalf of All Plaintiffs (Vaseliou, Thomas) Modified on 1/24/2023 to flatten document (naa). (Entered: 01/23/2023) |
| 01/23/2023 | 15 | ENTRY of Appearance by John Michael Connolly on behalf of All Plaintiffs (Connolly, John) Modified on 1/24/2023 to flatten document (naa). (Entered: 01/23/2023) |
| 01/23/2023 | 16 | ENTRY of Appearance by James Hasson on behalf of All Plaintiffs (Hasson, James) Modified on 1/24/2023 to flatten document (naa). (Entered: 01/23/2023) |
| 02/07/2023 | 17 | ENTRY of Appearance by Michael Burrage on behalf of Kayse Shrum(individual capacity) (Burrage, Michael) (Entered: 02/07/2023) |
| 02/07/2023 | 18 | ENTRY of Appearance by Reggie N Whitten on behalf of Kayse Shrum(individual capacity) (Whitten, Reggie) (Entered: 02/07/2023) |
| 02/07/2023 | 19 | ENTRY of Appearance by Jordan R Dennis on behalf of Kayse Shrum(individual capacity) (Dennis, Jordan) (Entered: 02/07/2023) |
| 02/07/2023 | 20 | ENTRY of Appearance by Austin R Vance on behalf of Kayse Shrum(individual capacity) (Vance, Austin) (Entered: 02/07/2023) |
| 02/07/2023 | 21 | MOTION to Dismiss by Kayse Shrum(individual capacity). (Burrage, Michael) (Entered: 02/07/2023) |

**App.17**

| 02/07/2023 | 22 | ENTRY of Appearance by Lyman G Lenker, IV on behalf of Kayse Shrum(official capacity as President of Oklahoma State University) (Lenker, Lyman) (Entered: 02/07/2023) |
|---|---|---|
| 02/07/2023 | 23 | ENTRY of Appearance by Kinsey C Wyatt on behalf of Kayse Shrum(official capacity as President of Oklahoma State University) (Wyatt, Kinsey) (Entered: 02/07/2023) |
| 02/07/2023 | 24 | MOTION to Dismiss *FRCP 12(b)(1)* by Kayse Shrum(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University). (Attachments: # 1 Exhibit Do No Harm Slip Copy, # 2 Exhibit Hallenbeck Declaration, # 3 Exhibit Mariott Declaration, # 4 Exhibit Barnes Declaration)(Stephens, Stephen) (Entered: 02/07/2023) |
| 02/07/2023 | 25 | RESPONSE to Motion re 3 MOTION for Preliminary Injunction filed by Kayse Shrum(individual capacity), Kayse Shrum(official capacity as President of Oklahoma State University). (Attachments: # 1 Exhibit College Free Speech Rankings Part 1, # 2 Exhibit College Free Speech Rankings Part 2, # 3 Exhibit College Free Speech Rankings Part 3, # 4 Exhibit 2022 Cook PVI, # 5 Exhibit Hallenbeck Declaration, # 6 Exhibit Mariott Declaration, # 7 Exhibit Barnes Declaration, # 8 Exhibit Stockton/Brooks Lecture Article, # 9 Exhibit OSU Student Code of Conduct, # 10 Exhibit 74 O.S. Chapter 62, App'x 1, # 11 Exhibit OSU Policy 3–0601 – Appropriate use Policy, # 12 Exhibit Murthy Declaration)(Stephens, Stephen) (Entered: 02/07/2023) |
| 02/13/2023 | 26 | REPLY by Plaintiff Speech First Inc re 25 Response to Motion,,, filed by All Plaintiffs. (Norris, Cameron) (Entered: 02/13/2023) |
| 02/17/2023 | 27 | AMENDED COMPLAINT against Kayse Shrum(official capacity as President of Oklahoma State University) filed by Speech First Inc.(Norris, Cameron) (Entered: 02/17/2023) |
| 02/20/2023 | 28 | RESPONSE to Motion re 21 MOTION to Dismiss , 24 MOTION to Dismiss *FRCP 12(b)(1) noting Mootness in light of Amended Complaint* filed by Speech First Inc. (Norris, Cameron) (Entered: 02/20/2023) |
| 03/03/2023 | 29 | MOTION to Dismiss *Plaintiff's Amended Complaint Based on Lack of Standing* by Kayse Shrum(official capacity as President of Oklahoma State University). (Attachments: # 1 Exhibit Do No Harm Slip Copy, # 2 Exhibit Hallenbeck Declaration, # 3 Exhibit Mariott Declaration, # 4 Exhibit Barnes Declaration)(Stephens, Stephen) (Entered: 03/03/2023) |
| 03/03/2023 | 30 | MOTION to Strike 27 Amended Complaint *in Accordance with FRCP 8* by Kayse Shrum(official capacity as President of Oklahoma State University). (Attachments: # 1 Exhibit Tietz Email)(Stephens, Stephen) (Entered: 03/03/2023) |
| 03/24/2023 | 31 | RESPONSE in Opposition re 30 MOTION to Strike 27 Amended Complaint *in Accordance with FRCP 8* filed by Speech First Inc. (Norris, Cameron) (Entered: 03/24/2023) |
| 03/24/2023 | 32 | RESPONSE in Opposition re 29 MOTION to Dismiss *Plaintiff's Amended Complaint Based on Lack of Standing* filed by Speech First Inc. (Attachments: # 1 Affidavit Trump MTD Decl., # 2 Affidavit Student A Decl., # 3 Affidavit Student B Decl., # 4 Affidavit Student C Decl., # 5 Affidavit Hasson MTD Decl., # 6 Exhibit Exhibit 1 Code of Conduct, # 7 Exhibit Exhibit 2 General Incident Report Form, # 8 Exhibit Exhibit 3 Report a Concern Page, # 9 Exhibit Exhibit 4 Reporting Forms, # 10 Exhibit |

**App.18**

| | | |
|---|---|---|
| | | Exhibit 5 FIRE BIRT Report, # <u>11</u> Exhibit Exhibit 6 New Republic Article, # <u>12</u> Exhibit Exhibit 7 Computer Policy, # <u>13</u> Exhibit Exhibit 8 FIRE No Comment Report, # <u>14</u> Exhibit Exhibit 9 Bias Incident Policy, # <u>15</u> Exhibit Exhibit 10 Bias Report Form, # <u>16</u> Exhibit Exhibit 11 SF BRS Report, # <u>17</u> Exhibit Exhibit 12 Board of Regents Policy, # <u>18</u> Exhibit Exhibit 13 Interim TIX Policy, # <u>19</u> Exhibit Exhibit 14 FIRE Spotlight 2021, # <u>20</u> Exhibit Exhibit 15 FIRE Using Spotlight, # <u>21</u> Exhibit Exhibit 16 FIRE Spotlight Code of Conduct, # <u>22</u> Exhibit Exhibit 17 FIRE Spotlight Bias Policy, # <u>23</u> Exhibit Exhibit 18 FIRE Spotlight Computer Policy, # <u>24</u> Exhibit Exhibit 19 FIRE Davis Part I, # <u>25</u> Exhibit Exhibit 20 FIRE Davis Part II, # <u>26</u> Exhibit Exhibit 21 OSU Offending Speech Page, # <u>27</u> Exhibit Exhibit 22 UT Policy, # <u>28</u> Exhibit Exhibit 23 UCF Policy, # <u>29</u> Exhibit Exhibit 24 Houston Policy, # <u>30</u> Exhibit Exhibit 25 Newspaper EIC Article)(Norris, Cameron) (Entered: 03/24/2023) |
| 03/31/2023 | <u>33</u> | REPLY to Response to Motion re <u>24</u> MOTION to Dismiss *FRCP 12(b)(1)* filed by Kayse Shrum(official capacity as President of Oklahoma State University). (Stephens, Stephen) (Entered: 03/31/2023) |
| 03/31/2023 | <u>34</u> | RESPONSE in Opposition re <u>30</u> MOTION to Strike <u>27</u> Amended Complaint *in Accordance with FRCP 8* filed by Kayse Shrum(official capacity as President of Oklahoma State University). (Stephens, Stephen) (Entered: 03/31/2023) |
| 04/10/2023 | <u>35</u> | **ORDER** ~ Defendant's motion to dismiss Plaintiff's amended complaint on standing grounds <u>29</u> is GRANTED. Defendant's motion to dismiss in her individual capacity <u>21</u> , Defendant's motion to dismiss Plaintiff's original complaint on standing grounds <u>24</u> , and Defendant's motion to strike Plaintiff's amended complaint <u>30</u> are DENIED as moot. Plaintiff's motion for a preliminary injunction <u>3</u> is also DENIED as moot. A separate judgment will issue. Signed by Judge Bernard M. Jones on 4/10/2023. (dwl) (Entered: 04/10/2023) |
| 04/10/2023 | <u>36</u> | **JUDGMENT** ~ Pursuant to the Order filed this same date, Judgment is entered in Defendant's favor. Signed by Judge Bernard M. Jones on 4/10/2023. (dwl) (Entered: 04/10/2023) |
| 04/11/2023 | <u>37</u> | NOTICE OF APPEAL by Speech First Inc. (Norris, Cameron) (Entered: 04/11/2023) |
| 04/11/2023 | <u>38</u> | PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re <u>37</u> Notice of Appeal (Attachments: # <u>1</u> Attachment 1 – Preliminary Record on Appeal)(naa) (Entered: 04/11/2023) |
| 04/11/2023 | <u>39</u> | Tenth Circuit USCA Case Number 23–6054 for <u>37</u> Notice of Appeal filed by Speech First Inc. Civil case docketed. Preliminary record filed. DATE RECEIVED: 04/11/2023 Fee, notice of appearance, transcript order form, disclosure statement, and docketing statement due by 04/25/2023 for Speech First, Inc. Notice of appearance due on 04/25/2023 for Kayse Shrum. [23–6054] (naa) (Entered: 04/11/2023) |
| 04/13/2023 | <u>40</u> | TRANSCRIPT Order Form by Speech First Inc re <u>37</u> Notice of Appeal that transcripts are not necessary. See order form for dates and proceedings. (Norris, Cameron) (Entered: 04/13/2023) |
| 04/13/2023 | <u>41</u> | TRANSCRIPT LETTER advising no transcripts are necessary re <u>37</u> Notice of Appeal filed by Speech First Inc. The record is ready for appeal purposes. (naa) (Entered: 04/13/2023) |
| 04/14/2023 | <u>42</u> | |

**App.19**

| | | Receipt for Money Received from Speech First Inc in the amount of $505, receipt number 500001676 regarding <u>37</u> Notice of Appeal. Emailed receipt to tvaseliou@consovoymccarthy.com (naa) (Entered: 04/14/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

*Plaintiff,*

v.

KAYSE SHRUM, in her official capacity as
President of Oklahoma State University,

*Defendant.*

Case No. 5:23-cv-29-J

**VERIFIED AMENDED
COMPLAINT**

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendant and alleges as follows:

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet Oklahoma State and its officials have created a series of rules and regulations that deter, suppress, and punish speech about the political and social issues of the day. These restrictions disregard decades of precedent.

3.      First, the University's harassment policy disciplines students who engage in speech that the University deems to be "intimidat[ing]," "verbal abuse," or other conduct that is "persistent, severe, or pervasive" and "threatens or endangers the mental … health" of

another student. The policy gives students no details about what the University considers "abusive" or "intimidating" and covers a wide swath of protected speech. This vague, overbroad, and content-based restriction on protected speech violates the First and Fourteenth Amendments.

4.     Second, the University's computer policy forbids students from using their student email accounts or the University's network to "transmit[] political campaigning." Violations of the computer policy can lead to the loss of privileges and are punishable under the Student Code of Conduct. This policy is similarly an overbroad and content-based restriction on protected speech that violates the First and Fourteenth Amendments.

5.     Third, the University's bias-incidents policy martials the authority of university administrators to police speech that someone believes is motivated by "bias." The University defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is close-minded, prejudicial, or unfair." "Bias incidents," in turn, are formally defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." Bias incidents can occur on or off campus, including on social media. Students accused of "bias incidents" can be referred for formal disciplinary proceedings. This policy poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague, overbroad, and viewpoint-based definition of "bias incident" that triggers them—violate the First and Fourteenth Amendments.

6.      Speech First has members who attend Oklahoma State and whose protected speech is chilled by these three policies. The policies should be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

7.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

8.      The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

9.      Venue is proper under 28 U.S.C. §1391 because Defendant resides here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

10.      Plaintiff, Speech First, is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. *E.g.*, *Speech First, Inc. v. Khator*, 2022 WL 1638773 (S.D. Tex. May 19, 2022); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

11.      Speech First has members who attend Oklahoma State University, including Students A, B, and C.

12.      Oklahoma State is a public university organized and existing under the laws of Oklahoma.

13.      Defendant Kayshe Shrum is President of the University. Shrum is responsible for the enactment and enforcement of University policies, including the policies challenged

here. Shrum is sued in her official capacity. She has stipulated that "any injunctive or declaratory relief or attorney's fees awarded in this action to Plaintiff against" her in her official capacity "will apply to and be binding on Oklahoma State University."

## BACKGROUND

### I.     College Students and Their First Amendment Rights

14.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

15.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

16.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

17.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Fenves*, 979 F.3d at 339.

## II.    Universities' Use of Speech Codes and Bias-Response Teams to Chill Speech

18.     Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

19.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression (FIRE), are "university regulations prohibiting expression that would be constitutionally protected in society at large." *Spotlight on Speech Codes 2022* at 9, FIRE, perma.cc/4P23-HJWV.

20.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 9; *see Fenves*, 979 F.3d at 338-39 n.17 (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

21.     In addition to speech codes, universities are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams." *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First (2022), perma.cc/DX37-LX3F.

22.     Living up to their Orwellian name, bias-response teams encourage students to monitor each other's speech and report incidents of "bias" to the University (often anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

23.     Students have been reported to bias-response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, perma.cc/84NZ-SM2E.

24.     After receiving reports of a bias incident, bias-response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

25.      Although universities claim this process is entirely voluntary, they know students do not see it that way. As the Sixth Circuit has explained, an "invitation from [a bias-response team] to meet could carry an implicit threat of consequence should a student decline the invitation." *Schlissel*, 939 F.3d at 765. Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background." *Id.*

26.      A 2017 report from FIRE found that bias-response teams monitor protected expression and lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Bias Response Team Report 2017*, at 28. "[T]he posture taken by many Bias Response Teams," the study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

27.      Other universities have discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias-response team, citing their "high failure rate" and their tendency to "become almost punitive."

28.      University professors have similarly observed that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or

minority viewpoints." Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), perma.cc/CS56-LQ7B; *see also* Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

29.     Courts have likewise recognized the chilling effect of bias-response teams that closely resemble Oklahoma State's. After Speech First challenged similar bias-response teams at the University of Texas, the University of Michigan, and the University of Central Florida, all three schools disbanded their teams. The Sixth Circuit held that Michigan's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. The Fifth Circuit agreed, stressing that Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation." *Fenves*, 979 F.3d at 338. The Eleventh Circuit likewise held that "the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights— by subjection to [Central Florida's] bias-related-incidents policy." *Cartwright*, 32 F.4th at 1124.

30.     Unsurprisingly, the rise of bias-response teams and speech codes is matched by a parallel rise in the percentage of college students who feel like they cannot express controversial opinions on campus. According to a September 2020 survey of more than 20,000 American college students, an astonishing 42 percent of students believe their university would punish them for making an offensive or controversial statement. *2020 College Free Speech Rankings*, at 19, FIRE (Sept. 2020), perma.cc/TSJ6-HRE7. A separate survey found that,

among non-freshman college students, nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are offensive to some people," had become "more difficult" in the Fall 2020 semester than in previous semesters. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), perma.cc/6RZA-SUE9.

31.    Many organizations oppose these speech codes and bias-response teams and argue that such policies are unconstitutional. For example, FIRE has criticized materially similar harassment and bias-response policies and argued that they are unconstitutional. *See* FIRE Amicus Br., *Cartwright*, 2021 WL 4726904, at *17-23 (similar harassment policy); FIRE Amicus Br., *Speech First, Inc. v. Sands*, 2022 WL 180779, at *4-24 (4th Cir. 2022) (similar bias-response team). FIRE has given each of the policies challenged here a "yellow light" rating, which means the "policies are unconstitutional." *Using FIRE's Spotlight Database*, FIRE ("Yellow Light").

## III.   The University's Harassment Policy

32.    In September 2022, University officials approved an updated Student Code of Conduct, including a section on "Prohibited Conduct."

33.    The Code of Conduct defines "Prohibited Conduct" as behavior that "detract[s] from the effectiveness of a university community and for which students may be subject to conduct action." Violations are punishable by "sanctions" that can include "suspension or expulsion from the university."

34.    One form of prohibited conduct is "harassment." Under the header "Social Justice," the University defines "harassment" as "[e]ngaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that threatens or endangers the

mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe, or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person." The definition of harassment is partially circular, as it includes the term "harassment" itself. Elsewhere, the Code, under the header "Cowboy Community Standards," states that "Social Justice" means that "respecting the dignity of every person is essential for creating and sustaining a flourishing university community" and that students are expected to "act to discourage and challenge those whose actions may be harmful to and/or diminish the worth of others."

35.     The Code also forbids students from "[a]ttempting to or encouraging others to commit acts prohibited by this Code" or displaying "[a]pathy or acquiescence in the presence of prohibited conduct."

36.     According to the University, harassment can occur anywhere, at any time, by any medium. The Code states that it "applies to conduct which occurs on university premises, at Oklahoma State University-sponsored events both on and off campus, and to off-campus conduct that adversely affects the Oklahoma State University community or the pursuit of its objectives." The Code applies to all conduct "from the time of application for admission through the actual awarding of the degree."

37.     Anyone—whether affiliated with the University or not—can file a complaint against a student. The University itself also "may initiate a complaint." The University expects "students, faculty and staff" to "report all violations of the Student Code of Conduct of which they become aware." After a complaint is filed, "Student Support & Conduct will conduct [an] investigation[] to gather information." Students found guilty of harassment are subject to

disciplinary action via the student conduct process outlined in the Code. Sanctions for violations "can range from a verbal warning to suspension or expulsion."

## IV.   The University's Computer Policy

38.    In March 2021, the Board of Regents approved a revised version of University Policy 3-0601, titled "Appropriate Use Policy." The computer policy "applies to all University owned or controlled information technology resources whether individually controlled or shared, stand alone or networked."

39.    Students violate the computer policy if they use the University's information technology resources "for transmitting political campaigning" messages.

40.    The policy informs students that they can "report material received via email" by "send[ing] a complaint" to an email hotline operated by the University.

41.    Students must comply with the computer policy to maintain access to the internet network. Because the computer policy is incorporated by reference in the Code of Conduct, violations of the policy are also punishable through the Student Conduct process.

42.    The computer policy's restrictions are consistent with the University's history of suppressing student speech about politics. For example, a 2016 investigation by FIRE found that the University used a "customizable blacklist" on Facebook to "automatically scrub[]" references to political candidates in the comments sections of its Facebook posts.

## V.   The University's Bias-Incidents Policy

43.    On top of its speech codes, the University has adopted a "bias incidents" policy designed to deter, suppress, and punish disfavored and controversial speech.

44.    The University defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is close-minded, prejudicial, or unfair." A "bias

incident," in turn, is defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics."

45.     The "actions" that the policy covers encompass pure speech. Students can be reported for, among other things, a "Comment in Class," a "Comment in Writing," "Incorrect name or pronoun usage," or an "Offensive Picture or Image." Bias incidents can occur on or off campus, including on social media or other digital platforms.

46.     The University "urges anyone who has experienced or witnessed a bias incident to report it." Bias-incident complaints can be submitted online via a "Bias Incident Report" form on the University's website.  In its advertisements urging students to "report[] concerning behavior," the University lists its "Bias Incident Report" form right next to the forms to "report sexual violence" and report "violations of the Code of Conduct."

47.     Importantly, complaints about biased speech can be submitted anonymously. When reporting biased speech, complainants specify the date and location of the alleged incident and list key details about the "involved parties," including the offender's name, phone number, and email address. Complainants also can provide a description of the incident and include "supporting documentation" for the complaint, such as "[p]hotos, video [and] email[s]." Complainants further specify whether they were the "[t]arget" of the bias incident, a "[w]itness to the incident," a "[f]riend/[f]amily/[p]artner of the target," or a "University employee." Complainants must also specify whether the "incident [was] reported to a police agency."

48.     The University has created the "Bias-Incident Response Team" or "BIRT" and charged it with responding to bias incidents. The BIRT "[r]eview[s] all reports with due diligence." After receiving a complaint, the BIRT "will contact the reporting person" and the accused, if possible and, "if desired, offer a meeting to discuss the incident" with both the reporter and the accused "in detail to explore a plan for resolution." The complainant's "[s]uggestions for redress . . . will be considered to the fullest extent of the [BIRT's] authority." The BIRT's goal is to achieve an "informal resolution" to the complaint, such as "training and educational opportunities" for the offender. But "where disciplinary or corrective action is a possibility," bias-incident complaints will be "referred to … Student Conduct." Finally, the BIRT will keep detailed records of the allegations against the offender and the BIRT's response, ostensibly so the University can "assess the campus climate on an ongoing basis."

49.     Since the BIRT's creation in 2020, numerous reports have been filed. Most of the reports involved accusations of perceived offensive speech. If the reporter requests it, a University staff member will reach out for the student accused of engaging in the perceived offensive speech to explain what was said and the intent behind it.

50.     Students at the University have already received backlash for talking openly about controversial topics. For example, in September 2021, the editor-in-chief of a student newspaper at the University was forced to resign after criticizing the University's mask policy. Before the forced resignation, the rest of the newspaper's editorial board issued a "correction" regarding the editor-in-chief's article and condemned the article.

## VI.     The Effect of the University's Policies on Speech First's Members

51.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech covered by the University's harassment policy, computer policy, and bias-incidents policy, but they credibly fear that the expression of their deeply held views will be considered "biased," "harassing," "unwarranted," "intimidating," and the like.

52.     One Speech First member, Student A, is a sophomore at the University. Student A is proceeding under a pseudonym because she is a current student at the University and, if her participation in this litigation becomes public, she fears reprisal from the University, her professors, her fellow students, and others.

53.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

54.     Student A is staunchly opposed to affirmative action and believes it is just old-fashioned racism by another name. She believes that giving preferences to college or job applicants based solely on the color of their skin is immoral and unconstitutional, and that people should be judged on merit, not race.

55.     Student A believes that abortion is wrong and that women should not be allowed to kill innocent babies. She likewise believes that laws that allow a mother and father to decide that a baby should die if its existence is inconvenient have no place in civilized society. She wants to emphasize Planned Parenthood's eugenicist roots and point out that abortion clinics largely target minority women.

56.     Student A is strongly against illegal immigration and wants the government to enforce our immigration laws. She thinks the government should not be using tax dollars paid by hard-working Americans to subsidize in-state tuition benefits for illegal aliens.

57.     Student A also believes that sex is inherent and immutable and that there is no such thing as a "gender spectrum." She thinks the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention or affirmation. When gender identity topics arise in class or in other discussions on campus, Student A wants to highlight this evidence and share her beliefs.

58.     Student A enrolled in the University because she wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

59.     Student A wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

60.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including affirmative action, abortion, gender identity, or immigration, Student A wants to point out the flaws in their arguments and convince them to change their minds.

61.     Student A wants to speak directly to her classmates about these topics, and she wants to talk frequently and repeatedly about these issues. Given her views, she knows that

many of these conversations will be heated and passionate. But she wants to have these conversations because she feels strongly about these issues.

62.     Student A speaks about these issues in small circles of friends when she knows that they share her opinions and are unlikely to report her for violating the University's speech policies.

63.     But University's harassment policy and bias-incidents policy make her reluctant to openly express her opinions or have these conversations in the broader University community.

64.     Student A does not fully express herself or talk about certain issues because she believes that sharing her beliefs will be considered "harassment." For example, she believes that others on campus will find her views "offensive" or "intimidat[ing]," especially if she shares those views passionately and repeatedly. Many of the topics that she wants to address could easily be considered "harassment" under the University's policy.

65.     Student A's fears are amplified by the fact that the University can punish her not only for committing "harassment" herself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

66.     Student A also does not fully express herself or talk about certain issues because she knows that students, faculty, or others will likely report her to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student A is confident that someone will find her speech to be "biased." She worries that there are other students who will "catch" her engaging in "biased" speech and that the University will take action against her. For example, Student A is afraid that the Bias Incident Response Team

will keep a record on her, share the allegations with others within the university, call her in for meetings, or refer the allegations to the Office of Student Conduct.

67.     Another Speech First member, Student B, is a junior at the University. Student B is proceeding under a pseudonym because he is a current student at the University and, if his participation in this litigation becomes public, he fears reprisal from the University, his professors, his fellow students, and others.

68.     Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

69.     Student B believes that life begins at conception and that abortion is a grave evil. He believes that no one has the right to end an innocent life just because a pregnancy is "unplanned" or "unwanted."

70.     Student B believes that marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family. Student B is a Christian, and his views on this issue stem partly from his religious beliefs.

71.     For the same reasons, Student B believes it is wrong for two men to use a "surrogate" to carry a baby. He believes that these men are simply "renting" the wombs of women, many of whom are in difficult financial circumstances. When Student B hears other students advocating for "surrogacy rights," he wants to tell them that they are simply advocating for the right to exploit women.

72.     Student B believes that gender dysphoria is a real condition that can occur in rare cases, but that biological sex is immutable and cannot change based on someone's internal feelings or how they "identify." He doesn't want to be forced to affirm that a biological male

is actually a female, or vice versa, simply because someone will be offended by his beliefs. When he hears classmates assert that "gender is a social construct," or that "trans women are women," he wants to respond with his belief that biological sex is binary—as it has been throughout human history.

73.    Finally, Student B believes that the Black Lives Matter organization has had a corrosive impact on race relations in America. He doesn't believe that any person is inherently "privileged" due to the color of their skin, or that America is a systemically racist country.

74.    Student B enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

75.    Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

76.    When another classmate or member of the university community voices contrary views about these and other controversial topics, including, abortion, the nuclear family, gender identity, or racial justice, Student B wants to point out the flaws in their arguments and convince them to change their minds.

77.    Student B wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

78.     Student B speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for violating the University's speech policies.

79.     The University's harassment policy, bias-incidents policy, and computer policy, however, make him reluctant to openly express his opinions or have these conversations in the broader University community.

80.     Student B does not fully express himself or talk about certain issues because he believes that sharing his beliefs will be considered "harassment." For example, he believes that others on campus will find his views "offensive" or "intimidat[ing]," especially if he shares those views passionately and repeatedly. Many of the topics that he wants to address could easily be considered "harassment" under the University's policy.

81.     Student B's fears are amplified by the fact that the University can punish him not only for committing "harassment" himself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

82.     Student B also does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student B is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student B is afraid that the Bias Incident Response Team will keep a record on him, share the allegations with others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

83.     Finally, Student B wants to send politically-oriented emails—including campaign-related emails—to his fellow students from his university email address. He refrains from doing so, however, because he is afraid that he will be punished under the computer policy's ban on "political campaigning."

84.     Another Speech First member, Student C, is a junior at the University. Student C is proceeding under a pseudonym because he is a current student at the University and, if his participation in this litigation becomes public, he fears reprisal from the University, his professors, his fellow students, and others.

85.     Student C is "politically conservative" and holds political beliefs that are unpopular, controversial, and in the minority on campus.

86.     Student C believes that human beings are created male or female and that a person cannot "transition" from one to the other. He has no ill-will towards members of the LGBT community, but he cannot in good conscience pretend that a biological male is actually a woman simply because someone believes that to be "his truth." When someone claims that to be the case, Student C wants to politely—but firmly—share his beliefs to the contrary.

87.     Student C is firmly pro-life. He believes that abortion kills a defenseless baby and that elective abortions should be illegal in all circumstances. He believes that many men who claim to be "pro-choice" are really just interested in avoiding the responsibility of fatherhood and living with the consequences of their decisions.

88.     Student C opposes illegal immigration and believes that "open border" policies are destructive and dangerous. He thinks that the government should focus on providing services to men and women who live in this country legally rather than extending already-

strained support systems to those who have no right to be here. When other students talk about "undocumented immigrants," Student C wants to point out that they are actually "illegal immigrants"—because they are here illegally.

89.    Student C enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

90.    Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

91.    When another a classmate or member of the university community voices contrary views about these and other controversial topics, including, abortion, gender identity, or immigration, Student C wants to point out the flaws in their arguments and convince them to change their minds.

92.    Student C wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

93.    Student C frequently discusses these issues with small circles of classmates who he knows share his views, and also in certain circumstances when he knows a classmate is unlikely to report him for violating University policies.

94.    The University's harassment policy, bias-incidents policy, and computer policy, however, make him reluctant to openly express his opinions or have these conversations in

the broader University community, particularly when he thinks other students are likely to report him.

95.     Student C does not fully express himself in certain circumstances or talk about certain issues because he believes that sharing his beliefs will be considered "harassment." For example, he believes that others on campus will find his views "offensive" or "intimidat[ing]," especially if he shares those views passionately and repeatedly. Many of the topics that he wants to address could easily be considered "harassment" under the University's policy.

96.     Student C's fears are amplified by the fact that the University can punish him not only for committing "harassment" himself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

97.     Student C also does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student C is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student C is afraid that the Bias Incident Response Team will keep a record on him, share the allegations with others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

98.     Finally, Student C wants to send politically-oriented emails—including campaign-related emails—to his fellow students from his university email address. He refrains from doing so, however, because he is afraid that he will be punished under the computer policy's ban on "political campaigning" if he does.

## COUNT I
### Violation of the First Amendment
### (Harassment Policy)

99.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

100.     The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

101.     "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive

- 23 -
**App.43**

because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

102.   The University's harassment policy is unconstitutionally overbroad. By its terms, the policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be considered "verbal abuse," "intimidation," or causing the "reasonable apprehension" of "harm" to "the mental … health" of a listener.

103.   While a university might be able to prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the University's harassment rule goes far beyond that.

104.   The Supreme Court has also consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

105.    The harassment policy is a content-based restriction on protected speech. The quintessential example of "a content-based regulation" is one that is "justifi[ed]" by "concern for the effect of the subject matter on listeners." *United States v. Playboy Ent. Group*, 529 U.S. 803, 120 (2000). The policy prohibits "verbal" conduct that another student finds "intimidat[ing]" or "abus[ive]." The University has no compelling interest in suppressing the unfettered exchange of political speech. Even if the University could identify a compelling interest, its content-discriminatory ban is not narrowly tailored to furthering that interest, because it "extends beyond harassment that objectively denies a student equal access to [the University's] education resources." *Saxe*, 240 F.3d at 210.

106.    Defendant adopted this unconstitutional policy under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments: Void for Vagueness (Harassment Policy)

107.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

108.    It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) ("A law is unconstitutionally vague if it fails to establish standards for the government and public that are sufficient to guard against the arbitrary deprivation of liberty interests.").

109.    As to the first goal, "'[a] statute which either forbids or requires the doing of an

act in terms so vague that [individuals] of common intelligence must necessarily guess at its

meaning and differ as to its application, violates the first essential of due process of law.'"

*Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391

(1925)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) ("The

purpose of the fair notice requirement is to enable citizens to conform their conduct to the

proscriptions of the law."). "With respect to the second goal, … 'if arbitrary and discriminatory

enforcement is to be prevented, laws must provide explicit standards for those who apply

them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on

an ad hoc and subjective basis.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Grayned*, 408

U.S. at 108-09).

110.    This principle of clarity is especially demanding when First Amendment

freedoms are at stake. If the challenged law "interferes with the right of free speech or of

association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside,

Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when

vagueness might induce individuals to forego their rights of speech, press, and association for

fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359

U.S. 344, 353 (1959).

111.    The harassment policy gives students no guidance about what speech is

permitted and what speech isn't. One definition of harassment is, entirely circularly,

"harassment." The definition is also subjective, as it covers any "other conduct" that

"threatens" another student's "mental … health/safety."

112.    This vagueness creates a serious risk that the policy will be enforced in an arbitrary manner or will be used to target speech based on the viewpoint of the speaker. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971). The University's general disclaimer that it "values and protects the constitutional right of free speech" only exacerbates the vagueness. *See Nat'l People's Action v. City of Blue Island*, 594 F. Supp. 72, 75-79 (N.D. Ill. 1984); *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1021 (N.D. Cal. 2007); *see also Fenves*, 979 F.3d at 337 (noting that disclaimers "simply reinforce[] the open-ended language" of the policy and the fact that it reaches protected speech); *id.* ("The difficulty with such disavowals is that regulations governing 'rude,' 'uncivil,' 'harassing,' or 'offensive' speech can in fact cover speech otherwise protected by the First Amendment.").

113.    The harassment policy is thus void for vagueness.

114.    Defendant adopted this unconstitutional policy under color of state law.

## COUNT III
### Violation of the First Amendment
### (Computer Policy)

115.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

116.    The University's computer policy prohibits students from using their student email accounts or the University's network to "transmit[] political campaigning."

117.    Violations of the computer policy are punishable under the Code of Conduct and can lead to the loss of network privileges.

118.    The computer policy is a content-based restriction on political speech—a category of expression where the First Amendment has "its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The University's email

accounts and internet networks are traditional public forums, at least for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech. Content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Summum*, 555 U.S. at 469.

119.    "The First Amendment's hostility to content-based regulation extends … to prohibition of public discussion of an entire topic." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (cleaned up). For instance, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* So too here.

120.    The University allows students to send emails about any issue of public debate *except* for "political campaigning" issues. That regulation is a classic content-based restriction. For example, the University's policy appears to allow a student to send an email that says "support universal healthcare" but forbids the same student from sending an email that says "re-elect Will Joyce for Stillwater Mayor because he supports universal healthcare." Such distinctions cannot satisfy any level of scrutiny, much less strict scrutiny.

121.    Defendant adopted this unconstitutional policy under color of state law.

## COUNT IV
### Violation of the First Amendment
### (Bias-Incidents Policy)

122.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

123.    The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

124.    The bias-incidents policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

125.    The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

126.    The University openly acknowledges that students can face disciplinary sanctions for committing "bias incidents," which renders the policy unconstitutional on its own. Otherwise, the University would not recognize that the BIRT will refer "the reporter … to Human Resources or Student Conduct" in "the case where disciplinary or corrective action is a possibility." But even when students cannot be formally disciplined, the bias-incident protocol objectively chills speech by keeping a record of reports, threatening students with negative consequences, and subjecting them to burdensome administrative processes. *See Schlissel*, 939 F.3d 756; *Fenves*, 979 F.3d 319; *Cartwright*, 32 F.4th at 1123.

127.    This overbroad policy chills protected speech and expression.

128.    Defendant adopted this unconstitutional policy under color of state law.

**COUNT V**
**Violation of the First and Fourteenth Amendments: Void for Vagueness**
**(Bias-Incidents Policy)**

129.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

130.   The bias-incidents policy gives students no guidance about what speech is permitted and what speech isn't, and the policy authorizes arbitrary and discriminatory enforcement.

131.   The policy defines "bias incident" as an "incident [that] involves actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." The policy then defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is closed-minded, prejudicial, or unfair."

132.   The bias-incidents policy encompasses speech and conduct on and off campus, including on social media.

133.   The policy turns on unpredictable assessments about whether student speech is "closed-minded, prejudicial, or unfair." Those terms are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332.

134.   The policy provides only examples of how bias "usually" occurs and thus are merely illustrative.

135.   The policy's vague standard deprives students of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002).

136.   The policy also "authorizes or encourages arbitrary and discriminatory enforcement." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 50 (10th Cir. 2013) (cleaned up).

137.   The bias-incidents policy is thus void for vagueness.

138.   Defendant adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant and provide the following relief:

A.      A declaratory judgment that the University's harassment policy violates the First and Fourteenth Amendments;

B.      A declaratory judgment that the University's computer policy violates the First and Fourteenth Amendments;

C.      A declaratory judgment that the University's bias-incidents policy violates the First and Fourteenth Amendments;

D.      A permanent injunction barring Defendant from enforcing the University's harassment policy;

E.      A permanent injunction barring Defendant from enforcing the University's computer policy;

F.      A permanent injunction barring Defendant from enforcing the University's bias-incidents policy;

G.      A permanent injunction barring Defendant from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias incidents;

H.      A preliminary injunction granting the relief specified above during the pendency of this action;

I.      Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

J.      All other relief that Plaintiff is entitled to.

Dated: January 9, 2023                    Respectfully submitted,

_s/ Ryan Haynie_                          _/s/ Cameron T. Norris_
(Signed by filing Attorney with           J. Michael Connolly (*pro hac vice*)
permission of attorney)                    Cameron T. Norris
Ryan Haynie, OBA No. 32796                 James F. Hasson (*pro hac vice*)
1401 N. Lincoln Blvd.                      Thomas S. Vaseliou (*pro hac vice*)
Oklahoma City, OK 73104                    CONSOVOY MCCARTHY PLLC
(405) 590-6070                             1600 Wilson Blvd., Suite 700
ryan@ocpathink.org                         Arlington, VA 22209
                                           (703) 243-9423
                                           mike@consovoymccarthy.com
                                           cam@consovoymccarthy.com
                                           james@consovoymccarthy.com
                                           tvaseliou@consovoymccarthy.com

**App.52**

## VERIFICATION

I, Cherise Trump, declare as follows:

1.    I am the Executive Director of Speech First, Inc., the plaintiff in this case.

2.    I have reviewed this complaint.

3.    For the allegations within my personal knowledge, I believe them all to be true.

4.    For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2023

_____
Cherise Trump, Executive Director of Speech First, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

          Plaintiff,

v.

KAYSE SHRUM, in her individual
capacity and official capacity as President
of Oklahoma State University,

          Defendant.

Case No. CIV-23-29-J

## DEFENDANT KAYSE SHRUM'S FRCP 12(b)(1) MOTION TO DISMISS
## PLAINTIFF'S AMENDED COMPLAINT BASED ON LACK OF STANDING

Respectfully submitted,

s/Steve Stephens
Steve Stephens, OBA #10479
Clinton W. Pratt, OBA #21329
Gaylan Towle II, OBA #32884
Kinsey Wyatt, OBA #32778
Lyman G. Lenker, IV OBA #33219
Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges
5th Floor, Student Union Building
Stillwater, OK 74078
(405) 744-6494 (phone)

**ATTORNEYS FOR DEFENDANT
KAYSE SHRUM IN HER OFFICIAL
CAPACITY AS PRESIDENT OF
OKLAHOMA STATE UNIVERSITY**

## TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................. i

TABLE OF AUTHORITIES ................................................................... ii, iii

I.     INTRODUCTION .......................................................................... 1

II.    STANDARD OF REVIEW ............................................................. 2

III.   ARGUMENT ................................................................................. 3

    A.  SPEECH FIRST DOES NOT ATTEMPT TO ESTABLISH STANDING
    IN ITS OWN RIGHT ................................................................. 3

    B.  SPEECH FIRST FAILS TO ESTABLISH, AND CANNOT ESTABLISH,
    ASSOCIATIONAL STANDING ................................................ 4

        1.  Anonymous References and Declarations Are Inadequate to
        Satisfy Associational Standing ........................................ 5

        2.  Speech First Did Not Obtain the Court's Permission to Use
        Pseudonyms, and Pseudonyms Are Improper in This Case ............ 8

        3.  Speech First Cannot Establish the Students Would Have Standing
        to Sue in Their Own Right ............................................. 11

            a.  The Students' Desires Expressions Are Not Proscribed by the
            Challenged Policies and Processes ..................................... 13

                i.   Definition of "Harassment" in the Student Code ....... 13

                ii.  Bias Incident Response Team .................................... 18

            b.  The Desired Expressions Are Not Subject to a Credible
            Threat of Enforcement by the BIRT ..................................... 18

        4.  Speech First's Claims Require the Students' Participation ........... 23

IV.    CONCLUSION ........................................................................... 25

## TABLE OF AUTHORITIES

CASES

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) ........................................................ 12, 22

*Already, LLC v. NIKE Inc.*, 568 U.S. 85 (2013) .................................................................. 4

*Am. Forest & Paper Ass'n. v. EPA*, 154 F.3d 1155 (10th Cir. 1998) ........................... 9, 11

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187 (9th Cir. 2013) ................................................................................................................................. 6, 7

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ................... 12, 13, 22

*Brown v. Buhman*, 822 F.3d 1151 (10th Cir. 2016) ................................................... 4, 7, 8

*Carney v. Adams*, 141 S. Ct. 493 (2020) ................................................................... 4, 7, 8

*Cent. Green Co. v. U.S.*, 531 U.S. 425 (2001) ................................................................... 2

*Citizen Ctr. v. Gessler*, 770 F.3d 900 (10th Cir. 2014) ................................................... 12

*Do No Harm v. Pfizer Inc.*, No.1:22-cv-07908, 2022 WL 17740157 (S.D.N.Y. Dec. 16, 2022) ....................................................................................................................... 6, 7, 9, 24

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) ................................................................. 6, 7

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) ........................................... 23

*Ga. Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018) ...................................... 6, 7

*Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189 (5th Cir. 2012).................. 6

*Harris v. McRae*, 448 U.S. 297 (1980)........................................................................ 23, 25

*Holt v. U.S.*, 46 F.3d 1000 (10th Cir. 1995) .................................................................... 2, 3

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ................................. 4, 23

*Laird v. Tatum*, 408 U.S. 1 (1972) .............................................................................. 12, 13

*Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .......................... 23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................ 3, 4, 5, 12, 18

*Nat'l Commodity and Barter Ass'n v. Gibbs*, 886 F.2d 1240 (10th Cir. 1989) ........ 8, 9, 10

*Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243 (N.D. Okla. 2016) .................... 6

*Prod. of Renewables United for Integrity Truth and Transparency v. EPA*, No. 19-9532, 2022 WL 538185 (10th Cir. Feb. 23, 2022) ...................................................................... 6

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) ............................. 6, 7

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) ................................................................................................... 6, 7

*Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208 (1974) ........................... 5

*Speech First v. Killeen*, 968 F.3d 628 (7th Cir. 2020) ......................................... 20, 21, 22

*Speech First v. Sands*, No. 7:21-CV-00203, 2021 WL 4315459 (W.D. Va. Sept. 22, 2021) ................................................................................................. 15, 18, 22, 23

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................. 3, 11

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................... 3, 4, 5, 7

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............................. 12, 13, 18, 19

*Tenn. Republican Party (16-3360) v. SEC*, 863 F.3d 507 (6th Cir. 2017) .................... 6, 7

*U.S. ex rel. Little v. Triumph Gear Sys.*, 870 F.3d 1242 (10th Cir. 2017) .................... 8, 9

*United Food and Com. Workers v. Brown Grp.*, 517 U.S. 544 (1996) ........................... 23

*W.N.J. v. Yocum*, 257 F.3d 1171 (2001) ........................................................ 8, 9, 10

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................... 3

*Younger v. Harris*, 401 U.S. 37 (1971) ........................................................ 13

Comes now, Defendant, Kayse Shrum as President of Oklahoma State University ("Defendant" or "President Shrum") and *again* moves the Court to dismiss Plaintiff, Speech First's ("Plaintiff" or "Speech First"), lawsuit pursuant to Fed. R. Civ. P. 12(b)(1). As discussed in Defendant's prior Motion to Dismiss (*see* Dkt. No. 24), although Speech First has sued numerous public universities, this case marks the first time a defendant has filed a 12(b)(1) motion challenging Speech First's constitutional standing to sue. A separate motion to strike pursuant to 12(f) is contemporaneously filed herewith attacking the impropriety of Plaintiff's Verified Amended Complaint (the "Amended Complaint"). Speech First must prevail on *both* motions before this Court can consider its previously filed Motion for a Preliminary Injunction.

## I.    INTRODUCTION

At issue are challenges to Oklahoma State University's ("OSU") (1) definition of "harassment" in its Student Code of Conduct (the "Student Code"), (2) use of a Bias Incident Response Team (the "BIRT") to address reported incidents of bias, and (3) Policy 3-0601 § 4.04 (the "Appropriate Use Policy"), a computer use policy, as it pertains to students' use of their institutional email addresses (@okstate.edu) to send emails transmitting political campaigning messages (collectively the "Challenged Policies and Processes"). In support of its claims, Speech First fails to identify by name a single OSU student who purportedly wants to express matters the Challenged Policies and Processes allegedly proscribe. Instead, Speech First identifies only three (3) anonymous students, students "A", "B", and "C," (each a "Student" and collectively the "Students") to prosecute

its claims. Additionally, in support of its request for a preliminary injunction, Speech First provided declarations from the Students, which were "signed" anonymously (the "Anonymous Declarations").

Speech First fails to establish standing in multiple regards. First, Speech First lacks standing to sue in its own right. Second, the Supreme Court and the overwhelming majority of federal appellate courts hold associational standing requires an association *to identify by name* at least one member with standing in the pleadings. Lastly, Speech First cannot establish associational standing because it fails to satisfy the associational standing test. The first prong of this test requires a plaintiff association to establish its identified members have Article III standing to bring the claims as pled. Here, they do not. The third prong requires the plaintiff association to establish that neither the claims made, nor the relief requested, requires the participation of the members. Here, because Speech First's claims rely upon the participation of individual student members, Speech First cannot satisfy this prong either.

## II.     STANDARD OF REVIEW

Generally, Rule 12(b)(1) motions to dismiss take one of two forms: (i) a facial attack contesting the sufficiency of a complaint's allegations as to subject matter jurisdiction, and/or (ii) a factual challenge attacking the facts upon which subject matter jurisdiction depends. *See Holt  v.  U.S.*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds* by *Cent. Green Co. v. U.S.*, 531 U.S. 425, 437 (2001). In reviewing a facial attack, a court must accept the allegations in the complaint as true. *See id.* at 1003. When reviewing

a factual attack, a court cannot presume the truthfulness of the complaint's factual allegations. *Id.* Accordingly, it has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. *Id.* In such instances, a court's consideration of evidence outside the pleadings does not convert the motion to a Rule 56 motion. *Id.* In the instant case, Speech First cannot overcome a 12(b)(1) facial or factual challenge based upon the allegations in the Amended Complaint.

## III.   ARGUMENT

### A.   SPEECH FIRST DOES NOT ATTEMPT TO ESTABLISH STANDING IN ITS OWN RIGHT

Article III standing is an "irreducible constitutional minimum," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), a plaintiff must establish for each type of relief sought. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal citations omitted). To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal citations omitted). The standing elements are an "indispensable part" of a plaintiff's case, and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]" *Lujan*, 504 U.S. at 561. Specifically, the elements obligate federal courts "to satisfy themselves that [a] plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

Further, a plaintiff "bears the burden of establishing standing as of the time it [brings the] lawsuit **and maintaining it thereafter**." *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (emphasis added) (citing *Lujan*, 504 U.S. at 561); *see also Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016) (stating "[s]tanding concerns whether a plaintiff's action qualifies as a case or controversy when it is filed" while "mootness ensures it remains one at the time a court renders its decision"). If a plaintiff fails to both establish **and** maintain standing throughout the lawsuit, such "[f]ailure . . . places a dispute outside the reach of the federal courts." *Brown*, 822 F.3d at 1164 (citing *Already, LLC v. NIKE Inc.*, 568 U.S. 85, 90–91 (2013)).

Here, Speech First makes no attempt to establish standing in its own right but instead seeks to establish associational standing on behalf of a few alleged members, the Students.

**B.   SPEECH FIRST FAILS TO ESTABLISH, AND CANNOT ESTABLISH, ASSOCIATIONAL STANDING**

Because Speech First does not attempt to establish standing individually, its ability to invoke federal court jurisdiction hinges on whether it can satisfy the elements of associational standing. Associational standing permits an organization to file and maintain suit on behalf of its members **only** if the organization shows: (1) **its members would otherwise have standing to sue in their own right**; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) **neither the claim, nor the relief requested, requires the participation of individual members in the lawsuit.** *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). If a plaintiff is not itself the object of government action, "standing is not precluded, but it is ordinarily 'substantially more

difficult' to establish." *Summers*, 555 U.S. at 493–94 (citing *Lujan*, 504 U.S. at 562). Here, Speech First's lawsuit must be dismissed because it: (1) fails to name any member allegedly injured by the Challenged Policies and Processes; (2) failed to obtain the Court's permission to use pseudonyms, and regardless, pseudonyms would be improper in this case; and (3) cannot satisfy the first and third prongs of the associational standing test.

### 1. Anonymous References and Declarations Are Inadequate to Satisfy Associational Standing

Speech First's anonymous Student references in the Amended Complaint and Anonymous Declarations cannot support associational standing. To establish associational standing, an organizational plaintiff must, among other items, specifically name a member with Article III standing. *See Summers*, 555 U.S. at 498–99. The "requirement of ***naming*** the affected members has never been dispensed with," *id.* (emphasis added), and "assures that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party[.]'"*Id.* at 493 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)). The sole exception to this requirement is inapplicable because it arises ***only*** when the challenged conduct affects all the organization's members, which is not the case here.[1] *See Summers*, 555 U.S. at 498–99.

Of the seven (7) federal appellate courts that have considered this issue, six (6) of them cite *Summers* to hold an organization must specifically ***name*** an affected member to

---

[1] *See* Dkt. No. 27 at ¶ 10 (explaining Speech First's "nationwide membership" includes students, alumni, and other concerned citizens").

establish standing.[2] District courts in the Tenth Circuit agree. *See e.g.*, *Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1251 (N.D. Okla. 2016) (the "[a]mended [c]omplaint does not name any of its members . . . . Without such information, the OPA cannot establish associational standing.").

Speech First's counsel is not only aware of the *Summers* naming rule but ***also*** knows nearly all federal courts of appeals interpret *Summers* to require an organizational plaintiff to name an affected member.[3] In a recent case, the U.S. District Court for the Southern District of  New York held the plaintiff organization—which Speech First's counsel represented—lacked standing because the organization failed to "identify by ***name*** any

[2] *See e.g.*, *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601–02 (8th Cir. 2022) (agreeing *Summers* requires an organization to name the member(s) on whose behalf suit is brought to establish associational standing); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) (rejecting argument based on pre-*Summers* precedent and recognizing *Summers* requires "an organization name at least one member who can establish an actual or imminent injury"); *Tenn. Republican Party (16-3360) v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J. sitting by designation) (citing *Summers* to hold "the Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual"); *Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (finding association lacked standing because it did "not identify any affected members by name"); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *see also Prod. of Renewables United for Integrity Truth and Transparency v. EPA*, No. 19-9532, 2022 WL 538185, at *3 n.2 (10th Cir. Feb. 23, 2022) (unpublished order) ("Ordinarily, a prerequisite for organizations alleging associational standing is to identify their affected members.").

[3] In the event Plaintiff asks the Court to follow *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189 (5th Cir. 2012), the Court should decline to do so. The *Hancock* decision predates all six (6) federal appellate opinions to which Defendant cites in support of its position. Further, the Fifth Circuit failed to even consider *Summers* when it stated "[w]e are aware of no precedent holding that an association must set forth the name of a particular member . . . to survive a 12(b)(1) motion to dismiss." *Id.* at 198–99.

member with standing" when it ***unsuccessfully*** tried to satisfy the naming requirement by using only anonymous references to and anonymous declarations of the organization's alleged members. *Do No Harm v. Pfizer Inc.*, No. 1:22-cv-7908, 2022 WL 17740157, at *7, 10 (S.D.N.Y. Dec. 16, 2022) (emphasis added) (attached hereto as Exhibit 1). There, the court expressly rejected the plaintiff's arguments that the naming requirement was inapplicable (1) for purposes of associational standing, and (2) where organizational members want to remain anonymous. *Id.* at *7–10. In addition, the court informed Speech First's counsel the "weight of authority in federal courts reaffirms that at least one member ***must be named*** for associational standing." *Id.* at *7 (emphasis added).

In this case, Speech First cannot establish associational standing because neither the Amended Complaint nor the Anonymous Declarations identify by name any OSU student allegedly harmed by the Challenged Policies and Processes.[4] The Amended Complaint and Anonymous Declarations (the latter of which Speech First attached ***only*** to its Motion for a Preliminary Injunction) refer exclusively to Students "A," "B," and "C" (*see* Dkt. Nos. 27 at ¶¶ 11, 52–62, 64–78, 80–98; 3-4, 3-5, 3-6 ), and the Anonymous Declarations are even "signed" anonymously. *See* Dkt. Nos. 3-4, 3-5, 3-6. Anonymous references and declarations do not equate to "naming" affected members. *See Do No Harm*, 2022 WL 17740157. Standing must be established ***and*** maintained throughout the lawsuit, and

---

[4] *See Summers*, 555 U.S. at 498–99; *Religious Sisters of Mercy*, 55 F.4th at 601–02; *Ga. Republican* Party, 888 F.3d at 1204; *Tenn. Republican Party*, 863 F.3d at 520; *Draper*, 827 F.3d at 3; *Assoc. Gen. Contractors of Am*, 713 F.3d at 1194; *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184; *see also* Dkt. Nos. 27, 3-4, 3-5, 3-6.

failure to do so deprives the court of subject matter jurisdiction. *See Carney*, 141 S. Ct. at 499; *Brown*, 822 F.3d at 1163–64. Thus, disclosure of the Students' true identities is vital to ensure they are ***actually*** OSU students throughout the pendency of this lawsuit.

Like the majority of federal appellate courts and district courts within the Tenth Circuit, the Court should dismiss Speech First's lawsuit because anonymous Student references and the Anonymous Declarations cannot support associational standing.

### 2. Speech First Did Not Obtain the Court's Permission to Use Pseudonyms, and Pseudonyms Are Improper in This Case

In its Amended Complaint, Speech First attempts to cure the standing defects President Shrum identified in her first Motion to Dismiss (*see* Dkt No. 24) by ***telling*** the Court the Students are proceeding pseudonymously, ostensibly because they fear reprisal from the "University" and others. Dkt. No. 27 at ¶¶ 52, 67, 84. These amendments, however, fail to remedy Speech First's standing deficiencies because: (1) Speech First did not obtain the Court's permission to use pseudonyms; and (2) pseudonyms are appropriate only where disclosure of a name implicates "significant privacy interests or threats of physical harm[.]" *Nat'l Commodity and Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989). Furthermore, Speech First's purported justification for using pseudonyms— fear of reprisal from the "University," professors, fellow students, and "others"—is illogical, unsubstantiated, and conclusory.

In the Tenth Circuit, a federal court lacks jurisdiction over an unnamed party absent the court's permission to proceed anonymously. *See U.S. ex rel. Little v. Triumph Gear Sys.*, 870 F.3d 1242, 1249–50 (10th Cir. 2017) (citing *Gibbs*, 886 F.2d at 1245); *see also*

*W.N.J. v. Yocum*, 257 F.2d 1171, 1172 (10th Cir. 2001). Thus, to proceed anonymously or pseudonymously (collectively hereinafter "pseudonymously" or "pseudonymity"), one "must first petition the district court for permission to do so." *Yocum*, 257 F.2d at 1172 (citing *Gibbs*, 886 F.2d at 1245). The prerequisites to proceed pseudonymously also apply in the associational standing context. A plaintiff organization must still establish Article III standing as to the members on whose behalf suit is brought. *See Am. Forest & Paper Ass'n v. EPA*, 154 F.3d 1155, 1159 (10th Cir. 1998); *Do No Harm*, 2022 WL 17740157, at *9. Here, the Court **still** lacks jurisdiction over Speech First's claims despite its inclusion of "pseudonym[s]" in the Amended Complaint because Speech First has yet to request—and the Court has yet to permit—the Students to proceed pseudonymously. *See Little*, 870 F.3d at 1249–50; *Yocum*, 257 F.2d at 1172; *Gibbs*, 886 F.2d at 1245.

Moreover, even if Speech First were to properly request the Court's permission for the Students' pseudonymity, the Court should deny such request. Federal courts may allow parties to proceed pseudonymously **only** when disclosure of names would implicate "significant privacy interests or threats of physical harm," such as personal health information—not simply when "economic or professional concerns are involved." *Gibbs*, 886 F.2d at 1245 (internal citations omitted); *Yocum*, 257 F.2d at 1172. Here, pseudonyms are impermissible. The Amended Complaint and Anonymous Declarations do not allege any threat of physical harm, and disclosure of the Students' names could not plausibly implicate "significant privacy interests." *See Gibbs*, 886 F.2d at 1245. Indeed, since Speech First's ultimate objective is for the Students to openly engage in free expression without

concealment of identity (*see* Dkt. No. 27 at ¶¶ 51, 57–61, 71–72, 74–77, 83, 86, 88–92, 98), Speech First can hardly argue pseudonymity is necessary or warranted.

Finally, Speech First's purported justification for using pseudonyms is absurd, conclusory, and speculative. First, when a court permits pseudonymity, the individual's real name is generally kept under seal after it is disclosed to the defense and the court. *See Yocum*, 257 F.2d at 1172; *Gibbs*, 886 F.2d at 1245. Thus, if Speech First requests, and the Court approves, pseudonymity for the Students, Speech First must still disclose the Students' real names to President Shrum and her counsel. *See Yocum*, 257 F.2d at 1172; *Gibbs*, 886 F.2d at 1245. This disclosure obligation seriously undermines pseudonymity to allegedly avoid purely speculative reprisal from the "University." Dkt. No. 27 at ¶¶ 52, 67, 84. Moreover, any alleged fear of reprisal from OSU professors, fellow students, and "others" is also unfounded. The Students' identities would be withheld from others because they would be kept under seal. *See Yocum*, 257 F.2d at 1172; *Gibbs*, 886 F.2d at 1245. Any potential remaining fear of President Shrum wrongfully disclosing the Students' names is purely speculative and legally insufficient.

Second, Speech First wholly fails to set forth allegations to support the Students' supposed fear of reprisal. The Amended Complaint fails to state ***why*** the Students allegedly fear reprisal from the "University" and others. To the extent Speech First relies on allegations concerning another student's resignation from the student newspaper (*see* Dkt. No. 27 at ¶ 50) to support the Students' alleged fear, such reliance is misplaced. As briefed more thoroughly in Defendant's 12(f) Motion to Strike filed contemporaneously herewith,

in addition to the fact the Court cannot consider the allegations concerning the student for procedural and evidentiary reasons, the Challenged Policies and Processes at issue in this case played no part in that student's resignation from the ***student newspaper***.

Lastly, if the Court, upon proper ***request*** from Speech First, permits the Students' pseudonymity and orders their true identities to be kept under seal, any continued fear of reprisal would be entirely speculative. Speech First must present factual allegations to substantiate a Students' fear President Shrum will violate a binding order of this Court. This it has not—and would not— be able to do.

Because Speech First failed to obtain (or even request) the Court's permission for the Students to proceed pseudonymously, the Court lacks jurisdiction over its claims and must dismiss this lawsuit. Regardless, even if Speech First eventually requests pseudonymity for the Students, the request must be denied because pseudonyms are improper and unjustified in the case at bar.

### 3.  Speech First Cannot Establish the Students Would Have Standing to Sue in Their Own Right

Even if the Court determines the Anonymous Declarations are sufficient, the Court should nevertheless dismiss Speech First's lawsuit because Speech First cannot show Student A, B, or C ***suffered an injury in fact that is fairly traceable to the Challenged Policies and Processes***. *See Spokeo, Inc.*, 578 U.S. at 338. The first prong of the associational standing test "embodies the Article III requirements of injury in fact, causal connection to the defendant's conduct, and redressability." *Am. Forest & Paper Ass'n*, 154 F.3d at 1159. Speech First must therefore establish, as to each claim, that Student A, B, or

C suffered "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and citations omitted).

Where a lawsuit challenges the constitutionality of a policy before the government enforces it, as Speech First does here, the standing inquiry looks to whether "threatened enforcement . . . creates an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). In the absence of an enforcement action, a plaintiff can establish standing only "under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159. Specifically, to demonstrate an injury in fact, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the challenged provision. *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). In addition, a plaintiff must show "a credible threat of prosecution" under the challenged provision. *Id.* "Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1292 (2019).

Further, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 913 (10th Cir. 2014) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Thus, fear of chilled speech is sufficient for standing only if "the challenged

exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the [plaintiffs are] either presently or prospectively subject to the regulations, proscriptions, or compulsions." *Laird*, 408 U.S. at 11. If plaintiffs fail to "'claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. 289, 298–99 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). Fear that is "chimerical"—either because the challenged policy has no enforcement component or because it is unrealistic the defendant would direct enforcement at the plaintiff—does not suffice. *See Susan B. Anthony List*, 573 U.S. at 159.

### a. The Students' Desired Expressions Are Not Proscribed by the Challenged Policies and Processes

To determine whether the Challenged Policies and Processes proscribe the expression at issue, the Court must conduct a fact-specific inquiry and examine allegations of chilled speech in conjunction with the Challenged Policies and Processes.

### i. Definition of "Harassment" in the Student Code

OSU encourages students to freely voice their opinions, and the Student Code clearly does not proscribe the opinions about which the Students desire to speak. The Student Code prohibits "harassment," defined as:

> Engaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that ***threatens or endangers*** the mental or physical health/safety *of **any person*** or causes ***reasonable apprehension*** of such harm that is persistent, severe, or pervasive and ***is subjectively offensive to the complainant*** and ***objectively offensive to a reasonable person***.

Dkt No. 3-2 at p. 7 (emphasis added). This definition therefore only disallows speech that actually threatens or endangers a person's health/safety or causes a person to reasonably apprehend a threat or danger to their health/safety, which apprehension must be subjectively and objectively offensive. The Amended Complaint lacks reference to any topic of expression the "harassment" definition proscribes.

The Students supposedly want to express their views in class and elsewhere on and off OSU's campus (the "Desired Expressions"). *See* Dkt. No. 27 at ¶¶ 51–98; *see also* Dkt. Nos. 3-4, 3-5, 3-6. Notably absent from the Desired Expressions is any indicia of speech that would (1) threaten or endanger another person's health/safety or (2) cause a person to reasonably apprehend a threat or danger to their health/safety that another would also find objectively offensive. Instead, the Desired Expressions contain only ***general viewpoints*** on current social, political, and legal issues, which are topics already discussed in and out of classrooms across OSU's campus. It is unreasonable to conclude the Desired Expressions constitute verbal abuse or qualify as threatening, intimidating, harassing, coercing, and/or bullying speech. Further, the Amended Complaint does not allege the Students intend to direct the otherwise non-threatening, non-intimidating Desired Expressions toward a fellow student because of such student's circumstances, preferences, and/or beliefs. Rather, it simply alleges the Students want to "***debate*** with [their] fellow students" about the topics of their Desired Expressions, "***point out the flaws*** in [their fellow students'] arguments" on such topics, "***speak*** directly to [their] classmates about [the] topics," and talk "frequently and repeatedly on [the] issues." Dkt. No. 27 at ¶¶ 59–61, 75–77, 90–92 (emphasis added).

The Desired Expressions do not constitute a threat or endangerment to another person's health/safety and cannot be interpreted to cause a person to reasonably apprehend a threat or danger to their health/safety based on an objective standard. Recently, a federal district court in Virginia found Speech First lacked standing to prosecute, among others, claims challenging Virginia Tech's ("VT") harassment policy, which only prohibited conduct **targeting an individual**. *See Speech First v. Sands*, No. 7:21-cv-203, 2021 WL 4315459, at *14–16 (W.D. Va. Sept. 22, 2021), *appeal filed* (No. 21-2061). The court there analyzed whether VT's harassment policy proscribed the speech—which was remarkably similar to the Desired Expressions here—Speech First claimed its anonymous VT student members wanted to express. The court found Speech First failed to establish standing because the anonymous students' alleged expressions did not reveal any intent "to target individual students" based on those students' particular characteristics. *See id.* at *16.

The similarities between the VT case and this one cannot be ignored. First, like the VT policy, OSU's Student Code only proscribes "harassment" targeting an individual. Second, like the alleged student expressions in the VT case, the Desired Expressions here are general viewpoints—not allegations of targeted, threatening, intimidating, and/or bullying speech toward another student.

Likewise, Speech First cannot overcome a factual challenge. OSU educates its campus community, particularly students, through a website (the "Free Speech Page") maintained by the Division of Student Affairs. *See* Declaration of Douglas Hallenbeck, attached hereto as Exhibit 2, at ¶ 7 and Ex. 2-C. On the Free Speech Page, OSU provides

information regarding free expression, providing in part: "OSU values and protects the constitutional right of free speech. Through this, we seek to provide all members of the OSU community with the broadest possible latitude to speak, write, listen, challenge and learn." *Id.* Furthermore, under the heading "Controversial and Offending Speech," the Free Speech Page states: "The right to engage in the aforementioned types of expression is a protected right under our laws, and court rulings exist that articulate offensive speech and unpopular viewpoints are what need legal protection most." *Id.* at ¶ 8 and Ex. 2-C.

Additionally, the Free Speech Page states unequivocally: "There's no constitutional right to not be offended. Controversial speech is expected and valued on college campuses and in our society, which means free speech protection still applies if a speaker is shouting derogatory comments or a social media post is offensive to a particular population." *Id.* at ¶ 9 and Ex. 2-C. Lastly, the Free Speech Page also explains the parameters of OSU's role with respect to expression:

> The university may not inhibit free speech by making direct or implicit threats of sanctions for engaging in protected speech. If the university is notified of an individual or a group of individuals who are expressing remarks that could be interpreted as offensive or hateful, but do not otherwise run afoul of the law concerning free speech the university cannot take conduct action.

*Id.* at ¶ 10 and Ex. 2-C.

The OSU campus supports numerous student organizations, which collectively cover a broad range of viewpoints and interests. *See* Declaration of Aleigha Mariott, attached hereto as Exhibit 3, at ¶ 8. In fact, "[s]everal student groups on campus represent the same viewpoints the anonymous students allege they are fearful of expressing,"

including Turning Point USA, OSU Students for Life, Free Enterprise Society, College Republicans, and many Christian and/or church-affiliated groups. *See id.* These groups routinely reserve space for tabling, displays, exhibits, and meetings in a very public forum on campus without incident or repercussion of any kind. *See* Declaration of Adam Barnes, attached hereto as Exhibit 4, at ¶ 5. Indeed, "since 2014, groups expressing pro-life and anti-abortion views have reserved space more than 100 times." *Id.* OSU has never denied a reservation or funding for a student group based on its viewpoint, and no one in any student group "expressing views similar to those held by the anonymous students has been or would be referred for discipline." *Id.* at ¶¶ 6–7; *see also* Mariott Decl. at ¶ 8. No student in any group at OSU has ever been referred for discipline for expressing ***any*** viewpoint. *See* Barnes Decl. at ¶ 7; *see also* Mariott Decl. at ¶ 8.

OSU also "routinely has conservative, and often controversial, preachers and speakers arrive on campus to speak in the outdoor public spaces on campus," including, for example, Sister Cindy, Matt Bourgalt, and Danny Washington, all of whom "have spoken on library lawn on multiple occasions." Barnes Decl. at ¶ 8. Consistent with its commitment to diverse expression and viewpoints, OSU has not "denied access to a public forum or asked [a speaker] to leave campus based upon the content of their speech" or "disciplined or referred for discipline [any student] for expressing views similar to or counter to those of any speaker on campus." *Id.* at ¶¶ 10–11.

Based on these facts, the Students cannot legitimately fear an actual or imminent invasion of a concrete and particularized protected interest. Instead, their subjective,

baseless fears are purely conjectural or hypothetical, which cannot support standing. *See Lujan*, 504 U.S. at 560. Speech First therefore fails to establish associational standing as to the Student Code claims. Those claims must therefore be dismissed.

### ii. Bias Incident Response Team

Speech First's claims as to the BIRT must also fail because the BIRT does not proscribe anything, and even if the Court were to find it does, the Desired Expressions fall outside the purview of the BIRT's review. The BIRT "aims to ***support*** individuals [who] have experienced a bias incident." Dkt. No. 3-2, Exhibit I (emphasis added). At OSU, a bias incident "involves actions ***committed against or directed toward a person or property*** that are motivated in whole or in part, by a bias against a person or group of persons who possess common characteristics." Dkt. No. 27 at ¶ 5 (emphasis added); Dkt. No. 3-2 (emphasis added). Just like its Student Code claims, Speech First's BIRT claims must fail because the Amended Complaint lacks any allegation the Students want to direct their views toward another person. *See* Dkt. No. 27 at ¶¶ 51–98; *Sands*, 2021 WL 4315459, at *16. For this reason, Speech First's BIRT claims must be dismissed with prejudice.

### b. The Desired Expressions Are Not Subject to a Credible Threat of Enforcement by the BIRT

Speech First ***also*** cannot show the Students have suffered an "injury in fact" as to the BIRT claims because the Students' Desired Expressions are ***not*** subject to a credible threat of enforcement. *See Susan B. Anthony List*, 573 U.S. at 159–60. OSU expressly informs students on ***multiple*** platforms the BIRT "is ***not*** an investigative or disciplinary body," and, true to its purpose, will "create a space for students/employees to process their

experiences," "aim to reassure students or employees that their feelings are valid," and "provide follow-up training and educational opportunities." Dkt. No. 3-2 (emphasis added). Although the BIRT may refer a matter to the Office of Student Support and Conduct ("OSSC"), a referral will occur *only if* disciplinary or corrective action is otherwise possible under the Student Code. *See id.* This is not a unique function of the BIRT. "Any member of the OSU community may make a report to the OSSC about a student's behavior," whether speech-related or not. Mariott Decl. at ¶ 14.

It is entirely speculative to suggest the BIRT would ever contact the Students, but even if it did, they would face no credible threat to their First Amendment rights in a *voluntary* process that cannot result in any adverse or disciplinary action. *See* Mariott Decl. at ¶¶ 19–22. Standing requires the conduct at issue be subject to a specific penalty, such as an arrest, prosecution, or an enforcement proceeding. *See Susan B. Anthony List*, 573 U.S. at 165–66. Speech First cannot make the requisite showing here.

Although not a formal policy, OSU implemented its BIRT "with the primary charge of supporting individuals who have experienced a bias incident." Mariott Decl. at ¶ 16; Hallenbeck Decl. at ¶ 20. Importantly, the BIRT is "not an investigative or disciplinary body," as explicitly outlined on its website. Mariott Decl. at ¶ 17; Hallenbeck Decl. at ¶ 21. When a person reports an alleged incident of bias to the BIRT, a member of the BIRT contacts "the reporting party to request further information and discuss available support options," such as counseling services. Mariott Decl. at ¶ 19. When an incident is reported, the BIRT educates the reporter on the "First Amendment and the limitations on OSU's

ability to take disciplinary action for speech." *Id.* Discussions with the reporting student are strictly voluntary. *Id.*

If the reporting student requests, the BIRT reaches out "to the person alleged to have engaged in the perceived biased behavior." Mariott Decl. at ¶ 20. The BIRT makes checking in on and supporting "the ***student reported to have engaged in the biased conduct*** . . . ***a priority***, just as much as providing support to the reporting student." *Id.* (emphasis added). The BIRT clearly informs the student that "the discussion is entirely voluntary and the student is not required to participate." *Id.* In offering these discussions, the "purpose . . . is to support the student as well as educate the student about how their actions impacted the reporting student, not to discipline the student or force the student to change their behavior." *Id.* The BIRT's goal is to help students achieve a deeper understanding of one another. OSU's philosophy for the BIRT is to try to seize the teachable moment to ***educate***, not discipline. *See* Mariott Decl. at ¶ 20. To date, the BIRT has received only 29 reports of alleged bias, a majority of those relating to "perceived offensive speech." *Id.* at ¶ 18. No speech-related incident—or any other incident for that matter—reported to the BIRT has ***ever*** "resulted in the initiation of disciplinary proceedings or sanctions" against a student. *Id.* at ¶ 21; *see also* Hallenbeck Decl. at ¶ 22. Thus, Speech First simply cannot establish a credible threat of punishment by the BIRT.

Speech First made a nearly identical argument in another case, which the Seventh Circuit rejected. *See Speech First v. Killeen*, 968 F.3d 628 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). In *Killeen*, the Seventh Circuit held

Speech First lacked standing to challenge the University of Illinois's Bias Assessment and Response Team (the "BART") for several reasons that nearly mirror the analysis as applied to OSU's BIRT. ***First***, a report to the BART was of no consequence, as the university's disciplinary process did not apply to the views the anonymous students there wished to express, and because bias-motivated speech ***alone*** did not constitute a student code violation. *Id.* at 639. ***Second***, the anonymous students did not describe any statements they wished to make with any particularity. As such, it was unclear whether they would likely even be reported to the BART. *Id.* at 640. ***Third***, conversations with the BART were optional. Students who did not respond at all or declined the offer to meet, which was usually the case, suffered no consequences. *Id.* ***Fourth***, while BART members worked in various departments with disciplinary or law enforcement functions, the BART had ***no*** authority to impose sanctions. *Id.* at 641. On this point, the court rejected Speech First's argument that the BART could refer student code violations to the student conduct department or legal violations to campus police. The record revealed bias-motivated speech, alone, would not be the sole basis for referral. *Id.* The court acknowledged some "practicalities" supporting its decision:

> Consider, for example, if BART learned of a violation or potential violation of law, such as one that may put a student in imminent danger. The fact the information came through a BART webform or email to the BART did not prevent BART from sharing the information with law enforcement. BART's ability to inform the authorities of a violation, ***when there would be no threat of sanction on the basis of speech absent that violation***, did not alone result in a First Amendment harm.

*Id.* at 643 (emphasis added).

Likewise, in *Abbott v. Pastides*, the Fourth Circuit held even the ***prospect*** of facing

a mandatory meeting and subsequent investigation (which is far more invasive than the

OSU BIRT's capabilities) was insufficient to establish Article III standing. 900 F.3d at

171. The court acknowledged the possibility of a student feeling "alarmed and thus deterred

by an official letter from a University authority . . . raising the prospect of an investigation,"

but nonetheless concluded:

> [A] threatened administrative inquiry will not be treated as an ongoing First
> Amendment inquiry sufficient to confer standing unless the administrative
> process itself imposes some significant burden . . . . Even an objectively
> reasonable "threat" that the plaintiffs might someday have to meet briefly
> with a University official in a non-adversarial format, to provide their own
> version of events in response to student complaints, cannot be characterized
> as the equivalent of a credible threat of "enforcement" or as the kind of
> "extraordinarily intrusive" process that might make self-censorship an
> objectively reasonable response.

*Id.* at 179. Here, Speech First presents only "a wholly speculative possibility" of

discipline—an objectively unreasonable one, at that—which does not establish an injury

in fact. *See Babbitt*, 442 U.S. at 302. Notably, Speech First does not allege a ***single instance***

of an OSU student facing discipline through the BIRT, nor could it. Discipline is thus not

"remotely possible" for bias-motivated speech. *See id.* at 298–99; *see also Abbott*, 900 F.3d

at 179.

Further, although Speech First alleges the BIRT's ability to make referrals is one

way it chills speech (*see* Dkt. No. 3-1 at pp. 21–22), this argument fails. Simply being able

to make a referral to another office cannot demonstrate standing. *See Killeen*, 968 F.3d at

643 (stating a "mere possibility of a referral does not demonstrate standing"); *Sands*, 2021

WL 4315459, at *12. Just like any member of the OSU community, the BIRT can refer or report an incident to an appropriate OSU department, and the fact such report is made by a BIRT member is of no consequence, as the *Killeen* court correctly concluded.

Moreover, as demonstrated herein, OSU students routinely express the same viewpoints Speech First describes as "chilled" and do so without repercussions. Speech First fails to show the Students are subject to a credible threat of enforcement under the BIRT Process, which negates the existence of any injury in fact. Speech First's claims as to the BIRT must therefore be dismissed.

### 4. Speech First's Claims Require the Students' Participation

Speech First also cannot satisfy the third prong of the associational standing test, which obligates it to prove neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *See Hunt*, 432 U.S. at 343. The third prong is prudential and not constitutional. *United Food and Com. Workers v. Brown Grp.*, 517 U.S. 544, 555 (1996). Prudential standing refers to judicially created limitations on a court's exercise of jurisdiction. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). These limitations include a general prohibition against a party raising another person's legal rights and a rule barring adjudication of generalized grievances that would be more appropriately addressed by the representative branches. *See Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). First Amendment challenges ordinarily require the participation of an organization's members in the suit. *See Harris v. McRae*, 448 U.S. 297, 321 (1980).

On its face, Speech First's Amended Complaint demonstrates Speech First cannot prosecute its claim without the Students' involvement. *See* Dkt. Nos. 3-4, 3-5, 3-6. Further, to determine if the purported Students' concerns are real—and to verify they are indeed OSU students—Defendant is entitled to depose or cross-examine each Student in court. The Anonymous Declarations are inadequate, constitute hearsay, and have ***no evidentiary reliability or value***—however, they do expose a major jurisdictional flaw, which Speech First cannot overcome. *See Do No Harm*, 2022 WL 17740157, at *9 n.4 (finding "the [c]ourt is unable to hold the anonymous declarants to their statements under penalty of perjury as required by 28 U.S.C. § 1746") (internal citations omitted).

All Students purport to be politically conservative (*see* Dkt. Nos. 27 at ¶¶ 53, 68, 85; 3-4 at ¶ 4), but not ***all conservatives*** share ***all*** the views expressed in the Anonymous Declarations. Further, Student B alleges he is a Christian (*see* Dkt. Nos. 27 at ¶ 70; 3-5 at ¶ 6), but not ***all Christians*** share the views expressed in Student B's Declaration. Speech First's Executive Director provided an affidavit verifying the allegations in Speech First's Amended Complaint. *See* Dkt. No. 27 at p. 33. However, she has no personal knowledge about the supposed "chill" on the Students' First Amendment rights. Instead, she states the following: "For all of the allegations not within my personal knowledge, I believe them all to be true . . . based on my conversations with members of Speech First, including Students A, B and C." *Id*. Those allegations constitute hearsay. Further, the Anonymous Declarations filed in support of Speech First's Motion for Preliminary Injunction also constitute hearsay and are inadmissible as evidence. *See* Dkt. Nos. 3-4, 3-5, 3-6.

The Supreme Court addressed this precise principle in *Harris v. McRae*, wherein a women's mission organization challenged the constitutionality of a law that limited the use of Medicaid funds to reimburse costs of abortions. *See Harris*, 448 U.S. at 300–01, 303–05. The Court determined the mission organization did not satisfy the third prong of the associational standing test because prosecution of the claim required participation of some of its individual members. *See id.* at 321.

Therefore, the Students' direct testimony is the ***only*** admissible form of evidence through which this Court can verify the content in the Anonymous Declarations. Consequently, Speech First's claims rely on the Students' participation. Like the mission organization in *Harris*, Speech First cannot satisfy the third prong of the associational standing test and thus cannot prosecute this case in its own name. Only the Students, in their own names, have that right.

## IV.    CONCLUSION

Speech First lacks standing, on its own, to bring this action. Therefore, it relies on associational standing. However, Speech First cannot predicate associational standing upon supposed injury to anonymous persons. Additionally, based on the Amended Complaint, Speech First cannot establish the first or third prong of the associational standing test. Accordingly, the Court should sustain this Motion and dismiss, with prejudice, Speech First's Amended Complaint in its entirety.

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2023, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Court Clerk will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| J. Michael Connolly (*pro hac vice*) | Michael Burrage, OBA #1350 |
| Cameron T. Norris | Reggie Whitten, OBA #9576 |
| James F. Hasson (*pro hac vice*) | J. Renley Dennis, OBA #33160 |
| Thomas S. Vaseliou (*pro hac vice*) | Austin R. Vance, OBA #33294 |
| CONSOVOY MCCARTHY PLLC | Whitten Burrage |
| 1600 Wilson Blvd., Suite 700 | 512 N. Broadway Ave., Suite 300 |
| Arlington, VA 22209 | Oklahoma City, OK 73102 |
| (703) 243-9423 | (405) 516-7800 |

Ryan Haynie, OBA #32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070

**ATTORNEYS FOR DEFENDANT KAYSE SHRUM IN HER INDIVIDUAL CAPACITY**

**ATTORNEYS FOR PLAINTIFF**

s/Steve Stephens _____
Steve Stephens

2022 WL 17740157
Do No Harm v. Pfizer Inc., Slip Copy (2022)

KeyCite Blue Flag – Appeal Notification
Appeal Filed by   DO NO HARM v. PFIZER INC.,   2nd Cir.,   January 4, 2023

2022 WL 17740157
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

DO NO HARM, Plaintiff,

v.

PFIZER INC., Defendant.

1:22-cv-07908 (JLR)

|

Signed December 16, 2022

**Attorneys and Law Firms**

Cameron Thomas Norris, Thomas McCarthy, C'Zar David Bernstein, Frank H. Chang, Consovoy McCarthy PLLC, Arlington, VA, Dennis Saffran, Dennis Saffran, Esq., Douglaston, NY, for Plaintiff.

Jeannie S. Rhee, Martha Lea Goodman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Liza May Velazquez, Loretta Lynch, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant.

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

**\*1**  On September 15, 2022, Plaintiff Do No Harm filed a Complaint and Emergency Motion for a Preliminary Injunction and Temporary Restraining Order against Defendant Pfizer Inc. ECF Nos. 1 ("Compl."), 5 ("Motion"). Plaintiff alleges that one of Defendant's fellowship programs discriminates against white and Asian-American applicants. Compl. ¶ 3. Plaintiff withdrew its request for a temporary restraining order during a conference on September 21, 2022. *See* ECF No. 25. For the following reasons, Plaintiff's request for a preliminary injunction is DENIED and this action is DISMISSED.

**BACKGROUND**

**I. The Parties**

Plaintiff Do No Harm is a Virginia-based nationwide membership organization. Compl. ¶ 9. Its members include "physicians, healthcare professionals, medical students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies, including the rise in explicit racial discrimination in graduate and postgraduate medical programs." *Id.* Do No Harm was founded six months prior to filing this action and, since it was founded, it has filed multiple complaints against what it perceives to be discrimination against white and Asian-American individuals. *Id.* ¶ 10; ECF No. 30 ("Opp.") at 5.

Defendant Pfizer is a global research-based company engaged in the business of the discovery, development, manufacture, marketing, sale, and distribution of biopharmaceutical products. Compl. ¶¶ 12, 18; ECF No. 33 ("Gramling Decl.") ¶ 3. It is headquartered and has its principal place of business in New York, New York. Compl. ¶ 13.

App.84

Do No Harm v. Pfizer, Inc., Slip Copy (2022)
2022 WL 17740157

## II. Recruiting, Retaining, and Promoting Diverse Talent

Defendant states that it strives to build and retain a talented and diverse workforce across all levels of the company. ECF No. 32 ("Bruce Decl.") ¶ 4. It views diversity at the company as including "socioeconomic status, first generation status, military status, membership in a minority racial group, and membership in the LGBTQ+ community." *Id.* ¶ 5. But Defendant has faced challenges with recruiting, retaining, and promoting diverse talent. *Id.* ¶ 8.

Defendant's employee positions are grouped into various levels. *Id.* ¶ 6. The positions are, in order of seniority: analyst, manager and senior manager, director and senior director, vice president and above. *Id.* Defendant relies substantially on internal promotion for senior positions, and generally prefers candidates with at least a graduate degree for those positions. *Id.*

Defendant's data shows that minority groups are underrepresented at the company, and that this gap increases at more senior positions. *Id.* ¶¶ 7-8. Defendant points out that, for 2019 and 2020, its employees who identify as Black/African American, Latino/Hispanic, or Native American made up only between zero and eight percent of Defendant's workforce at each of the analyst, manager, and director levels. *Id.* ¶ 7; Opp. at 2. Defendant states that its difficulty in recruiting and retaining diverse college graduates for analyst-level positions and diverse master's degree holders for manager-level positions has contributed to decreasing minority representation with increasing seniority. *Id.* Data from the Bureau of Labor Statistics shows that the Pharmaceutical and Medicine manufacturing industry, as a whole, faces similar – although less significant – racial disparities. Bruce Decl. ¶ 10.

*\*2* In 2019, Defendant set "Opportunity Parity Goals" to address the underrepresentation of minority groups and increase diversity in its leadership positions over the next five years. *Id.* ¶ 9. In order to achieve parity at the vice president and above levels for U.S. minorities, Defendant's Opportunity Parity Goals seek to increase minority representation at the vice president and above levels from 19% to 32% and double the population of Defendant's Black/African American and Latino/Hispanic workforce. *Id.* ¶ 9.

## III. The Breakthrough Fellowship Program

Defendant launched the Breakthrough Fellowship Program (the "Fellowship") in 2021. Compl. ¶ 31. Defendant designed the Fellowship to address its challenges with recruiting, retaining, and promoting diverse talent, and to increase underrepresented groups in leadership positions at the company. Bruce Decl. ¶¶ 11-12. The Fellowship is a prestigious program and represents a nine-year commitment by Defendant to 20 fellows in each cohort year. *Id.* ¶ 13; Compl. ¶ 32. The Fellowship's inaugural cohort commenced in 2021 and the second cohort began in 2022. Bruce Decl. ¶ 19.

The Fellowship proceeds through multiple stages. Compl. ¶ 35; Bruce Decl. ¶ 14. Students apply during their junior year of college. Compl. ¶ 33; Bruce Decl. ¶ 14. Selected fellows complete a summer internship at the company between their junior and senior college years. Compl. ¶ 34; Bruce Decl. ¶ 14. After graduating from college, successful fellows return to the company for a two-year position at the analyst level. Compl. ¶ 35; Bruce Decl. ¶¶ 14-15. Fellows who successfully apply and are admitted into a Master's in Business Administration ("MBA"), Master of Public Health ("MPH"), or a Master of Science in Statistics ("MS Statistics") program attend a two-year graduate program, paid for by Defendant, to earn one of these degrees. Compl. ¶ 36; Bruce Decl. ¶ 15. Successful fellows return to the company for paid internships during their first and second years of graduate study. Compl. ¶ 37; Bruce Decl. ¶ 16. Defendant invites fellows who have completed their internships and graduate degree program to return to the company in a full-time, manager-level position. Compl. ¶ 38; Bruce Decl. ¶ 16.

Applicants to the Fellowship must meet certain requirements. Bruce Decl. ¶ 18. Specifically, the applicant must: be a U.S. citizen or permanent resident; be an undergraduate student enrolled in a full-time university program and graduate the following year; show a committed interest and intent to pursue an MBA, MPH or MS Statistics program; apply to a Breakthrough Fellowship Intern opportunity on the Pfizer website; have earned a grade point average ("GPA") of 3.0 or higher; demonstrate exceptional leadership potential; and be willing to work in New York City or another Pfizer location as indicated by the job posting. ECF Nos. 5-5 ("Pl. Ex. A") at 5-6, 5-6 ("Pl. Ex. B") at 1-2; Bruce Decl. ¶ 18; Compl. ¶ 42. [1]

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

Applicants must also "[m]eet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans." Pl. Ex. A at 5; Pl. Ex. B at 2; Bruce Decl. ¶ 18; Compl. ¶ 45. Plaintiff contends that this means that the Fellowship "categorically excludes white and Asian American applicants" and applicants must "be Black/African American, Latino/Hispanic, or Native American." ECF No. 5-8 ("Opening Br.") at 1. Plaintiff alleges that "white and Asian-American applicants need not apply" in light of the selection criteria. Compl. ¶ 5. Plaintiff does not allege that white or Asian-American applicants, including the purported members who have submitted declarations in this lawsuit, have ever tried to apply or that such applicants have applied and not been selected to the Fellowship. Defendant states in its brief, without further explanation, that "nothing in the materials about the Fellowship ... categorically bans any applicant from applying." Opp. at 22.

**\*3**  The Fellowship selection process is highly competitive. Bruce Decl. ¶¶ 13, 22. Defendant received 2,600 applications for the 2021 cohort and 1,000 applications for the 2022 cohort. *Id.* ¶ 20. Of these, Defendant selected 40 total fellows. *Id.* ¶ 21. Every fellow selected received a "top tier" rating in the screening interview and "well exceed[ed] Pfizer's minimum criteria for selection to the Fellowship." *Id.* ¶¶ 22-24. Defendant's Director of Early Pipeline Lead states that she is not aware of any employee of Defendant who has been "terminated to make room for any Fellowship recipient." *Id.* ¶¶ 3, 34.

The application window for the 2023 Fellowship will open in early January 2023 and remain open for three weeks. Bruce Decl. ¶¶ 25-26. It takes Defendant approximately eight weeks to complete the application-screening process; two weeks to extend offers and receive acceptances; and four weeks to complete the hiring and background check processes. *Id.* ¶ 26. Selected 2023 fellows would begin their internships in early June 2023. *Id.* ¶ 25. Defendant has "carefully planned" this recruiting schedule and reports that, if the process is delayed, "at least some highly talented, extraordinary candidates that Pfizer wishes to recruit to its program will pursue opportunities other than the Fellowship." *Id.* ¶ 27.

Defendant posted announcements, Frequently Asked Questions ("FAQs"), an informational video, and advertisements for the Fellowship on the internet, including on Defendant's website, Facebook, LinkedIn, and ZipRecruiter. Compl. ¶ 31; Pl. Ex. A; Pl. Ex. B; ECF Nos. 5-7 ("Pl. Ex. C"). The informational video states that Defendant intends, by 2025, to "have a generation of 100 new leaders at Pfizer coming from underrepresented groups and lead [sic] on this organization." Compl. ¶ 46; Pl. Ex. C at 2. The FAQs, under the heading "I'm not from a minority group identified for the Breakthrough Fellowship Program; what opportunities are available to me?", states that "Pfizer is an equal opportunity employer" and provides information on additional early career programs offered at the company for "[u]ndergraduates and graduate students who are not eligible or interested" in the Fellowship. Pl. Ex. B at 2. The Breakthrough Fellowship Program Associate job description states that "Pfizer is committed to equal opportunity in the terms and conditions of employment for all employees and job applicants without regard to race ...." Pl. Ex. C at 4.

In addition to the Fellowship, Defendant offers several other early-career programs. Bruce Decl. ¶ 28. These include the Summer Growth Experience Program, Global Supply Program, Digital Rotational Program, MBA Summer Associate Program, and Refugee Leadership Initiative. *Id.* People of all backgrounds are encouraged to apply to these programs. *Id.* ¶ 29. Defendant also offers its Educational Assistance Program ("EAP") to benefits-eligible employees. *Id.* ¶ 33. The EAP provides $10,000 per year for recipients to pursue an advanced degree or other educational opportunity related to their employment. *Id.*

### IV. Member A and Member B

Plaintiff brought this action on behalf of two of its purported members – Member A and Member B – and submitted anonymous declarations from these members. Compl. ¶ 49; ECF Nos. 5-2 ("A Decl."), 5-3 ("B Decl."); Opening Br. at 7. Member A is white. A Decl. ¶ 2. Member B is Asian-American. B Decl. ¶ 2. Both members are allegedly in their junior year at unidentified Ivy League universities; are U.S. citizens; maintain a GPA higher than a 3.0 average; are involved in campus life; hold leadership positions on their college campuses; and would like to apply to the Fellowship. A Decl. ¶¶ 2-6; B Decl. ¶¶ 2-6. Member A has allegedly been involved in volunteer programs and expects to graduate in December 2023. A Decl. ¶¶ 3, 6. Member B allegedly expects to graduate in Spring 2024. B Decl. ¶ 3. According to the declarations, Member A would "benefit greatly" from working

in Defendant's New York City office, and Member B would "greatly enjoy" doing so. A Decl. ¶ 7; B Decl. ¶ 7. Both members allege they are "drawn" by the Fellowship's scholarship component. A Decl. ¶ 8; B Decl. ¶ 8.

**\*4** The declarations allege that both members are "able and ready" to apply to the 2023 Fellowship class "if Pfizer stops" discriminating by race, and that the members are prepared to meet the Fellowship's requirements and expectations if they are accepted to and join the Fellowship. A Decl. ¶¶ 9-10; B Decl. ¶¶ 9-10. Both members further allege that they are proceeding under a pseudonym because they fear reprisal if their participation in this litigation becomes public. A Decl. ¶ 12; B Decl. ¶ 12. [2]

At a conference on September 21, 2022, the Court observed that Plaintiff had not identified the two members by name in signed declarations or otherwise, and asked Plaintiff to address this issue in its further submissions. To-date, Plaintiff has not identified either "Member A" or "Member B" by name.

### V. Defendant's Relationship with the Federal Government

Defendant has partnered with healthcare providers, government health agencies, research hospitals and institutes, and other pharmaceutical companies. Compl. ¶ 21. Between 2014 and 2019 – prior to the facts underlying this action – Defendant's Center for Therapeutic Innovation ("CTI") collaborated with researchers from the National Institutes of Health ("NIH"). *Id.* ¶ 22; Gramling Decl. ¶ 8. Defendant also participates in the Accelerating Medicines Partnership ("AMP"), a public-private partnership between NIH, the Food and Drug Administration ("FDA"), and private pharmaceutical companies. Compl. ¶ 23; Gramling Decl. ¶ 6. The AMP is managed by a separate organization called the Foundation for the NIH ("FNIH"). Compl. ¶ 26. NIH has funded, through the FNIH, specific AMP projects that are targeted at specific diseases. *Id.* ¶¶ 25-26, 28. Additionally, Plaintiff alleges that Defendant "receives federal financial assistance through federal healthcare program (*e.g.*, Medicare and Medicaid) reimbursements and other monetary and non-monetary assistance." Compl. ¶ 15.

Notwithstanding these private-public partnerships, Defendant submitted a declaration from its Assistant General Counsel affirming that Defendant does not provide any medical treatment or administer any health care; does not receive any financial assistance from the federal government to operate its business as a whole; has not received any monetary assistance from the government through its participation in AMP or the collaboration with NIH; and does not receive any Medicare or Medicaid reimbursement directly from the federal government. Gramling Decl. ¶¶ 4-5, 7, 9-10. Additionally, Defendant submitted a declaration from its Director of Early Lead Pipeline affirming that the Fellowship does not receive, and is not funded by, any type of assistance from the federal government. Bruce Decl. ¶ 17.

### VI. Procedural History

Plaintiff filed its Complaint and Emergency Motion for a Preliminary Injunction and Temporary Restraining Order on September 15, 2022. *See* Compl.; Motion. Plaintiff asserts 15 claims under federal, state, and city law. *See generally* Compl. Specifically, it brings claims under Section 1981 of the Civil Rights Act of 1866 (Count I), Title VI of the Civil Rights Act (Count II), Section 1557 of the Affordable Care Act (Count III), and the New York State Human Rights Law and New York City Human Rights Law, which prohibit racial discrimination with respect to employment, internships, and training programs (Counts IV–IX) and advertising of the same (Counts X–XV). Compl. ¶¶ 71-213. In short, Plaintiff asserts that Defendant "is running a racially discriminatory fellowship – the Breakthrough Fellowship Program – that categorically excludes white and Asian-American applicants." *Id.* ¶ 3.

**\*5** The Court held a conference with counsel for all parties on September 21, 2022. ECF No. 25. On the record at the conference, Plaintiff withdrew its request for a temporary restraining order. *See id.* Defendant filed opposition papers on October 25, 2022. ECF Nos. 30-33. Plaintiff filed its Reply on November 8, 2022. ECF No. 36.

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

### DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." 🚩*Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *see* 🚩*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) ("Issuance of a preliminary injunction is an extraordinary and drastic remedy ... [and] should not be routinely granted." (internal citations and quotation marks omitted)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 🚩*Winter*, 555 U.S. at 20; *accord* 🚩*Pharaohs GC, Inc. v. United States SBA*, 990 F.3d 217, 225 (2d Cir. 2021) (same).

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." 🚩*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citation omitted). Further, where a plaintiff "seeks a preliminary injunction that will alter the status quo," it must satisfy a heightened standard by demonstrating "a 'substantial' likelihood of success on the merits," 🚩*Pharaohs GC, Inc.*, 990 F.3d at 225 (internal citation omitted), and "a 'strong showing' of irreparable harm," 🚩*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal citation omitted). A preliminary injunction motion should be denied if a plaintiff fails to show either irreparable harm or a likelihood of success on the merits. *See, e.g.*, 🚩*Pharaohs GC, Inc.*, 990 F.3d at 232 (a plaintiff's "failure to show a clear or substantial likelihood of success on the merits stands in the way of any preliminary relief"); 🚩*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007) ("The finding of no showing of irreparable harm is dispositive."). When considering these standards, "the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint," *Coney Island Prep v. U.S. Dep't Health & Hum. Servs.*, 506 F. Supp. 3d 203, 209 (S.D.N.Y. 2020) (internal citation omitted), and "may consider the entire record including affidavits and other hearsay evidence," *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (quoting *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019)).

As a threshold matter, the party invoking federal jurisdiction "bears the burden of establishing standing." 🏳️*Faculty v. N.Y. Univ.*, 11 F.4th 68, 74 (2d Cir. 2021), *cert. denied sub nom. Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.*, 142 S. Ct. 2813 (2022). "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.' " *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting 🚩*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). "Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting 🚩*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (internal quotation marks and brackets omitted).

**\*6** An organization has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 🏳️*Faculty*, 11 F.4th at 74 (quoting 🚩*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

To satisfy the first prong of associational standing, *i.e.*, that its members would otherwise have standing to sue in their own right, a plaintiff "must show that one or more of its members has: (1) 'suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical'; (2) 'there must be a causal connection between the injury and the conduct complained of'; [and] (3) 'it must be likely, as opposed to merely

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

speculative, that the injury will be redressed by a favorable decision.' " 🏳 *Id.* at 74 (quoting 🏳 *LaFleur v. Whitman*, 300 F.3d 256, 269 (2d Cir. 2002)).

If a plaintiff fails to establish standing, the court "need not address the factors to be considered in deciding whether to award a preliminary injunction" and should instead deny the motion and dismiss the case for lack of subject matter jurisdiction. 🏳 *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015) (affirming denial of motion and dismissal of case where the plaintiff failed to establish standing to move for a preliminary injunction); 🏳 *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 251 (2d Cir. 2008) ("Appellants' motion for a preliminary injunction should therefore have been dismissed for lack of jurisdiction, rather than on the ground that appellants are unlikely to succeed on the merits of their action."); *see also* 🏳 *Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." (internal quotation marks, brackets, and citation omitted)).

## I. Standing

Plaintiff brings this action as an association on behalf of its members. *See* Reply at 7 n.4. Accordingly, Plaintiff must satisfy the three requirements for associational standing set forth above. *See* 🏳 *Faculty*, 11 F.4th at 74. Defendant argues, among other things, that Plaintiff has not established the first prong – that its members would otherwise have standing to sue in their own right. Opp. at 7. The Court agrees. Plaintiff has failed to establish that at least one of its members has Article III standing. Plaintiff has additionally failed to show that any member has statutory standing to bring the federal claims.

### A. Article III Standing

### 1. Identification of Members with Standing

Associational standing requires that a plaintiff identify by name at least one member with standing. *See* 🏳 *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (holding that this "requirement of naming the affected members has never been dispensed with" except where "*all* the members of the organization are affected by the challenged activity"); 🏳 *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990) (finding association lacked standing because an affidavit referencing but not naming "one or two" individuals with standing "fail[ed] to identify the individuals"). In other words, "Plaintiff is required to identify at least one affected member by name." *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 320-21 (S.D.N.Y. 2020) (rejecting the "argu[ment]" that Plaintiff need not name an injured member at the pleading stage for associational standing" (internal quotation marks and citations omitted)).

 **\*7**  Plaintiff argues that, notwithstanding this precedent, there is no requirement that a member be named for purposes of associational standing. Reply at 3-5. Further, Plaintiff argues this is especially true where anonymous declarations are submitted on members' behalf because those members wish to remain unnamed. *Id.* Defendant argues that *Summers* and other case law establish that Plaintiff must name the members upon whose standing Defendant relies, and that the anonymous member declarations are not enough. Opp. Br. at 9-10. The Court agrees with Defendant.

The Court finds the Supreme Court's decision in *Summers* controlling. In *Summers*, the petitioners asserted associational standing on behalf of their members to challenge certain regulatory projects. 🏳 555 U.S. at 498-99. For one challenged project – the Burnt Ridge Project – the petitioners submitted an affidavit of a named association member, which the Government conceded was "sufficient to establish Article III standing with respect to Burnt Ridge." 🏳 *Id.* at 494. But the petitioners did

App.89

not identity by name any member with standing to challenge the other specific projects. *Id.* at 495. The Court determined that, as to those projects, the petitioners did not satisfy "the requirement of injury in fact[, which] is a hard floor of Article III jurisdiction ...." *Id.* at 497.

The Supreme Court in *Summers* rejected the contention that the petitioners could establish associational standing based on "the organization's self-description of the activities of its members," because such an approach "would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 497-98. As an example, the Supreme Court cited approvingly its decision in *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990), where it held that an affidavit that alleged that "one or two" of the petitioners had standing was insufficient "because it did not name" the specific individuals who were harmed by the challenged program and therefore could have standing in that case. *Summers*, 555 U.S. at 498.

The *Summers* Court concluded that the "requirement of naming the affected members has never been dispensed with" except where "*all* the members of the organization are affected by the challenged activity." *Id.* at 498-99. Here, Plaintiff argues that *Summers* does not apply because Plaintiff has submitted anonymous member declarations. Reply at 4. But the Supreme Court recognized only one exception to the naming requirement, and Plaintiff's declarations do not fall within that exception. Accordingly, because Plaintiff does not allege that all of its members are affected, *Summers* requires that it identify by name at least one member with standing. *Summers*, 555 U.S. at 498-99.

The weight of authority in federal courts reaffirms that at least one member must be named for associational standing. In this Circuit, courts in at least three cases have rejected Plaintiff's argument and concluded that an associational plaintiff must identify a member with standing by name. *See, e.g.*, *Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 320-21 (rejecting the "argu[ment] that Plaintiff need not name an injured member at the pleading stage for associational standing" and holding that "Plaintiff is required to identify at least one affected member by name" (internal quotations and citations omitted)); *Equal Vote Am. Corp. v. Pelosi*, 397 F. Supp. 3d 503, 509 (S.D.N.Y. 2019) ("And in order to bring claims on behalf of its members under the 'associational standing' doctrine, an organizational plaintiff such as EVA must identify, by name, at least one member with standing."); *Residents & Fams. United to Save Our Adult Homes v. Zucker*, No. 16-cv-1683 (NGG) (RER), 2018 WL 1175152, *6 (E.D.N.Y. Mar. 5, 2018) (finding an association lacked standing because it did not specifically identify and name members who were injured).

**\*8** Plaintiff cites one case from this District that reached a contrary result. *See New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) (allowing non-governmental organizational plaintiffs to proceed with unnamed members), *rev'd on other grounds*, 139 S. Ct. 2551 (2019) (finding standing as to *governmental* plaintiffs on other grounds and not addressing the naming issue). There, the district court permitted members to remain unnamed, "to the extent that standing [for those members] depends only on the facts of their existence and residence in a particular jurisdiction." *Id.* at 606. This is a far cry from the case at hand where numerous characteristics of the members must be examined to determine standing, including their background, qualifications to apply for the Fellowship, future career intentions, etc. *See infra* at 19-24. One case in this District cites to *New York v. United States Department of Commerce* for the premise that members may be unnamed for purposes of associational standing. *See NRDC, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 227 (S.D.N.Y. 2019) (citing *New York*, 351 F. Supp. 3d at 606). But the court there recognized that an association "must nevertheless establish that 'at least one identified member has suffered or would suffer harm,' " and the plaintiff's members in that case did submit named declarations, even if the members' names were not provided in the initial complaint. *Id.* at 227, 231-32 (internal citation omitted). The other cases cited by Plaintiff are non-binding decisions from outside of this Circuit, and at least three pre-date *Summers*.[3]

App.90

2022 WL 17740157

The Second Circuit has not considered the *Summers* naming requirement. In *Faculty v. New York University*, the appellant relied on a pre-*Summers* case to argue that they were "not required to 'name names' of injured members in its standing allegations at the pleading stage." 11 F.4th at 76. The Second Circuit did not address the argument, however, because even under the appellant's theory it lacked standing for other reasons. *Id.* More recently, the Second Circuit considered a related issue of whether a *pro se* party may proceed only under a pseudonym and sign their brief, motion, or other papers under that pseudonym. *Publicola v. Lomenzo*, No. 22-795, 2022 WL 17256714, ––– F.4th –––– (2d Cir. Nov. 29, 2022) (per curiam). The Second Court held that a party may not do so because, "[b]y signing his briefs under the fictitious name 'Publius Publicola,' Appellant has not made himself 'readily identifiable' to the Court." *Id.* at *3 (internal citations omitted).

Other Courts of Appeal that have addressed the naming requirement since *Summers* have repeatedly held that "an affidavit provided by an association to establish standing is insufficient unless it names an injured individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (requiring the submission of an affidavit from a named member for associational standing); *see, e.g., Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (finding an association lacked standing to challenge an affirmative action plan because it did "not identify any affected members by name"); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) (rejecting argument based on pre-*Summers* precedent and recognizing the post-*Summers* "requirement that an organization name at least one member who can establish an actual or imminent injury"); *see also Tenn. Republican Party (16-3360) v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017) (stating that associational standing "requires that the plaintiff-organization 'name the individuals who were harmed' unless 'all the members of the organization are affected by the challenged activity' " (quoting *Summers*, 555 U.S. at 498)); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) (recognizing that "courts have read *Summers* to expressly require names for associational standing on the pleadings").

**\*9** Plaintiff's argument that it need not identify members by name because the "mere addition of their names would serve no Article III purpose" is unavailing. Reply at 4. The Supreme Court has articulated important purposes served by requiring specific, named members with standing. Such standing requirements "assure[ ] that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party,' " *Summers*, 555 U.S. at 493 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)), and that a plaintiff has " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction," *id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). Absent identified members, courts would face "the difficulty of verifying the facts" upon which standing depends, which is the case here. *Id.* at 499.[4] And it is not this Court's role to question and rewrite the Supreme Court's mandate.

Plaintiff argues that anonymity serves the purpose of "protecting individuals who might prefer to remain anonymous." Reply at 4. The Court is sympathetic that individuals may wish not to publicize their identities. But when a plaintiff brings a lawsuit in federal court, it bears the burden of establishing the Court's Article III power to adjudicate its case. *Faculty*, 11 F.4th at 74. There are procedures for keeping information confidential in a litigation if legal standards are met; indeed, courts have carved out procedures that allow even a party to request to proceed anonymously when warranted and the requisite showing is made. *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189 (2d Cir. 2008) ("Courts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of parties], which permit plaintiffs to proceed anonymously.' "). Plaintiff never made such a request, despite the identification of this issue by the Court at the September 21, 2022 hearing. *See, e.g.*, *Publicola*, 2022 WL 17256714 at *3-5 (dismissing appeal where an unnamed appellant never made a request to the court to proceed anonymously).[5]

**\*10** Finally, while the Court concludes that Plaintiff would need to identify at least one member by name even at the pleading stage, it notes that a plaintiff's burden to establish standing is even greater on a preliminary injunction motion, where it is "no less than that required on a motion for summary judgment." *Cacchillo*, 638 F.3d at 404 (a preliminary injunction motion requires

a plaintiff "set forth specific facts" in contrast to the lower burden at the pleading stage). Plaintiff falls short of that burden here. *See, e.g.,* *Patterson v. Cty. of Oneida*, 375 F.3d 206, 223 (2d Cir. 2004) (finding the requirement to "set forth specific facts" was "not satisfied by an affiant whose identity is not disclosed"); *Associated Gen. Contractors of Am.*, 713 F.3d at 1194 (rejecting association's challenge to affirmative action plan at summary judgment for lack of standing because the association did "not identity any affected members by name").

Because Plaintiff does not identify by name any member with standing or advance a theory that all of its members have standing, Plaintiff lacks Article III standing. *See* *Summers*, 555 U.S. at 498-99.

### 2. Injury in Fact

Even if Plaintiff had identified Members A and B by name, the pleadings and evidence provided by Plaintiff do not establish that its members have suffered injury in fact, another requirement for Article III standing. *See, e.g.,* *Carney v. Adams*, 141 S. Ct. 493, 502-03 (2020) (dismissing claims for lack of an injury in fact); *Filozof v. Monroe Cmty. Coll.*, 583 F. Supp. 2d 393, 403-04 (W.D.N.Y. 2008) (same, on a motion for a preliminary injunction), *aff'd*, 411 F. App'x 423 (2d Cir. 2011).

To establish standing to challenge an allegedly discriminatory selection policy, "a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997). "This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application ... would have been futile." *Id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)); *Carney*, 141 S. Ct. at 503 (recognizing that "a plaintiff need not translate his or her desire for a job ... into a formal application where that application would be merely a futile gesture" (internal quotation marks and citation omitted)). "However, an unsupported claim of futility is not enough to excuse a plaintiff's failure to apply." *Jackson-Bey*, 115 F.3d at 1096.

Additionally, such a plaintiff must show that they are "able and ready" to apply. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). This can be a "highly-fact specific" undertaking and requires more than the non-applicant's belief that they meet the "minimum qualifications" and are "able and ready." *Carney*, 141 S. Ct. at 500-01 (concluding that the plaintiff lacked standing where the overall context did not demonstrate they were "able and ready" to apply); *see Houser v. Pritzker*, 28 F. Supp. 3d 222, 238 (S.D.N.Y. 2014) ("Applicants who fail to meet the basic eligibility requirements for employment cannot demonstrate that they suffered a 'particularized' personal injury by being denied such employment."). Being "able and ready" to apply "requires an intent that is concrete." *Carney*, 141 S. Ct. at 502; *see* *Faculty*, 11 F.4th at 76 (holding that the plaintiff lacked standing without a "description of concrete plans to apply" (internal quotation marks omitted)).

In support of its argument that it was futile for the Members to apply, Plaintiff alleges that "white and Asian-American applicants need not apply" to the Fellowship because "Pfizer explains that an applicant must '[m]eet the program's goals of increasing the pipeline for Black / African American, Latino / Hispanic and Native Americans' [ ] and it conspicuously leaves out otherwise qualified white and Asian-American students from being eligible to apply." Compl. ¶¶ 43, 45. Defendant, in turn, states in its brief that "Plaintiff cites nothing in the materials about the Fellowship that categorically bans any applicant from applying." Opp. at 22. Defendant's Fellowship materials further state that "Pfizer is an equal opportunity employer" immediately before listing the program requirements, Pl. Ex. B at 2, and "Pfizer is committed to equal opportunity in the terms and conditions of employment for all employees and job applicants without regard to race," Pl. Ex. C at 4. Perhaps the program's goals of increasing the pipeline could potentially be achieved through the selection of candidates who are committed to and have

2022 WL 17740157

demonstrated experience in diversity efforts, regardless of the candidate's race. But Defendant has not stated or put forth evidence of any alternative interpretation of the stated goal of the Fellowship to that posited by Plaintiff. Nor has Defendant discussed how candidates who are not Black / African American, Latino / Hispanic and Native Americans could meet the program's stated goals.

**\*11** The Court need not determine whether it would be futile for the members to apply because Plaintiff has not adequately shown that at least one identifiable member is "able and ready" to apply. As an initial matter, the anonymous declarations are entitled to diminished evidentiary weight on this motion, if any weight at all. *See supra* at 12-19 & n.4; *Patterson*, 375 F.3d at 223 (finding the requirement to "set forth specific facts" was "not satisfied by an affiant whose identity is not disclosed"). Even when affording those declarations full weight, however, Plaintiff has not affirmatively shown that Member A and Member B meet the minimum Fellowship qualifications and are able and ready to apply.

Plaintiff argues that its members have standing because a non-applicant plaintiff "satisfies the requirements of standing by stating that he is 'able and ready to apply' when the discrimination stops." Reply at 2. But the Supreme Court has rejected the notion that a non-applicant's assertion that they are able and ready to apply is sufficient. In *Carney v. Adams*, the plaintiff challenged a party-membership requirement that limited who was eligible to apply for certain state judicial positions. 141 S. Ct. at 496-98. The plaintiff claimed that the eligibility "requirement prevent[ed], him, a political independent, from having his judicial application considered ...." *Id.* at 499. In support, the plaintiff stated that he "wants to be, and would apply to be, a judge on any of Delaware's five courts" and "that he meets the minimum qualifications to apply for any judicial officer position," given his background, experience, and "12 years as a lawyer for the Delaware Department of Justice." *Id.* at 499-500. The Supreme Court determined that he "fail[ed] to show that, at the time [the plaintiff] commenced the lawsuit, [he] was 'able and ready' to apply for a judgeship in the reasonably foreseeable future." *Id.* at 501-02. The Court rejected as insufficient the plaintiff's affirmation that he "would apply" if the discrimination stopped, and noted that "similar cases in which this Court has found standing all contained more evidence that the plaintiff was 'able and ready.' " *Id.*

The Supreme Court concluded in *Carney* that the plaintiff's "few words of general intent" and the context of the case did not show an injury in fact. *Id.* Although the plaintiff stated that he would apply and believes that he met all of the qualifications for the positions, this did not "show that [the plaintiff] was 'able and ready' to apply" and did "not sufficiently differentiate[ ] [the plaintiff] from a general population of individuals affected in the abstract by" the challenged qualification. *Id.* at 500-02. To hold otherwise, the Court reasoned, "would significantly weaken the longstanding legal doctrine preventing this Court from providing advisory opinions." *Id.* at 501. The Supreme Court noted the plaintiff's change of party affiliation not long before commencing the lawsuit further indicated that the plaintiff's desire was to challenge the eligibility requirements, not to apply to a judicial position. *Id.*

Here, the perfunctory two-page anonymous declarations from Members A and B simply track the Fellowship requirements and provide very little facts showing that the members – from undisclosed universities, with unnamed majors or courses of study, with little to no details about their career and educational goals, employment history, or interests – were ready and able to apply to the Fellowship. Specifically, the Fellowship requires that an applicant have a "[c]ommitted interest & intent to pursue an MBA, MPH, or MS Statistics program." Pl. Ex. A at 5. At most, the anonymous declarations and Complaint indicate that Members A and B were "drawn" to the Fellowship by the scholarship component, that a fully funded MBA "would be a wonderful way to enrich [their] professional experience," and that they would "gain valuable management skills" through such a program. A Decl. ¶ 8; B Decl. ¶ 8. While these statements indicate some benefit gained from such graduate programs, they do not provide any information, facts, or prior experience that show a "committed interest and intent" to pursue them. *See, e.g.*, *Houser*, 28 F. Supp. 3d at 238 (finding that three plaintiffs whose qualifications fell below those required for the position "cannot demonstrate an injury-in-fact sufficient to prove Article III standing").

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

**\*12**  The brief conclusory sentences in the anonymous members' declarations regarding their leadership experience are also not enough to establish that they have demonstrated the "exceptional leadership potential" required for the positions. Member A's declaration states that the member is "involved in campus life and activities and hold[s] leadership positions in student organizations," and that the member "previously led and organized volunteer programs." A Decl. ¶ 6. In nearly identical fashion, Member B is allegedly "involved in campus life and hold[s] leadership positions in various campus activities, including student government." B Decl. ¶ 6. These generalized recitals do not allege with particularity any activity, leadership position, or volunteer program, nor do they demonstrate that the members possess "exceptional leadership potential."

Further, there are no allegations that either anonymous member has pursued opportunities similar to the Fellowship in the past, has engaged in a course of study at their unnamed university that would demonstrate an interest in pursuing a program like the Fellowship, or has any prior involvement with or interest in Pfizer, biopharmaceutical companies, or business management generally.

In sum, these sparse declarations do not establish that Plaintiff's members have an "intent [to apply] that is concrete." *Carney*, 141 S. Ct. at 502. Indeed, the members' statements that they joined Plaintiff's newly created organization because they "support its mission as well as this lawsuit," further suggests a generalized grievance against Defendant's alleged affirmative action efforts, not an actual desire by the members to apply to the Fellowship and work at Pfizer. A Decl. ¶ 11; B Decl. ¶ 11; *see* Opp. at 5. Similarly, in *Carney*, the Supreme Court concluded that the plaintiff's change of party affiliation before he commenced the lawsuit "suggests an abstract, generalized grievance, not an actual desire to" apply for a judicial post and become a judge. 141 S. Ct. at 502.

Therefore, the Court concludes that Plaintiff has not established injury in fact necessary for Article III standing because Plaintiff's members have "not sufficiently differentiated [themselves] from a general population of individuals affected in the abstract by the [program] [they] attack[ ]." *Carney*, 141 S. Ct. at 502 (concluding that the plaintiff's words "I would apply" were insufficient without concrete supporting facts, such as past injury, prior applications, prior relevant conversations, or other preparations for the position); *see, e.g.*, *Filozof*, 583 F. Supp. 2d at 403 (on preliminary injunction motion, finding the plaintiff "failed to show that he was 'able and ready' to seek the" affirmative action opportunities because he "does not allege that he ever attempted to attain the benefits of networking, leadership, or other training programs during his employment").

### B. Claim-Specific Standing

Even if Plaintiff had provided named member declarations with more definite affirmative facts regarding the members' qualifications and a concrete intent to apply, the Complaint must still be dismissed because Plaintiff also lacks standing to bring the particular federal claims alleged.

### 1. Section 1981

In this Circuit, an association lacks standing to assert claims on behalf of its members under the Civil Rights Act. *See Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973) (holding that an association may not "sue under the Civil Rights Act for the violation of rights of members"). The Second Circuit has applied this principle to the Section 1981 claims. *See Warth v. Seldin*, 495 F.2d 1187, 1194 (2d Cir. 1974) (finding no associational standing under Sections 1981, 1982, and 1983). And the Circuit has reaffirmed this precedent repeatedly. *See, e.g.*, *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 74 (2d Cir. 2019) (reaffirming this "string of opinions" starting with *Aguayo*).

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

**\*13** Plaintiff argues that *Aguayo* and its progeny apply only to Section 1983 of the Civil Rights Act and not Section 1981. Reply at 5-6. Further, Plaintiff suggests that the rule against associational standing in *Aguayo* contradicts subsequent Supreme Court precedent, and that "in the absence of controlling Second Circuit case law on § 1981," this Court should conduct an independent analysis of Section 1981 standing. *Id.* at 6. The Court disagrees and concludes that the Second Circuit's rule against associational standing applies equally to claims brought under Sections 1981 and 1983 and thus this Court is bound to follow that precedent.

In *Aguayo v. Richardson*, the Second Circuit held that an organization could not bring a Section 1983 claim based on associational standing. 🔖 473 F.2d at 1099. The Second Circuit observed that "Section 1983 confers a cause of action on 'any citizen of the United States or other person within the jurisdiction thereof' who has been deprived under color of state law 'of any rights, privileges, or immunities secured by the Constitution and laws.' " *Id.* The Court concluded that, "[n]either this language nor the [statute's] history ... suggests that an organization may sue under the Civil Rights Act for the violation of rights of members." *Id.* (internal citation omitted).

One year later, in *Warth v. Seldin*, the Second Circuit applied *Aguayo* to conclude that an association lacked standing to bring claims on behalf of its members under Sections 1981, 1982, and 1983. 495 F.2d at 1194 ("It is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act ... [the organization] therefore lacks standing." (citing 🔖 *Aguayo*, 473 F.2d at 1099)). On appeal, the Supreme Court in *Warth* affirmed the Second Circuit on other standing grounds. 🔖 422 U.S. 490, 517-18 (1975). In *dicta*, the Supreme Court noted that, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." 🔖 *Id.* at 511.

Plaintiff argues that the Second Circuit's associational standing rule set forth in *Aguayo* contradicts, and thus does not survive, the Supreme Court's *dicta* in *Warth*. Reply at 6. But the Second Circuit has rejected that argument and continues to rely on *Aguayo* and its decision in *Warth*. In *League of Women Voters of Nassau County v. Nassau County Board of Supervisors*, decided nine years after *Warth*, the Second Circuit held that the plaintiff organization did "not have standing to assert the rights of its members" under Section 1983. 737 F.2d 155, 160-61 (2d Cir. 1984). The Court approvingly cited its decision in *Warth* as "denying standing to a housing organization" and reiterating that "[i]t is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act." *Id.* at 161 (quoting *Warth*, 495 F.2d at 1194). The Second Circuit concluded that it must "[n]ecessarily ... adhere to our prior decisions." *Id.*

The Second Circuit relied on the *Aguayo* line of cases again in 🔖 *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). There, the Court held that it was "bound to agree with the district court that [the plaintiff organization] cannot bring this action as the representative of its members" under Section 1983. *Id.* The plaintiff there – like Plaintiff here – argued that "this rule is 'contradicted by a raft of Supreme Court precedent' and was effectively rejected by the Supreme Court in *Warth v. Seldin.*" *Id.* at 156 n.5. The Second Circuit rejected that argument because it had "reaffirmed the *Aguayo* rule in *League of Women Voters* nine years after *Warth* ... [and] we are bound by the implicit determination of prior panels that the rule survives *Warth* ...." *Id.* As previously stated, the Second Circuit reached the same conclusion in 2019 when it again reaffirmed the "string of opinions" beginning with *Aguayo* and continuing past *Warth*. 🔖 *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 74-75 ("In a string of opinions, this Court has held that organizations suing under Section 1983 must, without relying on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's standing requirements.") (internal citations omitted).

**\*14** Since the Second Circuit has concluded that there is no associational standing under the Civil Rights Act, including for Section 1981 claims, and has reaffirmed that line of cases, this Court is bound to apply that precedent to Plaintiff's Section 1981 claim here. *See Warth*, 495 F.2d at 1194; *see also* 🔖 *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 74. Accordingly, Plaintiff lacks standing to assert the Section 1981 claim on behalf of its members. *See, e.g., Warth*, 495 F.2d at 1194 (concluding that the plaintiff lacked associational standing to bring a Section 1981 claim on behalf of its members).

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

Case 5:23-cv-00029-J   Document 29-1   Filed 03/03/23   Page 13 of 21
Appellate Case: 23-6054   Document: 010110864064   Date Filed: 05/23/2023   Page: 96

### 2. Title VI and Section 1557

Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d. For purposes of Title VI, "the term 'program or activity' and the term 'program' mean all of the operations of ... an entire corporation ... (i) if assistance is extended to such corporation ... as a whole; or (ii) [the corporation] is principally engaged in the business of providing ... health care ...." 42 U.S.C. § 2000d-4a(3)(A)(i)-(ii). In other words, Title VI is limited to cases where (1) an entity discriminates under a "program or activity" for which it receives federal funding; (2) the entity receives federal funding as a whole; or (3) the entity receiving federal funding is principally engaged in providing health care (or one of the other services enumerated in 42 U.S.C. § 2000d-4a(3)(A)(ii)).

Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance ...." 42 U.S.C. § 18116(a). Under Section 1557, the "term 'health care provider' means any individual, group practice, corporation of health care professionals, or hospital (i) licensed, registered, or certified under Federal or State laws or regulations to provide health care services; or (ii) required to be so licensed, registered, or certified but that is exempted by other statute or regulation." 42 U.S.C. § 18122(2)(B). The United States Department of Health and Human Services' regulations define "health program or activity" to "encompas[s] all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R. § 92.3(b).

Here, Plaintiff contends that Defendant is principally engaged in the business of providing healthcare and receives financial assistance as a whole, so Defendant may be subject to race discrimination claims under Title VI and Section 1557. Opening Br. at 10-13; Reply at 11-13. [6] Defendant argues that its operations are "not subject to Title VI or § 1557" because Defendant is not a healthcare provider and does not receive federal assistance as a whole. Opp. at 16-19. Defendant also argues that "Plaintiff's Title VI claim fails because Plaintiff does not show – because it cannot show – that Pfizer receives federal funds aimed primarily at providing employment." *Id.* at 19 n.11. Plaintiff does not address the latter argument. The Court finds Plaintiff's allegations and evidence insufficient to establish standing under Title VI and Section 1557 for multiple reasons.

### a. Assistance Aimed Primarily at Providing Employment

**\*15** Plaintiff alleges that it would be futile for its members to apply to work at Pfizer through the Fellowship since they are white and Asian-American, and that this alleged employment discrimination violates Title VI and Section 1557 because Defendant receives federal financial assistance. *See* Reply at 2, 11-13; A Decl. ¶ 7 (describing desire to apply and work at Pfizer); B Decl. ¶ 7 (same). Given that Plaintiff has not alleged that Defendant receives federal financial assistance for the primary purpose of providing employment, Plaintiff lacks standing to assert its claims under both Title VI and Section 1557. *See, e.g.*, *Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 276, 284 (2d Cir. 1981) (finding claim that the company did not recruit, actively deterred, and did not hire applicants failed under Title VI because "[t]he complaint contained no express allegation" that the company received federal funds "aimed primarily at providing employment").

A plaintiff may not bring a claim under Title VI "with respect to any employment practice, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. "In the Title VI employment discrimination context, courts have construed Section 2000d-3 as imposing 'a threshold requirement ... that the employer be the recipient of federal funds aimed primarily at providing employment.' " *Bloomberg v. N.Y.C. Dep't of Educ.*, 410 F. Supp. 3d 608, 625 (S.D.N.Y. 2019) (collecting cases) (quoting *Ass'n Against Discrimination*

in *Emp., Inc.*, 647 F.2d at 276); *see* 🚩 *Johnson v. Transp. Agency*, 480 U.S. 616, 627 n.6 (1987) (noting that Congress imposed the requirement that Title VI applies only where the primary purpose of federal funds is to provide employment, lest "the receipt of any form of financial assistance ... render an employer subject to the commands of Title VI rather than Title VII"); Opp. at 19 n.11 (citing cases). [7]

Courts in this Circuit routinely dismiss Title VI employment discrimination claims where the plaintiff does not satisfy this threshold requirement. *See, e.g.*, 🚩⚠ *Murphy v. Middletown Enlarged City Sch. Dist.*, 525 F. Supp. 678, 709 (S.D.N.Y. 1981) (finding the Title VI plaintiff lacked standing to bring an employment discrimination claim because the federal financial assistance provided was not "designed with the primary objective of providing employment"); *Bloomberg*, 410 F. Supp. 3d at 625-26 (dismissing Title VI claim because the plaintiff did not plead a "logical nexus between the use of federal funds and the [allegedly discriminatory] practice") (internal citation omitted); 🚩 *Johnson v. Cty. of Nassau*, 411 F. Supp. 171, 174 (E.D.N.Y. 2006) (dismissing Title VI claims and observing that "courts have dismissed complaints for failure to specify when funds were received, what they were used for, and whether their primary objective was to provide employment") (collecting cases); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-cv-6694 (CS), 2012 WL 13059694, at *8 (S.D.N.Y. Jan. 20, 2012) ("Covered entities can only be sued for employment discrimination under Title VI where a primary objective of the Federal financial assistance ... is to provide employment." (internal citation and quotation marks omitted)).

Under Section 1557's plain language, the same threshold requirements under Title VI apply to race discrimination claims under Section 1557. Section 1557 provides that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of [Section 1557]." 🚩 42 U.S.C. § 18116(a); *see* 🚩 45 C.F.R. § 92.5 ("The enforcement mechanisms provided for, and available under, Title VI of the Civil Rights Act of 1964 ... including under the ... regulations implementing those statutes, shall apply for purposes of violations of § 92.2 [providing non-discrimination requirements] of this part.").

 **\*16**  In other words, "the rights of action and corresponding remedies, including all of their limitations, are to be drawn from the four federal civil rights statutes listed in 🚩 42 U.S.C. § 18116(a) and applied depending upon the nature of the discrimination alleged by a putative Section 1557 plaintiff." *Se.* 🚩 *Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 699 n.3 (E.D. Pa. 2015); *see* 🚩 *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) ("hold[ing] that Section 1557 does not create a new healthcare-specific anti-discrimination standard" and so, "to state a claim for a Section 1557 violation," a plaintiff must allege facts adequate under the applicable statute enumerated in Section 1557). [8] This means that, where a plaintiff brings a Section 1557 claim for employment discrimination based on race, the requirements for employment discrimination based on race under Title VI apply. *See* 🚩 *Se. Pa. Transp. Auth.*, 102 F. Supp. 3d at 699-702 (applying Title VI requirements to the plaintiff's Section 1557 race discrimination claim and applying Section 504 requirements to the plaintiff's Section 1557 disability claim); 🚩 *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 33 ("In other words, a litigant bringing a [Section 1557] claim based on race discrimination in violation of Title VI cannot employ the enforcement mechanism available for sex discrimination under Title IX."); *cf.* 🚩 *Weinreb v. Xerox Bus. Servs.*, No. 16-cv-6823 (JGK), 2020 WL 4288376, at *3 (S.D.N.Y. July 27, 2020) (finding "the weight of authority establishes that Section 1557 incorporates the standards of Title IX for health discrimination claims under Section 1557, the effect being that a Section 1557 plaintiff cannot allege sex discrimination under a disparate impact theory, which is not permissible under Title IX"). [9]

Here, Plaintiff does not even allege that Defendant is "the recipient of federal funds aimed primarily at providing employment." *Bloomberg*, 410 F. Supp. 3d at 625 (quoting 🚩⚠ *Ass'n Against Discrimination in Emp., Inc.*, 647 F.2d at 276). Nor does Plaintiff respond in its Reply to Defendant's argument (*see* Opp. at 19 n.11) that Plaintiff has failed to show this nexus.

2022 WL 17740157

Instead, Plaintiff alleges that Defendant participates in certain public-private partnerships and receives Medicare and Medicaid reimbursements. *See, e.g.*, Compl. ¶¶ 22-23, 25-26, 28; Gramling Decl. ¶ 8; Reply at 12-13. Indeed, as for the particular employment allegedly sought by Plaintiff's members, Defendant has submitted evidence that the Fellowship "does not receive, and is not funded by, any type of assistance from the federal government." Bruce Decl. ¶ 17.

Plaintiff's generalized allegations of federal financial assistance are insufficient to plead that the federal funds are primarily aimed at providing employment. Therefore, Plaintiff has failed to establish standing to assert its Title VI and Section 1557 claims. *See, e.g.*, *Bloomberg*, 410 F. Supp. 3d at 626 (dismissing Title VI claim because the defendant's generalized allegations that the plaintiff "is a recipient of federal funding ... do not sufficiently plead the requisite 'logical nexus' "); *Bhanusali*, 2012 WL 13059694, at *8-9 (dismissing Title VI claim because the plaintiff "failed to set forth facts supporting the conclusion ... that funds were primarily intended to provide employment" and rejecting argument that receipt of Medicare and Medicaid reimbursement "is primarily intended to provide employment" because "common sense dictates that ... [it] is intended to pay for the provision of medical care for qualifying patients"); *see also Kelly v. Rice*, 375 F. Supp. 2d 203, 208-09 (S.D.N.Y. 2005) (finding the plaintiff's failure to allege that the defendant "is receiving federal funds in connection with" the allegedly discriminatory program "is absolutely fatal to her Title VI claim").

### b. Principally Engaged in Providing Health Care

 **\*17**   Because Plaintiff does not allege facts sufficient to satisfy the threshold requirement that Defendant receives federal assistance for the primary purpose of providing employment, the Court need not further consider Plaintiff's standing arguments under Title VI and Section 1557. Even assuming the threshold requirement was met, however, Plaintiff's claims still fail because it has not shown that Defendant is "principally engaged in the business of providing ... healthcare." Opening Br. at 11-12 (internal citation omitted); *see* Reply at 11-12. Plaintiff argues that, under ordinary dictionary meanings, "principally engaged" means "the primary activities" of an entity, "provide" means "to supply or make available," and "health care" means "efforts made to maintain or restore physical, mental, or emotional well-being." Reply at 11-12. By scribing the statutes with these definitions, Plaintiff contends that Defendant is subject to the statutes' reach. *Id.* Defendant argues that the meaning of these terms, as used in Title VI and Section 1557 and defined by case law, regulations, and dictionary meaning, does not embrace a biopharmaceutical company like Defendant. Opp. at 17-18. The Court agrees with Defendant.

Title VI, under 42 U.S.C. § 2000d-4a(3)(A)(ii), requires that a subject entity be engaged in "providing health care." Section 1557, as implemented through 45 C.F.R. § 92.3(b), likewise requires that a subject entity be engaged in "providing healthcare." While Title VI does not appear to define "health care provider," Section 1557 defines the term as "any individual, group practice, corporation of health care professionals, or hospital (i) licensed, registered, or certified under Federal or State laws or regulations to provide health care services; or (ii) required to be so licensed, registered, or certified but that is exempted by other statute or regulation." 42 U.S.C. § 18122(2)(B). Defendant, a global research-based biopharmaceutical company, does not fall within Section 1557's definition of a "health care provider." *See* Compl. ¶¶ 12, 18; Gramling Decl. ¶ 3.

Both parties rely on federal regulations to define applicable terms. *See, e.g.*, Opening Br. at 11; Opp. at 17 & n. 9. Federal regulations generally define a "health care provider" as a person or entity, usually a licensed medical practitioner or facility, that renders medical treatment. *See, e.g.*, 29 C.F.R. § 825.125(a)(1)-(2) (2016) (FMLA) (defining "health care provider" as a "doctor of medicine or osteopathy who is authorized to practice medicine or surgery" or "any other person determined by the Secretary to be capable of providing health care services"); 42 C.F.R. § 400.202 (2012) (Medicare) (defining "provider" as a "hospital, a c[ritical] a[ccess] h[ospital], a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency or a hospice that has in effect an agreement to participate in Medicare, among others ..."); 42 U.S.C. § 1395x(u) (Medicare provider enrollment definitions) ("The term 'provider of services' means a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program ....").

App. 98

2022 WL 17740157

Dictionary definitions of "health care provider" are consistent with Section 1557 and federal regulations. For example, Black's Law Dictionary defines "healthcare" as "the services provided, usu[ally] by medical professionals, to maintain and restore health." Healthcare, Black's Law Dictionary (11th ed. 2019). Stedman's Medical Dictionary defines "provider" as a "term used by managed care organizations, referring to anyone rendering medical care, including physicians, nurse practitioners, physician assistants, and others." Provider, Stedman's Medical Dictionary 732090 (Nov. 2014). Plaintiff relies on Merriam-Webster to define "health care" and argues that the definition therein "broadly includes 'efforts made to maintain or restore physical, mental, or emotional well-being' of persons." Reply at 12. Plaintiff omits the remainder of the definition, which continues, "... especially by trained and licensed professionals." Health Care, Merriam-Webster (Nov. 2022). Plaintiff also omits that Merriam-Webster provides a second definition of "health care": "the maintaining and restoration of health by the treatment and prevention of disease especially by trained and licensed professionals (as in medicine, dentistry, clinical psychology, and public health)." *Id.*

**\*18** Here, Defendant is a global research-based company engaged in the business of the discovery, development, manufacture, marketing, sale and distribution of biopharmaceutical products. Compl. ¶¶ 12, 18; Gramling Decl. ¶ 3. [10] This Court finds that such an entity is not a health care provider as that term is used in the plain text of Title VI and Section 1557, federal regulations, or dictionary definitions. Moreover, Plaintiff has cited no case, and the Court is not aware of any, that has found an entity like Defendant to be principally engaged in providing health care for purposes of Title VI and Section 1557. Rather, courts have concluded that the provision of "health care" under these statutes refers to "some form of treatment or direct assistance to individuals." *Drachman v. Bos. Sci. Corp.*, 258 F. Supp. 3d 207, 212 & n.7 (D. Mass. 2017) (finding that "a global Fortune 500 medical device company" is not a "health care provider"); *see Bernier v. Trump*, 242 F. Supp. 3d 31, 44 (D.D.C. 2017) (finding a biopharmaceutical company is "in the business of manufacturing" prescription drugs and is not a "health program or activity"), *vacated on other grounds on reconsideration*, 299 F.Supp.3d 150 (D.D.C. 2018). [11] Defendant is not principally engaged in providing treatment or direct assistance to patients and therefore is not a "health care provider" for purposes of Title VI and Section 1557. *See* Gramling Decl. ¶ 4 ("Pfizer does not provide any medical treatment or administrate any health care to any patient or person.").

Plaintiff's remaining arguments as to why Defendant should be considered a health care provider are unavailing. Plaintiff relies on *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 739 (7th Cir. 2022), to argue that Defendant's operations and the Fellowship "constitute a 'health program or activity' " under the statutes. Opening Br. at 11. In *T.S.*, the defendant "operate[d] a skilled-nursing and assisted-living facility" and did "not dispute that its primary business is providing healthcare." *T.S.*, 43 F.4th at 739-40 ("CarDon does not dispute that its primary business is providing healthcare"). Here, Defendant is a biopharmaceutical company and not a nursing facility, and Defendant does dispute that it is primarily engaged in providing healthcare. Opp. at 17-18.

Finally, for the first time on Reply, Plaintiff argues that Defendant is principally engaged in providing health care because it "offers direct medical treatment to patients in its clinical trials 'involving hundreds of thousands of people.' " Reply at 12 (internal citation omitted). This argument "come[s] too late to support the current motion for a preliminary injunction." *Adrianza v. Trump*, 505 F. Supp. 3d 164, 185 (E.D.N.Y. 2020) (declining to consider argument raised for the first time on reply); *Barclays Capital Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 352 n.12 (S.D.N.Y. 2010) ("Arguments raised for the first time in a reply may not be considered when the opposing party is deprived of the opportunity to be heard as to that issue."), *rev'd in part on other grounds* (2d Cir. 2011). But even if considered, Plaintiff's untimely argument fails because there are no factual allegations (or evidence) that "clinical trials" serve the purpose of medical *treatment*. In fact, the only source that Plaintiff cites for this point supports the conclusion that such trials are conducted for the purpose of biopharmaceutical research. [12] Nor does Plaintiff's conclusory reference to clinical trials otherwise show that Defendant is a "corporation of healthcare professionals" or meets the other criteria used to define a "health care provider." 42 U.S.C. § 18122(2)(B). Most importantly, Plaintiff falls far short of showing that clinical trials – or any other activity that Plaintiff argues constitutes "health care" – are the "primary

activities" of Defendant's global biopharmaceutical business. *See Doe v. Salvation Army in the U.S.*, 685 F.3d 564, 571 & n.10 (6th Cir. 2012) (concluding that "principally engaged" means "the primary activities of a business" and not "incidental activities"); *Collins v. Giving Back Fund*, No. 18-cv-08812 (CM), 2019 WL 3564578, at *10 (S.D.N.Y. Aug. 6, 2019) (same).

### c. Federal Financial Assistance as a Whole

**\*19** Finally, the parties dispute whether Defendant receives federal financial assistance "as a whole" and is therefore subject to the statutes' reach on that basis. Plaintiff argues, among other things, that Defendant receives federal financial assistance through Medicaid and Medicare reimbursements and private-public partnerships with the federal government, which constitute assistance as "a whole." Opening Br. at 11-13; Reply at 12-13. Defendant has submitted a declaration showing that it does not directly receive any Medicaid or Medicare reimbursements and argues that none of the alleged sources of assistance identified by Plaintiff constitute the receipt of assistance as "a whole." Opp. at 18-19; Gramling Decl. ¶ 10 ("Pfizer does not receive any Medicare or Medicaid reimbursements directly from the federal government."). Based on the pleadings and evidence presented, the Court finds that Defendant does not receive federal financial assistance as a whole.

As an initial matter, Title VI defines "program or activity" to mean the entire corporation where either "assistance is extended to such corporation ... as a whole" or where the corporation "is principally engaged in the business of providing ... health care ...." 42 U.S.C. § 2000d-4a(3)(A)(i)-(ii). By contrast, Section 1557 (through an implementing regulation) defines "health program or activity" to only "encompas[s] all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance" and does not include "as a whole" as an alternative prong. 45 C.F.R. § 92.3(b). Therefore, Plaintiff's argument that Defendant is subject to Section 1557 because it receives assistance "as a whole" must fail.

"[T]he phrase 'as a whole' means that federal assistance is extended to the organization otherwise than for some specific purpose – put differently, that the recipient of federal funds received those funds as general assistance." *Collins v. Giving Back Fund*, No. 18-cv-08812 (CM), 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) (citing S. Rep, No 100-64, at 17 (1987)); *Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002) ("Federal financial assistance extended to a corporation or other entity 'as a whole' refers to situations where the corporation receives general assistance that is not designated for a particular purpose." (internal citation omitted)), *aff'd*, 361 F.3d 1263 (10th Cir. 2004). Assistance may be received "directly or through an intermediary," but "entities that only benefit economically from federal assistance are not [covered]." *NCAA v. Smith*, 525 U.S. 459, 468 (1999) (conducting analysis in the Title XI context). Moreover, coverage "applies only to entities that *receive* federal funds" and not to entities that do "not actually *receive*" the assistance or are only "the *intended* beneficiary of federal funding." *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 94 (2d Cir. 2021).

Plaintiff's allegations that Defendant participates in certain public-private partnerships – namely, Defendant's collaboration in the AMP and with the NIH – do not establish that Defendant receives federal financial assistance as a whole. *See, e.g.*, Compl. ¶¶ 22-23, 25-26, 28; Gramling Decl. ¶ 8; *see also* Opening Br. at 13. Rather, as alleged by Plaintiff, each partnership consists of specific programs between Defendant and other entities. *See, e.g.*, Compl. ¶¶ 25, 28. [13] Plaintiff even delineates the alleged federal financial assistance by their designated programs. *See* Compl. ¶ 28 (listing approximate funding amounts designated for certain programs). This assistance is program-specific and, therefore, insufficient to show receipt of federal funding by Defendant's business "as a whole." 42 U.S.C. § 2000d-4a(3)(A)(i).

Although unnecessary in light of Plaintiff's pleading deficiencies, Defendant has provided evidence that it does *not* receive funding as a whole. *See* Gramling Decl. ¶ 5 ("Pfizer does not receive any financial assistance from the federal government to operate its business as a whole."). Defendant has also supplied evidence that it has not received federal funding with respect to the specific programs identified by Plaintiff. *See, e.g.*, Gramling Decl. ¶ 7 (disclaiming any federal assistance with respect to Defendant's participation in the AMP), ¶ 9 (disclaiming any federal assistance with respect to the identified partnerships between

Defendant and the NIH). Put simply, Plaintiff has failed to show that Defendant's participation in public-private partnerships constitutes federal financial assistance to the company as a whole. *See, e.g.*, *Collins*, 2019 WL 3564578 at \*11-12 (finding the defendant's receipt of federal grant money was not "as a whole" because it was awarded in relation to a specific project); *Boswell*, 217 F. Supp. 2d at 1217 (finding federal assistance to an airline for the purpose of "serving particular rural airports and ... routes" was not received "as a whole").

 **\*20**  Finally, Plaintiff's allegation that Defendant "participates in the federal health program ... by offering federally reimbursable products and medicines" does not establish that Defendant receives federal funding as a whole. *See* Compl. ¶ 20. The Second Circuit has held that the allegation that an entity's products are federally reimbursable is not enough to show that the entity receives federal financial assistance from those products. *See T.W.*, 996 F.3d at 94 (finding the defendant did not receive federal financial assistance where it directly received payments from customers who could later seek federal reimbursement).

Plaintiff's Complaint does not allege that Defendant "actually *receive[s]*" money from those reimbursements. *See id.* Nor does Plaintiff show how receipt of money through such reimbursements would constitute federal assistance to Defendant "as a whole" and not for any particular purpose. *See generally Bhanusali*, 2012 WL 13059694, at \*8 ("[C]ommon sense dictates that ... [Medicare and Medicaid reimbursement] is intended to pay for the provision of medical care for qualifying patients[.]"). By contrast, Defendant has supplied a sworn statement that it "does not receive any Medicare or Medicaid reimbursement directly from the federal government." Gramling Decl. ¶ 10. Therefore, even assuming receipt of Medicaid and Medicare reimbursement can constitute federal assistance, Plaintiff has not pleaded (or shown) that Defendant receives federal funding from such reimbursements for its company as a whole. *See, e.g.*, 🔖*Rose v. Cahee*, 727 F. Supp. 2d 728, 737, 739 (E.D. Wis. 2010) ("Thus, there is no direct receipt or pass-through of Medicare and Medicaid funds and [the defendants] cannot be deemed 'recipients' of federal funds."); *Sw. Fair Hous. Council v. WG Campana del Rio SH LLC*, No. 19-cv-00179 (TUC) (RM), 2021 WL 321895, at \*6 (D. Ariz. Feb. 1, 2021) (finding defendant not subject to Section 1557 because there was "no evidence to support a finding that Defendant receives federal funding in the form of Medicare and/or Medicaid").

Accordingly, Plaintiff has failed to establish standing to bring claims under Title VI and Section 1557. *See, e.g.*, 🔖⚠️*Murphy*, 525 F. Supp. at 709 (dismissing employment discrimination claim for lack of standing because the plaintiff failed to show the requisite nexus to "federal financial assistance").

\* \* \*

Because the Court finds that Plaintiff lacks Article III standing and statutory standing to bring the federal claims, the Court declines to address "the factors to be considered in deciding whether to award a preliminary injunction" and will instead deny the Motion and dismiss the case for lack of subject-matter jurisdiction. 🔖*Rojas*, 793 F.3d at 259 (affirming dismissal for lack of standing on a preliminary injunction motion); *see* 🔖*Cave*, 514 F.3d at 251 (remanding case for the district court to dismiss the "complaint in its entirety," rather than deny only the preliminary injunction motion, for lack of subject-matter jurisdiction); *see, e.g.*, *Roberts v. Bassett*, No. 22-cv-710 (NGG) (RML), 2022 WL 785167, at \*1 (E.D.N.Y. Mar. 15, 2022) ("Thus, as there is no case or controversy before this court, the court declines to consider Plaintiffs' motion for a preliminary injunction, and the case is DISMISSED."), *aff'd*, No. 22-622-cv, 2022 WL 16936210 (2d Cir. Nov. 15, 2022) (affirming dismissal of case at the preliminary injunction stage); *E.F. v. Adams*, No. 21-cv-11150 (ALC), 2022 WL 601999, at \*6 (S.D.N.Y. Mar. 1, 2022) (on preliminary injunction motion, finding that certain plaintiffs "must be dismissed from this case for lack of standing"); *Williams v. N.Y. State Off. of Mental Health*, No. 10-cv-1022 (SLT) (JO), 2011 WL 2708378, at \*4 (E.D.N.Y. July 11, 2011) (dismissing case for lack of standing on a motion for preliminary injunction). Where subject matter jurisdiction is lacking, "there is no need to proceed" with a preliminary injunction hearing. *See, e.g.*, ⚠️*Pietsch v. Bush*, 755 F. Supp. 62, 68 (E.D.N.Y. 1991) (denying request for a preliminary injunction hearing because "the Plaintiff has failed to allege an injury in fact, [so] there is no need to proceed ... since the Court does not have subject matter jurisdiction to hear this case"). [14]

## II. New York State and City Claims

**\*21**  Where a plaintiff lacks standing to bring federal claims, it is "clearly inappropriate for the district court to retain jurisdiction over the state law claims ...." *Cave*, 514 F.3d at 250 (holding that the district court should have declined supplemental jurisdiction over state law claims where it denied the plaintiff's preliminary injunction motion for lack of standing); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well."). Since the Court finds Plaintiff lacks standing to bring its federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's non-federal claims. *See, e.g.*, *Cave*, 514 F.3d at 250-51.

### CONCLUSION

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction is DENIED and this action is DISMISSED without prejudice for lack of subject-matter jurisdiction.

### All Citations

Slip Copy, 2022 WL 17740157

### Footnotes

1    Unless otherwise stated, the pagination for exhibit record citations refers to the ECF-generated page numbers.

2    Plaintiff adds, on Reply, that both members are deterred from applying to the Fellowship by the Fellowship advertising. ECF No. 36-1 ("Reply Rasmussen Decl.") ¶ 4.

3    *See, e.g.*, *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) (pre-dating *Summers*); *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796 (7th Cir. 2008) (same); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 n.10 (D.D.C. 2018) (relying on pre-*Summers* cases); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114 (11th Cir. 2022) (without considering whether names are required, allowing associational standing based on unnamed members); *McGehee v. Neb. Dep't of Corr. Servs.*, No. 18-cv-03092, 2019 WL 1227928, *2 (D. Neb. Mar. 15, 2019) (finding an affidavit from the "President of Pharmacy N" sufficient because it was "made by a readily identifiable person" – *i.e.*, a singular president – while noting that affidavits submitted under a pseudonym are permitted only where "the actual person can be identified" (internal citations omitted)).

4    Relatedly, the Court is unable to hold the anonymous declarants to their statements under penalty of perjury as required by 28 U.S.C. § 1746. *See Doe v. L.A. Unified Sch. Dist.*, No. 16-cv-00305 (CAS), 2017 WL 797152, at *9 (C.D. Cal. Feb. 27, 2017) (rejecting declarations that did not provide the name of the individual signatory because "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury' "); *see also Keyview Labs v. Barger*, No. 20-cv-02131, 2020 WL 8224618, at *6 (M.D. Fl. Dec. 22, 2020) (finding the plaintiff "cannot rely on Jane Doe's declaration to meet its high burden to obtain a preliminary injunction") (collecting cases), *report and recommendation adopted*, 2021 WL 510295 (M.D. Fla. Feb. 11, 2021).

5    *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), cited by *New York v. United States Department of Commerce*, 351 F. Supp. 3d at 606 n.48 and relied on by Plaintiff here (Reply at 4), does not support the proposition that a "fundamental purpose of the associational standing doctrine" is to "protect[ ] individuals who might prefer to remain anonymous," *id.* There, the organization resisted a motion to compel production of its entire membership lists for purposes of corporate registration requirements "because it and its members are in every practical sense identical" and the organization itself would have been adversely affected. *NAACP*, 357 U.S. 459. Indeed, the *Summers* Court distinguished *NAACP* as a case falling into the narrow exception of associational standing "where *all* the members of the organization are affected" – which is not the theory advanced by Plaintiff here. *Summers*, 555 U.S. at 499. The only other case cited by *United States Department of Commerce* for this premise, *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996), does not address the propriety of using anonymous members to assert associational standing.

6    Plaintiff does not advance the theory that the "program or activity" – the Fellowship – receives federal financial assistance, and Defendant supplied evidence that the Fellowship does *not* receive federal assistance. *See* Bruce Decl. ¶ 17.

7    Both parties agree that Section 1557 "incorporates Title VI ...." Opening Br. at 10; *see* Opp. at 16 ("Title VI and § 1557 (which incorporates Title VI) prohibits race discrimination ....").

8    *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 15 (D.D.C. 2020) ("[Section 1557 and its implementing regulations] requires would-be plaintiffs to employ the particular enforcement mechanism and accompanying legal standard available under each of Section 1557's incorporated statutes, depending on the precise ground of discrimination asserted."); *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 744 (7th Cir. 2022) ("All courts agree that a private right of action is an enforcement mechanism. If one of the statutes cited in section 1557 provides a private right of action to challenge discrimination on a particular ground, section 1557 imports that right."); *York v. Wellmark, Inc.*, No. 16-cv-00627 (RGE) (CFB), 2017 WL 11261026, at *18 (S.D. Iowa Sept. 6, 2017) ("The Court concludes the plain language of § 1557 unambiguously allows discrimination claims under the enforcement mechanisms of the four identified statutes only."), *aff'd*, 965 F.3d 633 (8th Cir. 2020).

9    *See also Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738 (N.D. Ill. 2017) ("Title IX's enforcement mechanism applies to Plaintiffs' Section 1557 sex discrimination claim, so their claim fails because Title IX does not allow disparate-impact claims."); *York*, 2017 WL 11261026, at *18 ("Plaintiffs' [Section 1557] claim is for sex discrimination [so] Title IX's remedial scheme applies.").

10   Plaintiff's threadbare and conclusory allegation that Defendant's "principal focus is healthcare" will not support a preliminary injunction here, especially in the face of specific and supported facts proffered by Defendant. *See, e.g., Brooks v. Roberts*, 251 F. Supp. 3d 401, 432 (N.D.N.Y. 2017) ("Conclusory assertions lacking supporting evidence will not support a preliminary injunction."); *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-cv-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (same) (collecting cases).

11   Both parties rely on caselaw interpreting the Rehabilitation Act for purposes of determining whether Defendant is principally engaged in providing health care and receives federal financial assistance as a whole under Title VI and Section 1557. *See, e.g.*, Opp. at 18 & n.10; Reply at 11. The Court does so too where appropriate. *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020) (assuming "the case law construing the Rehabilitation Act generally applies to" claims under Title VI and Section 1557, "[g]iven the similar analytical framework applied to claims" under those statutes).

Do No Harm v. Pfizer Inc., Slip Copy (2022)
2022 WL 17740157

12    Reply at 12 n.8 (quoting Pfizer, *Frequently Asked Questions—What are clinical trials?*, https://
      www.pfizerclinicaltrials.com/about/frequently-asked-questions) ("Clinical trials (or research studies) are a type of
      medical *research* in which people volunteer to take part." (emphasis added)).

13    Plaintiff's allegations that Defendant's CTI collaborated with the NIH between 2014 and 2019 are irrelevant because
      this is before the Fellowship was created. Compl. ¶ 22.

14    The parties also did not request a hearing at the motion conference when Plaintiff withdrew its request for a temporary
      restraining order and the parties indicated their preference for the Court to issue its decision on the parties' submissions
      by year's end. *See* ECF No. 25; *see, e.g., Bowen v. Goldstein*, No. 07-cv-10997, 2007 WL 4457242, at *2 (S.D.N.Y. Dec.
      13, 2007) (no hearing because the parties agreed at a conference to resolve the motion "on submission" and "[w]hen
      parties are content in the district court to rest on affidavits, the right to an evidentiary hearing is waived" (internal citation
      omitted)); *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 386 & n.3 (E.D.N.Y. 2021). The perfunctory notation on Plaintiff's
      briefs regarding an "oral hearing" does not change the conclusion. Oral argument would not have assisted the Court.
      *See, e.g.,* 🚩 *AD/SAT v. AP*, 181 F.3d 216, 226 (2d Cir. 1999). And even if there was subject matter jurisdiction, the court
      need not hold a hearing where, as here, "essential facts are not in dispute," 🚩 *Md. Cas. Co. v. Realty Advisory Bd. on
      Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997), "disputed facts are amenable to complete resolution on a paper record," or
      resolution of the preliminary injunction factors would remain unchanged, 🚩 *Moore v. Consol. Edison Co. of N.Y., Inc.*,
      409 F.3d 506, 512 (2d Cir. 2005); *In re H2O v. Town Bd. of E. Hampton*, 147 F. Supp. 3d 80, 98 (E.D.N.Y. 2015).

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.,            )
                               )
            Plaintiff,         )
v.                             )        Case No. 19 CIV-23-29-J
                               )
KAYSE SHRUM, in her individual )
capacity and official capacity as )
President of Oklahoma State University, )
                               )
            Defendant.         )

## DECLARATION OF DOUGLAS HALLENBECK

I, Douglas Hallenbeck, declare as follows:

1.      My name is Douglas Hallenbeck.  Since March 29, 2019, I have served as the Vice

President for Student Affairs at Oklahoma State University ("OSU").  Prior to this role, I served

as Senior Associate Vice President of Student Affairs at Clemson University for twelve (12) years.

In my current role, I have primary responsibility for the leadership, management, strategic

direction, policy development, and administrative oversight of OSU's Division of Student Affairs.

My duties also include working collaboratively with campus constituents to create a welcoming

and safe campus environment, including establishing the Bias Response Team ("BIRT").  I also

oversee the Office of Student Support and Conduct ("OSSC"), which has primary responsibility

for implementing the Student Code of Conduct (the "Student Code").

2.      I am submitting this Declaration in conjunction with Defendant Kayse Shrum's

FRCP 12(b)(1) Motion to Dismiss Based on Plaintiff's Lack of Standing and Response to

Plaintiff's Motion for a Preliminary Injunction.

3.      I have personal knowledge of the facts set forth in this Declaration.

4.      I have read Plaintiff's Complaint and understand there are three anonymous students desiring to express views on the following topics: opposing affirmative action, opposing abortion, opposing illegal immigration, believing sex is inherent and immutable and opposing gender transition, believing marriage should only be between a man and woman, opposing surrogacy for homosexual couples, and believing Black Lives Matter has had a corrosive impact on race relations.  These anonymous students allege they do not express views on these subjects because they fear disciplinary action by OSU.

**Freedom of Speech at OSU**

5.      OSU is committed to students' right to free speech and free expression.  OSU's governing Board of Regents clearly articulates this expectation and standard in its policy on the use of institutional facilities for free expression purposes: "The Board and its institutions recognize and protect free inquiry and free Expression as indispensable components of the critical examination of philosophies and ideas.  Given the unique mission of public educational institutions in a democratic society, this inquiry should be open and vigorous, and should consequently have greater protection than in society at large, provided that such inquiry does not infringe upon the rights of others.  Commitment to free inquiry and Expression creates a strong presumption against prohibition of Expression based upon its content."  (Board Policy 3.13, attached hereto as Exhibit A).

6.      OSU's policy on Extracurricular Use of University Facilities echoes the overarching commitment established by OSU's governing Board of Regents: "[T]he University must recognize and protect free inquiry and free expression as indispensable components of the critical examination of philosophies and ideas.  Given the unique mission of educational institutions in a democratic society, this inquiry should be more open and vigorous and should

consequently have greater protection than in society at large . . . ."  (OSU Policy 5-0601, attached hereto as Exhibit B).

7.      OSU's Division of Student Affairs maintains a website (the "Free Speech Page") providing students with information on free speech.  The page provides in part: "OSU values and protects the constitutional right of free speech.  Through this, we seek to provide all members of the OSU community with the broadest possible latitude to speak, write, listen, challenge and learn."  Finally, the page clearly states, "There's no constitutional right to not be offended."  (https://studentaffairs.okstate.edu/free-speech, attached hereto as Exhibit C).

8.      The Free Speech Page further provides the following after the heading "Controversial or Offending Speech": "The right to engage in aforementioned types of expression is a protected right under our laws, and court rulings exist that articulate offensive speech and unpopular viewpoints are what need legal protection most." (https://studentaffairs.okstate.edu/free-speech, attached hereto as Exhibit C).

9.      The Free Speech Page unequivocally states, "There's no constitutional right to not be offended.  Controversial speech is expected and valued on college campuses and in our society, which means free speech protection still applies if a speaker is shouting derogatory comments or a social media post is offensive to a particular population."  (https://studentaffairs.okstate.edu/free-speech, attached hereto as Exhibit C).

10.     The Free Speech Page contains a link to a section on "Controversial or Offending Speech."  The page provides in relevant part: "The university may not inhibit free speech by making direct or implicit threats of sanctions for engaging in protected speech.  If the university is notified of an individual or a group of individuals who are expressing remarks that could be interpreted as offensive or hateful, but do not otherwise run afoul of the law concerning free speech

the university cannot take conduct action." (https://studentaffairs.okstate.edu/free-speech/controversial-speech.html, attached hereto as Exhibit D).

11.     The Division of Student Affairs periodically holds training for division employees explaining the parameters of the First Amendment and reiterating OSU's obligations to uphold the First Amendment on campus.  The training reviews the types of speech protected under the First Amendment, including hate speech. (First Amendment Monitoring, attached hereto as Exhibit E).

12.     All institutions of higher education in Oklahoma are required by state law to prepare an annual report that includes any reports of barriers or disruptions of free speech.  For the four calendar years the report has been required, OSU has had no instances of reports of barriers or disruptions to free speech to include in the report.  (Free Expression reports, attached hereto as Exhibit F).

13.     OSU routinely hosts speakers and lecturers to bring differing viewpoints and ideas to campus and to encourage robust discussion among students by introducing viewpoints and ideas that may be different from their own.  Examples of notable, primarily conservative speakers include:

- Frank Lucas, Republican U.S. Congressman from Oklahoma – commencement speaker, Fall 2022

- Stockton/Brooks lecture – Charles "Chic" Damback; Alex Morey (FIRE); Panel Discussion including Joey Senat and Andy Lester; discussions of free speech, cancel culture and the opportunity to exchange ideas and views, October 19, 2022

- Lauren Bush Lauren, great granddaughter of Republican former President George H.W. Bush – keynote speaker for Honoring Philanthropy and Scholarship, Women for OSU, August 31, 2022

- Kevin Stitt, Republican Oklahoma Governor – commencement speaker, Fall 2019

- Laura Bush, former First Lady – keynote speaker for Women for OSU Symposium, May 13, 2016

- George W. Bush, Republican former President – commencement speaker, Spring 2006

**Office of Student Support and Conduct**

14.      OSSC resides within the Division of Student Affairs.  OSSC is responsible for serving students experiencing challenges through a holistic approach of providing support services and administering the Student Code.  Through its support function, OSSC also has primary responsibility for implementation of the BIRT.

15.      The staff of OSSC has primary responsibility for determining if there has been a possible violation of the Student Code and, if so, administering the allegation through the appropriate adjudication process as outlined in the Student Code.  I understand Aleigha Mariott, Assistant Vice President for Campus Life and Student Support, provides more detail about the operation of OSSC in her Declaration.

16.      OSSC has no authority to impose discipline or sanctions on a student for any action that is not in violation of the Student Code, nor can OSSC impose discipline or sanctions without following the full process set forth in the Student Code.  Speech alone does not violate the Student Code.

17.      No student expressing views the same as or similar to those set forth by the anonymous students in Plaintiff's Complaint has ever or would ever face disciplinary consequence for expressing those views.  Expression of views on these subjects, regardless of the content of those views, does not violate the Student Code.  Moreover, the expression is protected by the First Amendment and OSU strictly adheres to the requirements thereof.

18.    Any member of the OSU community may make a report to OSSC about a student's behavior.  If the complaint is about a student's speech and does not allege any other accompanying behavior that would violate the Student Code, OSSC takes no action.  Many reports are made to OSSC on which no action is taken because the alleged conduct, even if true, does not rise to the level of a violation of the Student Code.

19.    Students across campus routinely engage in speech expressing the exact viewpoints the anonymous students hold without repercussions or disciplinary action.  This speech takes place in public forums, in student organizations, at student-hosted events, in classrooms, and in student publications.

**Bias Incident Response Team**

20.    The BIRT was implemented in the fall of 2020 with the primary charge of supporting individuals who have experienced a bias incident.

21.    The BIRT website lists the actions the team will take upon receiving a report.  The page explicitly provides the team is "not an investigative or disciplinary body." (https://studentaffairs.okstate.edu/students/bias-incident-response.html, attached hereto as Exhibit G).

22.    As detailed further in the Declaration of Aleigha Mariott, no incidents reported to the BIRT since its inception have resulted in the initiation of disciplinary proceedings or sanctions.

23.    Participation in the BIRT process is entirely voluntary for both the reporting party and the party alleged to have engaged in the behavior.  No student has ever been or would ever be disciplined for declining to participate in the process.

**Appropriate Use Policy**

24.     Until the filing of this lawsuit, I was unaware the Appropriate Use Policy could be construed to potentially restrict students' use of their OSU email to send political campaign material.

25.     I am not aware of any instance of a student being disciplined or even reported to OSSC for sending political campaign materials via their student email account.

26.     It is my understanding the Appropriate Use Policy is being changed to eliminate the potential restriction on students' use of OSU email to send political campaign material.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February ___6___, 2023.

_____
Douglas Hallenbeck

**App.111**



STUDENT
**AFFAIRS**(/)

WHO WE ARE(/WHO-WE-ARE/INDEX.HTML)   STUDENTS(/STUDENTS/INDEX.HTML)   STRATEGIC PLANNING

GIVE(/GIVE/INDEX.HTML)   INFO FOR

**Student Affairs(https://studentaffairs.okstate.edu/)**  /  Free Speech at OSU(index.html)

# FREE SPEECH AT OSU



# Free Speech at Oklahoma State

**OSU values and protects the constitutional right of free speech.**

Through this, we seek to provide all members of the OSU community the broadest possible latitude to speak, write, listen, challenge and learn.

**LEARN MORE (/FREE-SPEECH/FREE-SPEECH-AT-OSU.HTML)**

Appellate Case: 23-6054   Document: 010110864064   Date Filed: 05/22/2023   Page: 113



Why it's worth listening to people you disagree with | Zachar...

This Photo of Ellen & George W. Bush Will Give You Faith in ...

# Controversial or Offending Speech

## There's no constitutional right to not be offended.

Controversial speech is expected and valued on college campuses and in our society, which means free speech protection still applies if a speaker is shouting derogatory comments or a social media post is offensive to a particular population.

**LEARN ABOUT CONTROVERSIAL SPEECH (/FREE-SPEECH/CONTROVERSIAL-SPEECH.HTML)**

# Support for OSU Community Members

We understand some free speech can be upsetting and can affect individuals in different ways. At times, it's helpful to process through the emotions experience. Our university has various resources available.

**University Counseling Services** **(https://ucs.okstate.edu/)**

**Vice President of Student Affairs(/)**

**Office of Multicultural Affairs** **(https://oma.okstate.edu/)**



If you know of someone who has been affected by negative speech and you are concerned for their well-being, we encourage you to fill out a **Care** **(https://cm.maxient.com/reportingform.php?ReportOklahomaStateUniv&layout_id=60)**. This Report will notify university staff members who will then reach out to the student and provide resources.

# Oklahoma Senate Bill 361

On April 29, 2019, Governor Kevin Stitt signed Oklahoma Senate Bill 361 into law. This new law, as codified at 70 O.S. § 2120, states:

"The outdoor areas of campuses of public institutions of higher education in this state shall be deemed public forums for the campus community, and public institutions of higher education shall not create "free speech zones" or other designated areas of campus outside of which expressive activities are prohibited."

**READ THE LAW IN ITS ENTIRETY (HTTPS://WWW.OSCN.NET/APPLICATIONS/OSCN/DELIVERDOCUMENT.ASP?CITEID=485927)**

↑ BACK TO TOP

## STUDENT AFFAIRS



**Office of Vice President for Student Affairs (/)**
201 Whitehurst
Oklahoma State University
Stillwater, OK 74078
**(map) (https://map.okstate.edu/?id=1842#!m/522177)**
**(405) 744-5328 (tel:4057445328)** |
**Contact Us (mailto:vpsao@okstate.edu?subject=)**

## Follow US

**News** | **Events** | **Newsletter Signup**
**Social Media Directory (https://social.okstate.edu)**

**(https://www.facebook.com/pages/Oklahoma-State-University/39013362306)**



**(Https://Go.Okstate.Edu/)**     ↖ **OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/)**

**Campus & Parking Maps     All OSU Institutions     Careers @ OSU     Hire OSU Grads**

©(Https://A.Cms.Omniupdate.Com/11/?Skin=Okstate&Account=Okstate&Site=Studentaffairs-V2&Action=De&Path=/Free-Speech/Index.Pcf) 2023 Oklahoma State University. All rights reserved.

Accessibility  |  Campus Safety  |  Diversity  |  EEO Statement  |  Ethics Point  |  Privacy Notice  |  Terms of Service  |  Trademarks

**App.115**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.,              )
                                 )
                Plaintiff,       )
v.                               )          Case No. 19 CIV-23-29-J
                                 )
KAYSE SHRUM, in her individual   )
capacity and official capacity as )
President of Oklahoma State University, )
                                 )
                Defendant.       )

### DECLARATION OF ALEIGHA MARIOTT

1.      My name is Aleigha Mariott.  I have been employed at Oklahoma State University ("OSU") since January 5, 2011.  For the majority of that time, I served as the Director of Student Conduct.  In the summer of 2020, the Office of Student Conduct was renamed the Office of Student Support and Conduct ("OSSC") to acknowledge the role of the office goes beyond the formal conduct process to support and educate students in their development.  Since January 2023, I have served as Assistant Vice President for Campus Life and Student Support and Deputy Title IX Coordinator.  My duties include oversight of the student conduct process, which includes providing guidance to students in need of support through evaluation, referral, and educational options while also ensuring university-wide compliance with applicable policies and procedures.  I am also responsible for the administration and support of student groups on campus.  A core function of the OSSC is to engage in conversations with students to advance their development and learning for future success.  As part of this function, I oversee the Bias Incident Response Team (the "BIRT").  I report directly to Douglas Hallenbeck, Vice President of Student Affairs.

2.      I am submitting this Declaration in conjunction with Defendant Kayse Shrum's

FRCP 12(b)(1) Motion to Dismiss Based on Plaintiff's Lack of Standing and Response to

Plaintiff's Motion for a Preliminary Injunction.

3.      I have personal knowledge of the facts set forth in this Declaration.

4.      I have read Plaintiff's Complaint and understand there are three anonymous

students desiring to express views on the following topics: opposing affirmative action, opposing

abortion, opposing illegal immigration, believing sex is inherent and immutable and opposing

gender transition, believing marriage should only be between a man and woman, opposing

surrogacy for homosexual couples, and believing Black Lives Matter has had a corrosive impact

on race relations.  These anonymous students allege they do not express views on these subjects

because they fear disciplinary action by OSU.

**Freedom of Speech at OSU**

5.      As set forth in more detail in the Declaration of Douglas Hallenbeck, OSU is

committed to students' right to free speech and free expression.

6.      Part of OSU's commitment to free speech includes training employees in the

Division of Student Affairs on the requirements of the First Amendment.  In the fall of 2020,

Division employees participated in an online training program setting forth the types of speech

protected by the First Amendment and reviewing employees' obligations to ensure the First

Amendment is upheld on campus.

7.      I have presented trainings on the First Amendment, including a presentation in 2018

at the Oklahoma Legal Issues Conference on Current Issues with Student Behavior.   The

presentation included the First Amendment as one of nine topics discussed.

8.      OSU has numerous student groups on campus, covering a broad range of viewpoints and interests.    Several student groups on campus represent the viewpoints the anonymous students allege they are fearful of expressing.  Notable examples include Turning Point USA at Ok State, OSU Students for Life, Free Enterprise Society, College Republicans, and many Christian and/or church-affiliated groups.  No student group has been denied funding based upon viewpoint, nor has any member of a student group been disciplined or threatened with discipline for expressing their viewpoints.

**Student Support and Conduct**

9.      OSSC resides within the Division of Student Affairs.  OSSC is responsible for serving students experiencing challenges through a holistic approach of providing support services and administering the Student Code of Conduct (the "Student Code").

10.      The OSSC staff oversee all aspects of Student Support and Conduct, including conducting the student conduct disciplinary process, overseeing updates or changes to the Student Code, training the individuals selected to participate in disciplinary hearings, and providing support to students.  OSSC has primary responsibility for determining if there has been a possible violation of the Student Code and, if so, administering the allegation through the appropriate adjudication process as outlined in the Student Code.

11.      OSSC has no authority to impose discipline or sanctions on a student for any action that is not in violation of the Student Code, nor can OSSC impose discipline or sanctions without following the full process set forth in the Student Code.  Speech alone, regardless of content, does not violate the Student Code.

12.      The definition of "harassment" included in the Student Code was developed by a working group in 2015 and implemented in the Student Code in August of 2015.  Since that time, 13 students have been found responsible for a violation of the harassment provision of the Student

Code.  All 13 incidents involved more than just speech, typically physical violence or threats of physical violence.  No student has been disciplined for speech alone, regardless of content.

13.     No student expressing views the same as or similar to those set forth by the anonymous students in Plaintiff's Complaint has ever or would ever face disciplinary consequence for expressing those views.  Expression of views on these subjects, regardless of the content of those views, does not violate the Student Code.

14.     Any member of the OSU community may make a report to the OSSC about a student's behavior.  If the report is about a student's speech and does not allege any other accompanying behavior that would violate the Student Code, OSSC takes no conduct action.  Many reports are made to OSSC on which no conduct action is taken because the alleged conduct, even if true, does not rise to the level of a violation of the Student Code.

15.     Students across campus routinely engage in speech expressing the exact viewpoints the anonymous students hold without repercussions or disciplinary action.  This speech takes place in public forums, in student organizations, at student-hosted events, in classrooms, and in student publications.

**Bias Incident Response Team**

16.     The BIRT was implemented in the fall of 2020 with the primary charge of supporting individuals who have experienced a bias incident.  Through its support function, OSSC also has primary responsibility for implementation of the BIRT. While housed in the same office, the BIRT operates independently of the office's student conduct functions.

17.     The BIRT website lists the actions the team will take upon receiving a report.  The page explicitly provides the team is "not an investigative or disciplinary body."

(https://studentaffairs.okstate.edu/students/bias-incident-response.html, attached hereto as Exhibit A).

18.     Since its inception in the fall of 2020, 29 reports have been made to the BIRT. The majority of the reports involved perceived offensive speech. No conduct action was initiated for any of the 29 reports.

19.     When a BIRT report is received, I or a member of my staff reach out to the reporting party to request further information and discuss available support options. It is made clear to the student the discussion is voluntary. This conversation includes a discussion about the First Amendment and the limitations on OSU's ability to take disciplinary action for speech.

20.     If the reporting student requests, I or a member of my staff attempt to reach out to the person alleged to have engaged in the perceived biased behavior. The conversation begins by asking the student how they are doing; checking on and supporting the student reported to have engaged in the biased conduct is a priority, just as much as providing support to the reporting student. Again, it is made clear the discussion is entirely voluntary and the student is not required to participate. The student often describes the communication at issue and their intent. The purpose of the discussion is to support the student as well as to educate the student about how their actions impacted the reporting student, not to discipline the student or force the student to change their behavior.

21.     No incidents reported to the BIRT since its inception have resulted in the initiation of disciplinary proceedings or sanctions.

22.     Participation in the BIRT process is entirely voluntary for both the reporting party and the party alleged to have engaged in the behavior. No student has ever been or would ever be disciplined for declining to participate in the process. Of the 29 reports received, several have

involved a non-responsive student.  If a student does not respond, no further attempts are made to reach the student and no further action, disciplinary or otherwise, is taken.

23.     Records of reports made to the BIRT are maintained in OSSC for the purpose of assessing trends and climate on campus; however, the reports are maintained separately from disciplinary records, are not a part of any student's official record and are not provided to anyone outside of OSSC unless specifically requested by the student.

24.     The Clery Act, a federal law governing reporting of crimes on campus, requires the reporting of hate crimes.  The BIRT reporting function provides a mechanism for gathering necessary data to complete this report.

**Appropriate Use Policy**

25.     Until the filing of this lawsuit, I was unaware the Appropriate Use Policy could be construed to potentially restrict students' use of their OSU email to send political campaign material.

26.     I am not aware of any instance of a student being disciplined or even reported to OSSC for sending political campaign materials via their student email account.

27.     It is my understanding the Appropriate Use Policy is being changed to eliminate the potential restriction on students' use of their OSU email to send political campaign material.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6th, 2023.

Aleigha Mariott

**App.122**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.,             )
                                  )
          Plaintiff,        )
v.                              )     Case No. 19 CIV-23-29-J
                                  )
KAYSE SHRUM, in her individual    )
capacity and official capacity as      )
President of Oklahoma State University,   )
                                  )
         Defendant.      )

## DECLARATION OF ADAM BARNES

1.     My name is Adam Barnes.  I have worked at Oklahoma State University ("OSU")

since May of 2008 and have served as the Assistant Director of Events and Conference Services,

Student Union Meeting and Conference Services since January 2, 2013.  My job duties include

oversight of reservation of spaces in and around campus facilities and outdoor spaces on campus

for which the Student Union has oversight, which includes the majority of spaces on campus for

use by student groups, speakers invited by student groups and campus officials, and traveling,

spontaneous speakers.

2.     I am submitting this Declaration in conjunction with Defendant Kayse Shrum's

FRCP 12(b)(1) Motion to Dismiss Based on Plaintiff's Lack of Standing and Response to

Plaintiff's Motion for a Preliminary Injunction.

3.     I have personal knowledge of the facts set forth in this Declaration.

4.     I have read Plaintiff's Complaint and understand there are three anonymous

students desiring to express views on the following topics: opposing affirmative action, opposing

abortion, opposing illegal immigration, believing sex is inherent and immutable and opposing

gender transition, believing marriage should only be between a man and woman, opposing

**App.123**

surrogacy for homosexual couples, and believing Black Lives Matter has had a corrosive impact on race relations. These anonymous students allege they do not express views on these subjects because they fear disciplinary action by OSU.

**Freedom of Speech at OSU**

5.  Groups expressing the same views the anonymous students allege they are fearful of expressing have reserved space for tabling, displays, exhibits, and meetings countless times. For example, since 2014, groups expressing pro-life and anti-abortion views have reserved space more than 100 times. Turning Point USA, College Republicans, Brothers Under Christ, Baptist College Ministry, Lutheran Student Fellowship, Campus Crusade, Catholic Student Association, Navigators, Reformed University Fellowship, Christians on Campus, InterVarsity Christian Fellowship and many church-affiliated groups have also reserved space hundreds of times without incident. These groups routinely express their viewpoints to students and others in the campus community in a very public forum without repercussion of any kind.

6.  No student group has ever been denied a reservation based upon viewpoint.

7.  No student in any group expressing views similar to those held by the anonymous students has been or would be referred for discipline. In fact, no student in any group has been referred for discipline for expressing *any* viewpoint.

8.  OSU routinely has conservative, and often controversial, preachers and speakers arrive on campus to speak in the outdoor public spaces on campus. For example, Sister Cindy, Matt Bourgalt, and Danny Washington (all well-known religious conservative speakers) have spoken on library lawn on multiple occasions. These speakers often criticize LGBTQ students, other religions, abortions, liberal political thought and progressive social ideas. When these speakers arrive, my office emails a group of campus administrators requesting they monitor the situation to ensure the safety of the speaker and the crowds they typically attract.

9.     Impromptu conservative groups often come to campus unannounced.  For a very recent example, on January 26, 2023, a group held an anti-abortion protest in front of the OSU library.  (Photo of protest, attached hereto as Exhibit A).

10.    No speaker has been denied access to a public forum or asked to leave campus based upon the content of their speech.

11.    Likewise, students are not disciplined or referred for discipline for expressing views similar to or counter to those of any speaker on campus.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6ᵀᴴ, 2023.

_____
Adam Barnes

**App.125**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

*Plaintiff*,

v.

KAYSE SHRUM, in her official capacity as
President of Oklahoma State University,

*Defendant.*

Case No. 5:23-cv-29-J

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

Introduction ....................................................................................................................... 1

Legal Standard ................................................................................................................... 2

Argument ............................................................................................................................ 4

    I.    Speech First satisfies *Hunt*'s third requirement for associational standing
        because it brings facial challenges and seeks only prospective relief. ........................ 5

    II.   Speech First satisfies *Hunt*'s first requirement for associational standing
        because the challenged policies objectively chill its members' speech. ..................... 6

    III.  Speech First does not need to divulge its members' real names, especially at
        the pleading stage. ...................................................................................................... 16

Conclusion ........................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ............................................................. 16

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
   469 F.3d 129 (D.C. Cir. 2006) ........................................................... 4

*ACLU v. Fla. Bar,*
   999 F.2d 1486 (11th Cir. 1993) ......................................................... 10

*AFPF v. Bonta,*
   141 S. Ct. 2373 (2021) ......................................................... 13, 23, 24

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.,*
   833 F. App'x 235 (11th Cir. 2020) .................................................... 16

*Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Calif. DOT,*
   713 F.3d 1187 (9th Cir. 2013) ...................................................... 17, 21

*Backpage.com, LLC v. Dart,*
   807 F.3d 229 (7th Cir. 2015) ............................................................ 12

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ............................................................................ 13

*Barnett v. Okeechobee Hosp.,*
   283 F.3d 1232 (11th Cir. 2002) ......................................................... 3

*Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.,*
   448 F.3d 138 (2d Cir. 2006) ........................................................ 17, 22

*Brereton v. Bountiful City Corp.,*
   434 F.3d 1213 (10th Cir. 2006) ......................................................... 5

*Brown v. Davenport,*
   142 S. Ct. 1510 (2022) ...................................................................... 20

*Carter v. HealthPort Techs., LLC,*
   822 F.3d 47 (2d Cir. 2016) ................................................................. 3

*Cedars-Sinai Med. Ctr. v. Watkins,*
   11 F.3d 1573 (Fed. Cir. 1993) ........................................................... 3

*Chichakli v. Samuels,*
   2016 WL 11447755 (W.D. Okla. Mar. 10) ........................................ 2

*Citizens for Responsible Gov't State PAC v. Davidson,*
   236 F.3d 1174 (10th Cir. 2000) ....................................................... 10

*Coll. Republicans at SFSU v. Reed,*
   523 F. Supp. 2d 1005 (N.D. Cal. 2007) ............................................ 9

*Const. Party of Penn. v. Aichele,*
 757 F.3d 347 (3d Cir. 2014) ................................................................. 2

*Constantine v. George Mason Univ.,*
 411 F.3d 474 (4th Cir. 2005) .............................................................. 12

*Cowboys for Life v. Sampson,*
 983 F. Supp. 2d 1362 (W.D. Okla. 2013) ........................................... 10

*Dambrot v. Cent. Mich. Univ.,*
 55 F.3d 1177 (6th Cir. 1995) .............................................................. 10

*Davis v. Monroe Cnty. Bd. of Educ.,*
 526 U.S. 629 (1999) ......................................................................... 7, 8

*DHS v. Regents of Univ. of Calif.,*
 140 S. Ct. 1891 (2020) ....................................................................... 21

*Do No Harm v. Pfizer Inc.,*
 2022 WL 17740157 (S.D.N.Y. Dec. 16) ............................................. 22

*Doe #1 v. Syracuse Univ.,*
 2018 WL 7079489 (N.D.N.Y. Sept. 10) .............................................. 24

*Doe v. Alger,*
 317 F.R.D. 37 (W.D. Va. 2016) .......................................................... 25

*Doe v. Duerfahrd,*
 2022 WL 17253080 (N.D. Ind. Nov. 28) ............................................ 25

*Doe v. MIT,*
 46 F.4th 61 (1st Cir. 2022) ................................................................. 25

*Doe v. NYU,*
 537 F. Supp. 3d 483 (S.D.N.Y. 2021) ................................................ 24

*Doe v. Univ. of Chi.,*
 2017 WL 4163960 (N.D. Ill. Sept. 20) ............................................... 25

*Draper v. Healey,*
 827 F.3d 1 (1st Cir. 2016) .............................................................17, 21

*Erickson v. Pardus,*
 551 U.S. 89 (2007) ............................................................................. 17

*FAIR v. Rumsfeld,*
 291 F. Supp. 2d 269 (D.N.J. 2003) .................................................21, 23

*Femedeer v. Haun,*
 227 F.3d 1244 (10th Cir. 2000) .......................................................... 25

*Ga. Republican Party v. SEC,*
 888 F.3d 1198 (11th Cir. 2018) .......................................................17, 21

*Hamman v. UCF Bd. of Trustees,*
   2021 WL 2828313 (M.D. Fla. Mar. 2)...................................................................... 2

*Hancock Cnty. Bd. of Sup'rs v. Ruhr,*
   487 F. App'x 189 (5th Cir. 2012) ........................................................................... 17

*Harrell v. Fla. Bar,*
   608 F.3d 1241 (11th Cir. 2010) ............................................................................. 11

*Harris v. McRae,*
   448 U.S. 297 (1980) ................................................................................................. 5

*Hobby Lobby Stores, Inc. v. Sebelius,*
   723 F.3d 1114 (10th Cir. 2013) (en banc) .............................................................. 4

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ............................................................................................ 4, 5

*Initiative & Referendum Inst. v. Walker,*
   450 F.3d 1082 (10th Cir. 2006) (en banc) .................................................. 9, 11, 13

*Integrated Prac. Sols., Inc. v. Wilson,*
   2013 WL 2396446 (S.D. Cal. May 31) ................................................................... 1

*Laird v. Tatum,*
   408 U.S. 1 (1972) ................................................................................................... 13

*Lincoln Ben. Life Co. v. AEI Life, LLC,*
   800 F.3d 99 (3d Cir. 2015) ...................................................................................... 2

*Little v. Tex. Atty. Gen.,*
   2015 WL 5613321 (N.D. Tex. Sept. 24) ................................................................. 3

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................................ 2, 17

*LULAC v. Abbott,*
   2022 WL 2806850 (W.D. Tex. July 18) ...........................................................24, 25

*Majors v. Abell,*
   317 F.3d 719 (7th Cir. 2003) ................................................................................... 7

*Mangual v. Rotger-Sabat,*
   317 F.3d 45 (1st Cir. 2003) ................................................................................... 11

*McCloud v. McClinton Energy Grp., LLC,*
   2015 WL 737024 (W.D. Tex. Feb. 20) .................................................................. 19

*McGehee v. Neb. Dep't of Corr. Servs.,*
   2019 WL 1227928 (D. Neb. Mar. 15) ................................................................... 18

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.,*
   565 F.3d 683 (10th Cir. 2009) ................................................................................. 4

*NAACP v. Ala. ex rel. Patterson*,
 357 U.S. 449 (1959) ............................................................................ 23

*NAACP v. Trump*,
 298 F. Supp. 3d 209 (D.D.C. 2018) ................................................. 21

*Nail v. Martinez*,
 391 F.3d 678 (5th Cir. 2004) .............................................................. 23

*Nat'l Council of La Raza v. Cegavske*,
 800 F.3d 1032 (9th Cir. 2015) ..................................................... 16, 18

*Nat'l Mar. Union of Am. v. Commander*,
 824 F.2d 1228 (D.C. Cir. 1987) .......................................................... 5

*Nat'l People's Action v. City of Blue Island*,
 594 F. Supp. 72 (N.D. Ill. 1984) ........................................................ 9

*NCAA v. Califano*,
 622 F.2d 1382 (10th Cir. 1980) ........................................................... 6

*NCBA v. Gibbs*,
 886 F.2d 1240 (10th Cir. 1989) .................................................... 22, 23

*NetChoice, LLC v. Paxton*,
 573 F. Supp. 3d 1092 (W.D. Tex. 2021) ............................................. 6

*New York v. U.S. Dep't of Com.* ("*Census Case*"),
 351 F. Supp. 3d 502 (S.D.N.Y. 2019) .......................................... 18, 23

*NRDC v. Mineta*,
 2005 WL 1075355 (S.D.N.Y. May 3) ................................................ 6

*One Standard of Just., Inc. v. City of Bristol*,
 2022 WL 17688053 (D. Conn. Dec. 9) ............................................. 25

*Osage Producers Ass'n v. Jewell*,
 191 F. Supp. 3d 1243 (N.D. Okla. 2016) .......................................... 21

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
 551 U.S. 701 (2007) ........................................................................... 21

*Peck v. McCann*,
 43 F.4th 1116 (10th Cir. 2022) ..................................................... 6, 10

*Pennell v. City of San Jose*,
 485 U.S. 1 (1988) ................................................................................ 5

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*,
 50 F. Supp. 2d 443 (D. Md. 1999) ...................................................... 6

*Producers of Renewables United for Integrity Truth & Transparency v. EPA*,
 2022 WL 538185 (10th Cir. Feb. 23) ..................................... 17, 21, 25

*Progeny v. City of Wichita,*
  2022 WL 93406 (D. Kan. Jan. 10) ............................................... 5

*Publius v. Boyer-Vine,*
  321 F.R.D. 358 (E.D. Cal. 2017) ................................................ 24

*Pueblo of Jemez v. United States,*
  790 F.3d 1143 (10th Cir. 2015) ................................................... 2

*Religious Sisters of Mercy v. Becerra,*
  55 F.4th 583 (8th Cir. 2022) ................................................ 17, 21

*Retired Chicago Police Ass'n v. City of Chicago,*
  7 F.3d 584 (7th Cir. 1993) .......................................................... 6

*Rio Grande Found. v. Oliver,*
  57 F.4th 1147 (10th Cir. 2023) .......................................... passim

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) .................................................................... 21

*S. Foods Grp. L.P. v. Ben & Jerry's Homemade Inc.,*
  1998 WL 718302 (D. Utah Aug. 24) .......................................... 4

*S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe,*
  599 F.2d 707 (5th Cir. 1979) .................................................... 24

*S. Walk at Broadlands HOA, Inc. v. OpenBand at Broadlands, LLC,*
  713 F.3d 175 (4th Cir. 2013) ................................................ 17, 21

*S.C. State Conf. of NAACP v. Alexander,*
  2022 WL 453533 (D.S.C. Feb. 14) ...................................... passim

*SBA List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................... 6

*Sec. Indus. & Fin. Markets Ass'n v. CFTC,*
  67 F. Supp. 3d 373 (D.D.C. 2014) ............................................. 4

*Seegars v. Gonzales,*
  396 F.3d 1248 (D.C. Cir. 2005) ............................................... 11

*Snider v. Melindez,*
  199 F.3d 108 (2d Cir. 1999) ..................................................... 22

*Speech First, Inc. v. Cartwright,*
  2021 WL 3399829 (M.D. Fla. July 29) .................................. 1, 9

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ........................................... passim

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ............................................. passim

*Speech First, Inc. v. Khator*,
603 F. Supp. 3d 480 (S.D. Tex. 2022) ........................................................ 8

*Speech First, Inc. v. Killeen*,
968 F.3d 628 (7th Cir. 2020) ............................................................... 15, 18

*Speech First, Inc. v. Sands*,
2021 WL 4315459 (W.D. Va. Sept. 22) ................................................ 11, 12

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ......................................................... passim

*Springer v. IRS*,
1997 WL 732526 (E.D. Cal. Sept. 12) ....................................................... 18

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................. 16, 20, 21

*Sw. Ctr. for Bio. Diversity v. Clark*,
90 F. Supp. 2d 1300 (D.N.M. 1999) ........................................................... 6

*Tenn. Republican Party v. SEC*,
863 F.3d 507 (6th Cir. 2017) ............................................................. 17, 21

*Tyler v. Bank of N.Y. Mellon*,
2020 WL 2735367 (N.D. Ill. May 26) ......................................................... 3

*U.S. ex rel. Little v. Triumph Gear Sys., Inc.*,
870 F.3d 1242 (10th Cir. 2017) ............................................................... 22

*United Keetoowah Band of Cherokee Indians in Okla. v. Barteaux*,
527 F. Supp. 3d 1309 (N.D. Okla. 2020) ..................................................... 3

*United States v. Stevens*,
559 U.S. 460 (2010) ......................................................................... 10

*Univ. of Tex. at Austin v. Vratil*,
96 F.3d 1337 (10th Cir. 1996) ............................................................... 23

*W.N.J. v. Yocom*,
257 F.3d 1171 (10th Cir. 2001) ............................................................. 22

*Whitaker v. Peet's Coffee, Inc.*,
2022 WL 1189888 (N.D. Cal. Apr. 21) ....................................................... 18

*YAF v. Gates*,
560 F. Supp. 2d 39 (D.D.C. 2008) ........................................................... 20

## Other Authorities

Fed. R. Civ. P. 10(a) ......................................................................... 22

85 Fed. Reg. 30,026 (May 19, 2020) ........................................................... 8

Okla. Stat. tit. 70, §2120(A)(2) .............................................................. 8

## INTRODUCTION

Many courts have considered Speech First's standing to challenge many universities' speech codes and bias-response teams. The University notes that most of these cases were decided on a preliminary-injunction motion, and it boasts that "this case marks the first time" that a university has challenged Speech First's standing in a separate "12(b)(1) motion." Mot. (Doc. 29) at 1. Not all innovations are good. Other universities didn't move to dismiss because they knew they could challenge standing in their preliminary-injunction opposition and that filing a separate motion risked "substantial prejudice" to Speech First by "delaying resolution of the motion for a preliminary injunction." *Integrated Prac. Sols., Inc. v. Wilson*, 2013 WL 2396446, at *3 (S.D. Cal. May 31). And other universities understood that Speech First's burden to prove standing is, if anything, *easier* under the motion-to-dismiss standard than the preliminary-injunction standard. Though the University thinks it bypassed that problem by raising a "factual" attack to Speech First's standing, it did not.

Under any standard, the University's challenges to Speech First's standing fail. True, the "circuit courts of appeals are split" on whether Speech First can challenge bias-response teams. *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at *4 (M.D. Fla. July 29), *rev'd in part, vacated in part*, 32 F.4th 1110 (11th Cir. 2022). This Court should side with the Fifth, Sixth, and Eleventh Circuits over the Seventh. But on every other issue, the University is on an island. *No* court has faulted Speech First for not using its members' real names. *No* court has denied standing because the university says its policies don't cover protected speech. And *no* court has questioned whether Speech First can sue as an association. Courts have consistently rejected these arguments, and this Court should too. The motion to dismiss should be denied.

1
**App.134**

## LEGAL STANDARD

Motions to dismiss for lack of standing can be facial or factual. A facial attack questions "the sufficiency" of the complaint—whether the complaint plausibly alleges standing. *Chichakli v. Samuels*, 2016 WL 11447755, at *2 (W.D. Okla. Mar. 10). Courts address facial attacks by applying the liberal notice-pleading standard: confining themselves to the complaint, assuming its factual allegations are true, reading general allegations to include the necessary specifics, and construing everything in the plaintiff's favor. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147-48 & n.4 (10th Cir. 2015); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A factual attack, by contrast, questions "the veracity" of a fact needed to prove standing. *Chichakli*, 2016 WL 11447755, at *2. Courts address factual attacks by considering outside evidence and deciding, "after discovery," who is right "by a preponderance of the evidence." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).

This Court should treat the University's motion as a facial attack. Its motion challenges Speech First's standing on three grounds: that its members must participate in the litigation, Mot. 23-25; that the challenged policies do not objectively chill speech, Mot. 11-23; and that the complaint doesn't disclose members' real names, Mot. 5-11. The first and third arguments are questions of law that turn on the face of the complaint, and the University presents no outside evidence on either one. *See Const. Party of Penn. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (arguments not supported by external evidence cannot be factual attacks because "[a] factual attack requires a factual dispute"); *Hamman v. UCF Bd. of Trustees*, 2021 WL 2828313, at *4 & n.6 (M.D. Fla. Mar. 2) (same). Though the University reattaches its declarations from the preliminary-injunction briefing, those declarations only arguably address the University's second argument: whether the challenged policies objectively chill speech. The University uses

them to argue that it has never punished someone for expressing a viewpoint, *see* Mot. 15-17, and to explain what the bias-response team does, *see* Mot. 19-20.

The University's declarations do not convert its motion into a factual attack. This Court can ignore them because the points they make are legally "immaterial" and do not "contradict" any factual allegation in the complaint. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016); *accord Tyler v. Bank of N.Y. Mellon*, 2020 WL 2735367, at *4 (N.D. Ill. May 26); *United Keetoowah Band of Cherokee Indians in Okla. v. Barteaux*, 527 F. Supp. 3d 1309, 1317 (N.D. Okla. 2020). The complaint doesn't rely on a history of past enforcement or dispute what the bias-response team says it does—precisely because, even if everything the University says is true, Speech First still has standing. *See infra* II. At most, the University's declarations raise a factual attack *only on those two points*. For every other fact underlying standing, the University presents no external evidence, so this Court should apply the standard for a facial attack and treat the complaint's facts as true. *See Little v. Tex. Atty. Gen.*, 2015 WL 5613321, at *2 n.5 (N.D. Tex. Sept. 24) (analyzing all arguments as a facial attack, except the one "part" where the defendant cited external evidence), *aff'd*, 655 F. App'x 1027 (5th Cir. 2016).

Even if the University raised a factual attack more broadly, that attack would fail. Speech First wouldn't need any external evidence because, even on a factual attack, courts credit all "uncontroverted factual allegations" in the complaint. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993); *accord S.C. State Conf. of NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14) (Heytens, Gergel, Childs, JJ.) ("Absent contrary evidence, a plausible allegation suffices."); *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002) (similar). As explained, the University's evidence does not controvert any allegation

in the complaint, let alone enough allegations to defeat standing. Even if Speech First needed

evidence beyond the complaint, its complaint *is* evidence because it's verified. *See* Am. Compl.

33. The verified complaint is "'the equivalent of [an] affidavi[t]'" from Speech First's executive

director. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc). And

out an abundance of caution, Speech First is also submitting evidence and reattaching its dec-

larations from the preliminary-injunction stage, including the declarations from Students A, B,

and C. Declarations from members are "typically used to establish standing." *Abigail All. for*

*Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 134 (D.C. Cir. 2006); *e.g.*, *N.M.*

*ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 697 n.13 (10th Cir. 2009). And the facts

within them remain unchallenged by the University, even though it's known about them since

the day this case was filed. *See* Docs. 3-4–3-6. They should be accepted as true at this stage.

*See Sec. Indus. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 402 n.13 (D.D.C. 2014).[1]

## ARGUMENT

The University moves to dismiss for lack of "constitutional standing." Mot. 1. Speech

First asserts associational standing, which turns on three requirements: (1) "'one'" of "its

members would otherwise have standing to sue in their own right," (2) "the interests it seeks

to protect are germane to the organization's purpose," and (3) "neither the claims asserted nor

the relief requested requires the participation of individual members in the lawsuit." *Hunt v.*

*Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977). The University challenges the

first and third requirement, but not the second. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330

---

[1] These declarations also suffice at the preliminary-injunction stage, where the "proce-
dures" are "less formal" and "[a]ffidavits and other hearsay materials often are received." *S.*
*Foods Grp. L.P. v. Ben & Jerry's Homemade Inc.*, 1998 WL 718302, at *2 (D. Utah Aug. 24).

n.5 (5th Cir. 2020) (Speech First satisfies the second). The University also argues that Speech First must disclose its members' real names, though that argument has nothing to do with standing. None of these arguments provide a basis to dismiss. And they certainly don't provide a basis to dismiss "with prejudice." Mot. 18, 25; *see Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("[W]here the district court dismisses an action for lack of jurisdiction, … the dismissal must be without prejudice.").

## I.   Speech First satisfies *Hunt*'s third requirement for associational standing because it brings facial challenges and seeks only prospective relief.

Speech First satisfies *Hunt*'s third requirement because neither its "relief" nor its "claims" will "require the participation of individual members." *Fenves*, 979 F.3d at 330 n.5. The relief doesn't because it is "'prospective.'" *Hunt*, 432 U.S. at 343-44. And the claims don't because they are "facial." *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988); *see Progeny v. City of Wichita*, 2022 WL 93406, at *9 (D. Kan. Jan. 10) ("First Amendment overbreadth and facial vagueness" claims do not require members' participation). Tellingly, no other university has argued that Speech First fails *Hunt*'s third requirement, and several courts have noted that Speech First obviously satisfies it. *Fenves*, 979 F.3d at 330 n.5; *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022).

The University's novel attempts to contest this requirement fail. It cites *Harris v. McRae*, but the association there lacked standing because it tried to bring a free-exercise claim on an as-applied basis. *Nat'l Mar. Union of Am. v. Commander*, 824 F.2d 1228, 1232 n.7 (D.C. Cir. 1987) (discussing 448 U.S. 297, 321 (1980)). While as-applied claims often require members' participation, Speech First's facial overbreadth and vagueness challenges don't because they turn on the text of the challenged policies, not on how the policies apply to any member. *NetChoice,*

*LLC v. Paxton*, 573 F. Supp. 3d 1092, 1104 (W.D. Tex. 2021), *vacated in other part*, 49 F.4th 439 (5th Cir. 2022). Unsatisfied, the University says Speech First cannot prove standing unless its members give live testimony. Mot. 24. That's doubtful. *See, e.g., Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 50 F. Supp. 2d 443, 446 (D. Md. 1999); *Sw. Ctr. for Bio. Diversity v. Clark*, 90 F. Supp. 2d 1300, 1309 (D.N.M. 1999); *NRDC v. Mineta*, 2005 WL 1075355, at \*5 (S.D.N.Y. May 3). But regardless, participation on standing does not violate *Hunt. See NCAA v. Califano*, 622 F.2d 1382, 1392 (10th Cir. 1980). Otherwise virtually every association that tried to prove associational standing would, paradoxically, violate the third requirement for associational standing. *Cf. Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 602 (7th Cir. 1993).

## II. Speech First satisfies *Hunt*'s first requirement for associational standing because the challenged policies objectively chill its members' speech.

Speech First also satisfies *Hunt*'s first requirement because at least one member would have standing. The bar for proving standing in First Amendment cases is "'extremely low.'" *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022). Here it turns on "one" "fundamental inquiry": whether the challenged policies "'objectively'" chill speech. *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). The University does not dispute that its computer policy objectively chills speech, but it denies that its harassment and bias-incidents policies do. It insists that these policies "do not" cover protected speech, that they've never been used to discipline a "viewpoint," and that the BIRT does not "proscribe anything." Mot. 11-23. This Court should reject all three arguments, just like the Fifth, Sixth, and Eleventh Circuits did.

**1.** The University argues that its policies "d[o] not" cover protected speech, Mot. 13, 18, but the question for purposes of standing is whether they "arguably" do, *SBA List v. Driehaus*, 573 U.S. 149, 163 (2014); *Fenves*, 979 F.3d at 332 & n.10. If a policy "arguably covers"

the plaintiff's speech, "there is standing" because most people won't risk a violation "when the gains are slight, as they would be for people seeking only to make a political point." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003).

The challenged policies arguably cover "speech of the sort that Speech First's members intend to make." *Fenves*, 979 F.3d at 334. The University admits that both policies reach "speech." Mot. 14, 20. It must, because the policies are sweeping. The bias-incidents policy reaches any "actions committed against" someone that is "motivated ... by" any "bias," Ex. 9 at 1, such as a "Comment in Class" or "Incorrect name or pronoun usage," Ex. 10 at 4-5. And the harassment policy reaches "verbal abuse," "intimidation," and any "other conduct" that causes someone to "reasonabl[y] apprehen[d]" a threat of harm to their "mental ... health/safety." Ex. 1 at 7. Adding to the chilling effect, the harassment policy is impenetrably vague. One form of prohibited "harassment," according to this policy, is "harassment." *Id.* And it's unclear what the policy's two "that" clauses modify. *See id.* If they modify everything, the policy contains nonsense phrases like "threats ... that threatens." *Id.* If they don't modify anything, then the policy broadly covers any form of "harassment" or "verbal abuse." *Id.*

In all events, both policies chill speech because they deviate from the Supreme Court's definition of harassment in *Davis*. Instead of requiring harassment to be "severe, pervasive, *and* objectively offensive," *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (emphasis added), the University punishes harassment that is "sever[e] *or* pervasive, Ex. 1 at 7 (emphasis added). It thus covers even a "single" incident, *Davis*, 526 U.S. at 652, as the University admits, *see* Doc. 25-5 at Ex. 3-D ("A single statement by an individual [can] rise to the level of a policy violation."). And instead of requiring harassment to "effectively den[y]" someone's education,

*Davis*, 526 U.S. at 651, the University requires only that the harassment potentially harm some-one's mental health, *see* Ex. 1 at 7. The U.S. Department of Education has found that harass-ment policies that deviate from *Davis*, like this one, have been used to punish protected speech. 85 Fed. Reg. 30,026, 30,155 n.680 (May 19, 2020). Speech First has also challenged virtually identical policies in other cases, *see* Exs. 22-24, and courts have upheld its standing, *see Cart-wright*, 32 F.4th at 1119-24 ("harassment"); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 (S.D. Tex. 2022) (same); *Fenves*, 979 F.3d at 330-38 ("harassment" and "intimidation"); *Schlissel*, 939 F.3d at 763-67 ("bullying" and "intimidation").[2]

The University's responses are unpersuasive and, in any event, do not address whether the policies "arguably" cover Speech First's members. *Fenves*, 979 F.3d at 332 & n.10. Relying on *Sands*, the University claims that Speech First's members don't say their speech would "**targe[t] an individual**." Mot. 15, 18. This argument has several problems. For one, neither policy requires speech to target an individual. That language does not appear in the harassment policy. And the bias-incidents policy covers actions that are both "committed against *or* di-rected toward" someone based on "bias against *a* person *or group*." Ex. 9 at 1 (emphases added). In other words, saying something to someone that is biased about anyone counts. *See* Mariott Decl. (Doc. 29-3) ¶20. The University also ignores that students can be disciplined not just for their own harassment, but also for "[a]ttempting" harassment or displaying "[a]pathy or ac-quiescence in the presence of" harassment. Ex. 1 at 6. For two, even if targeting were required,

---

[2] Both the state legislature and the board of regents define harassment consistent with *Davis*. *See* Okla. Stat. tit. 70, §2120(A)(2); Ex. 12. A reasonable student looking at these policies would conclude that the University's decision to deviate from the *Davis* standard was inten-tional and designed to reach speech. *See Khator*, 603 F. Supp. 3d at 482.

Speech First's members do want to engage in targeted speech. *E.g.*, Student A Decl. ¶¶9-12. And their declarations must be construed "'in the light most favorable'" to Speech First. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc). For three, circuit precedent rejects the notion that Students A-C must provide "the specific content … of their desired speech." *Rio Grande*, 57 F.4th at 1164.

The University says its policies cannot reach protected speech because it has a website expressing its "commitment" to the First Amendment, Mot. 14-15; but free-speech disclaimers, which every university has, "will not defeat standing." *Cartwright*, 2021 WL 3399829, at *4. The University's website is not part of the challenged policies, does not purport to narrow their scope, and merely states that the University "seek[s]" to provide free speech as much as "possible." Hallenbeck Decl. (Doc. 29-2) Ex. 2-C. A reasonable student would assume that the specific policies trump the generic website—not the other way around. *Fenves*, 979 F.3d at 334-35, 337-38. The University's website says just that. *See* Ex. 21 (clarifying, on a page about the First Amendment, that "the university will initiate the appropriate conduct process" if "a violation of policy, such as harassment or discrimination[,] has occurred").

Even if the website somehow narrowed the policies, it would not remove their chilling effect. "[C]ollege students" are "not scholars of First Amendment law" who can figure out in advance what the University's amorphous website carves out from the policies. *Coll. Republicans at SFSU v. Reed*, 523 F. Supp. 2d 1005, 1021 (N.D. Cal. 2007); *Nat'l People's Action v. City of Blue Island*, 594 F. Supp. 72, 79 (N.D. Ill. 1984). Nor would they be reassured by the fact that, *after* they've been accused of harassment or a bias incident and roped into those protocols, some administrator might *later* conclude that their speech is protected. *ACLU v. Fla. Bar*, 999 F.2d

1486, 1495 (11th Cir. 1993); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995).

Those administrators aren't First Amendment scholars either, yet the decision whether a student's speech is protected will be made in their "sole discretion." Ex. 1 at 3. Those administrators are the sole deciders even though they currently have policies that free-speech groups have flagged as unconstitutional, *see* Exs. 14-20; and they have adopted other unconstitutional policies in the past, *see, e.g.*, *Cowboys for Life v. Sampson*, 983 F. Supp. 2d 1362, 1365-66 (W.D. Okla. 2013) (denying motion to dismiss); Notice of Settlement, Doc. 95, No. 13-cv-86 (Nov. 22, 2013) (agreeing to amend challenged policies).

**2.** Nor can the University defeat standing by submitting declarations from university administrators that promise no student "has ever or would ever face disciplinary consequence" for protected speech. Hallenbeck Decl. ¶17; Mariott Decl. ¶13. The "would ever" part is irrelevant because "representations in this litigation are not binding on this or future administrations." *Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1193 (10th Cir. 2000). "Such representations" are thus "insufficient to overcome the chilling effect of the [policy's] plain language." *Id.* at 1192; *accord Fenves*, 979 F.3d at 337. Courts "would not uphold an unconstitutional statute," much less deny standing to challenge it, "merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

The "has ever" part is also irrelevant because it assumes, wrongly, that "a lack of past enforcement" can defeat standing. *Fenves*, 979 F.3d at 336. That's not the law, especially for facial challenges based on chilled speech. *Id.* at 334-37; *Schlissel*, 939 F.3d at 766-67. Because the bar for proving standing in First Amendment cases is "'extremely low,'" courts "'often'" find it even where the challenged policies "'have *never* been enforced.'" *Peck*, 43 F.4th at 1133

(emphasis added; quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003)). Stressing a lack of enforcement "misses the point" when the injury is chilled speech. *Schlissel*, 939 F.3d at 766; *accord Rio Grande*, 57 F.4th at 1163. The University "may have taken no formal enforcement action" precisely "because speech is chilled" and so there's been nothing to enforce it against. *Walker*, 450 F.3d at 1088. Courts "cannot ignore such harms just because there has been no need for the iron fist to slip its velvet glove." *Id.*

Nonenforcement matters only when it's so consistent and longstanding that the challenged policies are "dust-covered and moribund"—something the University doesn't argue here. *Speech First, Inc. v. Sands*, 2021 WL 4315459, at *20 (W.D. Va. Sept. 22), *appeal pending*; *accord Mangual*, 317 F.3d at 57 ("long institutional history of disuse, bordering on desuetude"). Far from moribund, the University is vigorously "defend[ing]" the policies as written. *Fenves*, 979 F.3d at 337. The challenged policies are "recently enacted" or "revised." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010); *see* Ex. 1 at 6-10 (2022 for harassment policy); Mariott Decl. ¶20 (late 2020 for BIRT). And they are "generally enforced." *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005); *see* Mariott Decl. ¶12 (13 students disciplined under harassment policy); ¶18 (29 reports to BIRT); *cf. Schlissel*, 939 F.3d at 766 (16 students disciplined under challenged policies). While one declarant claims that the harassment policy has not been used to discipline a student for "speech alone," Mariott Decl. ¶12, that assertion is "based only on [her] personal experience" and untested because "the University's student disciplinary records [a]re unavailable to Speech First at this stage," *Fenves*, 979 F.3d at 337 n.14. And the same declarant admits that, for the BIRT, "the majority" of reports do involve "offensive speech."

11

**App.144**

Mariott Decl. ¶12. That admission is important because students can easily be reported to the BIRT for a violation of any of the challenged policies. Ex. 10; *see Fenves*, 979 F.3d at 335, 338.

Also irrelevant is the University's assertion that Speech First's members cannot be chilled because "groups," "preachers," and "speakers" express controversial views on campus. Barnes Decl. (Doc. 29-4) ¶¶6, 8. Universities always make this argument, *e.g.*, U-Texas *Fenves* Br., 2019 WL 5296547, at *7; U-Mich. *Schlissel* Br., 2018 WL 6738711, at *9-10, and yet it does not defeat standing, *see Sands*, 2021 WL 4315459, at *20. The fact that adults who don't attend the University feel comfortable doing events, or that students feel comfortable speaking within likeminded groups, does not suggest that an "average college-aged student" generally feels free to voice minority views on campus. *Cartwright*, 32 F.4th at 1123-24. More fundamentally, universities can "*chill* [First Amendment] activity" without "*freez[ing]* it completely." *Constantine v. George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Objective chill does not turn on any particular student's "will to fight." *Id.*; *accord Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015). And courts assessing "standing on a chilled-speech claim" are not supposed to "evaluate the strength of the plaintiff's evidence that it will, in fact, be chilled." *Rio Grande*, 57 F.4th at 1164 (cleaned up).

**3.** The University misfires again by suggesting that Speech First lacks standing to challenge the BIRT because, unlike violations of the harassment and computer policies, bias incidents cannot result in formal discipline. At its boldest, the University suggests a policy cannot chill speech unless violations are "subject to a specific penalty, such as an arrest, prosecution, or an enforcement proceeding." Mot. 19. That's not the law. "First Amendment plaintiffs can assert standing based on a chilling effect on speech even where the plaintiff is not subject to

criminal prosecution, civil liability, regulatory requirements, or other direct effects." *Walker*, 450 F.3d at 1095-96 (cleaned up). The government can objectively chill speech with policies "that fall short of a direct prohibition against the exercise of First Amendment rights," *Laird v. Tatum*, 408 U.S. 1, 11 (1972), including "informal sanctions," "threat[s]," and "other means of coercion, persuasion, and intimidation," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). The "protections of the First Amendment are triggered not only by actual restrictions"; the "risk of a chilling effect" is enough "because First Amendment freedoms need breathing space to survive." *AFPF v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (cleaned up). In short, "objective chill is the standard." *Cartwright*, 32 F.4th at 1122-24 n.4; *accord Schlissel*, 939 F.3d at 764-65.

Bias-response teams objectively chill speech, as three circuits have recognized. *See Cartwright*, 32 F.4th at 1122-24; *Fenves*, 979 F.3d at 333; *Schlissel*, 939 F.3d at 765. The Fifth, Sixth, and Eleventh Circuits reached that conclusion for four reasons, all of which apply here.

First, the bias-incidents protocol "acts by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. From start to finish, the policy is designed to send a clear message to students: If you engage in a "bias incident," you are in trouble. *See Cartwright*, 32 F.4th at 1124 n.5 (explaining that the "tenor" of these policies is "if your speech crosses our line, we will come after you"). The name "bias incident response team" suggests that "the accused student's actions have been prejudged to be biased" and "could result in far-reaching consequences." *Schlissel*, 939 F.3d at 765; *accord Cartwright*, 32 F.4th at 1124. The policy's terminology—*e.g.*, "bias," "incident," "target," and "disciplinary or corrective action," *see* Ex. 9 at 1; Ex. 10 at 4-5—also suggests serious misconduct, *see Schlissel*, 939 F.3d at 765; *Fenves*, 979 F.3d at 338. "No reasonable college student wants to run the risk of

being accused of" being biased, closed-minded, prejudicial, or unfair. *Cartwright*, 32 F.4th at 1124. "Nor would the average college student want to run the risk that the University will" create a dossier of everything she says or does. *Id.*; *see* Ex. 9 at 2 (BIRT will "[e]nsure reported bias incidents are properly recorded."); Mariott Decl. ¶23 ("reports are maintained").

Second, "the breadth and vagueness of the bias-related-incidents policy exacerbates the chill that the average student would feel." *Cartwright*, 32 F.4th at 1124. As noted above, the definitions of "bias" and "bias incident" are open-ended and ill-defined. The list of conduct that the University anticipates will be reported only underscores the point. Its form expects reports for conduct ranging from "incorrect name or pronoun usage," "harassment," and "verbal assault" to "property damage/destruction," "theft of property," and even "physical assault." Ex. 10 at 2 (cleaned up). And it expects reports for both on-campus and off-campus conduct. *See, e.g.*, Ex. 10 at 3-4 (listing options to report a student for comments in class and comments via email or social media). In essence, the University expects (indeed, encourages) anything and everything to be reported. And, to no one's surprise, "a majority of" reports have been for "perceived offensive speech." Mariott Decl. ¶20. "Pair th[e] broad, vague, and accusatory language with the task-force-ish name of the investigating organization—the [Bias Incident] *Response Team*—and … it is clear that the average college student would be intimidated, and quite possibly silenced, by the policy." *Cartwright*, 32 F.4th at 1124.

Third, the University's practice of "urg[ing]" *anonymous* reporting "carries particular overtones of intimidation to students whose views are 'outside the mainstream.'" *Fenves*, 979 F.3d at 338; *see* Ex. 9 at 1. And because bias incidents are addressed by high-level university officials, including the director of student discipline, a student "could be forgiven for thinking

that inquiries from and dealings with [University administrators] could have dramatic effects such as currying disfavor with a professor, or impacting future job prospects." *Schlissel*, 939 F.3d at 765. Experts thus agree that these teams objectively chill students' speech. *See* Exs. 5, 8, 11; Am. Compl. ¶¶31-35; *Fenves*, 979 F.3d at 338.

Fourth, the University's bias-response team has the power to both contact the accused student and refer bias-incident reports to disciplinary authorities. *See* Ex. 9 at 2; Mariott Decl. ¶20 (BIRT will "reach out to the person alleged to have engaged in the perceived biased"). It is no answer to say that interactions with the BIRT are technically "voluntary." Mot. 19-20. "The freedom that a student has to ignore the [BIRT] process is akin … to the freedom that a child has to refuse his parent when she asks, 'Would you please clean up your room?'" *Cart-wright*, 32 F.4th at 1124 n.5; *accord Schlissel*, 939 F.3d at 765. As the University admits, most students do not ignore the BIRT's requests to speak about their alleged bias, and their instinct is "often" to try to explain themselves. Mariott Decl. ¶¶29, 20; *cf. Speech First, Inc. v. Killeen*, 968 F.3d 628, 642-43 (7th Cir. 2020). Nor is it an answer to say that the BIRT *itself* cannot discipline students. The officials who are on the BIRT can. And the BIRT's referral power means that reports can "*lead* to" formal discipline or, at a minimum, "initiat[e] the formal investigative process, which itself is chilling." *Schlissel*, 939 F.3d at 765.

This regime is not designed to "***educate***." Mot. 20. If the goal were education, why create a separate response team, staff it with authority figures, formally define "bias incident," use disciplinary lingo, solicit anonymous complaints, and threaten referrals? The University does not need any of that to educate, but it needs all of that to *prevent* "biased" speech from happening in the first place. This regime also bears no resemblance to the University's ordinary

15
**App.148**

student-conduct process. *Cf. Abbott v. Pastides*, 900 F.3d 160, 177-80 (4th Cir. 2018). If "'any-one'" can report disciplinary violations to the office of student conduct, Mot. 19, then the BIRT serves no purpose—except, of course, to deter speech that violates no rules but that someone on campus deems "biased." Again, three courts deemed these features of bias-re-sponse teams sufficient to prove standing at the preliminary-injunction stage. They are more than sufficient to survive a motion to dismiss.

### III. Speech First does not need to divulge its members' real names, especially at the pleading stage.

The University, with disturbing tenacity, insists on unmasking Speech First's members. It says that, under *Summers v. Earth Island Institute*, an association lacks Article III standing if its complaint identifies standing members only by pseudonyms. Mot. 5-8 (discussing 555 U.S. 488 (2009)). Recognizing that many cases involve anonymous members (and even anonymous *parties*), the University quickly backtracks. It argues that Speech First at least needs this Court's permission to use pseudonyms and asks this Court to deny that permission. Mot. 8-11. The University is mistaken: It conflates summary judgment with the pleading stage, identifying members with using their real names, and anonymous parties with anonymous nonparties.

**1.** Even if *Summers*'s language about "identifying members" required associations to reveal their members' actual names, that principle wouldn't be a reason to dismiss Speech First's complaint. *Summers* was an appeal from final judgment. 555 U.S. at 492. Whatever the scope of its holding, most courts have ruled that it doesn't apply at the pleading stage.[3] The

---

[3] *See, e.g., Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020) ("[R]equiring specific names at the motion to dismiss stage is inappropriate."); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (sim-ilar); *S.C. NAACP*, 2022 WL 453533, at *2-3 (similar); *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487

University misses this important distinction. It cites a string of appellate cases, but all but two were decided under the summary-judgment standard, not the motion-to-dismiss standard.[4] And the two that were decided on a motion to dismiss either missed the issue, *see S. Walk at Broadlands HOA, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013), or incorrectly assumed that standing is subject to a "'heightened'" pleading standard, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).

The courts that distinguish between the pleading stage and later stages have the better view. A plaintiff's burden to show standing is no different from "any other matter on which the plaintiff bears the burden of proof"; it depends on the "stag[e] of litigation." *Lujan*, 504 U.S. at 561. "At the pleading stage, general factual allegations" suffice because courts "must presume that general allegations embrace those specific facts that are necessary." *Id.* (cleaned up). Faulting plaintiffs for not including names in their complaint would violate this principle and impose a "heightened" pleading standard for standing. *Bldg. & Const.*, 448 F.3d at 145; *accord S.C. NAACP*, 2022 WL 453533, at *3. The point of the federal pleading standard, after all, is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (cleaned up). A defendant "need not know the

---

F. App'x 189, 198 (5th Cir. 2012) (finding "no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss"); *Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144-45 (2d Cir. 2006) (similar).

[4] *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 598 (8th Cir. 2022) (summary judgment); *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Calif. DOT*, 713 F.3d 1187, 1194 (9th Cir. 2013) (same); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (petition for review evaluated under same standard as summary judgment); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 517 (6th Cir. 2017) (same); *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, 2022 WL 538185, at *4 (10th Cir. Feb. 23) (same).

identity of a particular member to understand and respond to an organization's claim of injury." *La Raza*, 800 F.3d at 1041.

Here, too, the University does not argue that, without the members' real names, it lacks fair notice of Speech First's basis for standing. Speech First's members have been anonymous in every case. Yet no court was unable to assess Speech First's standing; three courts found that Speech First had standing; and the Seventh Circuit suggested that Speech First *should* rely (at the preliminary-injunction stage) on anonymous "Doe affidavits." *Killeen*, 968 F.3d at 643. The University is likewise able to make a litany of standing arguments, despite the members' anonymity, because it understands that standing turns on the nature of the policies and the nature of the speech—"not on [anyone's] name." *New York v. U.S. Dep't of Com.* ("*Census Case*"), 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019), *aff'd in part*, 139 S. Ct. 2551, 2565-66 (2019).

The most the University can say is that it needs the members' names "to ensure they are ***actually*** OSU students throughout the pendency of this lawsuit," Mot. 8, but this argument goes to mootness, not standing. What matters for standing is that Speech First's members were students at the University when this suit was filed. *Rio Grande*, 57 F.4th at 1161. The University does not dispute that they were. So this Court must accept the complaint's uncontroverted allegation on that point. Am. Compl. ¶¶51-52, 67, 84; *see S.C. NAACP*, 2022 WL 453533, at *3. And it must accept the members' uncontroverted declarations on that point. *See supra* 2-4; *Whitaker v. Peet's Coffee, Inc.*, 2022 WL 1189888, at *4 (N.D. Cal. Apr. 21). Their anonymous declarations are valid because, if necessary, these individual students could be identified. *McGehee v. Neb. Dep't of Corr. Servs.*, 2019 WL 1227928, at *2 (D. Neb. Mar. 15); *see Springer v. IRS*, 1997 WL 732526, at *5 (E.D. Cal. Sept. 12) ("28 U.S.C. §1746 (declarations)

does not prohibit the use of … pseudonyms" if "such use is expressly stated in the declaration" and "the actual person can be identified"). And regardless, Speech First's executive director knows them and also confirms their status in her non-anonymous declaration. Trump MTD Decl. ¶¶3-5; *see McCloud v. McClinton Energy Grp., LLC*, 2015 WL 737024, at *4 n.5 (W.D. Tex. Feb. 20) (declarant can have personal knowledge about someone else's status based on their "interactions and conversations"). Speech First's lawyers also will continue to follow their ethical duties to state true facts in their papers and to notify this Court if a member is no longer enrolled. *E.g.*, *Speech First, Inc. v. Sands*, No. 21-2061, Doc. 67-1 (4th Cir. Oct. 21, 2022) (Speech First notifying the court about its members' graduations). All three students are still enrolled. *See* Trump MTD Decl. ¶¶3-5.

"At bottom," this "dispute about whether the [plaintiff] must disclose its members" is "a discovery dispute," not a basis to dismiss the complaint. *S.C. NAACP*, 2022 WL 453533, at *3. Speech First's initial refusal to divulge its members' names is "not evidence that [it] *lacks* the alleged members" but "merely suggest[s] [it] has reservations about revealing those member names to Defendan[t]." *Id.* If the University asks for the members' identities in discovery and proves that it's entitled to them, then Speech First will provide them with the proper protections to "safeguar[d]" these students. *Id.* But whether and how that disclosure occurs "can and should be handled using the ordinary mechanisms for resolving such disputes." *Id.*

**2.** No matter how early in the litigation *Summers* applies, the University misreads its language about "identifying members." The associations in *Summers* challenged regulations that allowed the Forest Service to undergo certain projects without first doing an environmental assessment. A member would have standing only if a forest project was imminent, the project

would affect an area that the member imminently planned to visit, *and* the project threatened the member's ability to enjoy that area. *See* 555 U.S. at 494. Yet the associations did not show that they had *any* member who satisfied these criteria. *See id.* at 497-98. They instead argued that, given the sheer size of their membership, it was a "statistical probability" that they had at least one member with standing. *Id.* at 497. The Court rejected this theory of "probabilistic standing." *Id.* at 499. The associations must instead "identify members who have suffered the requisite harm—surely not a difficult task." *Id.*

Speech First complied with *Summers.* It identified three specific members, named them ("Member A," "Member B," and "Member C"), and provided all the facts needed to show their standing. It explained that each member attends the University, has controversial views, would freely express those views, but currently doesn't due to the challenged policies. *See* Am. Compl. ¶¶51-98; *e.g.*, Student A Decl. ¶¶4-12. It did not refer to its membership generally. Nor did it speculate that, because it has so many members, at least one probably attends the University and is chilled by these policies. Though *Summers* said the associations had to "identify members," 555 U.S. at 499, a member can be identified without using her real name, *see YAF v. Gates*, 560 F. Supp. 2d 39, 49 (D.D.C. 2008), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009). And though *Summers* used the words "name" and "naming" once in passing, pseudonyms are still a kind of name. And besides, *Summers* used those words merely as a synonym for "identify." 555 U.S. at 498. Judicial opinions cannot be "'parsed as though we were dealing with the language of a statute.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (cleaned up).

*Summers* does not ban associations from identifying members with pseudonyms. It couldn't, since the associations there didn't identify a specific member at all—not even by

pseudonym. *See* 555 U.S. at 495. Not one of the University's cases applying *Summers* involves pseudonyms either; the words "pseudonym" and "anonymous" don't appear in the opinions. *See* Mot. 6-7. Like *Summers* itself, those cases involve associations that failed to identify any specific member with standing.[5] It would "overread" *Summers* and these other cases to think they "require an organization to *name* the member who might have standing." *Census Case*, 351 F. Supp. 3d at 606 n.48; *accord FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 289 (D.N.J. 2003). Indeed, some of the Supreme Court's most famous cases involve associations suing on behalf of anonymous members. *E.g.*, *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018), *aff'd*, 140 S. Ct. 1891, 1916 (2020) (anonymous DACA beneficiaries); *FAIR*, 291 F. Supp. 2d at 286-89, *aff'd on standing*, 390 F.3d 219, 228 n.7 (3d Cir. 2004), *aff'd on standing*, 547 U.S. 47, 52 n.2 (2006) (anonymous law schools); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (anonymous parents and students).

The University relies heavily on the Southern District of New York's decision in *Do No Harm*—as it must, since that case is the only time a court has dismissed a complaint because the association referred to its standing members with pseudonyms. This Court should not follow that aberration. The decision is currently on appeal and will likely be reversed. It ignores

---

[5] *See Draper*, 827 F.3d at 3 (association generically pointed to "many of its members"); *S. Walk*, 713 F.3d at 184 (association "failed to identify a single *specific* member"); *Assoc. Gen. Contractors*, 713 F.3d at 1194-95 (same); *Ga. Republican Party*, 888 F.3d at 1203 (association identified no "specific member"); *Religious Sisters*, 55 F.4th at 602 (same); *Tenn. Republican Party*, 863 F.3d at 521 (associations "fail[ed] to identify any members," except four people who weren't injured); *see also Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1251 & n.4 (N.D. Okla. 2016) (association identified no one, except two companies who weren't members). The standing member in *Producers of Renewables* was anonymous, but the Tenth Circuit *agreed* to keep its identity "confidential" and found a lack of standing on other grounds. 2022 WL 538185, at *5 n.3; *see id.* at *3-10 & n.2.

the Second Circuit's precedent in *Building & Construction*, 448 F.3d at 144-45. It openly conflicts with two decisions from that court and several decisions from other courts. *See Do No Harm v. Pfizer Inc.*, 2022 WL 17740157, at *9 n.5, *8 & n.3 (S.D.N.Y. Dec. 16). And it does not grapple with any of the arguments above, likely because it sua sponte dismissed the complaint without waiting for the defendant to file a motion to dismiss or giving the plaintiff notice and an opportunity to respond. *See* Appellant's Br., 2023 WL 2536426 (2d Cir. Mar. 10). This sua sponte dismissal decreases the "reliability of the order" and will be "'by itself, grounds for reversal.'" *Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir. 1999).

**3.** The reason why the University can't find another relevant case is because the use of pseudonyms does not even implicate Article III standing. The University admits that courts *can* let parties proceed under pseudonyms—the first clue that this issue doesn't involve standing, since courts can't waive jurisdictional defects. Mot. 8-11. Hence why, in the three cases that the University cites about the use of pseudonyms, the courts do not address standing. *E.g.*, *W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) (explaining that it was *not* affirming on the ground "that plaintiffs lacked standing"). The cases instead apply Federal Rule of Civil Procedure 10(a), which requires that "[t]he title of the complaint must name all the parties." *See U.S. ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1249 (10th Cir. 2017); *NCBA v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989); *Yocom*, 257 F.3d at 1172. Violations of Rule 10(a) deprive a court of jurisdiction not because the plaintiff lacks standing, but because the unnamed plaintiff hasn't "commenced" a case in the first place. *NCBA*, 886 F.2d at 1245.

The University never cites Rule 10(a), and Speech First's complaint plainly satisfies it. Speech First and President Shrum are the only "parties" to this case, Fed. R. Civ. P. 10(a), and

the complaint names them both in the title, *see* Am. Compl. 1. The title does not name Members A-C because an association's standing members are "not … parties to the litigation." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1959). They cannot be served party discovery, *Univ. of Tex. at Austin v. Vratil*, 96 F.3d 1337, 1339-40 (10th Cir. 1996), recover fees, *Nail v. Martinez*, 391 F.3d 678, 684 (5th Cir. 2004), or do anything else that parties do. If Speech First put them in the title, it would have *violated* Rule 10(a). In *NCBA*, for example, the association tried to put all its "members" in the caption as co-plaintiffs, without identifying who they were. 886 F.2d at 1244. The Tenth Circuit dismissed these "unnamed plaintiffs" because, under Rule 10(a), the members weren't named and thus couldn't be "parties." *Id.* at 1245. But critically, the Tenth Circuit held that the association itself was a party and could proceed "as an associational entity" on behalf of those unnamed members. *Id.* So too here.

Any rule that required Speech First to publish its members' names, as a condition of suing in federal court, would violate the Constitution. "[O]ne of the fundamental purposes" of "associational standing" is "protecting individuals who might prefer to remain anonymous." *Census Case*, 351 F. Supp. 3d at 606 n.48. The First Amendment protects the right to anonymously associate and litigate—rights that are chilled and infringed by compelled disclosure. *See Bonta*, 141 S. Ct. at 2382. Compelled disclosure would certainly create that risk here, as Speech First's executive director attests. *See* Trump MTD Decl. ¶¶10-11, 20-21; Ex. 25. Speech First's members are "young adults" with controversial views who depend on the University for their education and future careers. *Cartwright*, 32 F.4th at 1123. They naturally "fea[r] … retaliatory efforts on behalf of the [University] and private actors if th[ey] were to participate as named plaintiffs in [this] legal challenge." *FAIR*, 291 F. Supp. 2d at 286-87; *see* Am. Compl.

¶¶52, 67, 84; *e.g.*, Student A Decl. ¶18. These "risks are heightened in the 21st century and seem to grow with each passing year, as anyone with access to a computer can compile a wealth of information about anyone else, including such sensitive details as a person's home address." *Bonta*, 141 S. Ct. at 2388 (cleaned up). Any disclosure of Speech First's members thus must satisfy at least "[e]xacting scrutiny." *Id.* It cannot, especially given the availability of "less intrusive alternatives." *Id.* at 2386. For example, instead of disclosing to the public and the University, *cf.* Mot. 11, the members' identities could be disclosed to this Court in camera, to the University "attorneys' eyes only," or to a single University employee (who can access the University's records but lacks disciplinary authority) under a protective order.

But even if the rules governing anonymous parties applied to nonparty standing members, those rules would be satisfied here. Several factors favor anonymity here:

1. As just explained, Speech First's members have a constitutional right to "privacy in their chosen associations," which countervails any public right to publicity. *LULAC v. Abbott*, 2022 WL 2806850, at *7 (W.D. Tex. July 18).

2. Also as just explained, Speech First's members have a reasonable fear of "intimidation, harassment, physical violence, or economic reprisal … if their names were disclosed." *Id.* at *6-7; *see, e.g.*, *Doe #1 v. Syracuse Univ.*, 2018 WL 7079489, at *4-5 (N.D.N.Y. Sept. 10), *adopted*, 2020 WL 2028285 (N.D.N.Y. Apr. 28); *Doe v. NYU*, 537 F. Supp. 3d 483, 496-97 (S.D.N.Y. 2021).

3. To prove standing, Speech First's members had to "express a desire to participate in proscribed activities." *S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979). Their declarations identify controversial speech that they would express, but don't because they fear the consequences of the University's policies. Unmasking them would essentially make them *say* this speech publicly—creating the very chilling effect that injures them. *See, e.g.*, *Publius v. Boyer-Vine*, 321 F.R.D. 358, 364 (E.D. Cal. 2017).

4. Speech First—the actual party—isn't proceeding anonymously. The public thus will know "who is bringing [the] claims" and who is "accessing the public's judicial machinery." *LULAC*, 2022 WL 2806850, at *7. "There is little need to know the

Association Members' identity in order for the public to know the basis of Plain-tiffs' claims." *Id.* at *8.

5. Though not minors, Speech First's members are young. *See, e.g.*, *Doe v. Alger*, 317 F.R.D. 37, 40-41 (W.D. Va. 2016); *Doe v. Univ. of Chi.*, 2017 WL 4163960, at *1 n.1 (N.D. Ill. Sept. 20).

6. Other than their names, Speech First has provided all other necessary information about its standing members—their school, age, sex, beliefs, and intentions. The public thus "will have sufficient information to follow and assess the Court's anal-ysis of [the association's] standing." *LULAC*, 2022 WL 2806850, at *8.

7. Speech First's facial challenges are purely "'legal,'" so "the public can intelligently follow the proceedings without the Association Members' names." *Id.* at *5.

8. The University is the government. It isn't "harmed by the accusation of wrongdoing in the same way as a private defendant." *Id.* And Speech First is challenging a policy, not accusing any individual of wrongdoing. *One Standard of Just., Inc. v. City of Bristol*, 2022 WL 17688053, at *4-5 (D. Conn. Dec. 9).

9. Thanks to FERPA, students operate under a "background confidentiality regime" where universities are generally not free to disclose their information. *Doe v. MIT*, 46 F.4th 61, 76 (1st Cir. 2022). A "full appreciation of the public's interest in trans-parency must factor in [that] choice by Congress." *Id.*; *see, e.g.*, *Doe v. Duerfahrd*, 2022 WL 17253080, at *6 n.2 (N.D. Ind. Nov. 28).

For all these reasons, if Speech First needs permission to use pseudonyms for its standing members, then this Court should grant it. *See, e.g.*, *Producers of Renewables*, 2022 WL 538185, at *5 n.3 ("At the request of [the association], we keep the association's membership list confi-dential, and refer to the relevant company only as Member throughout this order."); *Femedeer v. Haun*, 227 F.3d 1244, 1247 (10th Cir. 2000) (allowing a plaintiff to move "to proceed by way of pseudonym" even after the district-court litigation had ended).

## CONCLUSION

The Court should deny the University's motion to dismiss.

Date: March 24, 2023

Respectfully submitted,

s/ Ryan Haynie
(signed by filing attorney with
permission of attorney)
Ryan Haynie, OBA No. 32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

/s/ Cameron T. Norris
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris
James F. Hasson (*pro hac vice*)
Thomas S. Vaseliou (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

*Counsel for Speech First, Inc.*

## CERTIFICATE OF SERVICE

On March 24, 2023, I filed this brief via ECF, which will email everyone requiring notice.

/s/ Cameron T. Norris

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

*Plaintiff*,

v.

KAYSE SHRUM, in her official capacity as
President of Oklahoma State University,

*Defendants*.

Case No. 5:23-cv-29-J

## DECLARATION OF CHERISE TRUMP

1.     I am the Executive Director of Speech First, Inc.

2.     Speech First is a nationwide membership organization of students, alumni, and others that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment to the U.S. Constitution. In particular, Speech First seeks to protect the rights of students and others at colleges and universities, through litigation and other lawful means.

3.     Speech First has members who are current students at Oklahoma State University.

4.     I am personally familiar with, and have spoken to, several of Speech First's members at the University, including the students (Students A, B, and C) who are mentioned in the complaint and whose declarations have been provided in this case. Based on those conversations and other materials I have personally seen, I have learned the following.

5.     Students A, B, and C attend Oklahoma State University and are undergraduates.

6.     Speech First's members hold a wide array of different views and opinions on matters such as politics, race, religion, gender identity, abortion, gun rights, immigration, foreign affairs, and many other sensitive and controversial topics.

7.     Speech First's members at the University, including Students A, B, and C, want to be able to have open and robust intellectual debates and discussions about these issues on campus, in the City of Stillwater, and online, including via email.

8.     Yet Speech First's members at the University, including Students A, B, and C, limit their speech because they reasonably fear it will be considered "harassment," "bias," "political campaigning," or otherwise prohibited under the University policies challenged in the complaint.

9.     Speech First brought this suit to ensure that its members and other students will not face discipline, investigation, or any other negative repercussions from the University for their views or their speech.

10.     As Executive Director of Speech First, I am in constant communication with our membership, and I frequently travel to universities to speak to college students. It is my experience that students would be far less likely to join Speech First if they could not be anonymous. Many members of Speech First would limit their communications and participation within the organization if they believed that their names, communications, and contributions could be disclosed to the public or their university. Many students would not participate in litigation to vindicate their First and Fourteenth Amendment rights if they could not participate anonymously.

11.     I have witnessed the chilling effect that the possibility of retaliation has caused students. This generation of students is more aware than ever of the potential consequences that come from being associated with an unpopular viewpoint online. As they have expressed to me and as I have witnessed firsthand, these students have seen numerous people digitally "canceled" for expressing controversial viewpoints. Many students, for example, have expressed concerns to me about their fear of a prospective employer searching their name online to see that their name is associated with accusations that they are "bigots" or "racists"—leading that prospective employer to not hire them.

12.     I have also witnessed firsthand the retaliation that individuals can receive for being associated with Speech First, bringing free-speech litigation, and speaking on controversial topics.

13.     After Speech First filed a lawsuit against Virginia Tech, for example, a tenured professor at Virginia Tech publicly called the students who were standing members "conservative s[***]bags" who were "suing the school because they're bigots." Tweet by @prof_gabriele, Joint Appendix 274 in *Speech First v. Sands*, No. 21-2061 (4th Cir.).

14.     In 2019, shortly before Speech First sued the University of Texas, a student network in Austin threatened to dox "incoming University of Texas-Austin freshmen who join conservative student organizations." J. Street, *Incoming Texas Freshmen Threatened With Doxxing If They Join Conservative Campus Groups*, Campus Reform (June 21, 2019), perma.cc/99SL-8TSM. The group had previously "post[ed] private information belonging to supporters of then-Supreme Court Justice nominee Brett Kavanaugh." *Id.*

15.     Another student at the University of Colorado-Boulder was "assaulted and ver-bally abused by some fellow students on campus for wearing a hat with a political slogan on it" that his fellow students disagreed with. *Student Spotlight: Political Speech Met With Persecution in University Life*, Speech First, perma.cc/YC9J-KRLC.

16.     Another student at the University of Oklahoma had a professor lower her grade because he disagreed with the political view expressed in her speech, even though the course had nothing to do with the speech's content. *See Student Spotlight: Fighting Censorship With More Speech*, Speech First (Oct. 27, 2021), perma.cc/C4V2-5MWM. The University also "attempted to silence" a student group that this student led. Specifically, the group had "invited Ann Coulter to speak on campus," and the University and student government opposed the event and even tried "to overcharge [the group] for the event, revoke [the group's] funding, and kick [the group] off campus." *Id.*

17.     Another student who was "[t]he vice president of the Student Government As-sociation at the University of Houston" was "punished by her student senate after she posted on Facebook: 'Forget #BlackLivesMatter; more like #AllLivesMatter.'" C. Hlavaty, *UH Student Body VP Under Fire for 'All Lives Matter' Gets Punished by Peers*, Houston Chronicle (Aug. 1, 2016), perma.cc/2QF2-6CQQ.

18.     Just a few weeks ago, students at Stanford Law faced reprisal for inviting a fed-eral judge to speak at the school. Student protestors put up posters with the names and faces of the students who led the school's Federalist Society chapter. The posters said the students "should be ashamed," with "ashamed" appearing in blood red. *See* A. Sibarium, *Federal Judge Decries Disruption of His Remarks by Stanford Law Students and Calls for Termination of the Stanford*

*Dean Who Joined the Mob*, Wash. Free Beacon (Mar. 10, 2023), perma.cc/UWA9-ATQT; *At Stanford, Public Accountability for Thee But Not for Me*, Wash. Free Beacon (Mar. 16, 2023), perma.cc/EFN8-WRZ7; *see also Bring Sanity Back to Stanford Law: Fire DEI Dean Steinbach!*, Speech First (Mar. 14, 2023), perma.cc/DAL2-2J3C.

19.     One controversial topic Students A, B, and C wish to speak about is affirmative action. Abigail Fisher—the named plaintiff who challenged affirmative action in *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013), and *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365 (2016)—"endured consistent harassment since 2008" "[a]s a direct result of [her] involvement in that case." *SFFA v. Harvard Coll.*, No. 1:14-cv-14176 (D. Mass. Apr. 29, 2016), ECF 150-4 ¶3. She experienced grotesque "threats" and "insults" from across the country and even suffered professionally. *See* ¶¶5, 9-10. According to Fisher, these experiences "often led [her] to second-guess [her] involvement in the case and as an advocate against unlawful affirmative action policies." ¶11.

20.     I recently was asked to speak about college free-speech issues on the campus of Trinity University in Texas. Because my last name is "Trump," the university instructed me to buy liability insurance. It feared that students and other groups would think I was related to former President Donald Trump (I am not) and conduct hostile, potentially damaging protests against me. *See 'Trump'ed-Up Charges: Trinity University Imposes University Imposes Insurance Requirement on Campus Speaker for Having Wrong Last Name*, FIRE (Mar. 3, 2023), perma.cc/YQB9-UN5U.

21.     I understand that being the director of a national association that is sometimes the named plaintiff in lawsuits comes with risks. But most college students whose rights are

being violated are, understandably, unwilling to endure the kind of retaliation that comes with

high-profile litigation.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 2 4, 2023

_____
Cherise Trump
Executive Director of Speech First, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SPEECH FIRST, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>KAYSE SHRUM, in her individual capacity and professional capacity as President of Oklahoma State University; D. ALEIGHA MARIOTT, in her individual capacity and professional capacity as Director of Student Support and Conduct for Oklahoma State University; DOUG HALLENBECK, in his individual capacity and official capacity as Vice President of Student Affairs for Oklahoma Stater University; RAJ MURTHY, in his individual capacity and professional capacity as Chief Information Officer for Oklahoma State University; JACKSON LANDRUM, in his individual capacity and professional capacity as Director of Equal Opportunity for Oklahoma State University; BILLY G. TAYLOR, RICK DAVIS, JIMMY HARREL, JOE HALL, CARY BAETZ, BLAYNE ARTHUR, RICK WALKER, JASON RAMSEY, JAROLD CALLAHAN, and TRUDY MILNER, all in their individual capacities and professional capacities as members of the OSU/A&M Board of Regents,<br><br>*Defendants.* | Case No. \_\_\_5:23-cv-29\_\_\_ |

## DECLARATION OF STUDENT A

1.      I am a Sophomore at Oklahoma State University.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.      I am a member of Speech First.

4.      I am politically conservative and hold views that are unpopular, controversial, and in the minority on campus.

5.      I am staunchly opposed to affirmative action and believe it is just old-fashioned racism by another name. Giving preferences to college or job applicants based solely on the color of their skin is immoral and unconstitutional. People should be judged on merit, not race.

6.      I believe that abortion is wrong and that women should not be allowed to kill innocent babies. Laws that allow a mother and father to decide that a baby should die if its existence is inconvenient have no place in civilized society. I want to emphasize Planned Parenthood's eugenicist roots and point out that abortion clinics largely target minority women.

7.      I believe that illegal immigration is wrong and that the government must enforce our immigration laws. The government should not be using tax dollars paid by hard-working Americans to subsidize in-state tuition benefits for illegal aliens.

8.      I believe that sex is inherent and immutable and that there is no such thing as a "gender spectrum." I think the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention or affirmation. When gender identity topics arise

in class or in other discussions on campus, I want to highlight this evidence and share my beliefs.

9.      I enrolled in the University because I wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

10.      I want to engage in open and robust intellectual debate with my fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

11.      When another a classmate or another member of the university community voices contrary views about these and other controversial topics, including affirmative action, abortion, gender identity, or immigration, I want to point out the flaws in their arguments and convince them to change their minds.

12.      I want to speak directly to my classmates about these topics, and I want to talk frequently and repeatedly on these issues. Given my views, I know that many of these conversations will be heated and passionate. But I want to have these conversations because I feel strongly about these issues.

13.      I speak about these issues in small circles of friends when I know that they share my opinions and are unlikely to report me for violating the University's speech policies.

14.      The University's harassment policy, bias-related incidents policy, and informational technologies policy, however, make me reluctant to openly express my opinions or have these conversations in the broader University community.

15.     I do not fully express myself or talk about certain issues because I believe that sharing my beliefs will be considered "harassment." For example, I believe that others on campus will find my views "offensive" or "intimidat[ing]," especially if I share those views passionately and repeatedly. Many of the topics that I want to address could easily be considered "harassment" under the University's policy.

16.     My fears are amplified by the fact that the University can punish me not only for committing "harassment" myself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence" to the violation.

17.     I do not fully express myself or talk about certain issues because I know that other students, faculty members, or others will likely report me to University officials for committing a "bias-related" incident. Because the definition of "bias" is so broad and vague, I'm confident that someone will find my speech to be "biased." I worry that there are other students who will "catch me" engaging in "biased" speech and that the University will take action against me. For example, I'm afraid that the Bias Incident Response Team will keep a record on me, share the allegations with others within the university, call me in for meetings, or refer the allegations to the Office of Student Conduct.

18.     I am signing this declaration under a pseudonym because I am a current student at the University and, if my participation in this litigation becomes public, I fear reprisal from the University, my professors, my fellow students, and others.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___4th___ day of ___January___, 2023

_Student A_
Student A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SPEECH FIRST, INC. | |
| *Plaintiff,* | |
| v. | |
| KAYSE SHRUM, in her individual capacity and professional capacity as President of Oklahoma State University; D. ALEIGHA MARIOTT, in her individual capacity and professional capacity as Director of Student Support and Conduct for Oklahoma State University; DOUG HALLENBECK, in his individual capacity and official capacity as Vice President of Student Affairs for Oklahoma Stater University; RAJ MURTHY, in his individual capacity and professional capacity as Chief Information Officer for Oklahoma State University; JACKSON LANDRUM, in his individual capacity and professional capacity as Director of Equal Opportunity for Oklahoma State University; BILLY G. TAYLOR, RICK DAVIS, JIMMY HARREL, JOE HALL, CARY BAETZ, BLAYNE ARTHUR, RICK WALKER, JASON RAMSEY, JAROLD CALLAHAN, and TRUDY MILNER, all in their individual capacities and professional capacities as members of the OSU/A&M Board of Regents, | Case No. 5:23-cv-29 _____ |
| *Defendants.* | |

## DECLARATION OF STUDENT B

1.      I am a Junior at Oklahoma State University.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.      I am a member of Speech First.

4.      I am politically conservative and hold views that are unpopular, controversial, and in the minority on campus.

5.      I believe that life begins at conception and that abortion is a grave evil. No one has the right to end an innocent life just because a pregnancy is "unplanned" or "unwanted."

6.      I believe that marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family. I am a Christian, and my views on this issue stem partly from my religious beliefs.

7.      For the same reasons, I believe it is wrong for two men to use a "surrogate" to carry a baby. These men are simply "renting" the wombs of women, many of whom are in difficult financial circumstances. When I hear other students advocating for "surrogacy rights," I want to tell them that they are simply advocating for the right to exploit women.

8.      I believe that gender dysphoria is a real condition that can occur in rare cases but that biological sex is immutable and cannot change based on someone's internal feelings or how they "identify." I don't want to be forced to affirm that a biological male is actually a female, or vice versa, simply because someone will be offended by my beliefs. When I hear classmates assert that "gender is a social construct," or that "trans women are women," I want to respond with my belief that biological sex is binary—as it has been throughout human history.

9.      I believe that the Black Lives Matter organization has had a corrosive impact on race relations in America. I don't believe that any person is inherently "privileged" due to the color of their skin, or that America is a systemically racist country.

10.     I enrolled in the University because I wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

11.     I want to engage in open and robust intellectual debate with my fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

12.     When another a classmate or another member of the university community voices contrary views about these and other controversial topics, including, abortion, gender identity, the nuclear family, or racial justice issues, I want to point out the flaws in their arguments and convince them to change their minds.

13.     I want to speak directly to my classmates about these topics, and I want to talk frequently and repeatedly on these issues. Given my views, I know that many of these conversations will be heated and passionate. But I want to have these conversations because I feel strongly about these issues.

14.     I speak about these issues in small circles of friends when I know that they share my opinions and are unlikely to report me for violating the University's speech policies.

15.     The University's harassment policy, bias-related incidents policy, and computer use policy, however, make me reluctant to openly express my opinions or have these conversations in the broader University community.

16.     I do not fully express myself or talk about certain issues because I believe that sharing my beliefs will be considered "harassment" or "discrimination." For example, I believe that others on campus will find my views "offensive" or "intimidat[ing]," or claim that my views "adversely affect" their education or academic environment, especially if I share those views passionately and repeatedly. Many of the topics that I want to address could easily be considered "harassment" under the University's policy.

17.     My fears are amplified by the fact that the University can punish me not only for committing "harassment" myself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence" to the violation.

18.     I do not fully express myself or talk about certain issues because I know that other students, faculty members, or others will likely report me to University officials for committing a "bias-related" incident. Because the definition of "bias" is so broad and vague, I'm confident that someone will find my speech to be "biased." I worry that there are other students who will "catch me" engaging in "biased" speech and that the University will take action against me. For example, I'm afraid that the Bias Incident Response Team will keep a record on me, share the allegations with others within the university, call me in for meetings, or refer the allegations to the Office of Student Conduct.

19.     Finally, I want to send politically-oriented emails—including campaign-related emails—to my fellow students from my university email address. I refrain from doing so, however, because I am afraid that I will be punished under the computer use policy's ban on "political campaigning" if I do.

20.    I am signing this declaration under a pseudonym because I am a current student

at the University and, if my participation in this litigation becomes public, I fear reprisal from

the University, my professors, my fellow students, and others.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___7th___ day of ___January___, 2022

*Student B*

_____
Student B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

        *Plaintiff,*

v.

KAYSE SHRUM, in her individual capacity
and professional capacity as President of
Oklahoma State University; D. ALEIGHA
MARIOTT, in her individual capacity and
professional capacity as Director of Student
Support and Conduct for Oklahoma State
University; DOUG HALLENBECK, in his
individual capacity and official capacity as
Vice President of Student Affairs for
Oklahoma State University; RAJ MURTHY,
in his individual capacity and professional
capacity as Chief Information Officer for
Oklahoma State University; JACKSON
LANDRUM, in his individual capacity and
professional capacity as Director of Equal
Opportunity for Oklahoma State University;
BILLY G. TAYLOR, RICK DAVIS,
JIMMY HARREL, JOE HALL, CARY
BAETZ, BLAYNE ARTHUR, RICK
WALKER, JASON RAMSEY, JAROLD
CALLAHAN, and TRUDY MILNER, all in
their individual capacities and professional
capacities as members of the OSU/A&M
Board of Regents,

        *Defendants.*

Case No. _____5:23-cv-29_____

## DECLARATION OF STUDENT C

1.     I am a Junior at Oklahoma State University.

1

**App.178**

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.      I am a member of Speech First.

4.      I am politically conservative and hold views that are unpopular, controversial, and in the minority on campus.

5.      I believe that human beings are created male or female and that a person cannot "transition" from one to the other. I have no ill-will towards members of the LGBT community, but I cannot in good conscience pretend that a biological male is actually a fellow woman simply because he believes that to be "his truth." When someone claims that to be the case, I want to politely—but firmly—share my belief to the contrary.

6.      I am firmly pro-life. I believe that abortion kills a defenseless baby and that elective abortions should be illegal in all circumstances. I believe that many men who claim to be "pro-choice" are really just interested in avoiding the responsibility of fatherhood and living with the consequences of their decisions.

7.      I oppose illegal immigration and believe that "open border" policies are destructive and dangerous. The government should focus on providing services to men and women who live in this country legally rather than extending already-strained support systems to those who do not have a right to be here. When other students talk

2

**App.179**

about "undocumented immigrants," I want to point out that they are actually "illegal immigrants"—because they are in the country illegally.

8.     I enrolled in the University because I wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

9.     I want to engage in open and robust intellectual debate with my fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

10.     When another classmate or another member of the university community voices contrary views about these and other controversial topics, including abortion, gender identity, or immigration, I want to point out the flaws in their arguments and convince them to change their minds.

11.     I want to speak directly to my classmates about these topics, and I want to talk frequently and repeatedly on these issues. Given my views, I know that many of these conversations will be heated and passionate. But I want to have these conversations because I feel strongly about these issues.

12.     I frequently discuss these issues with small circles of classmates who I know share my views, and also in certain circumstances when I know a classmate is unlikely to report me for violating University policies.

13.     The University's harassment policy, bias-related incidents policy, and computer use policy, however, make me reluctant to openly express my opinions or

3

**App.180**

have these conversations in the broader University community, particularly when I think other students are likely to report me.

14.     I do not fully express myself in certain circumstances or talk about certain issues because I believe that sharing my beliefs will be considered "harassment." For example, I believe that others on campus will find my views "offensive" or "intimidat[ing]," especially if I share those views passionately and repeatedly. Many of the topics that I want to address could easily be considered "harassment" under the University's policy.

15.     My fears are amplified by the fact that the University can punish me not only for committing "harassment" myself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

16.     I do not fully express myself or talk about certain issues because I know that other students, faculty members, or others will likely report me to University officials for committing a "bias-related" incident. Because the definition of "bias" is so broad and vague, I'm confident that someone will find my speech to be "biased." I worry that there are other students who will "catch me" engaging in "biased" speech and that the University will take action against me. For example, I'm afraid that the Bias Incident Response Team will keep a record on me, share the allegations with others within the university, call me in for meetings, or refer the allegations to the Office of Student Conduct.

**App.181**

17.     Finally, I want to send politically-oriented emails—including campaign-related emails—to my fellow students from my university email address. I refrain from doing so, however, because I am afraid that I will be punished under the computer use policy if I do.

18.     I am signing this declaration under a pseudonym because I am a current student at the University and, if my participation in this litigation becomes public, I fear reprisal from the University, my professors, my fellow students, and others.

**App.182**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge.

Executed this 5th day of January, 2023

Student C

Student C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

<em>Plaintiff,</em>

    v.

KAYSE SHRUM, in her official capacity as
President of Oklahoma State University,

<em>Defendants.</em>

Case No. 5:23-cv-29-J

## DECLARATION OF JAMES F. HASSON

1.    I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for plaintiff, Speech First, Inc.

2.    I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3.    The following materials attached as exhibits are true and accurate copies of pages from public websites that were downloaded as PDF files:

    a.  Exhibit 1 is Oklahoma State University's Student Code of Conduct;

    b.  Exhibit 2 is a webpage from the University, entitled "General Incident Report," last accessed on January 10, 2023, and available at perma.cc/M9YU-JPCC;

    c.  Exhibit 3 is a webpage from the University, entitled "Report a Concern," last accessed on January 10, 2023, and available at perma.cc/AZ6U-ESBU;

    d.  Exhibit 4 is a document, entitled "Please select the reporting form that is most appropriate," last accessed on January 10, 2023, and available at perma.cc/72GS-HG2C;

e.   Exhibit 5 is a report published by FIRE, entitled "Bias Response Team Report 2017," last accessed on January 10, 2023, and available at perma.cc/8H43-BWD5;

f.   Exhibit 6 is an article from the New Republic by Jeffrey Aaron Snyder and Amna Khalid, entitled "The Rise of 'Bias Response Teams' on Campus," published on March 30, 2016, and available at perma.cc/Z2ND-YMP3;

g.   Exhibit 7 is Oklahoma State University Policy 3-0601 Administration & Finance Information Technology, entitled "Appropriate Use Policy," which was published in February 2021 and available at perma.cc/TR8G-CH6X;

h.   Exhibit 8 is a report from FIRE, entitled "No Comment: Public Universities' Social Media Use and the First Amendment," which is available at perma.cc/4NQW-YRFG;

i.   Exhibit 9 is Oklahoma State University's Bias Incident Response policy, last accessed on January 10, 2023, at perma.cc/53ED-4JHM;

j.   Exhibit 10 is Oklahoma State University's "Bias Incident Report" form, last accessed on January 10, 2023, at perma.cc/6G92-AZHE;

k.   Exhibit 11 is a report from Speech First, entitled "Free Speech in the Crosshairs: Bias Reporting on College Campuses," published in 2022, and available at perma.cc/YY5S-WSLD;

l.   Exhibit 12 is a policy from the Board of Regents for the Oklahoma Agricultural & Mechanical Colleges, entitled "Extracurricular Use of Institutional Facilities,

Areas or Media for the Purpose of Expression" and is available at perma.cc/G25X-ULQ9;

m.  Exhibit 13 is the University's "Interim Title IX – Sexual Misconduct Policy," published in June 2020 and available at perma.cc/4T5W-X3H7;

n.  Exhibit 14 is a report from FIRE, entitled "Spotlight on Speech Codes 2021," which is available at perma.cc/S22E-76Q3;

o.  Exhibit 15 is an article from FIRE, entitled "Using FIRE's Spotlight Database," which is available at perma.cc/XF7M-T2J9;

p.  Exhibit 16 is an entry from FIRE's Spotlight Database on Oklahoma State's "Student Code of Conduct: Prohibited Conduct," which is available at perma.cc/LPX5-JQVC;

q.  Exhibit 17 is an entry from FIRE's Spotlight Database on Oklahoma State's "Bias Incident Response," which is available at perma.cc/JL2W-BF4L;

r.  Exhibit 18 is an entry from FIRE's Spotlight Database on Oklahoma State's "Appropriate Use Policy," which is available at perma.cc/NT8N-FGGF;

s.  Exhibit 19 is an article from FIRE, entitled "Why the Supreme Court's *Davis* standard is necessary to restore free speech to America's college campuses: Part I," which is available at perma.cc/4KFG-634L;

t.  Exhibit 20 is an article from FIRE, entitled "Why the Supreme Court's *Davis* standard is necessary to restore free speech to America's college campuses: Part II," which is available at perma.cc/4QXD-4H2T;

u.  Exhibit 21 is a page from Oklahoma State's website, entitled "Controversial or Offending Speech," and is available at perma.cc/XL72-7WNM;

v.  Exhibit 22 is a challenged policy in *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), which is excerpted from and available at Docket 8-2, No. 1:18-cv-01078 (W.D. Tex. Dec. 21, 2018);

w.  Exhibit 23 is a challenged policy in *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), which is excerpted from and available at Docket 3-1, No. 6:21-cv-00313 (M.D. Fla. Feb. 22, 2021); and

x.  Exhibit 24 is a challenged policy in *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480 (S.D. Tex. 2022), which is excerpted from and available at Docket 3-2, No. 4:22-cv-00582 (S.D. Tex. Feb. 28, 2022).

y.  Exhibit 25 is an article from Campus Reform by Ben Zeisloft, entitled "Student booted as newspaper's editor-in-chief over mask mandate editorial," published on September 30, 2021, and available at perma.cc/A84U-L235.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of March, 2023

*/s/ James F. Hasson*

4

**App.187**

# Exhibit 1



# STUDENT SUPPORT AND CONDUCT

## STUDENT CODE OF CONDUCT

Cowboy Community Standards ...........................................................................................2

I. Introduction ....................................................................................................................2

    A. Purpose ......................................................................................................................2

    B. Authority.....................................................................................................................2

    C. Interpretation..............................................................................................................3

    D. Definitions .................................................................................................................3

    E. Applicability of the Student Code of Conduct.............................................................5

    F. Good Samaritan ........................................................................................................5

II. Prohibited Conduct........................................................................................................ 6

III. Student Conduct Process.............................................................................................11

    A. Student Conduct Procedures ...................................................................................11

    B. Student Rights in the Conduct Process ...................................................................12

    C. Student Conduct Meeting.........................................................................................13

    D. Student Conduct Hearing.........................................................................................13

    E. Student Conduct Committee Panel Hearing .............................................................15

IV. Sanctions.....................................................................................................................19

    A. Parental Notification ................................................................................................20

    B. Failure to Complete Conduct Sanctions or Comply with Conduct Office Requests...........21

    C. Implementation of Sanctions....................................................................................21

V. Appeal Procedure.........................................................................................................21

VI. Reviewing Authority ....................................................................................................22

VII. Conduct Files and Records.........................................................................................23

1

Oklahoma State University (OSU) is committed to creating and maintaining a productive living and learning community that fosters the intellectual, personal, cultural, and ethical development of its students. Self-discipline and valuing the rights of others are essential to the educational process and good citizenship. Attending Oklahoma State University is a privilege and students are expected to meet or exceed the university's standards of conduct both on and off campus.

## Cowboy Community Standards

Oklahoma State University students aspire to promote:

**Integrity:** Oklahoma State University students are expected to exemplify honesty, honor, and respect for the truth in their actions.

**Community:** Oklahoma State University students build and enhance their community. They understand and appreciate how their decisions and actions impact others and are just and equitable in their treatment of all members of the community.

**Social Justice:** Oklahoma State University students recognize that respecting the dignity of every person is essential for creating and sustaining a flourishing university community. They act to discourage and challenge those whose actions may be harmful to and/or diminish the worth of others.

**Respect:** Oklahoma State University students must show positive regard for each other and the community.

**Responsibility:** Oklahoma State University students are expected to accept responsibility for their learning, personal behavior, and future success, and students should appropriately challenge others to do the same. Students should use good judgment, be trustworthy, and take personal responsibility for their actions.

## I. Introduction

### A. Purpose

The Student Code of Conduct outlines university policies and procedures to which all students are expected to adhere during their time at Oklahoma State University. The primary focus of the conduct process is on educational and corrective outcomes; however, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community. The current version of the Student Code of Conduct is available at *ssc.okstate.edu/code.html.* For questions regarding the Student Code of Conduct, contact Student Support & Conduct (405-744-5470) or the Office of the Vice President for Student Affairs (405-744-5328).

### B. Authority

Under authority granted by Article 6, Sections 31 and 31a of the Constitution of the State of Oklahoma and Title 70, Oklahoma Statutes, Section 3412 Oklahoma State University is granted full authority to adopt policies and procedures governing the conduct of its students. Attendance at Oklahoma State University is optional, voluntary, and a privilege. When students enroll at Oklahoma State University, they voluntarily accept obligations of performance and behavior consistent with Oklahoma State University's lawful mission, processes, and functions. In

2

general, these obligations are considered much higher than the obligations imposed by civil and criminal law for all citizens.

Students are expected to comply with all university policies, contracts, and/or agreements. Failure to do so may result in students being required to participate in the conduct process. Conduct action may also be taken for any violation of local ordinances, state, or federal law, on or off campus, which adversely affects the university community or the pursuit of the university's lawful educational mission, process, or function. The university will take necessary and appropriate action to protect the safety and well-being of the campus community. In addition, if a student has been found to have violated state or federal law, the university reserves the right to notify the appropriate authority.

Students will be afforded due process and the ability to appeal as prescribed in this document and other relevant university policies, rules, or regulations. Students may be subject to civil and criminal penalties in addition to campus sanctions. Campus resolution may proceed before, during, or after civil or criminal actions are concluded and is not subject to challenge based on the action or inaction of civil authorities.

**C. Interpretation**

Any question of interpretation regarding the Student Code of Conduct will be determined at the sole discretion of the Vice President for Student Affairs or their designee.

**D. Definitions**

**Action Plan:** During a Student Conduct Meeting, the student and the conduct officer will work together to develop an Action Plan that will consist of various assignments to aid the student in their ethical, personal, and intellectual development.

**Advisor:** A person who has agreed to assist a complainant or respondent during the university conduct process. The advisor may be a person of the student's choosing, including an Oklahoma State University faculty or staff member, an Oklahoma State University student, a parent, a friend, or an attorney. For more information go to *ssc.okstate.edu/advisors.html.*

**Complainant:** An individual who files a disciplinary complaint; the university may also serve as a complainant.

**Consent:** Effective consent is informed, freely, and actively given, using mutually understandable words or actions that indicate a willingness to participate in mutually agreed-upon sexual activity. Initiators of sexual activity are responsible for obtaining effective consent. Silence or passivity is not effective consent. The use of intimidation, coercion, threats, force, or violence negates any consent obtained. Consent is not effective if obtained from an individual who is incapable of giving consent due to lack of consciousness, age, mental disability, or incapacitation due to the use of drugs or alcohol.

**Day:** The term day refers to calendar day, including weekdays and weekends. Time deadlines may be extended during breaks and university holidays.

**Family Educational Rights and Privacy Act (FERPA):** A federal law originally passed in 1974 that defines student educational records and regulates who may access those records and

3

under what circumstances. The purpose of FERPA is to protect the privacy of student education records.

**Honesty Statement:** The university expects that all information presented will be truthful and accurate. If false information is willfully provided, a student will violate Section II (21) of the Student Code of Conduct and may be held accountable through the student conduct process.

**Incapacitation:** This occurs when an individual is incapable, temporarily or permanently, to give consent because the individual is mentally and/or physically helpless, either voluntarily or involuntarily, or the individual is unconscious, asleep, or otherwise unaware that the sexual activity is occurring. An individual may be incapacitated if they are unaware at the time of the incident of where they are, how they got there, or why or how they became engaged in a sexual interaction.

**Institution**: Oklahoma State University and Northern Oklahoma College

**Parental Notification:** FERPA permits educational institutions to notify parents of students under the age of 21 when a student has been found responsible for an alcohol or drug-related violation. Students are generally notified when parents or guardians will be contacted and are given the opportunity to contact their parents first.

**Respondent:** Any student that is alleged to have violated the Student Code of Conduct.

**Sanction:** Used synonymously with assignment or outcome, a disciplinary correction is imposed on students who are found responsible for violating the Student Code of Conduct. Typically, sanctions include educational measures that hold students accountable for their behavior, providing the opportunity for behavior change in an individual. Sanctions can range from a verbal warning to suspension or expulsion. Sanctions are primarily educational and corrective; however, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community.

**Standard of Evidence:** The standard of evidence used to determine whether a violation occurred is a preponderance of the evidence. Under this standard, the burden of proof is met when evidence exists or is presented that establishes that it is "more likely than not" that a violation occurred. This standard is often described as requiring a showing that there is a greater than fifty percent (50%) chance that the claim is true.

**Student**: Any person who has been admitted and/or enrolled for the current term or a future term at Oklahoma State University, including correspondence study, online courses, study abroad, and auditing courses. This also includes students who are enrolled in courses offered in Stillwater through Northern Oklahoma College or the English Language Institute. Students who leave the university before a conduct complaint is resolved may be prohibited from future enrollment until the matter is resolved.

**Title IX:** A clause in the 1972 Federal Education Act that states that no person shall be denied the benefits of any educational program or activity because of sex. Title IX prohibits sexual harassment, gender-based discrimination, and sexual violence. The processes outlined in the Student Code of Conduct are used to address alleged violations involving student respondents within the Interim Title IX – Sexual Misconduct Policy (https://eeo.okstate.edu/title-ix-0).

4

**University Premises:** Any buildings or grounds owned, leased, operated, controlled, or supervised by the university. Students should be advised that this includes properties that are not a part of the main university campus. Examples of these areas include, but are not limited to, Camp Redlands and Lake Carl Blackwell.

**University-sponsored Activity:** Any activity on university premises or at an off-campus location that is directly initiated or supervised by the university or a university-recognized group or organization. This includes, but is not limited to, fraternity and sorority organizations, study abroad programs, and sporting events. In addition, university-operated or -leased transit, such as THE BUS or THE BOB, is included even if the behavior occurs off university premises.

**Witness:** Material witnesses are individuals with firsthand knowledge of the incident. A witness may be allowed to present information related to their knowledge of the incident. Character witnesses will not be allowed.

## E. Applicability of the Student Code of Conduct

As previously stated, the Oklahoma State University Student Code of Conduct applies to conduct which occurs on university premises, at Oklahoma State University-sponsored events both on and off campus, and to off-campus conduct that adversely affects the Oklahoma State University community or the pursuit of its objectives.

Each student is responsible for their actions from the time of application for admission through the actual awarding of the degree. Inappropriate conduct that occurs before classes begin or after classes end, as well as during the academic year and periods between terms of actual enrollment (even if the conduct is not discovered until after a degree is awarded) is covered by the Student Code of Conduct. The Student Code of Conduct will apply even if the student withdraws from the university while a conduct matter is pending.

The university will take necessary and appropriate action to protect the safety and well-being of the campus community. Off-campus behavior that allegedly violates ordinances, local, state, or federal law adversely affects the university community and the pursuit of the university's lawful educational mission and may be subject to university conduct action. The Director of Student Support & Conduct will decide whether off-campus inappropriate conduct is subject to university conduct action. Examples of off-campus behavior that may be subject to university conduct action include, but are not limited to: selling or otherwise providing alcohol to underage students, selling or distributing illicit drugs, sexual harassment, sexual misconduct, dating violence, domestic violence, stalking, actions that result in the serious injury or death of another person(s), alcohol or drug offenses, or any alleged violation that jeopardizes an individual's or community's educational opportunities.

## F. Good Samaritan

The university may offer amnesty for minor conduct violations to (1) a student who may have committed a minor violation at the time of a more serious incident or (2) a student who offers help to those who need medical assistance. If amnesty is offered, educational options may be explored, but no conduct actions or record will result.

5

## II. Prohibited Conduct

The following list describes actions that detract from the effectiveness of a university community and for which students may be subject to conduct action. All violations below may be addressed by the university when the behavior potentially jeopardizes the individual's or community's safety or educational opportunities.

*Integrity*

1. **Academic Misconduct:** Cheating, plagiarism, unauthorized collaboration, alteration of academic materials, or other academic misbehavior. For more information, visit *https://academicintegrity.okstate.edu*.

2. **Attempts and Complicity:** Attempting to or encouraging others to commit acts prohibited by this Code. Apathy or acquiescence in the presence of prohibited conduct may constitute a violation of this policy.

3. **False Reporting:** Knowingly making a false report of a bomb, fire, or other emergency.

4. **False Representation(s):** Knowingly making false representation(s) to the university in any form, written, or verbal. Submission of false information or withholding information at the time of admission or readmission may make an individual ineligible for admission to, or continuation at, Oklahoma State University.

5. **Forgery or Unauthorized Use:** Forging or using without authorization university documents or records, financial aid documents, computers, electronic mail, telephones, identification, or university property.

6. **Theft:** Engaging in theft, attempted theft, or unauthorized possession of property belonging to the university or other individuals or recognized groups on university property or facilities on or near campus.

*Community*

7. **Animals:** Failing to properly leash and control the animal and properly dispose of its organic waste. Having unauthorized animals in university buildings. Emotional support animals are not allowed in non-residential university buildings. Emotional support animals are only allowed in residential university buildings when approved by Housing and Residential Life and Student Accessibility Services.

8. **Classroom Disruption:** Engaging in behavior that a reasonable person would view as substantial or repeated interference with the instructor's ability to teach the class or the ability of other students to benefit from instruction.

9. **Disorderly Conduct:** Behaving in a disorderly, lewd, or indecent manner or breaching the peace on university property or at university-sponsored activities. Includes, but is not limited to, any non-consensual photography, video, or audio recording of another person when such recording causes or is likely to cause injury or distress.

10. **Disruption or Obstruction:** Disrupting or obstructing normal university or university-sponsored or -hosted activities, including, but not limited to studying, teaching, research,

6

university administration, or fire, police, or emergency services on university premises or at university-sponsored activities off campus. This includes disrupting or obstructing other individuals' right to expressive activity as defined by Oklahoma law.

11. **Fire Safety:** Engaging in misuse or unauthorized use of firefighting equipment, fire sprinkling systems, and other safety equipment or warning devices, engaging in behavior that creates a fire hazard, or failure to evacuate when a fire alarm is activated.

12. **Housing & Residential Life Policies:** Failing to comply with on-campus residence hall policies. Policies are available in the *Housing and Residential Life Handbooks* at *https://reslife.okstate.edu/policies/undergraduate-singles-handbook/index.html.*

13. **Information Technology Policies:** Failing to comply with the university's Information Technology policies. Policies are available online at *https://it.okstate.edu/about-us.html.*

14. **Parties and Gatherings:** Participating in parties or gatherings that disturb the peace of campus residences or off-campus neighborhoods.

15. **Property Damage:** Attempting to or completion of defacing, damaging, or destroying property belonging to the university or other individuals or recognized groups on university property or facilities on or near campus.

16. **Unauthorized Entry:** Entering into, attempting to enter into, or using without proper authorization, any university building, facility, vehicle, equipment, room, area, or university-approved housing. This includes unauthorized possession or use of university keys, computers, lock combinations, or other special access codes or passwords.

17. **Tobacco:** Using tobacco in any form or using electronic cigarettes (vaping) on campus, as prohibited by OSU Policy and Procedures Letter No. 1-0530. Possessing tobacco under the age of 21.

18. **Weapons:** Possessing, using, or storing firearms, explosives (including firecrackers), weapons, or dangerous chemicals on university property or in the course of any university activity, except as specifically authorized under applicable state law. This includes, but is not limited to, BB guns, paintball guns, knives, swords, crossbows, handguns, shotguns, and rifles. See OSU Policy and Procedures Letter 1-1301 for more information.

*Social Justice*

19. **Harassment:** Engaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe, or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person.

20. **Discrimination:** Discrimination includes but is not limited to, disparate treatment directed toward an individual or group of individuals based on sex, race, color, sexual orientation, age, status as a veteran, gender identity or expression, pregnancy or pregnancy-related condition, sex stereotype, national origin, religion or a qualified individual with a disability that adversely affects their employment or education.

7

21. **Interfering with the Conduct Process:** Interfering with conduct procedures or outcomes, including but not limited to falsification; distortion or misrepresentation of information before a conduct officer or Hearing Panel; knowingly initiating a complaint without good cause; harassment or intimidation of any member of a Hearing Panel, witness(es), or university personnel before, during, or after a proceeding; violating a No Contact Order; and failure to comply with the sanction(s) imposed by either a conduct officer or Hearing Panel.

22. **Retaliation:** Behaviors including but not limited to, intimidation, threats, coercion, or discrimination against a person who, acting in good faith, brings a complaint forward or against an individual who has participated in an investigation or conduct process because of their report or participation. For more information, see the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges Policy 3.06 Non-Retaliation.

*Respect*

23. **Dating Violence:** Dating violence is committed by a person who is or has been in a social relationship of a romantic or intimate nature with another person. The existence of such a relationship shall be determined based on consideration of the following factors: length of relationship, type of relationship, and frequency of interaction between the persons involved in the relationship. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts that meet the definition of domestic violence.

24. **Domestic Violence:** Domestic violence is a crime of violence committed by a:

   a.  current or former spouse or intimate partner of the victim;
   b.  person with whom the victim shares a child in common;
   c.  person who is cohabitating with or has cohabited with the victim as a spouse or intimate partner;
   d.  person similarly situated to a spouse of the victim;
   e.  any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of Oklahoma.

Domestic violence is a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner. Domestic violence can be physical, sexual, emotional, economic, or psychological actions, or threat of actions that influence another person.

25. **Hazing:** Engaging in any action or activity that causes or is likely to cause physical or mental discomfort or distress, that may demean, degrade, or disgrace any person, regardless of location, intent or consent of participants, for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization. Apathy or acquiescence in the presence of hazing are not neutral acts; they are violations of this rule. State law classifies hazing as a crime, Title 21 Oklahoma Statutes Section 1190.

26. **Physical Violence:** Engaging in physical violence of any nature against any person, on or off campus. This includes fighting; assaulting; battering; using a knife, gun, or other weapon; physically abusing, restraining, or transporting someone against their will; or acting in a manner that threatens or endangers the physical health or safety of any person or causes reasonable apprehension of such harm.

8

27. **Sexual Harassment:** Conduct on the basis of sex that satisfies one or more of the following:
   a. A person acting on behalf of the University in a position of authority conditioning the provision of any aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct (quid pro quo);
   b. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity;
   c. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct that explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment.

Subsections (a) and (c) are not evaluated for severity, pervasiveness, or offensiveness, because such conduct is sufficiently severe to deny access to the University's education program or activities.

28. **Sexual Misconduct:** This term is used to encompass Sexual Assault, Indecent Exposure, and Sexual Exploitation.

*Sexual Assault:* An offense that meets the definition of rape, fondling, incest, or statutory rape:
   a. *Rape* – the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim;
   b. *Fondling* – the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity;
   c. *Incest* – sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law;
   d. *Statutory Rape* – sexual intercourse with a person who is under the statutory age of consent.

*Sexual Exploitation*: Conduct where an individual takes non-consensual or abusive sexual advantage of another for their own benefit, or to benefit anyone other than the one being exploited. Examples of sexual exploitation include, but are not limited to, engaging in voyeurism; sharing of pornographic or other sexually inappropriate material; the intentional removal of a condom or other contraceptive barrier during sexual activity without the consent of a sexual partner; and any activity that goes beyond the boundaries of consent, such as recording of sexual activity, letting others watch consensual sex, or knowingly transmitting a sexually transmitted disease (STD) to another. Allegations of sexual exploitation will be evaluated to determine if they meet the severe, pervasive, and objectively offensive standard.

*Indecent Exposure:* The act of intentionally exposing one's genitals in public or in front of others, for the purpose of sexual gratification or causing offense. Allegations of Indecent Exposure will be evaluated to determine if they meet the severe, pervasive, and objectively offensive standard.

9

29. **Stalking:** Stalking refers to one who engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress.

- **Course of conduct** means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
- **Reasonable person** means a person under similar circumstances and with similar identities to the victim.
- **Substantial emotional distress** means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

*Responsibility*

30. **Alcohol:** Consuming, possessing, manufacturing, distributing, selling, or serving alcoholic beverages on university premises (including residence halls and sorority and fraternity housing) or at university-sponsored activities regardless of age, except as expressly permitted by university policy. Knowingly being in the presence of alcohol where it is not permitted on campus is also prohibited. The following are also violations on or off campus:

a. Public intoxication or under the influence of alcohol
b. Driving under the influence of alcohol or while impaired
c. Actual physical control of a vehicle while under the influence of alcohol
d. Providing alcohol to individuals under 21 years of age
e. Social Host: Providing a location for any individual under 21 years of age to possess or consume alcohol
f. Transporting an open container of alcohol
g. Incapacitation due to alcohol
h. Possession or use of a fake ID
i. Underage in possession of alcohol
j. Underage in a liquor (package) store.

Lawful and responsible alcohol consumption is permitted <u>only</u> in designated areas of the OSU campus, properties, and facilities as authorized by the Board of Regents.

31. **Drugs:** Acting or intending to act to illegally use, possess, sell, share, distribute, cultivate, manufacture, or be under the influence of any state or federally controlled drug or substance. Possessing drug paraphernalia. Inhaling or ingesting any substances (e.g., nitrous oxide, glue, paint, etc.) that will alter a student's mental state. Knowingly providing a location for individuals to possess or consume drugs, or knowingly being in the presence of drugs are also prohibited. While the use of medical marijuana has been legalized in the state of Oklahoma, federal law continues to prohibit marijuana. Therefore, the possession or use of prescribed medical marijuana is prohibited on campus property and at University-sponsored activities.

32. **Failure to Comply:** Failing to comply with the lawful directions of any university employee acting within the scope of their official duties or failing to identify oneself to such a person when requested to do so.

33. **Gambling:** Illegal gambling for money or other things of value on campus or at university-sponsored activities.

10

### III. Student Conduct Process

The responsibility for the campus student conduct system is delegated from the Board of Regents for Oklahoma State University to the Vice President for Student Affairs through the President. The Vice President for Student Affairs further delegates authority for student conduct to Student Support & Conduct, Housing and Residential Life, and designated conduct officers. A conduct officer is a university employee who is an officially designated administrator, staff member, or graduate student working under the direct supervision of a professional staff member. The goal is to resolve cases by the lowest appropriate authority for maximum educational benefit.

**A. Student Conduct Procedures**

The following information is provided to inform students of the procedures in place at OSU for resolving alleged violations of university regulations. The procedures are designed to allow for fact-finding and decision-making in the context of the OSU educational community. The objective is to provide procedures that balance the rights of the individual with the legitimate interests of the university and community.

1. **Complaints:**
   a. Any member of the university community (faculty, staff, or student) or any person who is unaffiliated with the university who has knowledge of an alleged violation of the Student Code of Conduct may file a complaint against a student alleging that a violation of the Student Code of Conduct has occurred. The university may initiate a complaint.
   b. Complaints should be filed with Student Support & Conduct as soon as possible. An extended gap of time from the date of the incident until the date of reporting may substantially limit the ability to collect relevant information.
   c. The complaint should be submitted via the approved online form and signed before a hearing process. The online form is found at *https://ssc.okstate.edu/report.html.*
   d. Complaints may be initiated for incidents where concurrent criminal charges are pending. The university may adjudicate incidents without regard to either pending civil litigation or criminal prosecution. University conduct proceedings may proceed before, during, or after court proceedings.

2. **Interim Suspension:** In cases where student health or safety is reasonably believed to be significantly jeopardized, the Vice President for Student Affairs, in consultation with the President of the university, or designee, may suspend a student for the period of time required to allow a thorough investigation and an opportunity for a hearing. Students who are so suspended are not permitted on campus or in university buildings, facilities, or activities at any time for any reason during the period of the interim suspension, unless otherwise permitted in writing by the Director of Student Support & Conduct. If a student is interim suspended for a policy violation covered by Title IX policy then the emergency removal process shall be followed.

If the conduct or behavior of a student residing in an Oklahoma State University residence hall is determined by the Vice President for Student Affairs, the Director of Housing and Residential Life, or the Director of Student Support & Conduct to be a threat to others, the ability to live in the residence hall may be immediately suspended for a period of time pending the outcome of a hearing. During an interim housing suspension, the student is immediately removed from the residence hall and is not to reenter any campus residence hall until a hearing is held and a decision regarding the pending complaint has been made.

11

Appellate Case: 23-6054   Document: 010110864064   Date Filed: 05/23/2023   Page: 201

3. **Investigation:** As needed, Student Support & Conduct will conduct investigations to gather information. The complainant and respondent will receive a notice of the allegations before an investigation meeting. During the investigation meeting, each participant will have the opportunity to share their perspective of the alleged incident, name witnesses, and share any supporting documents. The investigator will compile a report summarizing the relevant information collected. The complainant and respondent will be provided ten days to review and respond to the information presented in the investigation report. A final investigation report and supporting information will be provided at least ten days before the hearing.

4. **Disposition of Allegations:** The university conduct process is administered through Student Support & Conduct. Alleged violations of university regulations where neither suspension nor expulsion is a possibility will normally be resolved through a **Student Conduct Meeting (see Section III (C) below)**.

Allegations that may result in suspension and where a one-on-one meeting between the conduct officer and the respondent would be the most effective way to establish the facts of the case are typically referred to a **Student Conduct Hearing (see Section III (D) below)**.

Allegations that could result in suspension or expulsion, or that are complex, sensitive, or require several witnesses or that involve an alleged victim are often referred to a **Hearing Panel (see Section III (E) below)**.

At the conclusion of a Student Conduct Hearing, the conduct officer may refer the case to a Hearing Panel if further development of the facts is warranted and would be aided by a more formal hearing. If this is done, the conduct officer will not make any findings. Additionally, a respondent or complainant in a case assigned to a Student Conduct Hearing may request that their case be resolved by a Hearing Panel. Such a request must be made before the scheduled hearing to the assigned conduct officer.

If a student is assigned to a Hearing Panel and admits responsibility for the alleged violation(s), a Student Conduct Hearing may be conducted. In instances when a complainant is involved, both parties must agree on any changes to the hearing type.

In instances where a student has been convicted of a felony through the criminal process or the university believes it has enough information that would make it more likely than not a violation of the Student Code of Conduct has occurred, the university may file a complaint against the alleged student without the cooperation of the victim.

## B. Student Rights in the Conduct Process

The university views the conduct process primarily as an educational experience that can promote growth in personal understanding of one's role as a member of an educational community and one's rights, responsibilities, and privileges therein. However, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community.

During a conduct process, both the respondent and the complainant have the rights to:
1. A written notice of the alleged violation(s);
2. An explanation of the student conduct process upon request;
3. Have no violation assumed;

4. A timely hearing;
5. Be accompanied by an advisor during the conduct process. In matters not involving possible suspension or expulsion, the advisor is limited to advising the student and may not present information, question relevant parties, or make statements during the proceedings;
6. Have access to the information and documents to be presented at the hearing in advance;
7. Be present during the entire proceeding, except during deliberation;
8. Ask relevant questions to any participant or witness present, either directly or indirectly, at the discretion of Hearing Panel Chair;
9. Present material witnesses (those with firsthand knowledge of the incident). The respondent and complainant are responsible for contacting and arranging for the attendance of their witnesses in all cases;
10. Receive written notification of the outcome of the conduct process; the complainant can only receive written notification of the outcome of the conduct process when permitted by federal law; and
11. An avenue for appeal from a hearing.

**C. Student Conduct Meeting**

Upon determining that sufficient information exists to believe that a violation of the Student Code of Conduct may have occurred, the Director of Student Support & Conduct, or another conduct officer with jurisdiction, will notify the student in writing of the alleged violations against them. The notice will be delivered in person, sent electronically to the student's institutional email address, or mailed to the student's last known address of record as filed in the Registrar's Office. (Students are responsible for providing and maintaining a current local address and e-mail address with the Registrar's Office.)

At the meeting, the student will be provided with the following:

1. An explanation of the alleged violation(s) of university policy;
2. A summary of the facts and information that substantiate the allegations;
3. The opportunity to reflect upon and give their account of the incident or circumstances pertaining to the allegation(s);

An explanation of the decision of the conduct officer that may result in the following:
   a. The allegation(s) may be dismissed as unfounded.
   b. The student may admit responsibility for the violation(s) and have a sanction(s) imposed.
   c. The student may be found responsible for violating the Student Code of Conduct and have a sanction(s) imposed.
   d. Any sanction (except suspension, deferred suspension, and expulsion) may be imposed.
   e. Decisions reached at the meeting will be final with no option to appeal or other proceedings.
   f. Failure to respond to a written allegation(s) or failure to complete the assigned sanction(s) will result in either a hold being placed on the student's enrollment privileges or graduation, additional alleged violations, or a decision being made based on the information available at the time.

**D. Student Conduct Hearing**
Hearing procedures are provided for allegations against an individual where suspension from the university is possible, if found responsible. Cases of suspension and expulsion are only processed through Student Support & Conduct.

13

Students have the right to be accompanied by an advisor, who may advise and support the student. The advisor may participate directly to the same extent as the student. Such direct participation is a privilege that, if abused, may be withdrawn by the conduct officer. If the privilege is withdrawn, the advisor may continue to advise the student. However, if the advisor fails to follow the hearing procedure, the conduct officer may bar the advisor from the hearing. The student must notify Student Support & Conduct four days in advance of the hearing if accompanied by an advisor. In such cases, the university may have an attorney in attendance.

1. **Pre-Hearing Procedures**

Student Support & Conduct will prepare and send a written notice to the respondent and complainant at least five days before the hearing. The notice will be delivered in person, sent electronically to the student's institutional email address, or mailed to the student's last known address of record as filed in the Registrar's Office and will include:
   a. The date, time, place, and nature of the hearing;
   b. Reference to the section(s) of the Student Code of Conduct involved;
   c. A brief explanation of the alleged violation(s), including the approximate date and place where the alleged violation(s) occurred;
   d. Names of witnesses, if known;
   e. The right to be accompanied by an advisor and the advisor's role in the hearing;
   f. Names of the conduct officer(s) for the case.

The Director of Student Support & Conduct or designee will be available to meet with the complainant and the respondent, separately, to explain the hearing procedure and answer questions.

2. **Three Days in Advance of the Hearing**
   a. The respondent and the complainant will provide to the Office of Student Support & Conduct copies of documents to be presented at the hearing and the names of witnesses who will be called.
   b. Each student must notify their witnesses of the date, time, and location of the hearing.
   c. The respondent and the complainant will have access to copies of documents to be presented at the hearing by prior appointment. Materials will be sent via email three days in advance of the hearing.
   d. The respondent and the complainant will provide notice to the Office of Student Support & Conduct of an advisor who will accompany them.

3. **Hearing Procedures**

The hearing provides a forum where all the information and documents can be presented, where questions can be asked of all parties, and where the conduct officer(s) can deliberate and make a decision using a preponderance of evidence, that is it more likely than not that a violation of the Student Code of Conduct did, or did not, occur. Formal rules of process, procedure, and technical rules of evidence, such as those applied in criminal or civil court, are not used in student conduct proceedings. Deviations from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the student or the university may result.

To protect the privacy of all parties and in accordance with FERPA (Family Educational Rights and Privacy Act), hearings will be closed.

14

The respondent and complainant can present witnesses who may be questioned by the conduct officer(s). Questioning by the complainant or the respondent is permitted so long as it is relevant and is not threatening or harassing.

The hearing (excluding the deliberations) will be audio recorded. The recordings are the property of the university. Others will not be allowed to make a recording of any type. The university is not responsible for equipment malfunctions. Requests to review audio recordings may be made to Student Support & Conduct.

If the respondent elects not to appear for the hearing, the hearing will be held in their absence. Failure to appear will be noted without prejudice. Findings will be based on the information presented at the hearing.

Material witnesses will be present during the introductory comments of the hearing, including the honesty statement, at which point they will be excused until time to give their testimony. Witnesses will be excused upon completion of testimony and questioning, but they may be asked to remain available for recall. The complainant and respondent may remain throughout the hearing.

At the conclusion of the hearing, all parties will be dismissed except for the conduct officer(s), who will deliberate and reach a decision.

A student's past conduct record may be subject to an educational discussion at the hearing. Past conduct history does not impact the finding of responsibility but could be used as information in determining appropriate sanctions.

The conduct officer(s) may accommodate concerns for the personal safety, well-being, or fears of confronting the complainant, respondent, or other witnesses. Procedures or the hearing environment may be modified as determined by the Director of Student Support & Conduct to be appropriate.

4. **Hearing Deliberations and Decision**
The conduct officer(s) will deliberate and determine whether it is more likely than not that a violation(s) of the Student Code of Conduct did or did not occur as alleged.
   a. The conduct officer(s) may find that the information presented was not sufficient to establish that a violation of the Student Code of Conduct was committed and dismiss the case.
   b. The conduct officer(s) may find that the information presented was sufficient to affirm the alleged violations and impose a sanction appropriate for the violation(s).

The decision of the conduct officer(s) will be communicated in writing to the respondent and, if appropriate, the complainant, within two days. The notification letter will include findings of fact, sanction(s) imposed (if any), and the rationale for the decision. The notification letter will be delivered in person, sent electronically to the institutional email address, or sent by certified mail to the student's last known address of record as filed with the Registrar's Office. The notification letter may also be picked up in the Student Support & Conduct office.

**E. Student Conduct Committee Panel Hearing**
Hearing procedures are provided for allegations against a student where suspension or expulsion from the university is possible, if they are found responsible, and for student discrimination grievances.

15

The Student Conduct Committee Panel Hearing option may not be available during dead week, final examinations, breaks, or other periods. If feasible, a hearing will proceed during these times. Additionally, a Student Conduct Committee Panel Hearing may not be available when the Director of Student Support & Conduct or Vice President for Student Affairs determines that appearing before the panel poses a threat to the physical welfare of panel members or witness(es). Hearings are scheduled around academic schedules on record of the complainant and respondent.

The Student Conduct Committee Panel Hearing (Hearing Panel) shall be selected from the Student Conduct Committee which is comprised of a minimum of 10 faculty nominated by the Faculty Council and appointed by the President; 10 staff nominated by the Staff Advisory Council and appointed by the President; and 10 students, appointed by the President of the Student Government Association and the President of the Graduate and Professional Student Government Association.

A Hearing Panel shall consist of three unbiased members — one faculty member, one student member, and one staff member —selected from the Student Conduct Committee by Student Support & Conduct. The faculty member will be the chairperson. Selected Hearing Panel members will be identified in the hearing file. Prior to the hearing, alternate Hearing Panel members may be seated to be available in case of conflicts. The Hearing Panel makeup may be altered if insufficient unbiased members are available to allow for a timely hearing and approved by the complainant and respondent.

A professional staff member from Student Support & Conduct will be present as a non-voting participant. Their role will be to facilitate dialogue between the Hearing Panel and the student(s) involved, ensure appropriate participation from advisors, and answer procedural questions as needed. A member of Legal Counsel may be present at the hearing to serve as a non-voting advisor to the Hearing Panel.

A student's advisor may participate directly to the same extent as the student. Such direct participation is a privilege that, if abused, may be withdrawn by the Chair of the Hearing Panel or the Student Support & Conduct staff member. If the privilege is withdrawn, the advisor may continue to advise the student. However, if the advisor fails to follow the hearing procedure, the Chair of the Hearing Panel or the Student Support & Conduct staff member may bar the advisor from the hearing. The student must notify Student Support & Conduct twelve days in advance of the hearing with their advisor's name and contact information.

In cases when the university compiles an investigation report, the investigator will present the report and answer questions regarding the investigation. The role of the investigator is to serve as an unbiased party conducting a thorough investigation of all allegations of sexual harassment or sexual misconduct. The investigation report is a compilation of relevant information, not a verbatim report, and is not appealable or rebuttable. The investigation report will be available ten days in advance for all parties to review.

1.  **Fifteen Days in Advance of the Hearing**
Hearing Panel members will be selected by Student Support & Conduct based on their availability. Student Support & Conduct will send a written notice to the respondent and the complainant at least fifteen days before the hearing. The notice will be delivered in person, sent electronically to the institutional email address, or sent via certified mail to the student's last known address of record as filed with the Registrar's Office and will include:

16

a. The date, time, place, and nature of the hearing;
b. Reference the alleged prohibited conduct violations of the Student Code of Conduct
c. Information regarding procedures for the process;
d. A brief explanation of the alleged violation(s) including the approximate date, time, and place where the alleged violation(s) occurred;
e. Names of witnesses, if known;
f. The right to be accompanied by an advisor and the advisor's role in the hearing.
g. The hearing file including the investigation report (if applicable).

The Student Support & Conduct staff will be available to meet with the complainant and the respondent, separately, to explain the hearing procedure and answer questions.

## 2. Twelve Days in Advance of the Hearing

The respondent and the complainant will provide to Student Support & Conduct copies of documents to be presented at the hearing, the names of witnesses who will be called, and the name and contact information of their advisor. It is the responsibility of each student to notify witnesses and advisor of the date, time, and location of the hearing.

## 3. Ten Days in Advance of the Hearing

The respondent and the complainant have the right to access documents to be presented at the hearing. Materials will be sent via email ten days in advance of the hearing.

## 4. Hearing Procedures

The hearing provides a live forum where all the information and documents can be presented, where questions can be asked of all parties, and where the Hearing Panel can deliberate and decide to the standard of "more likely than not" that a violation of the Student Code of Conduct did or did not occur. Formal rules of process, procedure, and technical rules of evidence – such as are applied in criminal or civil court – do not apply to student conduct proceedings. Deviations from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the student or the university may result.

To protect the privacy of all parties and in accordance with FERPA (Family Educational Rights and Privacy Act), all hearings will be closed. The respondent and complainant can present witnesses, who may be questioned by the Hearing Panel and the other participant. Questioning by the complainant or the respondent is permitted so long as it is relevant and is not threatening or harassing.

Only relevant questions may be asked of either participant during the hearing. Questions will be reviewed for relevance by the hearing panel chair before the question is answered. The Hearing Panel may, at its discretion, exclude information or questions of the participant's sexual history from discussion during the hearing. The past sexual history of the complainant with persons other than the respondent is irrelevant.

The hearing (excluding the deliberations) will be audio recorded. The recordings are the property of the university. Others will not be allowed to make a recording of any type. The university is not responsible for equipment malfunctions. Requests to review audio recordings may be made to Student Support & Conduct.

If the respondent or complainant elects not to appear for the hearing, the hearing will be held in their absence. If the respondent, complainant, or witnesses do not attend or participate in answering relevant questions at the hearing, the panel must not consider any of the participant's

17

statements when determining responsibility; however, the panel cannot assume responsibility based solely on the participant's or witness's refusal to participate or answer questions. In cases not covered by the Interim Title IX policy, witness information provided through the investigation process can be considered by the Hearing Panel even if the witness does not attend the hearing. The Hearing Panel should weigh their information appropriately.

The complainant and respondent remain present throughout the hearing. Witnesses will be present only during the time they are sharing information and being asked questions. It is preferred all witnesses be present in person; however, if a witness cannot be present for the hearing, arrangements can be made for a witness to participate via phone or other electronic means as long as adequate notice is provided.

At the conclusion of the hearing, all parties will be dismissed except for the Hearing Panel so they may deliberate and reach a decision.

Conduct history is not relevant in determining responsibility but can be used as information in determining an appropriate sanction. A student's conduct history will be available to the Hearing Panel if the respondent is found responsible.

The order of presentation at the hearing will be as follows:
   a. Introductions and reading of allegations.
   b. Opening statements may be presented to the Hearing Panel. Procedurally, the complainant is provided the opportunity to present first, followed by the respondent.
   c. If relevant, the university investigator will present the investigation report and answer related questions.
   d. The complainant will present information, call witnesses, and answer questions from the Hearing Panel and other participants.
   e. The respondent will present information, call witnesses, and answer questions from the Hearing Penal and other participants.
   f. Closing statements may be presented to the Hearing Panel. Procedurally, the complainant is provided the opportunity to present first, followed by the respondent.
   g. All participants are dismissed for Hearing Panel deliberation.

The Hearing Panel may accommodate concerns for the personal safety or well-being of the complainant, respondent, or other witnesses. Procedures or the hearing environment may be modified as determined by the Director of Student Support & Conduct.

**5. Hearing Panel Deliberations and Decision**
The Hearing Panel will deliberate and, by majority vote, a decision will be made using the preponderance of evidence standard.
   a. The Hearing Panel may find that the information presented was not sufficient to establish a finding of responsibility for a violation(s) of the Student Code of Conduct.
   b. The Hearing Panel may find that the information presented was sufficient to find the respondent responsible for violating the Student Code of Conduct and impose a sanction appropriate with the violation(s).

The Hearing Panel's decision will be communicated in writing to Student Support & Conduct, which will notify the respondent, and if appropriate, simultaneously notify the complainant in writing within two days.

The notification letter will include allegations made against the respondent, alleged policy violations, a description of procedural steps taken, findings of fact, determination of responsibility, sanction(s) imposed (if any), and the rationale for the decision. The notification letter will be delivered in person, sent electronically to the institutional email address, or sent by certified mail to the student's last known address of record as filed with the Registrar's Office. The notification letter may also be picked up in the Office of Student Support & Conduct, 328 Student Union, within two days of the hearing.

In cases of sexual misconduct, dating violence, domestic violence, stalking, sexual harassment, or physical violence, the complainant will be notified of the outcome at the same time as the respondent. For other violations, the complainant will not be notified of the outcome.

**F. Complainant Notification**
Complainants are entitled to know about the results of proceedings.

## IV. Sanctions

Although not intended to be inclusive, the following are possible sanctions that may be imposed, either singularly or in combination, for a student if a violation of the Student Code of Conduct is found. During a Student Conduct Meeting, the student and the conduct officer will work together to develop an Action Plan to aid the student in their ethical, personal, and intellectual development.

1.  **Written Warning** is an official written notice that the student has violated university policies and that more severe conduct action will result should the student be involved in other violations while the student is enrolled at the university.

2.  **Restriction** is a limitation on a student's privileges for a period of time and may include, but not be limited to, the denial of the use of facilities or access to parts of campus, denial of the right to represent the university, or denial of participation in extracurricular activities not directly associated with academics (e.g., intramural sports, attending athletic events, student organizations/clubs/associations, or leadership positions within housing, fraternities/sororities, or other organizations). Students must apply to re-instate the privilege by submitting documentation of their significant proactive efforts to become good citizens of the community and engage in responsible, productive behavior.

3.  **Educational and Behavioral Change Requirements** are assigned as an opportunity for personal development and can include, but are not limited to, attending alcohol education, a reflection essay, community service, seeking academic counseling, decision-making class, and other relevant educational opportunities.

4.  **Class Removal** occurs when a student is dropped from a class or moved to another section of a class. Faculty members, in consultation with the Director of Student Support & Conduct, reserve the right to interim suspend a student from class pending a hearing for alleged violations of the Student Code of Conduct occurring in the classroom that substantially interfere with teaching or other students' ability to learn.

5.  **No Contact Order** is an absolute prohibition from contact with a specified person or persons in any form whatsoever, including, but not limited to, contact in person, by phone, electronically, or through another person. A No Contact Order may be implemented as an interim measure for Title IX issues. Interim measures can be put in place without a formal complaint, conduct

19

process, or a finding of responsibility. Violating a No Contact Order may result in suspension from the university.

6. **Restitution** is compensation for the damage caused to the university or any person's property on campus. This is not a fine, but rather a repayment for labor costs and/or value of property destroyed, damaged, consumed, or stolen.

7. **Residence Hall Status Change**: The following sanctions may include:
   a. **Restrictions** on visitation to specified buildings or all university housing.
   b. **Reassignment** to another university housing facility as determined by Residential Life staff.
   c. **Suspension** from a university housing facility for a specified period of time, after which the student is eligible to return. Conditions for returning may be specified.
   d. **Removal** from living in or visiting any university housing facility.

8. **Conduct Probation** is a specified period of time during which the student is placed on formal notice that they are not in good standing with the university and that further violations of university regulations will subject them to suspension or expulsion from the university.

9. **Conduct Suspension** is the exclusion from enrollment in classes and other privileges or activities for a definite period of time not to exceed three years and until the conditions which are outlined in the hearing outcome letter are met. Students who are suspended from Oklahoma State University are not permitted on campus or in university buildings, facilities, or activities at any time for any reason during the period of suspension, unless otherwise permitted by the Director of Student Support & Conduct. Notation on the transcript is not made; however, a record of the action is maintained in the student's record in the Registrar's Office. If a transcript is requested during the period of suspension, a letter will be sent with the transcript to the requesting party/institution stating the student is under suspension for conduct reasons. Only unofficial transcripts will be released to the student directly. Any refund of tuition or fees will be subject to the university's normal withdrawal policy.

10. **Conduct Expulsion** is the termination of student status for an indefinite period. Students who are expelled from Oklahoma State University are not permitted on campus or in university buildings, facilities, or activities at any time for any reason, unless otherwise permitted by the Director of Student Support & Conduct. Notation on the transcript is not made; however, a permanent record of the action is maintained in the student's record in the Registrar's Office. If a transcript is requested, a letter will be sent with the transcript to the requesting party/institution stating the student has been expelled for conduct reasons. Only unofficial transcripts will be released to the student directly. Expulsion becomes a permanent part of a student's conduct record. Any refund of tuition or fees will be subject to the university's normal withdrawal policy.

## A. Parental Notification

Oklahoma State University reserves the right to notify the parents/guardians of dependent students regarding any conduct situation, particularly alcohol and other drug violations. The university may also notify parents/guardians of non-dependent students who are under the age of 21 of alcohol and/or other drug violations. Parental notification may also be utilized discretionarily by administrators when permitted by FERPA or consent of the student.

**B. Failure to Complete Conduct Sanctions or Comply with Conduct Office Requests**

All students, as members of the university community, are expected to comply with conduct sanctions within the timeframe specified by Student Support & Conduct. Failure to follow through on conduct sanctions by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanctions and an enrollment hold, which is a "hold" on enrollment privileges. This hold can prevent the adding or dropping of classes or enrollment for subsequent terms. Cancellation of enrollment occurs when a previous enrollment hold has been cleared with the condition that the enrollment will be canceled for failure to meet the conditions of the clearance. If canceled, the refund of tuition or fees will be subject to the university's normal withdrawal policy. A graduation hold is a hold on a student's participation in graduation exercises and diploma for failure to respond to a request to meet with the Director of Student Support & Conduct or other conduct officers, or for non-compliance with conduct sanctions. The Vice President for Student Affairs may recommend a graduation hold.

**C. Implementation of Sanctions**

Conduct actions or grievance decisions shall not be implemented until the time for appeal has expired, until the entire appeal process is completed, or until the individual voluntarily waives the right to appeal in writing. The exceptions to delaying sanctions until the process is complete include: 1) when interim suspension has been imposed or 2) to protect the well-being of students on the campus.

**V. Appeal Procedure**

An appeal is a review of the record of the original hearing, not a new hearing. It is the responsibility of the person who initiated the appeal to show that one or more of the listed grounds for appeal has merit. The parties will not appear before the university Conduct Appeal Panel (Appeal Panel) unless specifically requested to do so by the Appeal Panel.

Any outcome decided in a hearing may be appealed to the Appeal Panel by the respondent or the complainant.

The Appeal Panel has three members selected from the Student Conduct Committee: one student representative; one staff representative; and one faculty representative of the Student Conduct Committee. The faculty representative serves as the Chair. The Appeal Panel will have one advisor, either a representative from Student Support & Conduct or Legal Counsel.

Appeals must be submitted and authenticated online to Student Support & Conduct by 5 p.m. within ten days of the original hearing. The appeal form can be found at *https://ssc.okstate.edu/appeal.html*. Failure to file an appeal within the prescribed time constitutes a waiver of any right to an appeal. The appeal must cite at least one of the following appeals criteria as the reason for the appeal and provide a supporting argument(s) as to why an appeal should be granted on these grounds. Appeals criteria include the following:

1. The hearing was not conducted in conformity with prescribed procedures, and substantial prejudice to the complaint or the respondent resulted;
2. New information that could substantially affect the outcome of the previous lower hearing has been discovered since that hearing. The information must not have been available at the time of the original hearing. Failure to present information that was available is not grounds for an appeal under this provision;
3. The sanction is not appropriate for the violation. This provision is intended to be utilized when a determined sanction is inherently inconsistent with university procedures or

21

precedent. Simple dissatisfaction with a sanction is not grounds for overturning a sanction under this provision.

After receipt of a submitted appeal, the faculty chair of the Appeal Panel will review to confirm that the appeal submitted aligns with the appeal criteria. If the submitted appeal does not align with the appeal criteria then the appeal will be dismissed. If the chair determines the submitted appeal aligns with the appeal criteria, a full appeal panel will meet to consider the appeal.

Prior to the Appeal Panel review, if there is an opposing participant or university investigator involved in the case, they will be given ten days to provide a written response to the appeal.

The Appeal Panel will review the record of the original hearing, including documents, the appeal, and written response/s to appeal, if applicable, and issue a finding as to the merits of the criteria cited as the reason for appeal.

1. If the Appeal Panel finds there is no merit to any of the grounds cited in the appeal, it will issue a finding as such and that decision will be final
2. If the Appeal Panel finds the previous hearing was not conducted as prescribed and substantial prejudice resulted, the matter may be remanded to a new hearing.
3. If the Appeal Panel is presented with new information that could not have been presented at the original hearing and finds the new information is relevant, the matter may be resubmitted to the original hearing body.
4. If the Appeal Panel finds that the sanction is inappropriate for the violation, the Appeal Panel may recommend the sanction be modified by the Vice President for Student Affairs or their designee and state the reasons for that recommendation.

The Appeal Panel's final decision will be communicated in writing by Student Support & Conduct to the complainant and the respondent. The decision will normally be communicated within two days of receiving the written decision.

If the appeal panel recommends modifying the outcome or the sanction, the Vice President for Student Affairs or their designee will review the Appeal Panel's recommendation. The final decision will be communicated in writing by the Vice President for Student Affairs or their designee to the complainant and the respondent. The decision will normally be communicated within 10 days of receiving the written recommendation. The decision of the Vice President for Student Affairs or their designee will be final.

**VI. Reviewing Authority**

Reviewing authority is retained by the Vice President for Student Affairs, at their discretion, to convert any sanction imposed to a lesser sanction, to rescind any previous sanction, or to return a recommended sanction to a Hearing Panel for review or reconsideration.

### VII. Conduct Files and Records

Case referrals will result in the development of a conduct file in the name of the respondent. If the student is found not responsible for the allegations, the file will be marked no action. A no-action record will not constitute a conduct record. Student Conduct records with sanctions less than suspension or expulsion will be maintained in the Office of Student Support & Conduct for seven years following the calendar year of record and then destroyed. Records of cases in which suspension from the university occurred are kept for at least 10 years. Records of cases in which expulsion from the university occurred are kept indefinitely.

All conduct records are education records and may not be disclosed in whole or in part except as provided by law, by the written authorization of the student, under legal compulsion, or where the safety of other persons may be involved. Conduct records are maintained separate from the student's academic record but are part of the student's educational record.

23

## CERTIFICATE OF SERVICE

I filed this appendix with the Court via ECF, which will email everyone requiring notice.

Dated: May 23, 2023                     _s/ Cameron T. Norris_____