**No. 23-6054**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

SPEECH FIRST, INC.,

*Plaintiff-Appellant*,

v.

KAYSE SHRUM, in her official capacity
as President of Oklahoma State University,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the
Western District of Oklahoma, No. 5:23-cv-29 (Jones, J.)

---

## APPELLANT'S APPENDIX, VOLUME II: App.214 - App.430

---

Ryan Haynie, OBA No. 32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

J. Michael Connolly
Cameron T. Norris
James F. Hasson
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Appellant*

Dated: May 23, 2023

# TABLE OF CONTENTS

## <u>VOLUME I</u>

District Court Docket Sheet ................................................................................4

Verified Amended Complaint (Doc. 27) ...........................................................21

Defendant Kayse Shrum's FRCP 12(B)(1) Motion To Dismiss Plaintiff's Amended Complaint Based On Lack Of Standing (Doc. 29) ...........................................54

Ex. 1 Do No Harm Slip Copy (Doc. 29-1) .......................................................84

Ex. 2 Declaration of Hallenbeck (Doc. 29-2) ................................................. 105

Ex. 3 Declaration of Aleigha Mariott (Doc. 29-3) .......................................... 117

Ex. 4 Declaration of Adam Barnes (Doc. 29-4) .............................................. 123

Plaintiff's Oppposition To Defendant's Motion To Dismiss The Amended Complaint (Doc. 32) ...................................................................................... 126

Declaration of Cherise Trump (Doc. 32-1) ..................................................... 160

Declaration of Student A (Doc. 32-2) ............................................................. 167

Declaration of Student B (Doc. 32-3) ............................................................. 172

Declaration of Student C (Doc. 32-4) ............................................................. 178

Declaration of James F. Hasson (Doc. 32-5) .................................................. 184

Ex. 1: Student Code of Conduct (Doc. 32-6) .................................................. 189

Certificate of Service ..................................................................................... 213

## <u>VOLUME II</u>

Ex. 2: General Incident Report (Doc. 32-7) .................................................... 217

Ex. 3: Report a Concern Page (Doc. 32-8) ...................................................... 223

Ex. 4: Reporting Forms (Doc. 32-9) ............................................................... 227

Ex. 5: FIRE BIRT Report (Doc. 32-10) .......................................................... 229

Ex. 6: New Republic Article (Doc. 32-11) ...................................................... 265

Ex. 7: Computer Policy (Doc. 32-12) .............................................................. 277

Ex. 8: FIRE No Comment Report (Doc. 32-13) .............................................. 287

Ex. 9: Bias Incident Policy (Doc. 32-14) ........................................................ 323

Ex. 10: Bias Report Form (Doc. 32-15) .......................................................... 327

Ex. 11: SF BRS Report (Doc. 32-16) .............................................................. 334

Ex. 12: Board of Regents Policy (Doc. 32-17) .................................................. 355

Ex. 13: Interim TIX Policy (Doc. 32-18) ........................................................ 365

Ex. 14: FIRE Spotlight 2021 (Doc. 32-19) ...................................................... 390

## **VOLUME III**

Ex. 15: FIRE Using Spotlight (Doc. 32-20) ..................................................... 434

Ex. 16: FIRE Spotlight Code of Conduct (Doc. 32-21) .................................. 448

Ex. 17 FIRE Spotlight Bias Policy (Doc. 32-22) ............................................ 450

Ex. 18: FIRE Spotlight Computer Policy (Doc. 32-23) .................................. 454

Ex. 19: FIRE Davis Part I (Doc. 32-24) .......................................................... 458

Ex. 20: FIRE Davis Part II (Doc. 32-25) ........................................................ 478

Ex. 21: Oklahoma State University Offending Speech Page (Doc. 32-26) ................ 507

Ex. 22 University of Texas at Austin Policy (Doc. 32-27) ............................... 511

Ex. 23 University of Central Florida Policy (Doc. 32-28) ............................... 543

Ex. 24 University of Houston Policy (Doc. 32-29) ........................................ 574

Ex. 25 Newspaper EIC Article (Doc. 32-30) .................................................. 614

Defendant Kayse Shrum's Reply To Plaintiff's Response To Defendant's 12(B)(1) Motion To Dismiss (Doc. 33) .......................................................... 619

Order (Doc. 35) ............................................................................................. 631

Judgment (Doc. 36) ...................................................................................... 636

Notice of Appeal (Doc. 37) ........................................................................... 637

# Exhibit 2



# General Incident Report

**Please provide detailed information regarding the incident you are reporting.**

Choose **General incident report** for concerns or actions that are experienced or observed and present a danger to an individual or the OSU/NOC community.

Choose **Academic Integrity report** for incidents involving violations of the OSU Academic Integrity policy.

## Background Information

Enable additional features by logging in. ⧉ (https://cm.maxient.com/reportingform.php?
OklahomaStateUniv&layout_id=0&promptforauth=true)

Your full name:

Your position/title:

Your phone number:

Your email address:

Nature of this report (Required):

Please Choose...

Date of incident (Required):

01/04/2023

Time of incident:

Location of incident (Required):

Please select a location ...

Specific location:

**App.219**

## Involved Parties

Please list the individuals involved (excluding yourself), completing as many of the listed fields as you can provide.

Enter a CWID (Banner ID) in the ID Number field. For non-students, please list the individuals last name in caps and first name in lower caps like follows: DOEjohn. However when you enter the non-student's name in the name field enter the name correctly: John Doe.

Name or Organization

Banner ID Number

DOB (YYYY-MM-DD)

Phone number

Email address

Hall/Address

**App.220**

**Add another party**

# Questions

Please provide a detailed description of the incident/concern using specific concise, objective language (Who, what, where, when, why, and how).

Please provide the police report number (if applicable).

# Supporting Documentation

Photos, video, email, and other supporting documents may be attached below. 5GB maximum total size.

**Attachments require time to upload, so please be patient after submitting this form.**

Choose files to upload                                                              **Choose Files**

**App.221**

**Submit report**



Privacy - Terms

Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 10

# Exhibit 3



↖ OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/) Quicklinks / Search          APPLY(HTTPS://GO.OKSTATE.EDU/APPLY/)

**STUDENT**
# SUPPORT AND CONDUCT(/)

REPORT(/REPORT/INDEX.HTML)    STUDENT CONDUCT ⌄    STUDENT SUPPORT ⌄    RESOURCES ⌄

EDUCATION & AWARENESS(/EDUCATION-AWARENESS/INDEX.HTML)    ABOUT(/ABOUT.HTML)

Home(https://ssc.okstate.edu/)  /  Report(index.html)

# Report a Concern

### There are various forms for requesting support and reporting concerning behavior.

Please review the following descriptions and contact Student Support & Conduct (405-744-5470) if you have further questions.



**REPORT
(HTTPS://CM.MAXIENT.COM/REPORTING.PHP?
OKLAHOMASTATEUNIV)**

# Reporting Options

**App.224**

Case 5:23-cv-00029-J   Document 32-8   Filed 03/24/23   Page 3 of 4
Appellate Case: 23-6054      Document: 010110864065      Date Filed: 05/23/2023      Page: 12

## Care report (https://cm.maxient.com/reportingform.php?OklahomaStateUniv&layout_id=69)

See. Say. Do. Something. Anyone can submit a report outlining their concern for a student. If you see something, say something, and do something by submitting a Care Report.

## Report an incident (https://cm.maxient.com/reportingform.php?OklahomaStateUniv)

It is OSU's expectation that students, faculty and staff will report all violations of the Student Code of Conduct of which they become aware.

## Report sexual violence (https://cm.maxient.com/reportingform.php?OklahomaStateUniv&layout_id=40)

All university employees that are not confidential reporters are encouraged, if not required, to report when students, employees, or visitors disclose an incident of sexual violence. Sexual violence includes sexual harassment, sexual misconduct, dating violence, domestic violence, and stalking.

## Bias incident report (https://cm.maxient.com/reportingform.php?OklahomaStateUniv&layout_id=67)

Oklahoma State University respects and values the diversity of individual beliefs and opinions. The University urges anyone who has experienced or witnessed a bias incident to report it.

## Cowboy Strong Funding (https://studentaffairs.okstate.edu/students/cowboy_strong.html)

Cowboy Strong emergency funds provide financial support to students experiencing an unforeseen hardship that could impact their ability to remain enrolled in school.

# Consider reporting to the police

If you believe that someone's behavior violated the law, you are encouraged to report the situation to the appropriate law enforcement agency. The **OSU Police(https://safety.okstate.edu/police/)** department has jurisdiction to investigate and respond to allegations of criminal misconduct that occur on campus. The **Stillwater Police(http://stillwater.org/page/home/government/departments-divisions/police-department)** respond to situations that are off campus but within the municipal city limits of Stillwater. Other area law enforcement agencies include the **Payne County Sheriff's Office(https://paynecountyok.gov/)**, the **Oklahoma State Bureau of Investigation(http://www.ok.gov/osbi/)**, and the **Payne County District Attorney's Office(http://www.paynecounty.org/district-attorney/)**.

**App.225**

Appellate Case: 23-6054      Document: 010110864065      Date Filed: 05/23/2023      Page: 13

At your request, Student Support & Conduct will assist you in reporting to the appropriate law enforcement agency. It is important to note that it is not required that you report a situation to the police in order for the university to investigate and respond to a situation.

# STUDENT SUPPORT AND CONDUCT

## Follow us

_Part of the_

**Division of Student Affairs (https://studentaffairs.okstate.edu)**

**Student Support and Conduct (https://go.okstate.edu)**
328 Student Union
Oklahoma State University
Stillwater, OK 74078
**(map) (https://goo.gl/maps/aJL1unybG942)**
**(405)-744-5470 (tel:4057445470)** |
**Contact Us (mailto:student.support@okstate.edu)**

**News** | **Events** | **Newsletter Signup**
**Social Media Directory (https://social.okstate.edu)**

  **(https://www.facebook.com/pages/Oklahoma-State-University/39013362306)**

 **(Https://Go.okstate.edu/)**   ⬈ **OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/)**
**Campus & Parking Maps**   **All OSU Institutions**   **Careers @ OSU**   **Hire OSU Grads**

©(Https://A.cms.omniupdate.com/11/?Skin=Okstate&Account=Okstate&Site=Studentconduct-V2&Action=De&Path=/Report/Index.pcf) 2023 Oklahoma State University. All rights reserved.

Accessibility | Campus Safety | Diversity | EEO Statement | Ethics Point | Privacy Notice | Terms Of Service | Trademarks

**App.226**

# Exhibit 4



**Please select the reporting form that is most appropriate.**

**Bias Incident Report:**  Oklahoma State University respects and values the diversity of individual beliefs and opinions. The University urges anyone who has experienced or witnessed a biased incident to report it.

**Care Report:** Submit a Care Report if you are concerned for a student's wellbeing. This is for NON-EMERGENCY reporting. If the person poses a threat of harm to self or others contact Oklahoma State Police IMMEDIATELY at (405) 744-6523.

**Cowboy Strong Funding:** Cowboy Strong funding is intended to be a one-time grant, up to $500 or less, to assist students who are experiencing an unforeseen emergency or crisis.

**General Incident Report:** Use this report form to share concerns about a student's behavior that does not align with the expectations outlined in the Student Code of Conduct.

**Residence Life Incident Report:** This report form is used for concerns or actions that are experienced or observed in an on-campus living environment and alleged to have violated the Code of Conduct or Residential Life policies.

**Sexual Violence Report:**  This form may be used to report instances of sexual violence to Oklahoma State University officials.

# Select a Reporting Form

|  | Go |
|---|---|

# Exhibit 5



# BIAS RESPONSE TEAM

## REPORT 2017








The mission of FIRE is to defend and sustain individual rights at America's colleges and universities. These rights include freedom of speech, legal equality, due process, religious liberty, and sanctity of conscience—the essential qualities of individual liberty and dignity. FIRE's core mission is to protect the unprotected and to educate the public and communities of concerned Americans about the threats to these rights on our campuses and about the means to preserve them.



**FIRE**
Foundation for Individual
Rights in Education

**510 WALNUT ST.**
**SUITE 1250**
**PHILADELPHIA, PA 19106**


YOUTUBE.COM/THEFIREORG


@THEFIREORG


FACEBOOK.COM/THEFIREORG

# TABLE OF CONTENTS

**4**    **EXECUTIVE SUMMARY**

**6**    **METHODOLOGY**

**7**    **FINDINGS**

**9**    **DISCUSSION**

     9    **WHY** BIAS RESPONSE TEAMS EXIST

     10    **HOW MANY** BIAS RESPONSE TEAMS EXIST

     12    WIDELY **DEFINING "BIAS"**

     15    **EXAMPLES** OF REPORTED INCIDENTS

     19    **WHO** SERVES ON THE BIAS RESPONSE TEAM: THE SPEECH POLICE

     20    THE **RISK** OF FIRST AMENDMENT LAWSUITS

     23    A **LACK OF TRAINING** ON FREEDOM OF SPEECH

     24    HOW SOME UNIVERSITIES ARE **RESISTING TRANSPARENCY**

     26    NORMATIVE **CRITICISMS** OF BIAS RESPONSE TEAMS

     28    **STRIKING A BALANCE**

**29**    **APPENDICES**

     29    APPENDIX A: CATEGORIES OF BIAS

     31    APPENDIX B: INSTITUTIONS WITH BIAS REPORTING SYSTEMS

## EXECUTIVE SUMMARY

Over the past several years, the Foundation for Individual Rights in Education (FIRE) has received an increasing number of reports that colleges and universities are inviting students to anonymously report offensive, yet constitutionally protected, speech to administrators and law enforcement through so-called "Bias Response Teams." These teams monitor and investigate student and faculty speech, directing the attention of law enforcement and student conduct administrators towards the expression of students and faculty members.

To better understand this phenomenon, FIRE gathered data throughout 2016 on every bias reporting system we could locate. FIRE sought to determine who reviews the reports, what categories of bias they are charged with addressing, and whether the institution acknowledges that the system generates a tension with free speech and academic freedom.

FIRE discovered and surveyed **231 Bias Response Teams at public and private institutions** during 2016. The expression of at least **2.84 million American students** is subject to review by Bias Response Teams. While most students in higher education do not yet appear to be subject to bias reporting systems, we believe that the number of Bias Response Teams is growing rapidly.

The composition of Bias Response Teams is not always made public. About 28% did not reveal the names or rules of any team members. Of those whose membership FIRE could ascertain:

- 42% report speech to members of law enforcement or campus security officers, even though the teams deliberately solicit reports of a wide variety of non-criminal speech and activity.
- 12% of teams include at least one administrator dedicated to media relations, suggesting that part of the

purpose of such teams is to deter and respond to controversies that might embarrass the institution.
- Fewer than a third of teams included faculty members, whose absence diminishes the likelihood that the team will have a meaningful understanding of academic freedom.

Teams tend to cast a wide net when defining "bias." Almost all use categories widely found in discrimination statutes (race, sex, sexual orientation, etc.), while others investigate bias against obscure categories, such as "smoker status," "shape," and "intellectual perspective." A significant minority include **political affiliation or speech as a potential bias, inviting reports of and investigations into political speech by law enforcement and student conduct administrators**.

In responding to reports regarding this wide array of protected expression, administrators are frequently armed with vague or overly broad rules granting them leeway to impose sanctions for speech they dislike. In December 2016, FIRE found that some 92.4% of the 449 schools surveyed for our annual speech code report maintain policies that either clearly and substantially restrict speech, or can otherwise be interpreted to punish protected speech. At such schools, a Bias Response Team's practice of broadly defining and identifying "bias" may expose a wide range of protected speech to punishment. Even where schools purport only to provide "education" to the offending speaker, instead of formal punitive sanctions (such as suspension or expulsion), this response is often undertaken by student conduct administrators, not educators, and more closely resembles a reprimand.

There is an unavoidable tension between promoting free speech and academic freedom and working to combat the presence of "bias" (however defined) on campus. Yet **only 84**

**App.233**

EXECUTIVE SUMMARY

**(50.6%) of the teams surveyed acknowledged a tension with freedom of speech**, freedom of inquiry, or academic freedom on their websites or in their policies.

FIRE also used public records requests to discover the reports made at some institutions, how the schools responded to those reports, and the teams' policies and training. Many institutions complied with these requests. Others stonewalled, hid records, deleted websites, or demanded thousands of dollars to view records, claiming that knowing how Bias Response Teams operate is not in the public interest.

Further, how universities respond to bias reports may expose them to First Amendment lawsuits. Individual team members risk being held personally liable for violating constitutional rights in some circumstances. They may not even be aware of where the lines are drawn. FIRE found little evidence that Bias Response Teams are trained on First Amendment issues.

Bias Response Teams, when armed with open-ended definitions of "bias," staffed by law enforcement and student conduct administrators, and left without training on freedom of expression, represent an emerging risk to free and open discourse on campus and in the classroom. Bias Response Teams create—indeed, they are intended to create—a chilling effect on campus expression. Even if a Bias Response Team does not have the power to take punitive action, the prospect of an official investigation may make students and faculty more cautious about what opinions they dare to express.

Beyond First Amendment concerns, encouraging students and faculty to anonymously report one another to administrators for subversive or offensive views is illiberal, and antithetical to a campus open to the free exchange of ideas. While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their lives on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus.

**App.234**

## METHODOLOGY

### WHAT IS A BIAS REPORTING SYSTEM?

In order to distinguish bias reporting systems from other speech codes, and to identify systems that may not be explicitly identified as a "bias reporting" system,[1] FIRE applied a three-part definition. Where it was unclear whether a particular element was met, we used our best judgment. Links to the websites of all Bias Response Teams are provided in Appendix B so that the reader may form his or her own opinion.

FIRE defines a bias reporting system as any system identified as such, or that provides:

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Under FIRE's definition, a school policy or reporting system limited to criminal offenses involving hate or bias does not constitute a bias reporting system.

### LOCATING AND OBSERVING BIAS REPORTING SYSTEMS

FIRE relied on a number of methods to locate bias reporting systems, including mining schools' websites for information, using tools to monitor websites for changes, and issuing public records requests to collect additional information.

We first gathered state-by-state lists of public and private institutions on Wikipedia, as well as in FIRE's own Spotlight database,[2] to identify leading institutions in the United States. We then reviewed each school's website and Google presence, searching for references to bias reporting systems. To locate other systems, we searched for reporting forms provided by Maxient and other companies known to host reporting forms. The location process also utilized Google alerts and media reports concerning bias reporting systems.

Once the institutions were identified, FIRE monitored each Bias Response Team page for changes in text—a practice we will continue in order to observe whether, or how, institutions change their systems over time.[3]

FIRE also reviewed the public-facing websites of reporting systems to identify relevant policies, definitions, forms, and other information. We recorded the definitions of "bias" in both policies and reporting forms, which often differed from one another, to determine the categories of bias defined by each institution.

Finally, we utilized public records requests at some institutions to uncover the types of reports being made and how the Bias Response Teams acted in response to each submission.

### A NOTE ABOUT LIMITATIONS

This survey documents how Bias Response Teams operate and who serves on them. Given the number of higher education institutions in the United States, this survey was not intended to identify the rate at which institutions have adopted such systems.

---

[1] For simplicity's sake, this report uses the phrase "Bias Response Team" broadly to encompass both the teams and the reporting systems, even if there is no dedicated, independent team in place.
[2] FIRE's Spotlight database is a collection of policies at over 400 of our nation's biggest and most prestigious universities, collected in an effort to document institutions that ignore students' rights, or

don't tell them the truth about how they've taken them away. Spotlight is available at https://www.thefire.org/spotlight.
[3] In doing so, we have observed a number of institutions delete, modify, or hide their bias reporting systems following media criticism or public records requests.

**App.235**

Case 5:23-cv-00029-J   Document 32-10   Filed 03/24/23   Page 8 of 36
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 23

FINDINGS

**BIAS REPORTING SYSTEMS ARE WIDESPREAD**

During the course of 2016, at least **231** Bias Response Teams were publicized on American university or college campuses. **143** are at public institutions and **88** are at private institutions.[4] At least 2.84 million students are enrolled in these schools.

Of the 471 institutions catalogued in FIRE's Spotlight database, 181 (or 38.4%) maintain bias reporting systems. The committees that administer these systems are known by a variety of names, usually a variation on "Bias Response Team." Some schools do not provide an independent "team," instead channeling reports directly to existing offices or departments, including law enforcement or security, human resources departments, or campus housing authorities.

**CASTING A WIDE NET: WHAT CATEGORIES OF "BIAS" ARE REPORTED?**

### IMMUTABLE CHARACTERISTICS AND OTHER CATEGORIES OF BIAS

The most common categories of bias reports solicited[5] come from federal and state laws governing educational and employment discrimination. Every system surveyed invites reports of bias concerning race or religion, and most invite reports concerning sex, sexual orientation, gender identity or expression, age, disability, and so on. Some are unusual, such as bias against "behavior" (**Macalester College**), which appears to define criticism of behavior of any kind as "bias."

### POLITICAL AND SOCIAL BELIEFS

Some systems define "bias incidents" to include expressions of bias against political and social affiliations. 14% of institutions include "political affiliation" among their categories of bias. Still others include bias against similar categories such as "intellectual perspective" (**University of Central Arkansas**), "political expression" (**Dartmouth**), or "political belief" (**University of Kentucky**). It is critical to note that by soliciting reports of speech that is biased against political views, universities are expressly requesting that their students report one another to the authorities for expressing divergent political views.

### DEFINITIONS OF "BIAS INCIDENTS" BROADLY ENCOMPASS SPEECH

Bias reporting systems raise free speech concerns because they solicit reports of legal, protected speech and expression in addition to unprotected conduct such as actionable discrimination or harassment. The definitions often explicitly state that students should report speech protected by the First Amendment.

Many policies include catch-all categories of bias—*e.g.*, "other" biases. In such cases, the definition of a bias incident encompasses not only protected speech, but also any speech that offends ***anyone*** for ***any*** reason. The net effect is that broad definitions of "bias" invite reports of any offensive speech, whether or not it is tethered to a discernable form of bias, thereby inviting scrutiny of student activists, organizations, and faculty engaged in political advocacy, debate, or academic inquiry. For examples of reported political expression, see the Discussion section at page 15.

---

[4] For a list of schools with bias reporting systems observed in FIRE's survey, see **Appendix B**.
[5] For a list of the categories of bias observed in FIRE's survey, see **Appendix A**.

## FINDINGS

**WHO'S ON A BIAS RESPONSE TEAM? OFTEN, LAW ENFORCEMENT**

FIRE was unable to determine the makeup of every Bias Response Team. Of the 166 teams whose composition FIRE could determine, almost half include law enforcement ("speech police," in a quite literal sense) and more than half include what appear to be student conduct administrators. Only 27% include faculty members, reducing the likelihood that a Bias Response Team will have members likely to recognize issues of academic freedom. And 12% contain public relations administrators, raising the possibility that a team's decisions, including about whether to seek discipline for those displaying "bias," may be made on the basis of an institution's desire to avoid public embarrassment. Both common sense and FIRE's extensive experience suggest that public and donor relations can be significant factors driving universities' decisions.

|  | All institutions (166) | Public (104) | Private (62) |
|---|---|---|---|
| Law Enforcement[6] | 42% (70) | 41% (43) | 43% (27) |
| Student Conduct[7] | 63% (105) | 56% (59) | 74% (46) |
| Public or Media Relations | 12% (21) | 14% (15) | 9.7% (6) |
| Faculty | 27% (45) | 24% (25) | 32% (20) |
| Students | 21% (35) | 18% (19) | 26% (16) |

**ACKNOWLEDGING A TENSION WITH FREEDOM OF EXPRESSION AND ACADEMIC FREEDOM, BUT PROVIDING LITTLE (IF ANY) TRAINING**

84 institutions (50.6%) acknowledged freedom of speech, freedom of inquiry, or academic freedom in the descriptions or policies of their Bias Response Teams. Of these, 50 are public and 34 are private.

However, despite professing a dedication to free expression and academic freedom, few schools provide meaningful training to Bias Response Teams on recognizing these issues. Public records requests issued to dozens of schools have revealed only one Bias Response Team, at Louisiana State University, that offered any substantial training whatsoever on First Amendment concerns.

---

[6] "Law enforcement" includes campus police departments and their equivalents at private schools.
[7] Determining whether an administrator serving on a Bias Response Team is responsible for implementing disciplinary procedures can be difficult. FIRE views the inquiry from the student's perspective: What will a reasonable student perceive the administrator's role or authority to be? This number excludes administrators affiliated with diversity offices and includes administrators affiliated with dean of students' offices, absent specific information concerning an administrator's responsibilities or authority.

**App.237**

## DISCUSSION

### WHY DO BIAS RESPONSE TEAMS EXIST?

University administrators receive many complaints about criminal conduct on campus. They also learn of students who encounter "offensive" but legally protected speech or expression.[8] A proper response to these incidents would involve prompt, fair, and impartial discipline for instances of physical misconduct, true threats, and harassment, while fostering an environment in which offensive speech would be answered with more speech.

Campuses with Bias Response Teams have chosen to go further, often deploying administrators to conduct an "investigation" of the incident and, if the "respondent" is found "guilty," summon them for a "hearing" or an "educational" discussion, which may more closely resemble a reprimand than an enlightening exchange of views.

Such procedures risk becoming tools not only for imposing some form of political or intellectual orthodoxy, but also for policing politeness or civility.[9] They invite law-enforcement authorities and administrators, who are likely to be wary of expression that can cause conflict of any kind, to scrutinize activism, debate, and political speech regarding every ideology and viewpoint. Yet the essential elements of free discourse, whether on campus or off, *require* that people have right to offend or to cause conflict through speech.[10]

Other factors may also contribute to a university's decision to implement a Bias Response Team, such as:

- **Inability to implement speech codes.** FIRE has seen a continuous, nine-year decline in the maintenance of speech codes that prohibit speech,[11] and courts routinely strike down speech codes at public universities on First Amendment grounds.[12] In fact, some bias reporting systems, such as **Longwood University's**, have cited the unconstitutionality of speech codes as a reason for their existence.[13]

- **The low cost of expanding employment-based anti-discrimination systems.** A university cannot function as a true "marketplace of ideas" if campus expression is as

---

[8] Eugene Volokh, *No, It's Not Constitutional for the University of Oklahoma to Expel Students for Racist Speech*, WASH. POST, Mar. 10, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/03/10/no-a-public-university-may-not-expel-students-for-racist-speech; *see also* Susan Svrluga, *Student Arrested After Wearing Gorilla Mask, Handing Out Bananas at Black Lives Matter Protest*, WASH. POST, Sept. 29, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/09/29/student-arrested-after-wearing-gorilla-mask-handing-out-bananas-at-black-lives-matter-protest.

[9] *See, e.g.*, José A. Cabranes, *If Colleges Keep Killing Academic Freedom, Civilization Will Die, Too*, WASH. POST, Jan. 10, 2017, https://www.washingtonpost.com/opinions/if-colleges-keep-killing-academic-freedom-civilization-will-die-too/2017/01/10/74b6fcc2-d2c3-11e6-9cb0-54ab630851e8_story.html (Judge on the U.S. Court of Appeals for the 2nd Circuit arguing that Bias Response Teams indicate that "campus administrators have morphed into civility police.").

[10] For example, in overturning a man's conviction for wearing a jacket reading "Fuck the Draft" in a courthouse hallway, the Supreme Court noted that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us," and that words can serve an "emotive function" and are "often chosen as much for their emotive as their cognitive force." Cohen v. California, 403 U.S. 15, 25-26 (1971). In other words, words chosen because they convey hostility or incivility are as deserving of protection as calm, polite debate.

[11] *Spotlight on Speech Codes 2017*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf.

[12] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309, slip op. (Cal. Super. Ct. Feb. 27, 1995); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989).

[13] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on June 14, 2016 and *available at* http://archive.is/uUQic; *see also*, *No Hate Initiative*, MIAMI UNIV., archived on Dec. 15, 2005 and *available at* http://web.archive.org/web/20051215002453/http://www.miami.muohio.edu/documents_and_policies/nohate/index.cfm#hc9 (noting that "[e]very college hate speech code reviewed in the federal courts has been struck down").

## DISCUSSION

highly regulated as expression among employees in business corporations. Borrowing well-developed and widely available corporate procedures is a tempting shortcut. For as little as $8,600, schools can create reporting forms derived from existing systems used by employers to permit employees to report employment-based sexual harassment.[14] But using the tools of corporate anti-discrimination systems—perhaps even those used internally among their own employees—to solicit bias reports from and about the larger campus community sets colleges on a collision course with free discourse.

- **Avoiding public controversy**. By learning of events and disputes quickly, public and media relations administrators can attempt to frame the institution's response in the media. At the **University of New Mexico**, for example, administrators pushed to release a statement "rather than waiting for the media to get ahold of" flyers criticizing UNM's logo (which involves a conquistador) that were reported to the Bias Response Team.[15] Some 12% of Bias Response Teams include media relations administrators.

- **Student demand**. Certain student groups have called upon administrators to implement bias reporting systems.[16] But this seems to be relatively rare: Of

the various recent demands from students across the country, few have involved requests for reporting systems,[17] and one institution's audit suggested that students are unfamiliar with the term "bias incident."[18]

Whatever their motivations, universities implementing Bias Response Teams have cast a wide net, inviting reports of any offensive speech, on virtually any topic, for any reason. The result is that speech on political and social subjects, which is likely (and may be intended) to offend, gets reported to law enforcement and student conduct administrators, and bias reporting systems serve to "alert administrators to specific individuals … who would benefit most from diversity inclusion training."[19] This institutionalizes surveillance of activists of all political persuasions, exposes universities (and their administrators) to the prospect of costly First Amendment claims, and encourages an illiberal culture of anonymously reporting students or faculty for subversive or offensive speech—on hundreds of campuses across the country.

## BIAS RESPONSE TEAMS ARE FOUND ON HUNDREDS OF AMERICAN COLLEGE CAMPUSES

In early 2016, when Appalachian State University explored a proposal to create a Bias Response Team, administrators wanted to see what other schools were doing. They didn't have

---

[14] *Statement of Work*, ETHICSPOINT, July 12, 2010, produced to the Foundation for Individual Rights in Education by the University of California Office of the President in response to a public records request, *available at* https://www.documentcloud.org/documents/3418749-University-of-California-EthicsPoint-Statement.html.

[15] *See*, emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[16] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action.

[17] *See, e.g.*, *The Demands*, WETHEPROTESTERS, *available at* http://www.thedemands.org (last visited Jan. 9, 2017) (tracking demands of student protesters across the country).

[18] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[19] Liz Fonseca & John Tannous, PROMOTING DIVERSITY AND INCLUSION IN THE CLASSROOM: STRATEGIES TO FOSTER INCLUSIVE ACADEMIC ENVIRONMENTS AT LARGE RESEARCH UNIVERSITIES, EDUCATION ADVISORY BOARD (2013), *available at* https://www.mga.edu/student-affairs/docs/Promoting_Diversity_and_Inclusion_in_Classrooms.pdf.

## DISCUSSION

to look far; one said she was "hard pressed to find a school without" a Bias Team.[20] Boston College's student government described them as "ubiquitous."[21]

To a certain extent, FIRE found this to be true. According to publicly available records, there were at least 231 Bias Response Teams publicized by four-year or post-graduate institutions during 2016. Of these, 143 were at public institutions, all of which are bound by the First Amendment, while 88 were at private institutions, most of which advertise or commit to respecting students' freedom of expression and freedom of academic inquiry in official policy. At a conservative estimate,[22] at least 2.84 million American students are subject to often-anonymous reporting systems monitored by administrators and police officers.[23] But while Bias Response Teams are in use at hundreds of institutions, and appear to be growing in number, it does not appear that they can yet be found on a majority of campuses.

The names and acronyms used for bias reporting systems vary from campus to campus. The

**University of Oregon**'s team is currently known as the "Bias Education and Response Team,"[24] and the **University of North Carolina at Asheville**'s team is the "Bias Incident Response Team."[25] While most team names appear to include some variation on "Bias Response Team," some do not. **Arizona State University** previously hosted a "Campus Environment Team,"[26] and **Illinois State University** currently utilizes an "Inclusive Community Response Team."[27] The **University of Central Florida**'s "Just Knights Response Team" reflects the name of its athletic team.[28] And some institutions do not have a separate team for bias reports, instead relying on existing offices or departments. Some direct reports to police departments,[29] various deans[30] or human resources offices,[31] or housing authorities.[32]

To better understand these report-and-response systems, and to distinguish them from other types of speech codes, FIRE views "Bias Response Teams" as identified as such or generally adhering to three criteria:

---

[20] Email from Bindu Jayne, Assoc. Vice Chancellor for Equity, Diversity & Compliance, Appalachian State Univ. (Feb. 4, 2016), *available at* https://www.documentcloud.org/documents/3233900-Appalachian-State-University-Email-Re-Forming.html.

[21] Boston College UGBC Student Assembly, *A Resolution Concerning Bias Incidents*, *available at* https://www.documentcloud.org/documents/3233930-Boston-College-UGBC-Resolution-Concerning-Bias.html.

[22] This estimate assumes that each bias reporting system applies only to (1) undergraduate students, unless it is expressly dedicated to a graduate program or campus; (2) at the primary or main campus, unless it is expressly dedicated to a particular campus. It does not include faculty, staff, or (for the most part) post-graduate students or undergraduate students at satellite campuses.

[23] Enrollment statistics were calculated using data from the Integrated Postsecondary Education Data System, which is compiled by the U.S. Department of Education's National Center for Education Statistics. *About IPEDS*, NATIONAL CENTER FOR EDUCATION STATISTICS, https://nces.ed.gov/ipeds/Home/AboutIPEDS (last visited Jan. 8, 2017).

[24] Office of the Dean of Students, *Bias Education and Response Team*, UNIV. OF OREGON, http://dos.uoregon.edu/bias (last visited Jan. 1, 2017).

[25] *Bias Incident Response Team (BIRT)*, UNIV. OF N.C., https://msp.unca.edu/bias-incident-response-team-birt (last visited Jan. 2, 2017).

[26] ALLAN MICHAEL HOFFMAN ET AL., VIOLENCE ON CAMPUS: DEFINING THE PROBLEMS, STRATEGIES FOR ACTION, 300 (1998).

[27] Division of Student Affairs, *Inclusive Community Response Team*, ILLINOIS STATE UNIV., http://studentaffairs.illinoisstate.edu/who/diversity/icrt (last visited Jan. 1, 2017).

[28] *Just Knights Response Team*, UNIV. OF CENT. FLA., http://jkrt.sdes.ucf.edu/bias (last visited Jan. 1, 2017).

[29] *See, e.g.*, *USM Public Safety Anonymous Crime Reporting Form*, UNIV. OF SOUTHERN MAINE, https://usm.maine.edu/usm-public-safety-anonymous-crime-reporting-form (last visited Jan. 2, 2017) (form for reporting "Bias/hate activity" to campus police); *Human Dignity – Reporting Process*, DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 2, 2017) ("any victim" of a "Bias Incident [...] must report the incident to the Public Safety Office" in order to be investigated).

[30] *See, e.g.*, *Office of Student Conduct*, PENSACOLA STATE COLLEGE, http://www.pensacolastate.edu/studentconduct (last visited Jan. 2, 2017) (directing reports of bias incidents to the Office of Student Conduct); *Report an Incident*, BOWLING GREEN STATE UNIV., https://www.bgsu.edu/dean-of-students/student-conduct/report-an-incident.html (last visited Jan. 2, 2017) (directing reports to the Office of the Dean of Students).

[31] *See, e.g.*, *Bias Incident Report Form*, WASH. STATE UNIV., http://public.wsu.edu/~hrd/programs/hbreport.pdf (last visited Jan. 2, 2017) (directing reporting party to forward the form to the Human Relations and Diversity office).

[32] *See, e.g.*, *Bias Protocol & Illinois Intervenes*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, http://housing.illinois.edu/living-options/why-housing/inclusive-communities/bias-protocol (last visited Jan. 2, 2017) (directing reports to a "Residential Life professional").

**App.240**

## DISCUSSION

(1) a formal or explicit process for or solicitation of

(2) reports from students, faculty, staff, or the community

(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.[33]

These criteria are designed to include systems that invite reports of protected speech without specifically labeling it as "bias," while distinguishing speech codes unaccompanied by formal or explicit policies for reporting such incidents.

### CASTING A WIDE NET FOR BIAS INCIDENTS

What constitutes a "bias incident" varies widely from campus to campus. As the **University of West Florida** puts it, defining the term "seem[s] like a murky ground to traverse."[34]

Even the use of the term "bias incident" engenders debate and confusion. In a February 2015 audit of **Colgate University**'s bias reporting system, a campus committee reported that, although the sample size was small, *no*

student was aware that they could file bias reports online, most had never heard the phrase "bias incident" before, and the majority had "incorrect interpretations" about its meaning.[35]

Broad applications of the term can diminish serious misconduct by equating political squabbles and caustic speech with violent criminal conduct. For example, *The New York Times* was widely and credibly criticized[36] for an article[37] noting that "[b]ias incidents on both sides have been reported" at the **University of Michigan**, with one student alleging[38] that she had been "threatened with being lit on fire because she wore a hijab." The article continued: "Other students were accused of being racist for supporting Mr. Trump ... ."[39]

Such political criticism can hardly be placed under the same umbrella as true threats of violence. Yet this is precisely what many bias reporting systems do. Schools largely define bias incidents to encompass more than hate crimes or actionable conduct. Hate crimes—criminal conduct undertaken on the basis of a protected characteristic of the victim, which is *not* protected by the First Amendment[40]—are always bias incidents. "Bias incidents," however, include speech or expressive conduct that is not necessarily criminal or in violation of applicable policy.

---

[33] The U.S. Department of Justice employed a similar definition of "bias incident" in a 2001 report: "acts of prejudice that are not accompanied by violence, the threat of violence, property damage, or other illegal conduct." U.S. DEPT. OF JUSTICE BUREAU OF JUSTICE ASSISTANCE, HATE CRIMES ON CAMPUS: THE PROBLEM AND EFFORTS TO CONFRONT IT 5 (Oct. 2001), *available at* https://www.ncjrs.gov/pdffiles1/bja/187249.pdf.

[34] *What is Bias?*, UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/what-is-bias (last visited Jan. 5, 2017).

[35] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[36] *See, e.g.*, John K. Wilson, *Safe Spaces for Conservatives: Why Being Called a Racist Is Not a Bias Incident*, ACADEME BLOG, Dec. 11, 2016, https://academeblog.org/2016/12/11/safe-spaces-for-conservatives-why-being-called-a-racist-is-not-a-bias-incident; *see also*, Andre Segura (@andresegura), TWITTER (Dec. 8, 2016, 5:01 PM), http://twitter.com/andresegura/status/806982019674677248; Jessica Valenti (@JessicaValenti), TWITTER (Dec. 8, 2016, 4:17

PM), http://twitter.com/JessicaValenti/status/806971007307280384.

[37] Anemona Hartocollis, *On Campus, Trump Fans Say They Need 'Safe Spaces'*, N.Y. TIMES, Dec. 8, 2016, http://www.nytimes.com/2016/12/08/us/politics/political-divide-on-campuses-hardens-after-trumps-victory.html.

[38] Police later alleged that the report was false. John Counts, *U-M Student's Claim of Threat for Wearing Hijab Is False, Police Say*, MLive.com, Dec. 21, 2016, http://www.mlive.com/news/ann-arbor/index.ssf/2016/12/police_say_no_evidence_muslim.html. While some reports of bias incidents, as with any type of report to authorities, may be false, there is no shortage of true threats (if not acts) of violence similar to that alleged at the University of Michigan.

[39] Erik Wemple, *New York Times Deserts 'Both Sides' Language in Story on Campus Trump Supporters*, WASH. POST, Dec. 9, 2016, https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/12/09/new-york-times-deserts-both-sides-language-in-story-on-campus-trump-supporters/?utm_term=.341a5dd304a5.

[40] Wisconsin v. Mitchell, 508 U.S. 476, 484-490 (1993).

**App.241**

DISCUSSION

Take, for example, the **University of Northern Iowa**'s definition:[41]

> A bias-related incident is any word or action directed toward an individual or group based upon actual or perceived identity characteristics or background of a group or person that is harmful or hurtful. Some bias-related incidents may be contrary to law or policy, while some may be speech protected by the First Amendment of the Constitution of the United States.

**Western Washington University**'s definition extends to "demonstrations" of bias, including "language, words, signs, symbols, threats, or actions that could potentially cause alarm, anger, or fear in others[.]"[42] Moreover, the existence of a bias incident under the policy turns entirely on whether the complainant subjectively perceived the incident to be motivated by bias, rather than on the intent of the speaker.[43]

In targeting speech that may cause "alarm, anger, or fear," or that might otherwise offend on the basis of a proscribed subject, universities expressly set their sights on constitutionally protected speech. All speech is presumptively protected by the First Amendment unless it falls within certain narrow exceptions carved out by the Supreme Court: incitement to immediate violence; so-called "fighting words"; harassment[44]; true threats and intimidation; obscenity; child pornography; and defamation. Speech is *not* unprotected simply because it is offensive,[45] insulting,[46] causes anger,[47] or is viewed as prejudiced or as "hate speech."[48] If the speech in question does not fall within one of the listed exceptions, it most likely is protected speech.[49]

Most reporting systems are predicated on specific, enumerated characteristics. Of the systems identified by FIRE, 199 (or 86%) explicitly set forth these characteristics. Among them, the categories vary widely on different campuses. Each of these teams solicits reports about bias against race or religion, and all but one explicitly solicit reports about disability or sexual orientation.[50] There is less agreement on more specific categories. For example, while 94.5% seek reports of bias based on national origin or nationality, only 14.1% explicitly seek reports of bias against immigration or citizenship status.

Some categories of "bias" are peculiar. For example, the **University of Kentucky** permits

---

[41] *Bias Response Protocol*, UNIV. N. IOWA, https://uni.edu/brt/bias-response-protocol#overlay-context=bias-response-protocol (last visited Jan. 5, 2017).

[42] *Bias Incident Reporting Form*, WESTERN WASH. UNIV., http://www.wwu.edu/eoo/bias-incident-response.shtml (last visited Jan. 5, 2017).

[43] *See, e.g., Florida State University Bias Incident Response System*, FLA. STATE UNIV., http://thecenter.fsu.edu/article/florida-state-university-bias-incident-response-system (last visited Jan. 5, 2017) ("An incident of bias may occur whether the act is intentional or unintentional").

[44] For more on the application of peer harassment law on campus, see Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009), *available at* https://ssrn.com/abstract=1400300.

[45] Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[46] Boos v. Barry, 485 U.S. 312, 322 (1988) (First Amendment protects "insulting, and even outrageous, speech").

[47] Terminiello v. Chicago, 337 U.S. 1, 4 (1949) (A "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").

[48] Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, WASH. POST., May 7, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/05/07/no-theres-no-hate-speech-exception-to-the-first-amendment/?utm_term=.2cca993394b8.

[49] For a more in-depth discussion of the application of the First Amendment to public universities, and of the principles of freedom of speech to the private institutions that promise it, see FIRE's *Spotlight on Speech Codes 2017*, *supra* note 11, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf#page=10.

[50] The anomaly, at Baylor University, appears to be the result of a lack of effort to promulgate a complete definition, providing that bias incidents relate to "race, nationality, religion, gender, age, etc." *Bias Motivated Incident Support Team*, BAYLOR UNIV., http://www.baylor.edu/student_life/index.php?id=85780 (last visited Jan. 5, 2017).

## DISCUSSION

reports of bias against "smoker status,"[51] perhaps as a result of borrowing language from a state law concerning employment discrimination against tobacco users.[52]

There is also significant divergence when it comes to reporting bias based on political affiliation, views, or conduct. Worryingly, 21% of public institutions seek out reports of bias on the basis of political affiliation, as opposed to 2.6% of private institutions. Among them, concerns regarding bias against political and social views vary:

- **Dartmouth College** lists "political expression" as a potential motivation on its reporting form[53] and defines bias to include "[t]reating someone negatively because of their actual or perceived .... [p]olitical or social affiliation."[54] This broad wording could encompass voting against a person for campus political offices or simply criticizing their political speech.

- The **University of North Carolina at Charlotte** includes "[p]olitical beliefs" in its definition of bias, and provides the following example: "Drawing pictures or cartoons that belittle someone because of their beliefs ... or political affiliation."[55] This would apply to virtually all political cartoons.

- Examples of bias incidents at **Williams College** include "comments on social media about someone's ... political affiliations/beliefs."[56] This definition could include any response to any political view posted on social media, or even simple criticism of elected officials.

- The **University of Colorado** included both "political philosophy" and "political affiliation" as protected classes.[57] (It has since shut down its Bias Response Team.)

- The **University of Kentucky**'s definition targets, in part, bias against a person for his or her "political belief."[58]

Other systems invite reports of even broader ranges of criticism and discussion:

- **Macalester College**'s now-deleted definition included "bias against another person based on ... his or her membership in a group ... or an individual's particular characteristics, *role*, or *behavior*."[59] This definition could apply to almost any criticism of anyone.

- Both **Syracuse University** and **Longwood University** list political and "social affiliation" as unacceptable grounds for bias.[60] It is nearly impossible

---

[51] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).

[52] Unlawful discrimination by employers – Difference in health plan contribution rates for smokers and nonsmokers and benefits for smoking cessation program participants excepted, KY. REV. STAT. § 344.040.

[53] *Bias Reporting Form*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).

[54] *Achieving Community Together (A.C.T.) Program*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).

[55] *What is Bias*, UNIV. N.C. BIAS ASSESSMENT AND RESOURCE TEAM, http://unccdso.uncc.edu/org/biasassessmentandresourceteam145871/What_Is_Bias (last visited Jan. 31, 2017).

[56] *Questions about Bias and Bias Reporting*, WILLIAMS COLLEGE, http://speakup.williams.edu/faq (last visited Jan. 6, 2017).

[57] *Definitions*, UNIV. OF COLO., archived on July 25, 2016 and available at http://archive.is/hR0ps.

[58] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).

[59] *What is a bias-related incident?*, MACALESTER COLLEGE, archived on Sept. 12, 2016 and available at http://archive.is/27e8C (emphasis added).

[60] *What is bias?*, SYRACUSE UNIV., http://www.syracuse.edu/currentstudents/stopbias/whatisbias.html (last visited Jan. 5, 2017); *What is Bias?*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/what-is-bias (last visited Jan. 5, 2017).

**App.243**

Case 5:23-cv-00029-J   Document 32-10   Filed 03/24/23   Page 16 of 36
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 31

DISCUSSION

to discern a meaningful limit to this category.

Some of these examples are likely the result of definitions borrowed from state employment discrimination statutes. Yet asking students to report one another for broadly defined bias against their voluntary political or social affiliation invites surveillance of and intrusion into political speech, subjecting it to the scrutiny of administrators and police.

### EXAMPLES OF REPORTED INCIDENTS: CAUGHT IN A WIDE NET, UNIVERSITIES ENTANGLE THEMSELVES INTO REFEREEING POLITICAL SPEECH

It is not mere speculation that core political speech, academic discourse, and outspoken activists are likely to become the subjects of bias incident reports. FIRE used public records requests, reviewed similar requests by media outlets, and examined the sparse public disclosures by Bias Response Teams to discern what gets reported.

The reports we reviewed, which often fail to disclose what action (if any) was undertaken in response, span the ideological spectrum:

- **Appalachian State University**: A student filed a report regarding the 2016 presidential election, claiming to be "offended by the politically biased slander that is chalked up everywhere reading 'TRUMP IS A RACIST'" and describing the "slander" as "unlawful." Another report stated that supporters of then-candidate Bernie Sanders were "destroying" messages chalked by

Trump supporters by drawing penises next to them. Yet another report complained that a pro-Trump student organization was using chalk to write "hate speech" in support of Trump.[61]

Another series of reports was filed against a student activist on several grounds: tweeting that she "hate[s] white men"; "refus[ing] to support all students if a student fits the certain stereotype of a white male"; "display[ing] disturbing apathy [and] ignorance and bitterness"; and "express[ing] profound disregard for the lives of students based on race and gender and for [police] officers based on their careers."[62]

- **Texas Tech University**: The Black Student Union (BSU) was reported to administrators for tweeting "All lives don't matter... White lives don't matter... Blue lives don't matter... #BlackLivesMatter." The complainant wanted the BSU characterized as a "Hate Group" and complained that the student chapter of the College Democrats planned to release a statement in support of BSU.[63]

- **University of California, San Diego** (UCSD): A student humor publication, *The Koala*, lost its student funding after satirizing "safe spaces" on campus.[64] Spurred by bias incident reports, specifically one calling on UCSD to "stop funding" *The Koala*, administrators asked the university's lawyer to "think creatively" about how to address the newspaper, which they felt "crosse[d]

[61] Spreadsheet of Incidents Reported, APPALACHIAN STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* http://www.documentcloud.org/document/3255183-Appalachian-State-University-Bias-Incident.html.
[62] APPALACHIAN STATE UNIV., *supra* note 61.
[63] Texas Tech University Campus Climate & Incident Reporting Form Submitted on July 14, 2016, produced to the Foundation for Individual Rights in Education in response to a public records

request, *available at* https://www.documentcloud.org/documents/3255186-Texas-Tech-BSA-Black-Lives-Matter-tweet.html.
[64] Adam Steinbaugh, *As 'The Koala' Files Lawsuit Against University of California, San Diego, Public Records Reveal Administration's Censorship*, NEWSDESK, June 1, 2016, https://www.thefire.org/as-the-koala-files-lawsuit-against-university-of-california-san-diego-public-records-reveal-administrations-censorship/.

**App.244**

## DISCUSSION

the 'free speech' line."[65] It didn't, and *The Koala* is suing UCSD with the assistance of the ACLU of Southern California.[66]

- **John Carroll University**: A summary report recounted that an "[a]nonymous student reported that [the] African-American Alliance's student protest was making white students feel uncomfortable."[67]

- **University of Northern Colorado** (UNC): Two professors were investigated for encouraging students to debate gay and transgender rights in class—including one professor who was responding to a student's comments on the issue and encouraging his students to confront arguments they find uncomfortable.[68] Other reports indicated that students were ordered to remove a Confederate flag from their dormitory room because it might offend someone.[69] These disclosures spurred letters of inquiry from two state senators,[70] a condemnation from the *Denver Post* editorial board,[71] and

concessions from a UNC administrator that the Bias Response Team's efforts may have been improper in some cases.[72] UNC subsequently shuttered its Bias Response Team.[73]

- **University of Oregon:** The Bias Response Team intervened to explain "community standards and expectations" when students had the audacity to "express[] anger about oppression."[74] In a separate incident, the Bias Response Team intervened with the reporter and editor of a student newspaper after an anonymous report that the "newspaper gave less press coverage to trans students and students of color."[75]

- **University of Michigan**: A snow sculpture perceived to be a "snow penis" was reported.[76]

- **Connecticut College**: Pro-Palestinian students were reported over flyers mimicking Israeli eviction notices to Palestinians, sparking an investigation

---

[65] Email from Becky Pettit, Univ. of Cal. San Diego Vice Chancellor for Equity, Diversity, and Inclusion, to Daniel Park, Univ. of Cal. San Diego Chief Campus Counsel, Nov. 13, 2016, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/01095740/Koala-v-UCSD_Public-Records-and-Bias-Incident-Reports.pdf#page=8.

[66] *Defending Freedom of Speech for Everyone, ACLU Sues UCSD to Enforce First Amendment Rights of the Student Press*, AM. CIVIL LIBERTIES UNION OF SAN DIEGO, May 31, 2016, https://www.aclusandiego.org/defending-freedom-speech-everyone-aclu-sues-ucsd-enforce-first-amendment-rights-student-press/.

[67] JOHN CARROLL UNIV., INTERIM REPORT ON BIAS REPORTING SYSTEM SUMMER-FALL 2015 4 (2015) *available at* http://webmedia.jcu.edu/bias/files/2016/02/Bias-Reports-Fall-2015-web-rev.-2.24.2016.pdf.

[68] Adam Steinbaugh & Alex Morey, *Professor Investigated for Discussing Conflicting Viewpoints, 'The Coddling of The American Mind'*, NEWSDESK, June 20, 2016, https://www.thefire.org/professor-investigated-for-discussing-conflicting-viewpoints-the-coddling-of-the-american-mind/.

[69] Tyler Silvy, *University of Northern Colorado's Handling of Speech Deemed Offensive Raises Questions, Concerns*, GREELEY TRIBUNE, June 28, 2016, http://www.greeleytribune.com/news/local/university-of-northern-colorados-handling-of-speech-deemed-offensive-raises-questions-concerns/.

[70] Tyler Silvy, *Sen. John Cooke Rips University of Northern Colorado in Scathing Letter*, GREELEY TRIBUNE, July 2, 2016, http://www.greeleytribune.com/news/local/sen-john-cooke-rips-university-of-northern-colorado-in-scathing-letter/.

[71] Denver Post Editorial Board, *UNC's Weak-Kneed Commitment to Free Speech*, DENVER POST, July 5, 2016, http://www.denverpost.com/2016/07/05/uncs-weak-kneed-commitment-to-free-speech/.

[72] Alex Morey, *Facing More Troubling Details and Public Outcry, Northern Colorado Vows to Reconsider Bias Response Team*, NEWSDESK, June 27, 2016, https://www.thefire.org/facing-more-troubling-details-and-public-outcry-northern-colorado-vows-to-reconsider-bias-response-team/.

[73] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[74] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[75] UNIVERSITY OF OREGON BIAS RESPONSE TEAM, ANNUAL REPORT 2014-2015 10 (2015), archived at http://web.archive.org/web/20151015075754/http://uodos.uoregon.edu/Portals/0/BRT/Annual%20Report%202014-2015.pdf.

[76] Erin Dunne, *Snow Penis Reported as Bias-Incident*, MICH. REVIEW, Feb. 25, 2016, http://www.michiganreview.com/snow-penis-reported-as-bias-incident/.

**App.245**

Case 5:23-cv-00029-J   Document 32-10   Filed 03/24/23   Page 18 of 36
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 33

DISCUSSION

by a dean.[77] The college's response led to students occupying the president's office, inquiring "about the differential treatment of alleged bias incidents on campus, particularly why some bias incidents warrant all-campus communications and administrative actions while others do not."[78]

- **Colby College**: Logs of bias incident reports—which are now hidden from public view[79]—show one student reported for claiming that a student group was racist against white people, while another was reported for using the phrase "on the other hand," which was perceived as ableist.[80]

- **University of New Mexico** (UNM): A student member of the College Republicans was reported and investigated by the office of the dean of students for criticizing a student and her organization by name[81] during a public debate over whether UNM should cut ties with Chick-fil-A.[82]

- **Cornell University**: A professor was reported for speaking at a rally as a private citizen and referring to police as "terrorists." The complaint was referred

to human resources administrators, who discussed freedom of speech policies with the complainant.[83]

In a separate instance, an anonymous person reported the student government for participating in efforts to encourage Cornell to become a sanctuary campus.[84]

- **Ohio State University**: A group of students was reported for sharing memes comparing Hillary Clinton to Adolf Hitler in a "political discussion," resulting in a housing employee holding a "mandatory floor meeting about triggering events."[85]

Another student called upon administrators to compel the College Democrats to allow anyone to attend their meetings after the Democrats had asked the student to leave, believing him to be a member of the College Republicans sent to observe the meeting.[86]

Yet another student reported a chalk message stating "Build the Wall," which the student wanted "erased"; the student also requested "a clear message from the

[77] Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, ALGEMEINER, May 16, 2016, https://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices/.
[78] *Why We're Here*, OCCUPY FANNING, May 13, 2016, http://occupyfanning2.blogspot.com/2016/05/why-were-here.html.
[79] Colby College's bias incident policy earned that institution the dubious honor of being FIRE's July 2016 Speech Code of the Month. Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/.
[80] *Bias Incident Log*, COLBY COLLEGE, archived on July 23, 2016 and *available at* http://archive.is/wRwfw.
[81] University of New Mexico Hate/Bias Incident Reporting Form, Feb. 27, 2013, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3234844-University-of-New-Mexico-Chick-Fil-a-Report.html.
[82] Astrid Galvin, *UNM Board: Chick-fil-A to Stay*, ALBUQUERQUE JOURNAL, Feb. 27, 2013,

https://www.abqjournal.com/173096/unm-board-chick-fil-a-to-stay.html; *Chick-fil-A to Stay on UNM Campus*, KOAT-TV, Feb. 27, 2013, https://www.youtube.com/watch?v=LYUCfnstTro.
[83] *Bias Incident Summaries: July 1 – August 31, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Aug2016_Incident%20Summaries.pdf.
[84] *Bias Incident Summaries: July 1 – November 30, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Nov2016_Incident%20Summaries.pdf.
[85] Bias incident report dated Oct. 23, 2015, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3255200-Ohio-State-University-Bias-Assessment-and.html. How OSU responded to these reports is unclear, as OSU declined to produce "voluminous" records relating to its responses.
[86] Bias incident report dated Feb. 1, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418811-Ohio-State-University-College-Democrats-Report.html.

**App.246**

<u>DISCUSSION</u>

university that this type of hate speech will not be allowed."[87]

(OSU's police chief, in an article posted on OSU's Bias Assessment and Response Team's website, recommends that students who are "verbally insulted or confronted by someone with whom you strongly disagree" should "not engage in debate.")[88]

- **University of Texas at Austin**:[89] The Campus Climate Response Team (CCRT) fielded dozens of reports about a conservative student group's protest of affirmative action in the form of an "affirmative action bake sale."[90] 94% of the reports sought disciplinary action. Administrators met with the student group following the reports and acknowledged in an open letter that it was the student group's "right to" engage in the protest.[91] The CCRT's annual report also disclosed that "[f]aculty and student commentary in the classroom perceived as derogatory and insensitive" was an example of the "types of incidents" reported to the CCRT.[92]

- **University of Wisconsin—Platteville**: Documents acquired by *Heat Street* showed that students were reported for

dressing up as the "Three Blind Mice" for Halloween, which the complainant feared *might* offend others who *might* believe the costumes were making fun of disabilities.[93]

- **Case Western Reserve University** (CWRU): A professor was reported for a writing assignment that challenged students to "[w]rite about a gay child being kicked out of their house, and make the audience feel sorry for the person kicking them out."[94]

Another CWRU professor was reported because, among other things, students were "required to read plays with racist depictions of First Nations people."[95]

A third CWRU professor was reported for asking students who were neither citizens nor permanent residents to raise their hands, then pointing out that they could be sued anywhere.[96] This appears to have been an exercise in explaining residency and venue during a law school course on civil procedure.[97]

There is no public indication as to whether CWRU intervened in any of these cases.

---

[87] Bias incident report dated Apr. 18, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418842-Ohio-State-University-Build-the-Wall-Report.html.

[88] Paul S. Denton, *How OSU Police Respond to Incidents of Bias or Intimidation*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/pdfs/how-osu-police-respond-to-incidents-of-bias-or-intimidation.pdf (last visited Jan. 31, 2017); *see also, Bias Response Tools*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/bias-response-tools.aspx (last visited Jan. 6, 2017) (linking to Chief Denton's article as one of its "bias response tools").

[89] UT Austin asked FIRE to pay $2,437.20 for records relating to how its CCRT responded, although other Texas institutions provided such records at no cost. We declined.

[90] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, CAMPUS CLIMATE TREND REPORT, 2013-2014 20 (2014), *available at* http://utexas.app.box.com/s/88ccrqlayd41b1nzqjos7z3izkrepol3.

[91] *Statement From Dr. Gregory Vincent About the Young Conservatives of Texas's Bake Sale*, UNIV. OF TEXAS AT AUSTIN, Sept. 27, 2013, http://diversity.utexas.edu/news/2013/09/27/statement-from-dr-gregory-vincent-about-the-young-conservatives-of-texass-bake-sale/.

[92] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, *supra* note 90 at p. 15.

[93] Jillian Kay Melchior, *'Bias Incident Team': Students' Three Blind Mice Halloween Costume 'Makes Fun of a Disability'*, HEAT STREET, Aug. 3, 2016, https://heatst.com/culture-wars/bias-incident-team-students-three-blind-mice-halloween-costume-makes-fun-of-a-disability/.

[94] *Bias Reporting System (BRS)*, CASE WESTERN RESERVE UNIV., archived on Sept. 12, 2016 at http://archive.is/kpceX.

[95] *Id.*

[96] *Id.*

[97] 28 U.S.C. § 1391 (2011).

**App.247**

DISCUSSION

To be sure, Bias Response Teams also field a number of reports of conduct *not* protected by the First Amendment. For example, many reports involve vandalism, assault, or true threats motivated by bias. These, however, are acts that may be reported to existing resources, such as student conduct administrators or police departments. Schools could also invite students to report unlawful conduct using online reporting systems, or even to a team set aside to address unlawful conduct motivated by bias. But schools are implementing broad definitions of "bias" to expressly invite reports of protected *speech*, including a broad range of political speech, and they often do so without any training on First Amendment rights.

### WHO SCRUTINIZES THE SPEECH? POLICE, CONDUCT ADMINISTRATORS, AND MEDIA RELATIONS STAFF

Having cast a wide net, who reviews the reported speech? Bias Response Teams are often populated by police and student conduct administrators. They also include, to a lesser extent, media relations administrators, faculty members, and students.

Some institutions, including the **University of West Florida**[98] and **Montana State University**,[99] embed police or security officials within their Bias Response Teams. Others, such as the **University of Montana**[100] and **DePaul University**,[101] direct reports straight to police or security officers.

Some 42% of Bias Response Teams include police or security officials. By including police and student conduct administrators on their Bias Response Teams, schools send a message to students that undercuts claims of respect for freedom of expression: If you say something that offends someone, you may (or in some cases *will*) be investigated by police. Their inclusion can also lead universities to use police to investigate offensive speech or anonymous speakers.[102] For example, at **Evergreen State College**, administrators responded to anonymous flyers critical of, among other things, Black Lives Matter, by emailing students:[103]

> The College wants to identify the individual(s) engaged in posting and distributing these flyers. If you have any information about who may be doing this, it is critical that you contact Police Services or provide information anonymously using the online incident report form.

Including student conduct administrators, as do approximately 63% of Bias Response Teams, also sends a chilling message. Students summoned to meet with a member of the office of the dean of students are likely to view the meeting not as educational, but as punitive. Even when the intention is not punitive, administrators are likely to approach "offensive" speech or sharp disagreement from a conflict-resolution perspective. This approach may conflict with a student speaker's purpose; many use speech to heighten or clarify conflict and disagreement in order to further their message.

---

[98] *About Us,* UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/about-us (last visited Jan. 9, 2017) (including Chief of University Police on its Bias Response Team).
[99] *Bias Incident Response Team,* MONT. STATE UNIV., http://www.montana.edu/biasreporting/BIRT.html (last visited Jan. 9, 2017) (Bias Incident Response Team includes a "representative from the Montana State University Police Department").
[100] *Hate Crime Form,* UNIV. OF MONT., http://www.umt.edu/police/Police/Hate%20Crime%20Form.php (last visited Jan. 9, 2017) (Police department soliciting reports of bias incidents, including "Leafleting" and the use of slurs).

[101] *Reporting Process,* DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 9, 2017) (directing reports to the DePaul Public Safety Office).
[102] The First Amendment protects anonymous speech and association. *See, e.g.,* Talley v. California, 362 U.S. 334, 357 (1960) (anonymous pamphleteering), NAACP v. Alabama, 357 U.S. 449, 462 (1958) (anonymous association).
[103] *Bias Related Incident – April 19 Flyers,* EVERGREEN STATE COLLEGE, Apr. 19, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3418430-Evergreen-State-College-April-19-2016-Flyers.html.

## DISCUSSION

Including media relations administrators is also concerning, because it suggests that a school's decision to respond to offensive speech may be driven by the potential impact to the school's reputation. Where this is the case, it undermines the notion implicitly underlying Bias Response Teams that universities are primarily concerned with providing a safe environment.

And there is reason to be concerned that universities' responses may be driven by a desire to manage the institutions' reputation at the expense of protecting freedom of expression. At the **University of New Mexico**, administrators wanted to rush to release a statement from the



Office of the President "rather than waiting for the media to get ahold of" flyers critical of the university's logo, which included conquistadors but not Native Americans.[104] These flyers were perceived by the Bias Response Team as a threat to Native Americans because the mock logo incorporated skulls and bones underneath the feet of conquistadors—a rather obvious criticism of the treatment of Native Americans in the New Mexico area. Ultimately, it was faculty members on the Diversity Council who placed the flyers in context. Without their intervention, it is possible that administrators who erroneously viewed the flyers as threatening could have continued their investigation and initiated charges.

In other words, the lack of faculty or student membership may deprive Bias Response Teams of valuable insight into instances of purportedly

offensive speech, as well as principles of academic freedom. That may explain why the **University of Northern Colorado**'s Bias Response Team warned at least one professor that he could face lengthy, intrusive investigations for permitting students to debate controversial issues in class.[105]

## BIAS RESPONSE TEAMS MAY EXPOSE UNIVERSITIES TO FIRST AMENDMENT LAWSUITS

To date, FIRE is aware of no legal challenges to a bias reporting system. It's unclear whether a legal challenge could be mounted by a student or faculty member based on the mere existence of such a system. However, each time a Bias Response Team embarks upon an investigation or intervention with the reported person, it risks exposing the institution and its administrators to claims under the First Amendment.

That a university provides a mechanism for community members to share information concerning offensive speech may not, alone, amount to a justiciable First Amendment controversy. In *Laird v. Tatum* (1972), the Supreme Court of the United States held that the "mere existence" of broad, intelligence-gathering programs does not, "without more," impermissibly chill speech.[106]

The First Amendment, however, does not simply restrict the government from expressly *penalizing* or *prohibiting* speech. It also prohibits "adverse government action against an individual because of First Amendment freedoms."[107] When universities depart from the *Laird* baseline by mounting investigations or interventions with offending speakers, they expose themselves to the possibility of a First

---

[104] *See* emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[105] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.
[106] Laird v. Tatum, 408 U.S. 1, 10 (1972).
[107] Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005).

DISCUSSION

Amendment retaliation claim. This exposure isn't limited to legal action against the university; because many First Amendment principles are so well established under the law, members of a Bias Response Team risk being held *personally* liable for their actions in some circumstances.

To mount a First Amendment retaliation claim, for example, an aggrieved party must demonstrate three things: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech."[108] Whether government conduct has an adverse effect is determined by an objective standard: if the retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights."[109] The retaliatory conduct need not be successful, as the cause of action is intended to address "conduct that tends to *chill* [speech], not just conduct that *freezes* it completely."[110]

To the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds. But the reality is that Bias Response Teams are generally intended to deter offensive speech and conduct. Their goal is to chill speech that the institution or its constituents find offensive or unkind.[111]

When Bias Response Teams intervene directly with the reported student, the risk of exposing the university to First Amendment claims increases. Bias Response Teams often submit speech to the review of police and campus conduct administrators, who launch an "investigation"[112] or bring "charges"[113] against the "respondent,"[114] who may be summoned for a "hearing"[115] and found "guilty"[116] or be provided with an "educational"[117] reprimand—or, in the case of **Longwood University**, "education sanctions."[118] This is the language of punitive systems, not educators, and it is likely to be perceived as such by students and by courts. Simply calling a quasi-punitive response system "educational" doesn't make it so. After all, many institutions already describe at least some of their *punitive* measures as "educational" in nature.[119]

---

[108] Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).
[109] *Id.*
[110] Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original).
[111] Rio Fernandes, *In a Charged Climate, Colleges Adopt Bias-Response Teams*, CHRON. OF HIGHER EDUC., Feb. 1, 2016, http://www.chronicle.com/article/In-a-Charged-Climate-Colleges/235120 (describing how Ohio State University formed a bias response team because "they needed a proactive means to prevent occurrences of offensive speech").
[112] *See, e.g., Discrimination Cases, Fall 2015*, UNIV. OF CAL. DAVIS, http://reporthateandbias.ucdavis.edu/fall_2015.html (last visited Jan. 30, 2017) ("Offensive classroom comments, course content" resulted in an "Investigation").
[113] *See, e.g., Student Reporting of Bias-Related Incidents*, STATE UNIV. OF N.Y. GENESEO, https://www.geneseo.edu/diversity/procedures (last visited Jan. 30, 2017) (in a "Level I" incident, "the accused student is made aware of the charges and has a hearing with the Student Conduct Administrator").
[114] *See, e.g., Tolerance Program Annual Report: 2014-2015*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, at 4, *available at* http://www.conflictresolution.illinois.edu/tolerance/downloads/toleranceReport_1415.pdf ("If a meeting with the respondent(s) occurs, the assigned [Bias Incident Investigation Team] member will provide her/him with general information about bias-

motivated incidents and the Tolerance Program and will give her/him the opportunity to respond to the report.").
[115] *See, e.g., Student Reporting of Bias-Related Incidents, supra* note 113 (describing a "hearing with the Student Conduct Administrator").
[116] *See, e.g., Difference Between a Hate Crime and a Bias Incident*, DAVIDSON COLLEGE, http://www.davidson.edu/student-life/multicultural-life/hate-crime-and-bias-incidents (last visited Jan. 30, 2017) ("Professors who make pejorative comments or stereotypes about a protected class of people ... are also guilty of commiting [*sic*] a bias incident.").
[117] *See, e.g., Bias and Discrimination Response Protocol*, COLUMBIA COLLEGE, https://www.cc-seas.columbia.edu/studentlife/bias/protocol (last visited Jan. 30, 2017) ("Columbia College and Columbia Engineering students involved in perpetrating a hate crime/ bias incident will be subject to an educational and/or disciplinary process determined by Judicial Affairs.").
[118] *Bias & Hate Incidents*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/bias--hate-incidents (last visited Jan. 9, 2017).
[119] *See, e.g.,* Missouri State University, which promises not to "discipline" through its Bias Response Team, but instead "provide educational opportunities for those engaging in speech contrary to ... values [of diversity and inclusion]." Its Code of Conduct, however, is *also* "intended to be educational in nature[.]" If

## DISCUSSION

Even the public pronouncement that an investigation is underway—particularly when conducted by law enforcement—can itself have a chilling effect.[120] While universities need not remain silent about offensive speech, going "beyond simple vocal condemnation" and implying that particular instances of protected speech may be punished can amount to a violation of the First Amendment.[121]

The Supreme Court's perspective in *Bantam Books, Inc. v. Sullivan* (1963) is instructive. There, the state of Rhode Island established a commission whose goal was to, among other things, "educate the public" about books and printed materials it viewed as obscene, acting as a gatekeeper to "investigate and recommend the prosecution" of persons found to be distributing obscene materials.[122] The commission promulgated lists of "objectionable" publications to police departments and, when booksellers were reportedly selling objectionable material, the commission sent them notices suggesting that the commission had the power to recommend prosecution if materials were found to be obscene.[123] The Supreme Court held that the commission's claim that it simply "exhort[ed]" publishers to avoid distributing obscenity, and could not itself punish booksellers, was "untenable":[124]

> It is true that [the] books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications ... .

Bias Response Teams are arguably quite comparable to the Rhode Island commission discussed in *Bantam Books*. While they might protest that they are intended not to punish speech but to discourage speech contrary to the values of the institution, even if that speech is protected, Bias Response Teams are nevertheless intended to chill speech. By using the language, tools, and administrators associated with disciplinary systems, Bias Response Teams risk being perceived as intimidating, not educating. While some systems strike an appropriate balance by, among other things, limiting their definitions of reportable conduct to speech unprotected by the First Amendment,[125] the vast majority do not.

---

discipline can be described as educational, then an "educational" response which is mandatory or lacks substance may be perceived as disciplinary. *Cf. Bias Response Team,* MO. STATE UNIV., https://www.missouristate.edu/dos/268885.htm (last visited Jan. 11, 2017); *Code of Student Rights and Responsibilities*, MO. STATE UNIV., https://www.missouristate.edu/policy/G5_01_StudentRightsandResponsibilities.htm (last visited Jan. 11, 2017).

[120] *See generally* Adam Steinbaugh, *The Chilling Effect of Investigations*, NEWSDESK, May 11, 2016, https://www.thefire.org/the-chilling-effect-of-investigations/; *see also* Sweezy v. New Hampshire, 354 US 234, 245 (1957) ("There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press,

freedom of political association, and freedom of communication of ideas, particularly in the academic community."); *see also* Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) (an "unwarranted disciplinary investigation" alone amounted to an adverse employment action in a First Amendment retaliation case).

[121] Levin v. Harleston, 966 F.2d 85, 89-90 (2d Cir. 1992); *but see* Stolle v. Kent State Univ., 610 Fed. App'x 476, 482-83 (6th Cir. 2015) (faculty member verbally reprimanded for sending letter to legislator on university letterhead in violation of policy amounted to "de minimus" act insufficient to deter person of ordinary firmness from First Amendment activities).

[122] Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 59-60 (1963).

[123] *Id.* at 62-63.

[124] *Id.* at 66-67 (footnotes omitted).

[125] *See, e.g.,* Azhar Majeed, *UW-Madison Demonstrates What a 'Green Light' Definition of a Bias Incident Looks Like*, NEWSDESK, Oct. 6, 2016, https://www.thefire.org/uw-madison-demonstrates-

---

**App.251**

DISCUSSION

The prospect of a retaliation claim should alarm colleges and universities. The central question of such a claim—whether the conduct would deter a person of ordinary firmness from continuing to speak—is fact-based, meaning it's unlikely to be resolved before summary judgment, increasing universities' legal exposure.[126] Additionally, many of the scattered decisions on what meets the "ordinary firmness" test are based in the context of government employment, where the government's interest is given substantially more weight, than in the context of retaliation against a non-employee.[127]

This is not to say that universities must refrain from criticizing or condemning offensive conduct or speech. Criticism is not censorship, whether it is broadcast to the student body or public at large or instead sent directly to a student. University officials retain their own First Amendment right to contribute to discourse on campus and can do so without creating a substantial risk of a First Amendment retaliation claim.[128] The tools universities deploy in response to speech, how they are deployed, and how universities describe these systems to students matter.

Finally, because universities often keep opaque records documenting their interventions with reported speakers (discussed below), universities have a diminished ability to argue that such interventions provided meaningful education, as opposed to a chilling instruction to stop speaking.

## DESPITE ACKNOWLEDGING FIRST AMENDMENT TENSIONS, UNIVERSITIES PROVIDE LITTLE IF ANY TRAINING

The First Amendment issues faced by Bias Response Teams are complex, nuanced, and fraught with potential pitfalls that may lead public institutions into costly lawsuits. Leaving aside legal risks, Bias Response Teams also risk conflicting with essential principles of academic freedom, freedom of expression, and freedom of inquiry. Yet despite these risks, few Bias Response Teams receive meaningful training, if any, on the contours of these issues.

Of institutions surveyed, **84** (50.6%) acknowledge a tension with freedom of speech, freedom of inquiry, or academic freedom on their websites or in their policies. Of these, 50 are public institutions and 34 are private.

While Bias Response Team training requirements and materials were not part of FIRE's survey, FIRE has utilized state public records requests to explore the types of training required of members of Bias Response Teams. Although FIRE has issued or reviewed dozens of public records requests to universities seeking training materials distributed to Bias Response Teams, we've only seen materials from one school, **Louisiana State University**, that provided substantive training on First Amendment issues.[129]

---

what-a-green-light-definition-of-a-bias-incident-looks-like (definition of bias incidents consistent with standard for peer-on-peer hostile environment harassment standard in an educational setting, as set forth in Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651 (1999)).

[126] Thompson v. Ohio State Univ., 990 F. Supp. 2d 801, 809 (S.D. Ohio) (retaliation claim against professor proper where the professor allegedly filed charges against a student in retaliation for criticism of a colleague, as issue of whether an action is sufficient to deter a person of ordinary firmness) (citing Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 584 (6th Cir. 2012)).

[127] *See generally* Kinney v. Weaver, 367 F.3d 337, 358-60 (5th Cir. 2004) (noting that First Amendment analyses proceed on a "spectrum").

[128] *See, e.g.*, Samad v. Jenkens, 845 F.2d 660, 663 (6th Cir. 1988) (university's statement to outgoing dean that it would release

information to defend itself against any criticism by the dean was a reservation of "their own first amendment right to speak out," and the subjective chill resulting was insufficient to establish a justiciable controversy); *see also,* Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998) (concluding in the employment context that merely being "bad-mouthed and verbally threatened" by supervisors was insufficient, and that it "would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation"); *but see* De Leon v. Little, 1999 U.S. Dist. LEXIS 23091, at *13-14 (D. Conn. Sept. 29, 1999) (criticizing Nunez as inconsistent with Supreme Court precedent in that threats of dismissal can support First Amendment retaliation claims).

[129] FIRE is currently sponsoring a First Amendment lawsuit against Louisiana State University over its treatment of a former

<u>DISCUSSION</u>

Other institutions, despite acknowledging that identifying First Amendment issues can be nuanced, do not appear to provide training. For example, the **University of California, San Diego (UCSD)** notes on its website that "[i]ssues pertaining to freedom of speech and expression can be very complicated and confusing."[130] The university's definition of "bias incidents" likewise observes that the "protection of freedom of expression, including controversial speech and sometimes even offensive or hurtful words, is vital to a community of teachers and learners" and that some "acts of bias may either not be severe enough to violate policy or be protected expressions of speech."[131] Yet despite freedom of expression being both "complicated" and "vital," the University of California's Office of the President, responding on UCSD's behalf to a public records request issued by FIRE, did not produce any training materials relating to the First Amendment at UCSD.

Another school, **Longwood University**, claimed as recently as August 2016 that because universities could not impose "campus judicial codes that include specific prohibitions related to bias and hate" under the First Amendment, it instead "train[s] board members to identify bias-related behavior and include appropriate education sanctions when a student is found responsible."[132] An August 2016 "Bias Response Team Training" memorandum, in discussing

"consequences" for bias incidents, asserted that there are "no laws for bias incidents" and that the team doesn't "get the firm backing through law or the institution in general about these topics."[133] A contemporary training slideshow indicated that Bias Response Team members would be trained on "legal issues" without elaboration.[134] None of the materials provided to FIRE indicate that any training on First Amendment issues was provided.

## A RESISTANCE TO TRANSPARENCY

With few exceptions, Bias Response Teams suffer from a lack of transparency, and universities are too often willing to stonewall public records requests concerning their teams. While protecting the privacy of both reporting and reported parties is important, this hesitance to engage in meaningful transparency is worrisome. The ways in which universities respond to offensive speech and discrimination are of particular public concern,[135] and doing so without being transparent, or being selectively transparent,[136] risks being seen as an effort to hide incidents from the community.

Approximately 28% of institutions with bias reporting systems do not even disclose who reviews the reports. If universities are unwilling to publicly identify who is responsible for

---

faculty member, Teresa Buchanan, but the case does not involve the school's Bias Response Team.

[130] *Freedom of Speech and Expression at UC San Diego*, UNIV. CAL., SAN DIEGO, https://students.ucsd.edu/student-life/diversity/expression (last visited Dec. 29, 2016).

[131] *Frequently Asked Questions*, UNIV. CAL., SAN DIEGO OFFICE FOR THE PREVENTION OF HARASSMENT & DISCRIMINATION, http://ophd.ucsd.edu/faq/index.html#What-are-bias-incidents? (last visited Dec. 29, 2016).

[132] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on Aug. 26, 2016 and *available at* http://web.archive.org/web/20160826220917/http://www.longwood.edu/diversity/45365.htm.

[133] *Bias Response Team Training (Handout)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288823-Longwood-University-Bias-Response-Team-Training.html.

[134] *Bias Response Team Training (Slideshow)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in

Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288824-Longwood-University-Bias-Response-Team-Training.html.

[135] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action (student group, "disheartened by the lack of communication and transparency" concerning a student's conduct, calls upon administrators to take acts "to ensure that hate bias on this campus is heavily policed, reported, and made transparent").

[136] *See, e.g.*, Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, THE ALGEMEINER, May 16, 2016, http://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices (students protest, in part, over mass email concerning political protest labeled as a bias incident, when other bias incidents weren't similarly announced).

**App.253**

DISCUSSION

reviewing and responding to reports, then students, faculty, and the public will be hindered in holding public servants accountable. Similarly, a refusal to identify Bias Response Team members does not instill confidence that schools take complaints seriously by devoting capable people to overseeing them.

And while many Bias Response Teams purport to exist for the purpose of keeping statistics, the statistics themselves are rarely published. The **University of California**, for example, developed its multi-campus reporting system in 2010 with the "[p]rimary purpose" of "statistical reporting,"[137] yet it appears to have *never* published statistics. The University of California Office of the President, in response to a public records request for all statistics,[138] only provided statistics last compiled in 2012 and apparently never published.[139] Some institutions publish statistics on periodic bases, with varying degrees of transparency. And while the Clery Act requires federally funded institutions to publish statistics concerning hate crimes,[140] most schools define "bias incident" more broadly than criminal acts. In any event, most institutions publish neither statistics nor reports.

FIRE has utilized public records requests under state law—similar to requests pursuant to the federal Freedom of Information Act—to ask dozens of schools to produce records relating to complaints; how they responded to those

complaints; and the composition, policies, and training of their Bias Response Teams. While most complied with both the letter and spirit of the law,[141] a number have resisted. Ominously, even where schools produce records, those records often fail to substantially document the actions the university took in response to the report, instead stating that the respondent was provided with "education." This does not inspire confidence that the response was meaningful education, as opposed to a reprimand.

Justice Louis Brandeis famously opined that sunlight was the best of disinfectants.[142] But a popular tactic of sunshine-shy administrators is the employment of hefty fees to locate and redact public records, notwithstanding open records laws encouraging universities to reduce or waive fees when releasing documents that would serve the public interest. The **University of Northern Colorado** attempted to charge FIRE hundreds of dollars for records eventually obtained by a media outlet, *Heat Street*, which revealed that UNC's Bias Response Team had discouraged professors from discussing subjects of debate raging in legislatures and the media.[143] That blast of sunlight caused UNC to shutter its Bias Response Team.[144]

Similarly, the **University of Oregon** concluded that releasing its records would not be in the public interest,[145] demanding that FIRE pay

---

[137] Meg Carter & Jerlena Griffin-Desta, *Campus Climate Project Requirements*, UNIV. OF CAL., June 16, 2010, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288857-University-of-California-Campus-Climate-Project.html.

[138] California Public Records Act Request from Adam Steinbaugh to the University of California Office of the President, Apr. 8, 2016, *available at* https://www.documentcloud.org/documents/3288861-2016-04-08-Public-Records-Request-to-the.html.

[139] *Update on Universitywide Campus Climate Incidents Reporting System*, UNIV. OF CAL. ETHICS, COMPLIANCE AND AUDIT SERVICES, Feb. 7, 2012, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288860-University-of-California-Feb-7-2012-Update-on.html.

[140] Institutional Security Policies and Crime Statistics, 34 C.F.R. § 668.46(c)(1)(iii).

[141] Evergreen State College merits an honorable mention, having produced over seven *thousand* pages of thorough records on a timely basis, in a response to a records request by FIRE. Contrast this with the University of California, which produced scant records after months of delay and obfuscation.

[142] Louis D. Brandeis, *Other People's Money*, HARPER'S WEEKLY, Dec. 20, 1913, at 92.

[143] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.

[144] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[145] *See* In Defense of Animals v. Oregon Health Sciences University, 112 P.3d 336, 354 (Or. Ct. App. 2004) (agencies may reduce or waive fees if it determines that the records relate to a matter which "affects the community or society as a whole, in contrast to a concern or interest of a private individual or entity").

## DISCUSSION

$1,483.30 to review its team's records.[146] The university's steadfast refusal to acknowledge the public interest was plainly belied by criticism by national media outlets,[147] which spurred a faculty inquiry into the team's activities. When the records were eventually produced, Oregon was unable to locate records of some incidents, including one pilloried in the media.[148]

Other institutions have been quick to delete or hide once-public websites documenting bias incidents following public criticism. **Colby College** placed its log of bias incidents behind a password-protected field after it was publicly criticized.[149] So, too, did **Skidmore College**.[150] More alarmingly, several institutions responded to FIRE's public records requests by initially claiming that there were no records to produce. When FIRE issued additional requests seeking records of what efforts the school made to search for records, the originally-requested records were suddenly located and produced. This suggests a certain lack of good faith from these institutions in following their legal obligations.

Other institutions found more creative ways to stonewall. The **University of California**'s Office of the President (UCOP), for example, intervened to respond on behalf of its subsidiary campuses after FIRE issued records requests to each campus about its processes. Months later, UCOP professed that it would be too difficult for the central office to locate records of how its campuses responded to reported incidents. UCOP also refused to produce records of any reported incident whatsoever, claiming that it would be too difficult to redact students'

names—a task somehow accomplished without complaint by dozens of other schools, many of which boast far fewer resources than the University of California system.

## NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

Given that reported incidents of perceived "bias" run the ideological gamut, subjecting campus speech to review by conflict-averse administrators runs the risk of chilling speech from any and every perspective. This illiberal approach invites administrative intervention whenever there are impolite words or disagreement of any sort. College campuses must remain open for vehement disagreement and impolite rhetoric lest they invite administrators to limit speech and debate.

This view is not FIRE's alone. Writing in the *New Republic*, Carleton College professors Jeffrey Aaron Snyder and Amna Khalid aptly observed the limitations of Bias Response Teams and their potential chilling effects on academic discourse and campus speech:

> We do not want our campuses overrun with eager "see something, say something" "student informants." Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College student asserted, encourage "students to ask the administration to solve problems

[146] Adam Steinbaugh, *University of Oregon on 'Bias Response Team': Nothing to See Here*, NEWSDESK, May 27, 2016, https://www.thefire.org/university-of-oregon-on-bias-response-team-nothing-to-see-here/.
[147] *See, e.g.*, Catherine Rampell, *College Students Run Crying to Daddy Administrator*, WASH. POST, May 19, 2016, https://www.washingtonpost.com/opinions/college-students-run-crying-to-daddy-administrator/2016/05/19/61b53f54-1deb-11e6-9c81-4be1c14fb8c8_story.html?utm_term=.f2f5652cd55c; *see also, e.g.*, Robby Soave, *The University of Oregon's Thought Police Investigate Students for Saying Anything*, REASON, May 10, 2016, http://reason.com/blog/2016/05/10/the-university-of-oregons-thought-police.

[148] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.
[149] Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/; Robby Soave, *Saying 'On the Other Hand' Got a Student Reported to the Campus Bias Police*, REASON, June 22, 2016, http://reason.com/blog/2016/06/22/saying-on-the-other-hand-got-a-student-r.
[150] Blake Neff, *Skidmore College: 'Make America Great Again' Is A 'Racialized Attack'*, THE DAILY CALLER, July 1, 2016, http://dailycaller.com/2016/07/01/skidmore-college-maka-america-great-again-is-a-racialized-attack/.

**App.255**

## DISCUSSION

instead of solving them amongst themselves."

[...]

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints is profoundly misguided.

[...]

BRTs will result in a troubling silence: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints.[151]

At **John Carroll University**, a private, Catholic institution, Bias Response Team administrators acknowledged that critiques concerning freedom of speech "must be taken seriously."[152] Troubled both by the potential for "malicious-anonymous" abuse of the ability to anonymously report others and by the possibility that the system might have a chilling effect on speech, the university's annual report observed:[153]

If a person is able to report a peer, professor, supervisor, or other community member for "speech code violations," and particularly if those reports result in punitive action toward the offender, the system could shut down, rather than open up, critically important dialogue. On a university campus with an implicit commitment to the free exchange of ideas, such a result must be considered unacceptable.

Other institutions have recognized these risks. In August 2016, the **University of Iowa** scrapped a planned Bias Response Team, observing a "high failure rate in the [teams] at other institutions" as they became "almost punitive in nature," rendering them "scolding panels." Although the University of Iowa's planned team did not involve a punitive component, the type of response undertaken by other BRTs "accomplishes nothing," said one administrator.[154]

As academic freedom expert Donald Downs, professor of political science, law, and journalism at the University of Wisconsin—Madison, observed, Bias Response Teams attempt to strike a difficult balance:[155]

In some telling respects, some of these new policies [including Bias Response Teams] do not overtly call for censorship, as the old speech codes did. Rather, they are meant to "educate" the academic community about the negative impact that certain types of speech can have. Such educational schemes can be consistent with the goals of higher education if

---

[151] Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, THE NEW REPUBLIC, Mar. 30, 2016, https://newrepublic.com/article/132195/rise-bias-response-teams-campus.
[152] JOHN CARROLL UNIVERSITY, BIAS REPORTS 2014-2015, *available at* http://webmedia.jcu.edu/diversity/files/2015/12/2014-2015-Bias-Report-web-version.pdf.
[153] *Id.*

[154] Jeff Charis-Carlson, *University of Iowa Changing Course on Bias Response Team*, IOWA CITY PRESS-CITIZEN, Aug. 18, 2016, http://www.press-citizen.com/story/news/education/university-of-iowa/2016/08/18/university-iowa-changing-course-bias-response-team/88962048.
[155] Donald Downs, *The Good, the Less-Good, and the Path Forward: Thoughts on FIRE's Annual Report*, OPEN INQUIRY PROJECT, Jan. 4, 2017, http://openinquiryproject.org/blog/thoughts-on-fires-annual-report/.

**App.256**

## DISCUSSION

done right and in the right spirit. There is nothing intrinsically wrong with educating students and others about the potential impacts of speech, so long as such educational endeavors are not smokescreens for informal or formal ideological bullying. However, given the climates on many campuses today, such educational efforts too often amount to speech codes in disguise. The new policies may not be overt speech codes, but they can accomplish censorship by other means.

### STRIKING A BALANCE

It is understandable that universities wish to monitor the climate for students on their campuses and to have support systems in place for students who, for one reason or another, may be struggling to feel at home on campus. But it does not follow from these precepts that universities must effectively establish a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration.

While not every Bias Response Team impermissibly limits protected speech, the reality is that it is extremely difficult to have a system in place for the reporting of protected speech without creating a risk that speech and expression on campus will be chilled as a result. As lawyer, writer, and former FIRE President David French wrote, universities with Bias Response Teams are playing a "dangerous constitutional game" by not explicitly prohibiting protected speech but creating a "process-is-punishment" mechanism that deters people from speaking out.[156]

When setting parameters for their teams and implementing responses, universities must be cognizant of the risks created by broad definitions, anonymous reporting systems, unclear policies, and lack of training, and must take steps to minimize or eliminate these risks. While some Bias Response Teams have demonstrated familiarity with freedom of speech in their responses to reports of offensive speech, such actions are too often *not* the result of effective training and policies.

If bias reporting systems are to exist on campuses, they should describe reportable situations narrowly, excluding protected speech, or at the very least avoid characterizing the teams and their responses in ways that convey a punitive message. Universities should also recognize that even narrow definitions of bias are likely to result in reports of protected speech, and provide accurate and impartial training to Bias Response Team members so that they are able to identify protected speech.

Universities would do best to focus on how they can help the reporting student, not on the reported speaker. Unless a community member has engaged in conduct *unprotected* by the First Amendment or academic freedom, any institutional response to bias should avoid uninvited intervention with the speaker and instead focus on providing resources to the reporting student. In doing so, they will help encourage all community members to express themselves and participate in the marketplace of ideas that our nation's colleges and universities are uniquely suited to provide.

---

[156] David French, *Campus Ideologues Double Down on Censorship—Beware the 'Bias Response Team,'* NAT'L REVIEW, Feb. 3, 2016, http://www.nationalreview.com/corner/430750/campus-ideologues-bias-response-teams-first-amendment.

**App.257**

APPENDIX A: CATEGORIES OF BIAS

The following is the percentage of schools that promulgate the following categories of bias:

**Race and Culture**
  Race: 100%
  National Origin or Nationality: 94.5%
  Ethnicity or Ethnic Origin: 73%
  Color: 60.3%
  Ancestry: 25.6%
  Immigration Status or Citizenship: 14.1%
  Language or Accent: 2%
  Culture: 2%
  Geographic Origin: 1%
  Anti-Semitism: 0.50% (U. Vermont)
  Place of Birth: 0.50% (Middlebury)

**Religion or Existential Beliefs**
  Religion or Spiritual Beliefs: 100%
  Creed: 22%
  Spirituality: 0.50% (Middlebury)

**Sex, Gender, and Sexuality**
  Sexual Orientation: 99.5%
  Gender Identity or Expression: 81%
  Gender: 61%
  Sex: 41.2%

**Military Service**
  Veteran Status: 60%
  Military Status: 9%
  National Guard Status: 0.50% (SUNY Potsdam)

**Family and Relationships**
  Marital Status: 36.2%
  Familial or Parental Status: 7%
  Victim of Domestic Violence: 1%
  Relationship Status: 0.50% (U. Nebraska—Omaha)
  Civil Union Status: 0.50% (Rutgers)
  Domestic Partnership: 0.50% (Rutgers)
  Spousal Relationship to Current Employee: 0.50% (N. Dakota State U.)
  Childbirth: 0.50% (Grinnell College)

**Ex-Offender Status:** 4%

**Ability, Disability, Health, or Physical Attributes Unrelated to Race or Gender**
  Disability: 99%
  Age: 81.4%
  Genetic Information: 19%
  Pregnancy: 15%
  Mental Health: 7%
  Physical Appearance: 7%
  Medical Condition: 5%
  Size: 2.5%
  Height: 2%
  Weight: 2%
  Shape: 0.50% (U. Northern Colorado)
  Atypical Heredity: 0.50% (Rutgers)
  Cellular Blood Trait: 0.50% (Rutgers)
  Positive HIV-Related Blood Test Results: 0.50% (Middlebury)
  Intellectual Ability: 0.50% (Clemson)
  Emotional Ability: 0.50% (Clemson)
  Smoker Status: 0.50% (U. Kentucky)

**Views and Beliefs**
  Political Affiliation: 14%
  Membership Affiliation: 3.5%
  Group Affiliation: 1.5%
  Intellectual Perspective: 0.50% (U. Central Arkansas)
  Participation in Lawful, Off-Campus Activity: 0.50% (North Dakota State U.)
  Role: 0.50% (Macalester College)
  Political Expression: 0.50% (Dartmouth)
  Religious Expression: 0.50% (Dartmouth)
  Social Affiliation: 1% (Syracuse, Longwood U.)
  Social Standing: 0.50% (UNC Charlotte)
  Belief System: 0.50% (UNC Charlotte)
  Political Belief: 1% (U. Kentucky, U. Central Arkansas)

**Income, Housing, and Welfare**
  Socioeconomic Status: 23.6%
  Public Assistance Status: 1.5%
  Homelessness: 1 %

APPENDIX A: CATEGORIES OF BIAS

**Miscellaneous Categories of Bias**[157]

Anti-Semitism: University of Vermont

Atypical Heredity: Rutgers University

Behavior: Macalester College

Belief System: University of North Carolina, Charlotte

Cellular Blood Trait: Rutgers University

Characteristics: Macalester College

Childbirth: Grinnell College

Cultural: University of Wisconsin, Madison

Emotional Ability: Clemson

Intellectual Ability: Clemson

Intellectual Perspective: University of Central Arkansas

Major of Study: Missouri University of Science and Technology

National Guard Status: SUNY Potsdam

Participation in Lawful, Off-Campus Activity: North Dakota State University

Place of Birth: Middlebury College

Political Belief: University of Central Arkansas, University of Kentucky

Political Expression: Dartmouth

Positive HIV-Related Blood Test Results: Middlebury College

Religious Expression: Dartmouth

Role: Macalester College

Shape: University of Northern Colorado

Smoker Status: University of Kentucky

Social Affiliation: Syracuse University, Longwood University

Social Standing: University of North Carolina, Charlotte

Spirituality: Middlebury College

Spousal Relationship to Current Employee: North Dakota State University

Victim of Domestic Violence: SUNY Potsdam, University of Denver

---

[157] These categories of bias are unique to only one or two institutions. Some are identified in subcategories above and repeated here.

APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Alabama**
University of Alabama at Birmingham

**Alaska**
None observed

**Arizona**
Arizona State University
Northern Arizona University
University of Arizona

**Arkansas**
University of Central Arkansas

**California**
California Polytechnic State University,
    San Luis Obispo
California State Polytechnic Institute,
    Pomona
California State University, Chico
Humboldt State University
Loyola Marymount University
Occidental College
Pepperdine University
Pomona College
Sonoma State University
University of California, Berkeley
University of California, Los Angeles
University of California, Davis
University of California, Irvine
University of California, Merced
University of California, Riverside
University of California, San Diego
University of California, San Francisco
University of California, Santa Barbara
University of California, Santa Cruz
University of Southern California
University of the Pacific
Whittier College

**Colorado**
Colorado State University
University of Colorado at Boulder
University of Denver
University of Northern Colorado

**Connecticut**
Central Connecticut State University
Connecticut College
Trinity College
University of Connecticut
University of New Haven

**Delaware**
None observed

**Florida**
Florida International University
Florida State University
Pensacola State College
Stetson University
University of Central Florida
University of Florida
University of West Florida

**Georgia**
Armstrong State University
Emory University
Georgia Southern University
Kennesaw State University

**Hawaii**
None observed

**Idaho**
Boise State University

**Illinois**
DePaul University
Illinois State University
Loyola University Chicago
Northeastern Illinois University
Northern Illinois University
Northwestern University
Saint Xavier University
University of Chicago
University of Illinois at Urbana—
    Champaign

**Indiana**
Ball State University
DePauw University
Indiana University—Bloomington
Purdue University

**App.260**

**APPENDIX B:** INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Iowa**
- Coe College
- Grinnell College
- University of Northern Iowa

**Kansas**
- Kansas State University

**Kentucky**
- Georgetown College
- Kentucky State University
- University of Kentucky
- University of Louisville

**Louisiana**
- Louisiana State University—Baton Rouge
- Tulane University

**Maine**
- Bates College
- Bowdoin College
- Colby College
- University of Southern Maine

**Maryland**
- St. Mary's College of Maryland
- Towson University

**Massachusetts**
- Babson College
- Boston College
- Clark University
- Emerson College
- Framingham State University
- Harvard University
- Mount Holyoke College
- Northeastern University
- Smith College
- Tufts University
- University of Massachusetts Amherst
- Williams College

**Michigan**
- Grand Valley State University
- Michigan State University
- University of Michigan—Ann Arbor

**Minnesota**
- Carleton College[i]
- Hamline University
- Macalester College
- Minnesota State University, Mankato
- University of Minnesota—Morris
- University of Minnesota—Twin Cities

**Mississippi**
- University of Mississippi

**Missouri**
- Missouri State University
- Missouri University of Science and Technology
- Saint Louis University
- Southeast Missouri State University
- University of Central Missouri
- University of Missouri—Columbia
- Washington University in St. Louis

**Montana**
- Montana State University
- University of Montana

**Nebraska**
- University of Nebraska—Lincoln
- University of Nebraska—Omaha
- University of Nebraska Medical Center

**Nevada**
- None observed

**New Hampshire**
- Dartmouth College
- Plymouth State University
- University of New Hampshire

**New Jersey**
- Montclair State University
- Rowan University
- Rutgers University
- The College of New Jersey

**New Mexico**
- University of New Mexico

**App.261**

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**New York**
Alfred University
Bard College
Buffalo State College
Colgate University
Columbia University
Cornell University
Empire State College
Fordham University
Hamilton College
Le Moyne College
New York University
Skidmore College
SUNY Binghamton
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Fredonia
SUNY Geneseo
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Potsdam
Syracuse University
Union College
University of Rochester
Vassar College

**North Carolina**
Appalachian State University
Davidson College
Duke University
Elon University
Fayetteville State University
North Carolina State University—Raleigh
University of North Carolina, Asheville
University of North Carolina, Charlotte
Wake Forest University
Western Carolina State University

**North Dakota**
North Dakota State University
Valley City State University

**Ohio**
Bowling Green State University
Case Western Reserve University
John Carroll University
Kenyon College
Miami University of Ohio
The Ohio State University
University of Cincinnati
Wright State University

**Oklahoma**
University of Oklahoma

**Oregon**
Lewis & Clark College
Oregon Institute of Technology
Oregon State University
Portland State University
Reed College
Southern Oregon University
University of Oregon

**Pennsylvania**
Albright College
Allegheny College
Bryn Mawr College
Bucknell University
Dickinson College
Gettysburg College
Lafayette College
Lehigh University
Muhlenberg College
Pennsylvania State University—
    University Park
Swarthmore College
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania
Widener University

**Rhode Island**
Providence College
Rhode Island College
University of Rhode Island

**App.262**

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**South Carolina**
Clemson University
Furman University
University of South Carolina
Winthrop University

**South Dakota**
None observed

**Tennessee**
Sewanee, The University of the South
University of Tennessee, Knoxville

**Texas**
Baylor University
Southern Methodist University
Texas A&M University—College Station
Texas Tech University
University of Texas at Austin

**Utah**
University of Utah

**Vermont**
Middlebury College
University of Vermont

**Virginia**
George Mason University
Longwood University
University of Mary Washington
University of Richmond
University of Virginia
Virginia Commonwealth University
Virginia Polytechnic Institute
 and State University

**Washington**
Central Washington University
Evergreen State College
Washington State University
Western Washington University
Whitman College

**Washington, D.C.**
Georgetown University

**West Virginia**
None observed

**Wisconsin**
Marquette University
St. Norbert College
University of Wisconsin—Eau Claire
University of Wisconsin—Green Bay
University of Wisconsin—La Crosse
University of Wisconsin—Madison
University of Wisconsin—Milwaukee
University of Wisconsin—Oshkosh
University of Wisconsin—Platteville
University of Wisconsin—River Falls
University of Wisconsin—Stevens Point
University of Wisconsin—Stout
University of Wisconsin—Whitewater

**Wyoming**
None observed

---

[i] **Correction:** Carleton College was included due to a misinterpretation of a proposed policy found on its website. FIRE has since been informed that the proposal was rejected and was not implemented, and we regret the error. This report has been updated to reflect minor changes in figures impacted by the removal of Carleton College, but no findings were significantly impacted.



**510 WALNUT ST.**
**SUITE 1250**
**PHILADELPHIA, PA 19106**



YOUTUBE.COM/THEFIREORG



@THEFIREORG



FACEBOOK.COM/THEFIREORG

# Exhibit 6

The Rise of "Bias Response Teams" on Campus | The New Republic

# The Rise of "Bias Response Teams" on Campus

Colleges across America are creating shadowy groups to handle complaints. Will they end up muzzling students instead?



Photo illustration by Adam Peck/Image via Shutterstock.com

Jeffrey Aaron Snyder, Amna Khalid /
March 30, 2016

"Trump 2016." After this message was <u>scrawled</u> in chalk across the Emory

**App.266**

The Rise of "Bias Response Teams" on Campus | The New Republic

Case 5:23-cv-00029-J   Document 32-11   Filed 03/24/23   Page 3 of 12
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 54

1/4/23, 12:26 PM

University campus earlier this month, some 40 students <u>met</u> with President James Wagner to express their "fear" and "frustration," insisting that "Trump's platform and his values undermine Emory's values [of] diversity and inclusivity." Wagner reassured the students that the university would review the footage from security cameras to identify the culprit. "If they're students," he said, "they will go through the conduct violation process." In a subsequent campus-wide email, Wagner declared that Emory's "commitment to respect, civility, and inclusion calls us to provide a safe environment." He also emphasized that the school would make "immediate refinements" to the "procedural deficiencies" of its "bias incident and response process."

<u>Bias incident reporting</u> is not unique to Emory. More than 100 colleges and universities have Bias Response Teams, which aim to <u>foster</u> "a safe and inclusive environment" by <u>providing</u> "advocacy and support to anyone on campus who has experienced, or been a witness of, an incident of bias or discrimination." These teams have multiple missions, <u>including</u> educational "prevention," investigating alleged bias incidents, disciplining offenders, and organizing "coping events" after such incidents. Depending on the campus, these teams are known as <u>BRTs,</u> <u>BARTs,</u> <u>BERTs</u> or <u>BIRTs</u>. Students and faculty occasionally serve on BRTs, but they are <u>largely composed of administrators</u>, with sizable representation from Residential Life and Dean of Students offices. As committees with unelected members that meet behind closed doors, they lack both transparency and accountability.

## BRTs are rapidly becoming part of the institutional machinery of higher education, but have yet to face any real scrutiny.

BRTs are rapidly becoming part of the institutional machinery of higher education, but have yet to face any real scrutiny. As Carleton College faculty members committed to <u>"rigorous studies in the liberal arts disciplines"</u> and the vitality of diverse campus communities, we believe that the proliferation of BRTs

**App.267**

is a grave mistake. They degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important—and controversial— topics across all academic disciplines. They are inherently anti-intellectual enterprises, fundamentally at odds with the mission of higher education. And ultimately they will undermine a bedrock principle of the modern university: that more diversity leads to better learning.

Special offer: Get ahead of the news in 2023.
**6 months for $15.**

Subscribe

The dramatic diversification of the student body is one of the most significant trends in higher education over the past half-century. Circa 1965, about 94 percent of the nation's college students were white and 61 percent were men; today, those figures have fallen to 59 percent and 43 percent, respectively.

That shift was encouraged by the pivotal 1978 Supreme Court decision on affirmative action, *Regents of the University of California* v. *Bakke*, a 5-4 ruling that banned racial quotas for college admissions but deemed it permissible to include race as one of a broad "array of qualifications and characteristics" in a "highly individualized, holistic review of each applicant's file." (This is the policy under

**App.268**

The Rise of "Bias Response Teams" on Campus | The New Republic
Case 5:23-cv-00029-J   Document 32-11   Filed 03/24/23   Page 5 of 12
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 56
1/4/23, 12:26 PM

consideration in _Fisher_ v. _University of Texas_.) In his majority opinion, Justice Lewis Powell <u>rejected</u> the social justice rationale for affirmative action but endorsed the diversity rationale, asserting that an otherwise qualified student "with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged" may bring "outlooks and ideas" that enrich "the atmosphere of speculation, experiment and creation" on campus.

Colleges and universities promote the benefits of a multicultural student body, calling diversity <u>"a defining institutional value"</u> that adds <u>"depth, richness and excitement"</u> to campus life. There has always been tension, though, between the rhetoric and the reality of diversity on college campuses—between the slogans that celebrate "differences" and how these differences really shape campus life. If the photographs of smiling students in college catalogs depict a multicultural utopia, the groups of students sitting in the cafeteria often tell a different story. Admissions officers would have you believe that campus life is a bubble, sealed off from the social inequities of the "real world" such as racism, sexism and homophobia. The news proves otherwise, whether it be the University of Oklahoma fraternity members <u>singing</u> a racist song or the <u>explosion</u> of student protests this past fall.

From an administrative point of view, there is a pressing need to more effectively "manage" campus diversity, and BRTs are at the heart of this effort. (Ohio State University <u>founded</u> one of the first in 2007 after <u>"racist letters"</u> were distributed to students through campus mail. Most are only a few years old.) Public relations, not surprisingly, have spurred the growth of BRTs, with "institutional reputation" and the desire to "reassure campus communities that administrators [are] addressing bias" as main <u>concerns</u>.

Definitions of bias incidents vary by campus but have the following key features: They <u>encompass</u> "any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics." These characteristics <u>include</u> "race, color, ethnicity, social class, national origin, religion, sexual

**App.269**

Case 5:23-cv-00029-J    Document 32-11    Filed 03/24/23    Page 6 of 12    1/4/23, 12:26 PM
The Rise of "Bias Response Teams" on Campus | The New Republic
Appellate Case: 23-6054      Document: 010110864065      Date Filed: 05/23/2023      Page: 57

orientation, gender identity and/or expression, age, marital status, veteran status, and physical and mental health"—sometimes even <u>"height" and "weight."</u>

## Last month, at the University of Michigan, a hall director reported a "phallic snow object."

A bias incident can <u>occur</u> "whether the act is intentional or unintentional," meaning that "microaggressions" (subtle, often unintended slights) are squarely within bias incident <u>territory</u>. All "verbal, written or physical" <u>conduct</u> is fair game, whether it transpires in actual spaces such as cafeterias and classrooms or in the endless virtual world of social media. Examples include "symbols, language and imagery objectifying women" (<u>University of Utah</u>); "name calling," "avoiding or excluding others" and "making comments on social media about someone's political affiliations/beliefs," (<u>Syracuse</u>); "I don't see skin color," "I was joking. Don't take things so seriously," and "Thanks, Sweetie." (<u>University of Oregon</u>). Given the expansive definitions of bias incidents, it is no surprise that some dubious complaints are filed: Last month, at the University of Michigan, a hall director <u>reported</u> a "phallic snow object." "It is the height of privilege and entitlement to be obsessively concerned with utterly inconsequential events such as this," a member of the university's residential staff said.

Anyone can report a "bias incident," <u>including</u> "faculty, staff, students, as well as parents, alumni and visitors to campus." Reporters may be "victims," "witnesses" or even "third parties"—and they may choose to remain anonymous. That opens the door to <u>hoaxes</u>. Indeed, more than 20 percent of all the bias incident <u>reports</u> filed at one university during a single academic year were "pranks," the investigation of which "occupied a great deal of time and attention for multiple staff members and senior level administrators."

We do not want our campuses overrun with eager <u>"see something, say something"</u> <u>"student informants."</u> Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College

**App.270**

student <u>asserted</u>, encourage "students to ask the administration to solve problems instead of solving them amongst themselves." At University of California, Santa Cruz, a student filed a bias incident <u>complaint</u> that a single poster advertising a college "mafia" game was "extremely offensive to me as an Italian American woman" and "could result in harassment of Italian American students on campus"; the poster was removed. As the aforementioned Boston College student <u>lamented</u>, BRTs create "a false, and dangerous impression that the administration can/should police speech on campus to ensure everyone is 'comfortable.'"

"Police" is an apt word. A vice chancellor at University of California, Santa Barbara <u>encouraged</u> students to report "hate crimes or bias incidents" to the campus police department and the Office of Judicial Affairs. (Santa Clara University even <u>instructed</u> students to call 911 if a "bias incident is in progress or just occurred," a policy subsequently revised.) A <u>study</u> based on extensive interviews with BRT members representing 17 colleges and universities found they devoted more time to "punishing and condemning the perpetrators of specific acts" than to community-wide education. A criminal justice framework informs much of the work done by BRTs, with terms such as "victim," "perpetrator" and "offender" being used. Punishment was swift indeed in the recent "ethnic stereotyping" <u>brouhaha</u> at Bowdoin, where students who hosted a "fiesta" featuring tequila and mini-sombreros were <u>forced</u> to move out of their room, placed on social probation, and required to complete future educational programming. The college president <u>described</u> the party as an "<u>act of bias</u>."

---

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints

is profoundly misguided. They run counter to the basic conviction that we learn best through experimental trial-and-error: changing our minds voluntarily, not because we are told to. Nothing quite kills intellectual exploration like the fear of causing offense. "How are students supposed to feel empowered to share their honest opinions on social issues," a student at UC Santa Barbara asked about the campus' BRT, "when they run the risk of being accused of 'undermining our culture of inclusivity?'"

Peer learning, the hallmark of a residential liberal arts campus, is immeasurably better when students are not mirror images of one another. But diversity works its magic only through meaningful contact between people with varying "identity characteristics." Contact, by definition, will sometimes lead to conflict. Imagine a conversation between an evangelical student and a gay student on same-sex marriage, or a discussion about U.S. drone policy between a dove and a hawk. Such conversations are invaluable. But without the space to debate and argue, students won't ever be forced to confront the underlying assumptions framing their worldviews. BRTs threaten to drive students into their own corners with peers who look and think like them, reducing the potency of diversity to a glib slogan on admissions brochures.

In addition to threatening the vitality of informal peer learning, BRTs pose a threat to the basic integrity of classroom teaching. Among the most frequently reported bias incidents are classroom comments perceived as "derogatory" or "insensitive." Apart from flagging intentionally fraudulent reports, BRTs rarely determine that a particular complaint does not qualify as a "bias incident." At the very least, then, "accused" professors will need to have a "professional development" conversation with a BRT member as a result. At the most extreme, they may find themselves in the position of University of Colorado, Boulder sociologist Patricia Adler, who faced pressure to resign after some students complained about a prostitution lecture she regularly delivered. Faculty, of course, are not paragons of virtue and will no doubt sometimes make obtuse comments, but BRTs will prevent us from doing our jobs the best way we know how.

# Much of what we teach and how we teach could come under fire with BRTs in place.

Much of what we teach and how we teach could come under fire with BRTs in place. They would, for instance, undermine co-author Amna's strategic use of provocation, a pedagogical device that yields some of the best educational moments in her course. In a class on women in South Asia, Amna screens the controversial film _Bandit Queen_—a biopic of Phoolan Devi, a low-caste woman who endured extreme sexual violence, ultimately becoming a Robin Hood-esque outlaw. Amna uses the film knowing that students will be outraged by both the content and the director's approach. Students' strong reactions, in fact, lay the necessary groundwork for a critical discussion about the politics of representation. Does the film exploit—or challenge—stereotypical depictions of "third-world" women? Is there a limit to artistic license when a creative work is presented as a true story?

The advent of academic tracking in the early twentieth-century is a key topic in co-author Jeff's field, the history of American education. It requires a close look at Stanford University psychologist Lewis Terman (1877-1956), chief architect of the first intelligence tests used to place students in different educational programs (college prep, vocational ed. and the like). Terman was a card-carrying eugenicist who believed that "racial differences in general intelligence" could not be "wiped out by any scheme of mental culture." "Mexicans," "Indians" and "negroes," according to Terman, were innately "dull," destined to be the "world's hewers of wood and drawers of water." When students engage with Terman's work, they begin to understand how powerful social currents such as racism, Social Darwinism, and anti-immigration sentiment informed IQ testing, academic tracking, and the shape of the modern high school.

More broadly, this example speaks to the kind of imaginative critical analysis essential to history as a discipline. We have to contemplate and discuss how it is possible that people in the past held views we find morally reprehensible today, an

Case 5:23-cv-00029-1   Document 32-11   Filed 03/24/23   Page 10 of 12
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 61

undertaking rife with "bias incident" pitfalls. Just imagine tentative answers to the following question: Why do you think Terman and other highly educated people of his generation found racial hierarchies so attractive? We would not feel comfortable posing questions like this knowing that one student's response might result in a bias incident complaint from a peer. This would only ramp up the all-too-common student fear of saying "the wrong thing."

Bias reporting policies blur the all-important <u>distinction</u> between articulating a position and endorsing it—a distinction many no longer see. At Dartmouth, student activists <u>demanded</u> that the college ban from campus the use of "any racially-charged term" such as "illegal immigrants." Similarly, the BRT at Oregon <u>suggests</u> faculty add the following "classroom behavior" statement to their syllabi: "no racist, ableist, transphobic, xenophobic, chauvinistic or otherwise derogatory comments will be allowed."

A recent draft <u>report</u> on Title IX by the American Association of University Professors concludes that universities sometimes "overreach and seek to punish protected academic speech" in adjudicating sexual harassment charges. There is "a tendency," <u>for example</u>, "to treat academic discussion of sex and sexuality as contributing to a hostile environment." Consider too last year's controversy at the University of Minnesota over <u>a poster</u> advertising a panel discussion about free speech, which featured a *Charlie Hebdo* cover illustration of the Prophet Muhammad. In response to a petition signed by over 300 people condemning the "blasphemous" use of the image, the university's Equal Opportunity and Affirmative Action office held a formal investigation and <u>concluded</u> that "university members should condemn insults made to a religious community in the name of free speech."

Bias reporting puts at undue risk those of us who teach in the humanities and social sciences, fields that explicitly address "identity characteristics" such as race, social class, and sexual orientation. In an <u>*Inside Higher Ed* piece</u> on the flaws of trigger warnings, seven humanities professors maintain that "faculty of color,

App.274

The Rise of "Bias Response Teams" on Campus | The New Republic                    1/4/23, 12:26 PM

Case 5:23-cv-00029-1   Document 32-11   Filed 03/24/23   Page 11 of 12
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 62

queer faculty, and faculty teaching in gender/sexuality studies, critical race theory, and the visual/performing arts will likely be disproportionate targets of student complaints about triggering, as the material these faculty members teach is by its nature unsettling." The same could be said about the faculty most likely to be subject to bias incident complaints. At a community college in Minnesota three years ago, a female African American professor was <u>reprimanded</u> by the administration for "offending" three white male students during a discussion of "structural racism" in a communications course. With BRTs in place, white students will be more likely to file <u>complaints</u> against faculty of color as well as students of color for "offensive" remarks and actions. There is a real danger that these policies will <u>boomerang</u> to harm the very groups they were intended to protect. (<u>This</u>, for example, is a recent BRT complaint from John Carroll University: "Anonymous student reported that African-American Alliance's student protest was making white students feel uncomfortable.")

At the University of Richmond in the spring of 2008, a black doll was <u>found</u> hanging from a noose in a campus theater, with a note that read, "Art is dead. Long live art." In the aftermath of this incident, Glyn Hughes—sociologist and administrator—led the effort to create a BRT and formulate the university's "<u>bias incident protocol</u>." As chair of the Richmond BRT, Hughes mediated bias incidents on campus, while also closely following national BRT policies and trends. In a <u>candid essay</u>, Hughes explained how he became increasingly skeptical of BRTs overwhelming public relations function. Incidents were presented as "scandals," isolated instances of "hatred or ignorance" perpetrated by bad apples, he wrote. Through BRTs, campus communities could profess that everybody was "shocked" and congratulate themselves on taking a righteous stand, all the while ignoring institutionalized prejudice and discrimination. Hughes's damning conclusion: "diversity and social justice efforts" such as BRTs too often "reproduce rather than challenge systemic inequities."

BRTs are fatally flawed. Adjudicating "he said, she said" incidents is a logistical nightmare, if not downright impossible for thinly stretched administrators. There

will no doubt be examples of injustice where the "accused" are investigated—even penalized—over paltry evidence, or where the discipline meted out is far too harsh for the alleged "crime." What's more, BRTs will result in a troubling <u>silence</u>: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints. BRTs will substitute diktats for debate when what we need most is constant, frank conversation. By almost any measure, colleges and universities are more diverse today than they have ever been, and that's the paradox: BRTs will turn the genuine, transformative educational power of diverse voices into a farce.

*Correction: A previous version of this article incorrectly stated that Glyn Hughes is an administrator in the University of Richmond's Office of Multicultural Affairs. He is the director of the school's <u>Common Ground</u> initiative.*

---

**Jeffrey Aaron Snyder**

Jeffrey Aaron Snyder is assistant professor in the Educational Studies department at Carleton College. He is completing a book titled *Making Black History: The Color Line, Culture, and Race in the Age of Jim Crow*, to be published by the University of Georgia Press.

---

**Amna Khalid**

Amna Khalid is assistant professor in the History department at Carleton College. She specializes in modern South Asian history and is currently working on a book manuscript on pilgrimage and disease in British India.

---

**Read More:** <u>Education</u>, <u>Political Correctness</u>, <u>Higher Education</u>, <u>College</u>, <u>Race</u>, <u>Diversity</u>, <u>Culture</u>

---

# Exhibit 7



↗OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/)Quicklinks / Search          APPLY(HTTPS://GO.OKSTATE.EDU/APPLY/)

# ADMINISTRATION AND FINANCE(/)

**FINANCIAL STATEMENTS(/FINANCIAL-STATEMENTS.HTML)**    **INCENTIVE PLANS(/INCENTIVES/INDEX.HTML)**

**POLICIES AND PROCEDURES(/POLICIES/INDEX.HTML)**    **DEPARTMENTS(/DEPARTMENTS.HTML)**

**SENIOR VPAF STAFF(/STAFF.HTML)**

# POLICIES, PROCEDURES, AND FORMS

# APPROPRIATE USE POLICY

### 3-0601 ADMINISTRATION & FINANCE Information Technology February 2021

→ Download(/site-files/documents/policies/appropriate-use-policy.pdf)

## PURPOSE

### 1.01

As an institution of higher learning, Oklahoma State University encourages, supports, and protects freedom of expression, the free exchange of ideas, and an open environment that facilitates the pursuit of scholarly inquiry. The purpose of this policy is to outline, in general terms, the University's philosophy about acceptable use of information technology resources, with the overall objective of remaining consistent with other OSU A&M policies, and respecting the rights and obligations of academic freedom while protecting the rights of others.

### 1.02

As a public University, the resources of Oklahoma State University, discussed in this policy, are intended for use by users with no expectation of privacy. In this context, this policy addresses this intent and responsibility of the University to the public.

## SCOPE

### 2.01

This policy applies to all University owned or controlled information technology resources whether individually controlled or shared, stand alone or networked.

# Search Policies

Find the policy that you're looking for...

**SEARCH (/)**

**BACK (/POLICIES/INDEX.HTML)**

## 2.02

This policy applies to the users of University information technology resources, whether
such persons are students, staff, faculty, or authorized third-party users.

## 2.03

This policy applies to all information technology resource facilities owned, leased, operated, or contracted by the University

## 2.04

This Policy applies equally to all University-owned or University-leased information technology resources.

# DEFINITIONS

## 3.01

A user is a person, whether authorized or not, who makes use of University information technology resources from any location.

## 3.02

Information technology resources – Technology and/or computer resources including, but not limited to, personal computers, workstations, mainframes, mobile devices (laptops, tablets, smart phones, etc.), printing equipment, and all associated peripherals and software, and electronic mail accounts, regardless of whether the resource is used for administration, research, teaching, or other purposes.

# POLICY

## 4.01 User Responsibility and Expectations

Within the following sections, examples of acts or omissions, though not covering every situation, are included to specify some of the responsibilities that accompany computer use at Oklahoma State University, and to outline acts or omissions that are considered unethical and unacceptable, and which may result in immediate revocation of privileges to use the University's computing resources and/or just cause for taking disciplinary action up to and including discharge, dismissal, expulsion, and/or legal action, which may include referral for criminal investigation and/or prosecution.

## 4.02 Use Purposes

A. Appropriate use of OSU's computing and networking resources includes purposes such as instruction, independent study, authorized research, independent research, communications and official work of the offices, units, recognized student and campus organizations of Oklahoma State University. University computing facilities, systems, accounts and network resources are to be used for University-related activities for which they are assigned. At all times, use of the University's information technology resources must comply with federal and state law, and University policies.

3-0601 Appropriate Use Policy, Oklahoma State University

Case 5:23-cv-00029-J   Document 32-12   Filed 03/24/23   Page 4 of 10
Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 67
1/4/23, 12:27 PM

B. University information technology resources are not intended to be used for generating or accessing obscene material as defined by Oklahoma or federal law and acceptable community standards or for creating a hostile work and/or educational environment.

C. Incidental personal use of University information technology resources is permitted, but must not interfere with a user's performance of official University business, result

in direct costs to the University, expose the University to unnecessary risks, or violate

applicable laws or other University or Board policy. Users shall have no expectation of privacy in any personal information stored by a user on a University information technology resource, including University electronic mail accounts. Storage of any electronic mail messages, voice messages, file, or documents created by incidental personal use by a user must be nominal.

## 4.03 Personal Devices and Systems

Users who connect to the University's information technology resources using privately owned personal computers, or other privately owned devices, consent to being scanned by the University's scanning programs for security purposes, such as malicious network traffic, while connected to those technology resources.

## 4.04 System Abuse and Disruptive Use

A. Users are expected to report suspected illegal activity or abuse, especially if related to any damage to or problems with their files, to **abuse@okstate.edu(mailto:abuse@okstate.edu)** or Ethics Point. Any defects discovered in the system accounting or system security are to be reported, as well, so that steps can be taken to investigate and solve the problem. The cooperation of all users is needed to ensure prompt action. System administrators are required to report suspected unlawful or improper activities to the proper University authorities. Users have an affirmative duty to cooperate with system administrators in investigations of system abuse.

B. It is a violation of this policy to use the University's information technology resources

for transmitting political campaigning, commercial or personal advertisements, solicitations, promotions, or programs, to libel, harass, threaten, or without authorization, invade the privacy or impersonate the identity of other individuals. Offices utilizing applications that send communications on behalf of an employee have the responsibility to ensure the employee is aware of this activity. It is also a violation to use University information technology resources for the purpose of introducing a malicious program into the network, any server or any computer connected to the network. The use of any unauthorized or destructive program may result in legal civil action for damages or other punitive action by any injured party, including the University, as well as criminal action. This policy prohibits both the circumvention of mechanisms which protect private or restricted information, systems, or networks, as well as use of University resources for unauthorized access to private or restricted systems or networks and/or damage to software or hardware components of those systems or networks.

Case 5:23-cv-00029-J   Document 32-12   Filed 03/24/23   Page 5 of 10
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 68

C. Modifying or removing computer equipment, software, or peripherals without proper authorization is a violation of this policy. Users will use great care to ensure that they
do not use programs or utilities which interfere with other users or which modify normally protected or restricted systems, networks or user accounts. It is inappropriate to encroach on others' use of the University's computers, via intended, unintended or negligent behaviors including but not limited to: sending of excessive electronic communications ('spam'), either locally or off-campus; printing excess copies of documents, files, data, or programs; running grossly inefficient programs when efficient alternatives are known to be available; unauthorized modification of system facilities, operating systems, or disk partitions; attempting to crash or tie up a
University computer; damaging or vandalizing University computing facilities, equipment, software, or computer files.

D. Interfering with the intended use of information resources or without authorization, destroying, altering, dismantling, disfiguring, preventing rightful access to or otherwise interfering with the integrity of electronic information and/or information systems are not all, but further examples of systems abuse.

# 4.05 User Accounts and Passwords

A. The integrity of most systems is maintained by password protection of accounts. Users are responsible for assisting in the protection of the systems they use. The integrity and secrecy of an individual's password is a key element of that responsibility. The security of your user account is your responsibility. Users are responsible for ensuring account passwords are strong according to best practices and by not using:

   1. passwords from other accounts such as social media, external email, or other web sites

   2. dictionary words

   3. personal names

   4. computer system names

   5. adjacent keyboard combinations such as 'qwerty', 'asdzxc' or '12345'

B. Users may use only their own computer accounts and are personally responsible for all use of their computer account(s). Users who have been authorized to use computing
resources (by provision of a user account) may be subject to both criminal and civil liability, as well as University discipline, if the user discloses a password or otherwise makes those resources available to others without the permission of the system administrator.

C. Gaining, or attempting to gain access to the account of another user either by using programs or devices to intercept or decode passwords or similar access control information or by using any other means is prohibited. The negligence or naiveté of another user in revealing an account name or password is not considered authorized

Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 69

use. Convenience of file or printer sharing is not sufficient reason for sharing a computer account. Intentionally allowing or assisting others to gain unauthorized access to information technology resources is prohibited, regardless of whether the computer, software, data, information, or network in question is owned by the University. Abuse of the networks to which the University belongs or the systems at other sites connected to those networks will be treated as an abuse of Oklahoma State University information technology resources privileges.

## 4.06 System Logging, Reviews, Privacy

A. Users of the University's information technology resources are placed on notice that all computer systems maintain audit logs and/or file logs within the computer and that user information is backed up periodically. Information collected and stored may

include, but is not limited to, user identification, date and time of the session, software used/accessed, files used/accessed, internet use and access, when requested and deemed necessary. The University reserves the right to view or scan any file or software stored on the computer or passing through the network, and will do so periodically to verify that software and hardware are working correctly, to look for particular kinds of data or software (such as computer viruses), or to audit the use of University resources. For example, analysis of audit files may indicate why a particular data file is being erased, when it was erased, and what user identification has erased it.

B. Users should be aware that information transmitted via the Internet may be intercepted by others. Accordingly, the privacy of electronic mail, voicemail and similar data should not be presumed. With regard to all information system data, users should also be aware that the University, as an agency of the State of Oklahoma, and as its officers and employees, are subject to the provisions of the Oklahoma Open Records Act, 51 Okla. Stat. § 24A.1, et seq.

## 4.07 Additional Responsibilities

Some departments may have additional use restrictions and it is the user's responsibility to adhere to them. Individual units within the University may define "conditions of use" for information resources under their control. These statements must be consistent with this overall Policy but may provide additional detail, guidelines and/or restrictions. Such policies may not relax or subtract from, this policy.

## 4.08 Email Use

### A. General Purpose Use

1. As with other University resources, electronic mail (email) is made available to faculty, staff and students, to further the teaching, research, service, and Extension/outreach goals and mission of the University. Use of University email services, therefore, is intended to be in furtherance of such goals and mission. Incidental personal use of electronic mail is permitted, but must not interfere with a user's performance of official University business, result in direct costs to the University, expose the University to unnecessary risks, or violate applicable laws or other University or Board policy. Users shall have no expectation of privacy in

**App.282**

any personal information sent, received, or stored by a user using University electronic mail accounts. Storage of any electronic mail messages created by incidental personal use by a user must be nominal.

2. Users shall respect the purpose and charters of electronic mailing lists (including
local or network news groups and social media). It is the responsibility of any user of an electronic mailing list to determine the purpose of the list before sending messages to the list or receiving messages from the list. Persons subscribing to an electronic mailing list will be viewed as having solicited any material delivered by the list as long as that material is consistent with the purpose of the list. Persons sending to a mailing list any materials which are not consistent with the purpose of the mailing list will be viewed as having sent unsolicited material to the mailing list.

3. Graduates and retirees are granted life-long use of their institutional email accounts with the understanding that they will adhere to the same policies and procedures which apply to students, faculty and staff. This privilege can be revoked by the University if use of the account results in a violation of policies or procedures, or if the account is needed for business continuity by the area which it served.

## B. Reporting Offensive Email

The University provides email services to the University to support the academic and administrative activities, and email is used as an official form of communication. As members of the University's community, all users are expected to demonstrate good taste and sensitivity to others in their communications. However, the University cannot
protect individuals against the existence or receipt of material that may offend them, and users are warned that they may willingly or unwillingly come across, or be recipients of, material they find offensive. To report material received via email, send a complaint to **abuse@okstate.edu(mailto:abuse@okstate.edu)** or Ethics Point.

## C. University Access to User Email

1. Users should be aware that the University, as an agency of the State of Oklahoma,
as well as its officers and employees, are subject to the provisions of the Oklahoma Open Records Act. There is no privacy associated with use of University email resources. The University owns, and has right of access to, for any purpose, the contents of all computing information transmitted through or stored on its systems.
The University may access and disclose any, or all, of the following:
  a. Data transmitted through or stored on its electronic mail and Internet access systems, regardless of the content of the data,

  b. Information related to the use of electronic communication.
2. If an occasion arises when a University officer or supervisor believes that access to
an individual's email account is required for the conduct of University business, the

University individual is not available (i.e., death, disability, illness or separation from the University), and a system administrator is required to access the individual's email account, the following procedure shall be followed:

    a. The University official or supervisor shall secure permission to access the email account from the Provost and Senior Vice President (Provost) or the designee of such officer.

    b. If the Provost approves the request, he/she will provide written authorization to the Information Security Officer (ISO), who will direct the system administrator to access the email account.

    c. When email communications from a specific individual's University email account are requested by a third party pursuant to the Oklahoma Open Records Act, as part of an internal University investigation, or pursuant to court order or other legal proceeding, the University may, when reasonable and allowed by law, make a reasonable and timely effort to notify the individual whose email account is accessed. However, the University is not required to make such notification.

## D. Email Content Classification

It is the responsibility of email users to follow the OSU Data Classifications Policy regarding email content classification and restrictions, protections, or other applicable limitations on email distribution and storage.

# 4.09 Digital Media Communications / Social Media Use

## A. Digital Media Defined

This section applies to any faculty, employee or associate involved in creating, contributing to or distributing University-related information via digital media communication channels often times referred to as Social Media platforms. The term digital media refers to any communications facilitated by technology. This can include online channels, phone/app-based communications and more.

## B. Professional and Personal Use

1. The University utilizes social media technologies to enhance more direct communications with its faculty, staff, students, alumni, and prospective students.

2. University employees that use social media should use caution when using their personal social media accounts for business purposes. Specifically:

    a. Individuals should not use their personal account to act or be perceived as acting as representatives of a University, their college, school division, etc. unless given the expressed authority to do so by University Communications. This will help prevent the perception that published personal content is an expression of an official University position. See OSU Policy 1-0103, Use of University Name, for more information.

    b. Individuals should never share proprietary or confidential information or comment on anything related to legal matters without the appropriate approval.

c. Content shared via social media platforms must also adhere to OSU and OSU
A&M policies and procedures as well as state and federal regulations, including
though not limited to, FERPA, HIPAA, PCI DSS and NCAA limitations.

## C. Registering Digital Media Accounts

1. Any person that would like to register a digital media account on behalf of an
OSU
A&M organization, department or college must request access to the official
registration form and work with the Office of Communications to ensure accounts
are set up properly. All registered digital media accounts also must adhere to the
Digital Media Policy above and University Social Media Guidelines.

2. For questions concerning the use of OSU trademarks, including the OSU logo,
please visit, **https://trademarks.okstate.edu/(https://trademarks.okstate.edu/)**.

# 4.10 Network Usage

Excessive or inappropriate use of the network and network resources may result in
network access restriction, revocation of access privileges entirely, or further
sanctions covered in Section 4.12 regarding Non-Compliance.

## A. Prohibited Devices on Network

1. Users of University information technology resources, specifically those using
the
University's network are authorized to use only network devices authorized by the
campus Information Technology department. Specifically, prohibited devices
include, but are not limited to, hubs, switches, repeaters, routers, network modems
and wireless access points. These devices may be incorrectly configured or
incompatible with the University network causing outages and reliability problems
to all or part of the network. Devices not approved for use on the network will be
disabled to ensure the stability and availability of the network.
2. For more information on network use, reference the OSU Network Policy at
**it.okstate.edu/policies.(http://it.okstate.edu/policies)**

# 4.11 Software Licenses and Copyrights

## A. Software Licenses

Violating any software license agreement or copyright, including copying or
redistributing copyrighted computer software, data, or reports without proper,
recorded authorization is prohibited. Software protected by copyright shall not be
copied except as specifically stipulated by the owner of the copyright. Protected
software is not to be copied into, from, or by any University facility or system,
except by license. The number and distribution of copies must be handled in such a
way that the number of simultaneous users in a department does not exceed the
number of original copies purchased by that department, unless otherwise
stipulated in the purchase contract.

## B. General Use of Copyright Material

1. All users of University technology resources are required to abide by and comply
with all state and federal laws governing software license, leasing, or copyright
agreements.

**App.285**

2. More information on copyright compliance can be found through the United States copyright Office, the Copyright Clearance Center, or the OSU A&M Libraries Copyright pages.

## 4.12 Non-Compliance

Violations of this policy may result in immediate revocation of privileges to use the University's computing resources and/or just cause for taking disciplinary action up to and including discharge, dismissal, expulsion, and/or legal action, which may include referral for criminal investigation and/or prosecution.

# Approved:

E-Team, June 2017
Board of Regents, June 2017
E-Team, February 2021
Board of Regents, March 2021

# Revised:

February 2021

 (/)

## OSU Institutions

**Stillwater (Main) (https://go.okstate.edu)**

**Oklahoma City (https://osuokc.edu/)**

**Tulsa (https://tulsa.okstate.edu/)**

**Center for Health Sciences (Tulsa) (https://health.okstate.edu/)**

**Institute of Technology (Okmulgee) (https://osuit.edu/)**

**Veterinary Medicine (Stillwater) (https://cvhs.okstate.edu/)**

Oklahoma State University         (https://go.okstate.edu)
Stillwater, OK (Oklahoma)  74078 (https://goo.gl/maps/aJL1unybG942)
**Campus & Parking Maps (https://maps.okstate.edu)**
(405) 744-5000 (tel:14057445000)

**Careers at OSU (http://jobs.okstate.edu)**

**Hire OSU Grads (http://hireosugrads.com)**

## Follow OSU

**News** | **Events** | **Inside OSU**

**Social Media Directory (https://social.okstate.edu)**

**(https://www.facebook.com/pages/Oklahoma-State-University/39013362306)**

**OSU ATHLETICS >> (https://okstate.com)**

©(Https://A.cms.omniupdate.com/11/?Skin=Okstate&Account=Okstate&Site=Adminfinance&Action=De&Path=/Policies/Html-Pages/3-0601_appropriate-Use-Policy.pcf) 2023 Oklahoma State University. All rights reserved.

Accessibility | Campus Safety | Diversity | EEO Statement | Ethics Point | Privacy Notice | Terms Of Service | Trademarks

# Exhibit 8



# N✳ C✳MMENT

**Public Universities' Social Media Use
and the First Amendment**



 **@thefireorg**

# Table of Contents

**1** **Executive Summary**

**2** **Methodology**

**3** **Discussion**

**3** Facebook's tools
- The profanity filter
- The customized blacklist
- Blocking functions
- Manual removal

**3** Twitter's tools
- Blocking function
- Muting function

**3** The First Amendment limits public actors' use of filtering tools
- What is the public forum doctrine?
- What are the different standards for different public forums?
- How does the public forum doctrine apply to social media?

**7** Public institutions are using Facebook and Twitter tools to violate the First Amendment
- Most public colleges use Facebook's 'profanity' filters, secret blacklists of words that risk violating the First Amendment.
- Facebook's customizable blacklists are used to restrain speech critical of government institutions and their corporate partners, or speech on matters of public concern.
- Not just words: Public universities block thousands of Facebook and Twitter users.
- The extent of manual removal of posts and comments is unknown.

**14** How private and government actors can mitigate the risk of censoring speech on social media
- Public actors and private colleges must avoid censoring speech on social media.
- Social media companies can discourage government actors from abusing tools to censor online speech.

**15** Conclusion

**16** **Appendix A: List of surveyed institutions, their responses, and survey data**

**23** **Appendix B: Exceptions to survey methodology**

**24** **Appendix C: Example of a public records request**

**25** **Appendix D: Customized blocked words**

# Executive Summary

In October 2019, Facebook founder and chief executive officer Mark Zuckerberg spoke at Georgetown University, extolling the virtues of freedom of expression and noting in particular the importance of college students' ability to "express who they were and what mattered to them," including through "challeng[ing] some established ways of doing things on campus."[1]

Because Facebook is a private entity, the First Amendment—which only limits government actors—does not require it to honor expressive freedom. Zuckerberg's endorsement of freedom of expression as a principle is a welcome and encouraging development.

It is, however, at odds with the fact that Facebook provides governments the tools to censor. These actors include public universities and colleges which are bound by the First Amendment—those very campuses where students have "challenged some established ways of doing things."

These tools include Facebook's automated content filters, which allow state institutions to automatically "hide" users' comments if they contain words included on Facebook's undisclosed list of offensive words or the government actor's customized list of prohibited words. These tools enable public universities—and other government actors—to quietly remove critical posts, transforming the Facebook pages into less of a forum and more of a vehicle for positive publicity.

This censorship has deleterious effects on campus and public discourse. Using public records requests, FIRE surveyed over 200 public universities and colleges across 47 states and the District of Columbia. Half of the surveyed institutions choose to use Facebook's "strong" profanity filter, and nearly a third—55, or 27.8%—use the medium filter. This means that 77.4% of surveyed institutions choose to employ a blacklist of prohibited words not disclosed to the public.

Additionally, nearly a third of the universities surveyed (59, or 30.3%) use a custom blacklist, collectively censoring 1,825 unique words and phrases. These range from familiar profanities to words relating to matters of local and national concern—for example, blocking animal rights activists' criticism of food vendors, curbing discussion of what to do about a campus Confederate monument, and

shielding criticism of itinerant preachers, controversial faculty, politicians, and sports teams.

Even without these tools, public actors can prune their Facebook comments, manually hiding comments to manipulate and shape the apparent public discourse. Wright State University, for example, deleted comments supporting a faculty strike from its Facebook page, leaving behind a community "forum" that largely (and falsely) appeared supportive of the university's administration and critical of striking faculty.

Because Facebook doesn't alert a user when their post has been removed, or tell the public that comments have been censored, these commenters (and other users) may never know their words have vanished.

Further, both Facebook and Twitter allow government actors to block members of the public from participating in these public forums.

These automated methods of censorship are not only contrary to a commitment to freedom of expression, but also provide government actors with tools that—in light of recent federal court rulings concerning President Trump's Twitter feed—violate the government actors' legal obligations under the First Amendment.



Half of the surveyed institutions choose to use Facebook's strong profanity filter and 27.8% use the medium filter.

■ Strong filter    ■ Medium filter

---

[1] Mark Zuckerberg, *Standing for Voice and Free Expression*, Georgetown University (Oct. 17, 2019) (transcript available at https://www.facebook.com/notes/mark-zuckerberg/standing-for-voice-and-free-expression/10157267502546634).

# Methodology

FIRE issued public records requests to five institutions in each state where public institutions of higher education are subject to public records laws, which are similar to the commonly known federal Freedom of Information Act (FOIA).

The five institutions per state were divided into two categories:

1. The three public, four-year institutions with the largest undergraduate enrollment; and

2. The two public, two-year institutions with the largest undergraduate enrollment.

Our approach has some logistical limitations. Some states, like Delaware and Pennsylvania, exempt some or all of their institutions of higher education from their public records laws, or limit the scope of the laws to specific expenditures. Other states' public records laws expressly limit their public records laws to requests made by citizens of the state.[2] In other states, there are fewer than five institutions, or fewer than the three four-year and two two-year institutions this survey sought to cover. Finally, some institutions could not be contacted due to the potential for conflict with a pending FIRE lawsuit against the institution. In those cases, the institution was replaced with the public institution with the next-highest enrollment. A full list of exceptions may be found in Appendix B.

Altogether, FIRE's survey issued public records requests to **224 public universities and colleges in 47 states and the District of Columbia**. 198 institutions provided substantive responses. A full list of surveyed institutions may be found in Appendix A, which also identifies the institutions which failed or refused to produce records and includes data compiled from the survey.

Our public records requests identified the official Facebook and Twitter account for the institution and asked the institution to provide to FIRE the Facebook settings, list of blocked Facebook users, and list of blocked Twitter users. An example of a representative request may be found in Appendix C. We encourage journalists or interested members of the public to adapt our request to ask other public institutions—not just universities—about their records.

The calculation of the number of words on institutions' customized blacklists excludes duplicates. Thus, if two institutions blocked the word "dog," that word is counted only once. However, the calculation of the number of blocked Facebook users, as well as the number of blocked Twitter users, did not exclude duplicates. Accordingly, if one user were blocked by two universities, she would be counted twice.



**FIRE issued public records to 224 public universities and colleges. 198 institutions provided substantive responses.**

■ Substantive responses   ■ Non-substantive responses

---

[2] This limitation has been upheld by the Supreme Court. McBurney v. Young, 569 U.S. 221, 224 (2013).

# Discussion

## FACEBOOK'S TOOLS

Facebook allows institutions, entities, organizations, and government actors to establish pages, operating as a forum where the public can share their thoughts with or about the organization. This includes public officials and government entities, ranging from the President of the United States to the City of North Pole, Alaska. As described below, public actors are bound by the First Amendment when they use tools provided by private entities.

When a business, organization, government entity, or public figure creates a "page," Facebook allows them to create posts on their own page, gives the option of allowing others to add their own posts, and allows Facebook users to add comments to those posts.

Facebook provides page owners with four tools to limit user content:

1. **The profanity filter.** Facebook's "profanity filter" automatically hides visitors' posts if they contain words on one of two lists—one for the "medium" setting and one for the "strong" setting.[3] The words on these lists are not publicly disclosed, but are composed of "the most commonly reported words and phrases marked offensive" by Facebook users.[4] The profanity filter is turned off by default.

2. **The customized blacklist.** The "page moderation" filter allows an administrator to establish a custom list of blocked words.[5] Like the profanity filter, this filter automatically hides posts or comments if they contain a phrase on the custom list.

3. **The blocking function.** An administrator of the page may ban particular accounts, after which "they'll

no longer be able to publish to [the page], like or comment on your . . . posts, message [you] or like your [page]."[6]

4. **Manual removal.** An administrator may manually hide specific posts or comments.

A user may not know that their comment has been hidden, as it remains visible to the poster.

## TWITTER'S TOOLS

Twitter offers fewer methods of regulating user interactions with government accounts:

1. **The blocking function.** Twitter users can block others from interacting with them.[7]

2. **The muting function.** Twitter users can mute users and terms, but this function does not prevent those users from interacting with the account, and a muted user's tweets can still be seen by other visitors.[8]

## THE FIRST AMENDMENT LIMITS PUBLIC ACTORS' USE OF FILTERING TOOLS

With the emergence of the internet and social media, courts have increasingly been called upon to apply the First Amendment to the digital realm. As the Supreme Court of the United States recently observed, "in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views," but the answer today is "clear": "It is cyberspace . . . and social media in particular."[9]

Accordingly, a wide range of courts across the country have held government actors' social media sites,[10] including those

---

[3] Facebook, *Moderate Your Facebook Page*, Dec. 7, 2015, https://www.facebook.com/facebookmedia/blog/moderating-your-facebook-page; see also Facebook, How can I proactively moderate content published by visitors on my Page?, https://www.facebook.com/help/131671940241729 (last visited Apr. 15, 2020).

[4] *Id.*

[5] *Id.*

[6] Facebook, *How do I ban or unban someone from my Page?*, https://www.facebook.com/help/185897171460026 (last visited Apr. 15, 2020).

[7] Twitter, *How to control your Twitter experience*, https://help.twitter.com/en/safety-and-security/control-your-twitter-experience (last visited Apr. 15, 2020).

[8] This function does not infringe on a user's First Amendment rights: One has a right to speak at or about the government, but the government is not obligated to pay attention to that speech. Accordingly, FIRE's survey did not ask about muted users or content.

[9] Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017); *see also* Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 237 (2d Cir. 2019) ("Knight") ("[S]ocial media is entitled to the same First Amendment protections as other forms of media.").

[10] To be sure, the First Amendment does not restrict the use of Facebook or Twitter by *private* actors, such as businesses or private colleges. Nor do Facebook or Twitter themselves violate the First Amendment by providing these tools.

on Facebook and Twitter, to be subject to First Amendment limitations.[11] The most prominent of these decisions thus far is a successful challenge to President Trump's practice of blocking critics from his Twitter account.[12] These rulings only limit *government* actors' use of social media tools; the First Amendment does not impose legal obligations on social media sites like Facebook and Twitter, nor on other private parties when they use social media.[13]

### A.  What is the public forum doctrine?

The general thrust of the cases addressing public actors' use of social media is that the "interactive space" constitutes a "public forum." This is a term of art in First Amendment law, setting forth a "metaphor . . . first used in constitutional free speech cases as a way of explaining why the government cannot engage in . . . content discrimination with regard to speaking, picketing, or leafleting on city parks and sidewalks."[14]

A public forum is most often seen as a physical site. For example, a public sidewalk or park would likely be seen as a **"traditional public forum"**: places where members of the public may freely gather and talk about whatever is on their minds.[15] In those places, attempts to limit *viewpoint* are never permissible, and attempts to limit *content* must meet

"strict scrutiny"—that is, any limits must be necessary to address a *compelling* government interest and narrowly tailored to serve that interest.

Meanwhile, a meeting space set up by a government entity for discussion of particular subjects or use by particular groups might be a "limited public forum." For example, school board meetings at which members of the public can speak are limited public forums, as they're set aside for a particular purpose.16 In these spaces, government has a freer hand to regulate the subject matter of speech or who may utilize the space, but can't exclude people or speech based on the viewpoint expressed. Even if a particular space is privately owned, it is a public forum when a government actor exercises control over it, such as when a city leases a private theater.17

Public forum doctrine distinguishes between speech by the government and its employees—"government speech"—and speech by others that the government regulates.[18]

### B.  What are the different standards for different public forums?

Not every space opened to expression is a free-for-all in which anything goes. Different standards attach to the forum depending on its purpose, and the extent to which

---

[11] *See, e.g.,* Robinson v. Hunt Cty., 921 F. 3d 440, 447–49 (5th Cir. 2019) (assuming a sheriff's Facebook page is a public forum and holding that a policy of deleting "inappropriate" comments was viewpoint discriminatory); Davison v. Randall, 912 F.3d 666, 681–87 (4th Cir. 2019) (county official's Facebook page was a public forum); Lloyd v. City of Streetsboro, No. 18-3485, 2018 U.S. App. LEXIS 36090, at *9–14 (6th Cir. 2018) (unpublished opinion reversing *sua sponte* dismissal of complaint alleging viewpoint discrimination on city's official Facebook page); Report and Recommendations, Clark v. Kolkhorst, No. A-19-cv-0198-LY-SH, *11–12 (W.D. Tex. Feb. 5, 2020), ECF No. 36 (recommending denial of motion to dismiss First Amendment claim); American Atheists, Inc. v. Rapert, No. 4:19-cv-17, at *43–44 (W.D. Ark. Sept. 30, 2019), ECF No. 27 (plaintiffs had "fair chance" of showing state legislator's Twitter and Facebook blocks were viewpoint discrimination); Garnier v. Poway Unified Sch. Dist., No. 17-cv-2215-W (JLB), U.S. Dist. LEXIS 167247, at *14–21 (S.D. Cal. Sept. 26, 2019), ECF No. 42 (denying motion for summary judgment and finding that the interactive portions of school board members' Facebook and Twitter accounts were designated, not limited, public forums); Order of Dismissal, Landman v. Scott, No. 19-cv-01367 (D. Colo. Sept. 10, 2019), ECF No. 27 (state legislator agrees to unblock Facebook and Twitter critic, pay $25,000); Findings of Fact and Conclusions of Law, Campbell v. Reisch, No. 2:18-cv-4129-BCW, 2019 U.S. Dist. LEXIS 138881, at *9–15 (W.D. Mo. Aug. 16, 2019), ECF No. 55 (interactive space created by state representative's tweets was a designated public forum); Windom v. Harshbarger, No. 1:19-cv-24, 2019 U.S. Dist. LEXIS 95080, at *13–18 (N.D.W. Va. June 6, 2019), ECF No. 18 (First Amendment challenge survives motion to dismiss where constituent blocked from legislator's "politician" Facebook page); Hyman v. City of Walnut Ridge, No. 2:18-cv-02138, 2019 U.S. Dist. LEXIS 90509, at *4–5 (E.D. Ark. May 30, 2019), ECF No. 17 (interactive portion of police department's Facebook page was not government speech); One Wisconsin Now v. Kremer, 354 F. Supp. 3d 940 (W.D. Wis. Jan. 18, 2019) (legislators blocking critic on Twitter); People for the Ethical Treatment of Animals, Inc. v. Young, No. 4:18-cv-01547 (S.D. Tex. Sept. 10, 2018), ECF No. 31 (summary order denying motion to dismiss First Amendment claims premised on keyword-based content filters on public university's Facebook page); Leuthy v. LePage, No. 17-cv-00296, 2018 U.S. Dist. LEXIS 146894, *36–43 (D. Me. Aug. 29, 2018) (governor's Facebook page was limited public forum); Price v. City of New York, No. 15-cv-5871, 2018 U.S. Dist. LEXIS 105815, *25–46 (S.D.N.Y. June 25, 2018) (where NYPD precinct blocked Twitter user, whether the forum was a "public, designated, or nonpublic" forum was immaterial, as "viewpoint discrimination that results in the intentional, targeted expulsion of individuals . . . is unlawful in *any* forum," including nonpublic forums); Dingwell v. Cossette, No. 3:17-cv-01531, 2018 U.S. Dist. LEXIS 95832 (D. Conn. June 7, 2018) (critic blocked from police Facebook page); Davison v. Plowman, No. 1:16-cv-180, 2017 U.S. Dist. LEXIS 4348, at *10 (E.D. Va. Jan. 10, 2017) (county's policy and practice of encouraging comments on its Facebook page created a limited public forum).

[12] Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 549 (S.D.N.Y. May 23, 2018) (upheld on appeal by the Second Circuit in *Knight*).

[13] *See, e.g.,* Prager Univ. v. Google LLC, No. 18-15712, 2020 U.S. App. LEXIS 5903, at *7 (9th Cir. Feb. 26, 2020) (no First Amendment claim that YouTube "censored" speech because the free speech clause "prohibits the government—not a private party—from abridging speech.").

[14] Aaron H. Caplan, *Invasion of the Public Forum Doctrine,* 46 WILLAMETTE L. REV. 647, 647 (2009-2010).

[15] ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1099 (9th Cir. 2003) (the "quintessential traditional public forums are side-walks, streets, and parks.").

[16] *See, e.g.,* Lowery v. Jefferson Cty. Bd. of Educ., 586 F.3d 427, 432 (6th Cir. 2009) (school board meetings give "citizens a chance to express their views to the board, [but] cannot accommodate the sort of uninhibited, unstructured speech that characterizes a public park.").

[17] Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 555 (1975) (government-leased theater "under [the] control" of public officials); Denv. Area Educ. Telecomm. Consortium, Inc. v. F.C.C., 518 U.S. 727, 749 (1996).

[18] Government actors have sought to frame *visitors'* Facebook or Twitter comments as government speech, arguing that because the government hasn't removed those comments, it is effectively publishing the comments as the government's *own* speech. Most people, however, would not view a Facebook comment or tweet as government-endorsed simply because it hasn't been removed.

**App.293**

government actors may regulate expression within that forum depends on the forum's purpose and the expression at issue:

- Government actors can almost **always** limit expression that falls into one of the historic, narrowly-defined exceptions to the First Amendment: "incitement, obscenity, defamation, speech integral to criminal conduct, so-called 'fighting words,' child pornography, fraud, [and] true threats."[19] This is true in all forums: traditional, designated, and limited.

- Government actors can **never** limit expression because of its "point of view"[20] or where the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."[21] This is also true in all forums.

- If no effort is made to set aside the space for discussion by particular people or about particular subjects, the space is likely to be treated as a *designated* or "open" public forum.[22] In that case, restrictions on the "time, place, and manner of expression" are permissible only if they are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."[23] If a burden on speech is content-based, the regulation is permissible only if it is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."[24]

- If a policy is established and consistently enforced[25] to limit use of the forum for particular people or discussion of certain subjects, the space is more likely to be treated as a limited public forum, in which the government has greater leeway to regulate speech.[26] There, restrictions need not be content-neutral, but must be *viewpoint*-neutral, "reasonable in light of the purpose served by the forum,"[27] and must "comport with the definition of the forum"[28]— that is, the government cannot exclude speech for which, or speakers for whom, the forum was opened.

These standards are also important for evaluating whether the regulation of online expression is permissible under the First Amendment.

## C. How does the public forum doctrine apply to social media?

While public forums are most easily conceptualized as physical spaces—such as open areas, meeting rooms, and bulletin boards[29]—the public forum doctrine has also been applied by the Supreme Court to forums which consist "more in a metaphysical than in a spatial or geographic sense."[30] For example, the same principles have been applied to—albeit with varying outcomes—student activity fees pooled for student organizations,[31] schools' internal mailing systems,[32] and email systems.[33] As governments have ventured into cyberspace, courts have applied these principles to government websites, distinguishing

---

[19] United States v. Alvarez, 567 U.S. 709, 709 (2012).

[20] Rodriguez v. Maricopa Cty. Cmty. College Dist., 605 F.3d 703, 710 (9th Cir. 2009).

[21] Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829–30 (1995). This is true even if the interactive space of the social media page is deemed a non-public forum, as access even to a non-public forum may only be "restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 450 U.S. 37, 46 (1983)).

[22] Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001) (distinguishing "traditional or open" public forums from "limited" public forums); Garnier v. Poway Unified Sch. Dist., No. 17-cv-2215-W (JLB), U.S. Dist. LEXIS 167247, at *14–21 (S.D. Cal. Sept. 26, 2019), ECF No. 42 (interactive portions of school board members' Facebook and Twitter accounts were designated, not limited, public forums); One Wisconsin Now v. Kremer, 354 F. Supp. 3d 940, 953–55 (W.D. Wis. Jan. 18, 2019) (interactive portions of legislators' Twitter accounts were designated public forums).

[23] Perry Educ. Ass'n, 450 U.S. at 45.

[24] Id.

[25] Garnier, U.S. Dist. LEXIS 167247 at *20–21.

[26] Faith Center Church Evangelistic Ministries v. Glover, 480 F. 3d 891, 908 n.8 (9th Cir. 2006) (A "limited public forum is a sub-category of the designated public forum, where the government opens a nonpublic forum but reserves access to it for only certain groups or categories of speech.").

[27] Good News Club, 533 U.S. at 106–07 (quoting, in part, Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)).

[28] OSU Student All. v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012).

[29] See, e.g., Lister v. Def. Logistics Agency, 482 F.Supp.2d 1003, 1009–11 (S.D. Ohio 2007) (government agency's bulletin board had "some aspects of a limited public forum" because it was "open to all employees" to "post matters addressing a broad range of topics or meetings," rendering removal of religious materials unconstitutional).

[30] Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 830 (1995).

[31] Id.

[32] Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 450 U.S. 37, 46–49 (1983).

[33] Rodriguez v. Maricopa Cty. Cmty. College Dist., 605 F.3d 703, 710 (9th Cir. 2009).

government-published websites from websites that allow members of the public to exchange views.[34]

Courts have used the legal framework provided by public forum doctrine to analyze government social media use. While the government actor has control over its own posts (which are quintessential "government speech"), the "interactive space" that follows those posts and allows for response from the public constitutes a public forum subject to the First Amendment's protection.[35] In other words, while a public university student or faculty member might have a right to post a relevant comment on an existing thread, they could not compel the university to "share" their post in the same manner as the university publishes its own posts.

Because the First Amendment protects users' speech in these interactive spaces, government actors like public colleges and universities cannot censor user comments in that space because they disagree with the *viewpoint*

expressed. That means that—at a minimum—government actors cannot block users,[36] remove posts,[37] or otherwise "burden" speech[38] because they find the expression offensive, disagreeable, or wrong.

That does not mean that every digital space associated with a government actor is a free-for-all forum where any content may be shared. How government actors characterize and treat digital spaces is important, as regulations on interactive spaces will be analyzed based on whether they are—as with physical spaces—traditional, dedicated, or limited public forums.

If the interactive space is a limited public forum, some restrictions will be permissible. For example, a prohibition on "clearly off topic" comments is a "self-evidently viewpoint-neutral" regulation "limiting a forum to discussion of selected topics," and is "reasonably related — indeed, integral — to the forum's purpose."[39] As such, these



Here's a visual demonstration of how "government speech" and the interactive digital spaces work on Facebook (left) and Twitter (right):

University's post: government speech.

Interactive space: First Amendment applies.

[34] Compare Putnam Pit, Inc. v. City of Cookeville, 221 F.3d 834, 844 (6th Cir. 2000) (city's website listing links to other sites was a non-public forum, not a public forum, because it was not structured to allow "dialogue between users," but primarily "to convey information to the reader") with Page v. Lexington Cty. Sch. Dist. One, 531 F.3d 275, 284 (4th Cir. 2008) (school district's website was not a public forum, but "the issue would, of course, be different" if the website were a "type of 'chat room' or 'bulletin board' in which private viewers could express opinions or post information").

[35] Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 572–73 (S.D.N.Y. May 23, 2018).

[36] Davison v. Randall, 912 F.3d 666, 687–88 (4th Cir. 2019) (official who blocked constituent because of his critical viewpoint was viewpoint discrimination, which is "prohibited in all forums.").

[37] Robinson v. Hunt Cty., 921 F. 3d 440, 447 (5th Cir. 2019).

[38] Knight at 238–39.

[39] Davison v. Plowman, 247 F.Supp.3d 767, 777 (E.D. Va. 2017).

kinds of viewpoint-neutral limitations are constitutionally permissible and do not violate the First Amendment.

But the government's ability to regulate speech in a limited public forum has boundaries. If, in crafting a policy governing social media content, the policy affords too much discretion to the institution's content moderators, those standards will inevitably be abused to censor criticism of the institution. The **University of Connecticut**'s policy, for example, reserves to officials "the right" to remove comments they believe to be "offensive," expression that "aligns with hate speech," or posts that are "otherwise objectionable."

These types of broad, ambiguous policies will lead to viewpoint discrimination and may render the policy itself unconstitutional.[40] For example, **Wright State University** created "guidelines" barring comments deemed to be "propaganda," "foul," "trolling," "offensive," or "inflammatory," giving staff members—overseen by university administrators—unfettered discretion to manually hide comments criticizing the administration's positions during a faculty strike, such as those disclosing senior administrators' salaries.[41] (At the time of publication, Wright State officials had communicated to FIRE that the university was conducting an internal review of its Facebook guidelines in response to a letter from FIRE raising concerns about the policy.)

In addition to the ability to limit expression by policy and manual enforcement, Facebook provides a variety of automated content-policing tools to administrators of Facebook pages.

However, the tools provided by Facebook are not adequately tailored and do not respect the contours of the First Amendment, and their use by government actors will almost certainly lead them to violate the First Amendment rights of students, faculty, and the general public. When used by public institutions, Facebook's tools amount to always-on sentinels tasked with identifying and automatically censoring student and faculty speech—and, for years, government actors have been using these tools to

effectuate online censorship.

## PUBLIC INSTITUTIONS ARE USING FACEBOOK AND TWITTER TOOLS TO VIOLATE THE FIRST AMENDMENT

It has long been settled law that the First Amendment is binding on public colleges and universities, including when they act to regulate the otherwise-protected speech of students, faculty, and organizations comprised of students or faculty members, such as student clubs or faculty unions.[42] When public universities open digital spaces for discussion by faculty, students, and the general public, regulations of those digital spaces must meet First Amendment scrutiny.

Beginning in October 2018, FIRE issued requests under public records laws to 224 public universities and colleges in 47 states, plus the District of Columbia. The selected institutions represent the three four-year institutions and the two two-year institutions with the highest enrollment in the state.[43]

Of the 224 institutions surveyed, 198 (or 88.4%) provided substantive responses.

FIRE found that many public universities and colleges are using automated tools to regulate online expression in ways that do not comport with the First Amendment.

### A. Most public colleges use Facebook's 'profanity' filters, secret blacklists of words that risk violating the First Amendment.

Half of the responding institutions—99 of 198—use Facebook's "strong" profanity filter, and nearly a third—55, or 27.8%—use the platform's "medium" filter. This means that 77.8% of surveyed institutions use some version of the profanity filter.

Because Facebook does not disclose the list of words or phrases on either the "medium" or "strong" profanity filters, it is not clear what content is automatically scrubbed from

---

[40] *See, e.g.*, Crowder v. Hous. Auth. of Atlanta, 990 F.2d 586, 591 (11th Cir. 1993) (a restriction vesting unfettered discretion in a government actor "opens the way to arbitrary suppression of particular points of view.").

[41] Greg Harold Greubel, *Public records reveal Wright State used unconstitutional Facebook page policy to censor pro-union speech during historic faculty strike*, FOUND. FOR INDIV. RIGHTS IN EDUC., Jan. 24, 2020, https://www.thefire.org/public-records-reveal-wright-state-used-unconstitutional-facebook-page-policy-to-censor-pro-union-speech-during-historic-faculty-strike; *see also*, Letter from Greg Harold Greubel, Staff Attorney, Foundation for Individual Rights in Education to Larry Y. Chan, General Counsel, Wright State University, Jan. 23, 2020, *available at* https://www.thefire.org/fire-letter-to-wright-state-university-january-23-2020.

[42] Healy v. James, 408 U.S. 169, 180 (1972) (there is "no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large").

[43] As discussed in the methodology section of this report and in the appendices, some states or institutions could not be surveyed, failed to respond at all, sought exorbitant fees, or cited exceptions to open records laws, ranging from arguments that they cannot be required to "create" records to claims that revealing Facebook blacklists creates a risk to public safety.

the pages of institutions that utilize the filters created by Facebook. (The custom filters, described below, can be identified through public records requests.)

Facebook, again, does not violate the First Amendment when it creates these filters and offers them to their users. Instead, the First Amendment *protects* the rights of private entities like Facebook to decide what speech to publish or refuse.[44]

However, when a *government* agency uses these tools to filter particular words or phrases, it raises serious First Amendment concerns. The premise underlying this type of restriction—that blocking individual words is justifiable under the First Amendment because it will improve public discourse—has been expressly rejected by the Supreme Court. In *Cohen v. California*, the Court held that a jacket emblazoned with the words "Fuck the Draft," worn in a courthouse hallway populated with "women and children," was protected speech.[45] "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process," the Court explained, as "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views."[46]

This risk is most colorfully illustrated by institutions' use of customized blacklists to suppress discussion of local controversies, as discussed below. However, the broader use of Facebook's own profanity filters—a *secret* list of disapproved words automatically compiled from Facebook users' feedback—will have the same effect, while failing to meaningfully protect equitable, civil discourse.

First, because the list is generated by compiling the terms "most commonly reported" as offensive, it necessarily limits speech that is in the greatest need of protection from censorship because it is disapproved by those whose

views and sensibilities are more likely to be majoritarian or mainstream. As the Supreme Court observed in holding that burning the American flag is protected expression, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[47]

The use of these databases may also, incidentally, inure to the detriment of minority speakers. One recent study, for example, found that "tweets by African American authors are 1.5 times more likely to be labeled 'offensive,'" and tweets in African American English are "more than twice as likely to be labeled as 'offensive' or 'abusive.'"[48] As a result, automated means of identifying human speech, when relying on human-generated data, may introduce "human biases [which] can easily result in a skewed distribution in the training data," yielding "unintended bias in the resulting models, and therefore potentially unfair applications."[49] Because datasets of offensive language may yield a "systemic racial bias," they may "have a disproportionate negative impact" on minority communities, effectively creating systems that "may discriminate against the groups who are often the target of the abuse we are trying to detect."[50]

Second, an automated system is unlikely to interpret the context and meaning of uses of words that may be offensive in some contexts and inoffensive in others. Content "moderation is, inherently, a subjective practice," rendering "content moderation at scale . . . impossible to do well."[51]

As a journalist reporting on recent studies on attempts to create filtering mechanisms for offensive speech observed:

> [W]hat is considered offensive depends on social context. Terms that are slurs when used in some settings — like the "n-word" or "queer" — may not be in others. But algorithms — and content

---

[44] *See,* Miami Herald Pub. Co., Div. of Knight Newspapers Inc. v. Tornillo, 418 U.S. 241, 256–57 (1974) (a "[g]overnment-enforced right of access" in the form of a statute compelling newspapers to publish rebuttals "operates as a command in the same sense as" a rule prohibiting speech, violating the First Amendment). This right is fortified by statute shielding providers of an "interactive computer service" from civil liability for removing content they deem "objectionable." 47 U.S.C. § 230(c)(1).

[45] Cohen v. California, 403 U.S. 15, 16 (1971).

[46] *Id.* at 26.

[47] Texas v. Johnson, 491 U.S. 397, 414 (1989).

[48] Maarten Sap, Dallas Card, Saadia Gabriel, Yejin Choi, and Noah A. Smith, 2019, The Risk of Racial Bias in Hate Speech Detection. In *Proceedings of the 57th Annual Meeting of the Association for Computational Linguistics* at 1668–78, *available at* https://homes.cs.washington.edu/~msap/pdfs/sap2019risk.pdf.

[49] Lucas Dixon, John Li, Jeffrey Sorensen, Nithum Thain, and Lucy Vasserman. 2018. Measuring and Mitigating Unintended Bias in Text Classification. In *Proceedings of AAAI/ACM Conference on Artificial Intelligence, Ethics, and Society* at 67, *available at* https://dl.acm.org/doi/pdf/10.1145/3278721.3278729.

[50] Thomas Davidson, Debasmita Bhattacharya, and Ingmar Weber, 2019, Racial Bias in Hate Speech and Abusive Language Detection Datasets, *available at* https://arxiv.org/pdf/1905.12516.pdf.

[51] Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, Nov. 20, 2019, https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.shtml.

**App.297**

moderators who grade the test data that teaches these algorithms how to do their job — don't usually know the context of the comments they're reviewing.[52]

Similarly, automated systems are incapable of making value judgments, resulting in the suppression of speech that makes *use* of offensive words in order to appropriate or report on that speech. While a filter may be intended to prevent, for example, the use of a racial slur directed to another user, it will also suppress posts by a student who, targeted by use of that same slur, posts about their experience on their university's Facebook page to call on the university to take action. Activists utilizing offensive language or imagery in order to report on or criticize their use may not anticipate automated filtering, but a user dedicated to using the language or imagery in order to harass others may be more likely to devise workarounds, or use language less likely to be caught in a filter.

Third, the use of blacklists almost certainly fails First Amendment scrutiny under either a designated or limited public forum analysis. Facebook's profanity filter is expressly premised on feedback identifying which words or phrases users find offensive. A limitation on this basis is not viewpoint-neutral, rendering its use fatal in any forum.[53] Further, it is unlikely that a public institution will be able to bear its burden—to demonstrate that its restriction is reasonable—if it cannot identify the words that it is restricting. Similarly, an undisclosed list of prohibited terms necessarily means that members of the public do not have notice as to what speech is permitted or prohibited, ensuring that the restriction will "trap the innocent by not providing fair warning" about what is prohibited.[54]

An automated blacklist also fails First Amendment scrutiny because it automatically hides speech unless it is reviewed by an administrator of the page, effectuating a system of prior restraints on speech, "the most serious and the least

tolerable infringement on" freedom of expression.[55] The risk prior restraints present to freedom of expression is so great that the "chief purpose" in adopting the First Amendment was to prevent their use.[56] Prior restraints are permissible only where they are bound by "narrow, objective, and definite standards"[57] and where the authorities' review and determination must be made within a specific period of time.[58] Absent these procedural safeguards, which FIRE has not observed at any surveyed institution, a prior restraint is unconstitutional.

An automated system that bars specific words does not differentiate between offensive uses of a word or uses of profound public importance. While it may serve a college or university's public relations goals to police public-facing expression by students and faculty for civility, it undermines the institution's commitment to freedom of expression and obligations under the First Amendment.

**B. Facebook's customizable blacklists are used to restrain speech critical of government institutions and their corporate partners, or speech on matters of public concern.**

Nearly a third of the public colleges and universities FIRE surveyed (60, or 30.3%) use a customized blacklist on their Facebook pages, collectively censoring 1,825 unique words and phrases. These range from the words populating George Carlin's famous list of "Filthy Words"[59] to words and phrases pertaining to political and social matters of local and national concern. Together, these customized lists evidence use of Facebook's technology to automatically censor criticism of institutions, corporate partners, campus controversies, and even sports-related chest-thumping.

These filters are not likely to pass First Amendment scrutiny. Moreover, many of these filters evidence viewpoint discrimination, as they are specifically designed to hide terms closely associated with particular criticisms. For

---

[52] Shirin Ghaffary, *The algorithms that detect hate speech online are biased against black people*, Vox, Aug. 15, 2019, https://www.vox.com/recode/2019/8/15/20806384/social-media-hate-speech-bias-black-african-american-facebook-twitter.

[53] *See, e.g.*, Matal v. Tam, 137 S. Ct. 1744, 1763 (2017) (striking down regulation barring trademark registration for "any mark that is offensive to a substantial percentage of the members of any group" because it amounted to viewpoint discrimination, and observing that "[g]iving offense is a viewpoint").

[54] Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

[55] Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).

[56] Near v. Minnesota, 283 U.S. 697, 713 (1931).

[57] Shuttlesworth v. Birmingham, 394 U.S. 147, 151 (1969).

[58] *See, e.g.*, Pan Am v. Municipality of San Juan, No. 3:18-cv-1017 (PAD), 2018 U.S. Dist. LEXIS 208014, at *21–24 (D.P.R. Dec. 10, 2018) (surveying the procedural and substantive strands of the doctrine of prior restraint); see also, Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 431 (4th Cir. 2007) ("A prior restraint on speech that imposes no time limitations on the decision-making process plainly fails" First Amendment scrutiny when the prior restraint is based on content.).

[59] *In the Matter of a Citizen's Complaint Against Pacifica Foundation Station WBAI (FM), New York, New York*, 56 F.C.C.2d 94, 109, Declaratory Order (Feb. 21, 1975) (Transcript of George Carlin's "Filthy Words" monologue, prepared by the Federal Communications Commission), *archived at* https://web.archive.org/web/20110123114427/http://www.law.umkc.edu/faculty/projects/ftrials/conlaw/filthywords.html.

example, restrictions on posting about "chickens" at the **University of Kentucky** are inarguably intended to suppress criticism by animal rights activists, even if a supporter of the university's vendor would also face restrictions because of a post containing the same term.

Even where a filter is not likely to amount to viewpoint discrimination, its use is not likely to be sufficiently tailored to meet the institution's obligations under the First Amendment.

For example, a student at the **University of North Carolina at Chapel Hill** might want to respond to a university post about Black History Month[60] to raise questions about "Silent Sam," a Confederate monument that until recently stood on UNC's campus. But they could not have done so if their comment used the monument's name, because that phrase was on UNC's Facebook blacklist.[61] Or, similarly, when the university posted a message announcing the removal of the monument's pedestal,[62] comments containing the words "Silent Sam" would unquestionably be relevant. Yet none of the hundreds of visible comments contain those words—almost certainly because of the blacklist. Similarly, students who used the phrases "9/11" or "terrorism" in responding to the university's post memorializing the September 11 attacks[63] would not reach their intended audience—again, almost certainly because of the blacklist. Yet each of these comments would be on-topic and not otherwise fall within a categorical exception to the First Amendment.

Similarly, students at schools like **Oklahoma State University**, where the names of political candidates are automatically scrubbed, would encounter difficulty if they mentioned their favored (or disfavored) candidates' names in response to the schools' posts about getting out the vote.[64]

These restrictions, even where they are viewpoint neutral, are not "reasonable in light of the purpose served by the forum"[65] because they burden relevant, on-topic expression in a medium intended to operate in real-time. Instead, they effectuate a system of prior review on particular terms, and institutions are not likely to provide the procedural protections required by the First Amendment.

FIRE's survey revealed that public institutions are using the customized blacklist feature to limit a wide range of criticism, or to blunt discussion of local controversies:

- The **University of Kentucky** blocks the words "birds," "chicken," "chickens," and "filthy." The university explained to FIRE that it instituted this restriction "around the time that Aramark came on campus" and activists began posting "highly graphic videos of chicken slaughter." In 2014, the university announced it was entering into a 15-year contract worth $250 million with Aramark.[66] Similarly, Mississippi State University blocks mentions of "Aramark" and terms related to its dining facilities.

- **Texas A&M University** blocked terms in an effort to bar criticism by animal rights activists, including People for the Ethical Treatment of Animals, over research conducted on dogs. These terms include "peta," "abuse," "abusers," and "lab." PETA and the Electronic Frontier Foundation sued Texas A&M in 2018 over the censorship.[67] **Santa Monica College** likewise bars "cats," "dissecting," "torture," and "killing" following a

---

[60] *See, e.g.*, Univ. of N.C. at Chapel Hill, *Recognizing Carolina's black pioneers*, Fᴀᴄᴇʙᴏᴏᴋ (Feb. 23, 2018), https://www.facebook.com/uncchapelhill/videos/10155430896997709.

[61] After a letter from FIRE, UNC removed some of the terms on its customized list, but it is not clear what terms remain. Letter from Kara E. Simmons, Associate Vice Chancellor and Senior Univ. Counsel, Univ. N.C., to Adam Steinbaugh, Director, Individual Rights Defense Program, Found. for Indiv. Rights in Educ. (Sept. 13, 2019) (on file with author).

[62] Univ. of N.C. at Chapel Hill, *Chancellor Folt announces resignation…*, Fᴀᴄᴇʙᴏᴏᴋ (Jan. 15, 2019), https://www.facebook.com/uncchapelhill/posts/10156120737537709.

[63] Univ. of N.C. at Chapel Hill, *Carolina community gathers in remembrance of 9/11*, Fᴀᴄᴇʙᴏᴏᴋ (Sept. 11, 2018), https://www.facebook.com/uncchapelhill/videos/1925944624166629.

[64] *See, e.g.*, Oklahoma State Univ., *It's Election Day, Cowboys! Get out and VOTE!*, Fᴀᴄᴇʙᴏᴏᴋ (Nov. 8, 2016), https://www.facebook.com/okstate/photos/a.145735572306/10153859326792307.

[65] Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106–07 (2001) (quoting, in part, Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)).

[66] Jay Blanton, *Dining Partnership Will Transform Vital Service to UK Campus*, Uɴɪᴠ. ᴏғ Kʏ., June 13, 2014, https://uknow.uky.edu/campus-news/dining-partnership-will-transform-vital-service-uk-campus.

[67] Adam Schwartz, *EFF Lawsuit Ends Censorship Against PETA on Public University's Facebook Page*, Eʟᴇᴄᴛʀᴏɴɪᴄ Fʀᴏɴᴛɪᴇʀ Fᴏᴜɴᴅ., Feb. 4, 2020, https://www.eff.org/deeplinks/2019/12/eff-ends-censorship-against-peta-public-universitys-facebook-page; *see also* Adam Steinbaugh, *Texas A&M: Our secret list of naughty words you can't say on our Facebook page doesn't offend the First Amendment*, Fᴏᴜɴᴅ. ғᴏʀ Iɴᴅɪᴠ. Rɪɢʜᴛs. ɪɴ Eᴅᴜᴄ., Aug. 23, 2018, https://www.thefire.org/texas-am-our-secret-list-of-naughty-words-you-cant-say-on-our-facebook-page-doesnt-offend-the-first-amendment.

**App.299**

PETA campaign critical of cat dissection in an anatomy course.[68]

- During protests over the "Silent Sam" Confederate monument, the **University of North Carolina at Chapel Hill** blocked posts containing the phrase "Silent Sam," as well as mentions of "Nazis." The university also blocked mentions of the terms "9/11," "terrorist," "terrorism," and the name of a professor whose teaching about the September 11, 2001, terrorist attacks drew national media coverage when a student, who had not read any of the materials,[69] publicly complained about the materials read in the course.[70] The university also barred terms relating to sexual assault.

- The **University of Arizona** automatically removes posts containing the word "rape" or the name of an itinerant preacher known for holding signs reading "You Deserve Rape," which has drawn media criticism.[71] This restriction presumably removes complaints about the preacher.

- **Suffolk County Community College (NY)** blocks posts concerning inclement weather closures, and includes terms that demonstrate that the purpose is to inhibit criticism, barring the words "blizzard," "snow," "dangerous," "slip," "scared," "irresponsible," "tragedy," and "accident." They also block "apologize," "resign," and "disgrace."

- **Clemson University** blocked mentions of Harambe, a meme about a gorilla that had previously generated controversy on campus when a residential employee sought to bar students from referencing the meme on their dormitory doors. Clemson also blocked phrases referring to other controversies on campus,

including the name of a professor criticized for calling Republicans "racist scum," the word "turtle" (apparently because of a student's poll of his classmates, which was reported in the press, about purposefully driving over turtles). Clemson also blocks the words "boycott" and "Nike"—a company with which the university has entered into a $58 million contract.[72] Similarly, the university blocked the words "senators," "pledge," and "anthem," likely relating to students who protested by sitting during the pledge of allegiance during a student government meeting.[73] Clemson also blocked the word "balloonsblow," referring to environmental activists who called on the university to end its practice of releasing balloons during football games.[74] Ominously, Clemson also blocked the words "rape" and "rapeculture." In response to FIRE's records request, Clemson removed the blocked terms and implemented "measures so that blocks of protected speech do not occur" in the future.[75]

- The once-popular awareness campaign "Kony"[76] cannot be found on **Auburn University**'s Facebook page, because comments containing that word are automatically deleted.

- The **University of Mississippi** prohibits mentions of its former mascot, "Colonel Reb," a "caricature of an antebellum Southern plantation owner" no longer used by the university.[77]

- The **University of Washington** blocks a pejorative pun on its team name, the Huskies ("Fuskies"), as well as references to its football rivals: "Cougars," "Ducks," "Bruins," and "Beavers." **Texas A&M University** blocks references to the "hook em" horn gesture of their University of Texas at Austin rivals, the Longhorns.

[68] Press Release, *Secret Student Video Exposes Dissection of Pregnant Cat at Santa Monica College*, People for Ethical Treatment of Animals, Sept. 7, 2016, https://www.peta.org/media/news-releases/secret-student-video-exposes-dissection-pregnant-cat-santa-monica-college.

[69] Neel Ahuja, *Distorting the study of 9/11 at UNC*, News & Observer, Sept. 19, 2015, https://www.newsobserver.com/opinion/op-ed/article35735889.html.

[70] Jane Stancill, *UNC course on 9/11 criticized in conservative publications*, Charlotte Observer, Sept. 1, 2015, https://www.charlotteobserver.com/news/local/education/article33282939.html.

[71] Aviva Shen, *University Of Arizona Student Tells Women: 'You Deserve Rape'*, ThinkProgress, Apr. 25, 2013, https://thinkprogress.org/university-of-arizona-student-tells-women-you-deserve-rape-14039c6c7737/.

[72] Manie Robinson, *Clemson extends Nike partnership with 10-year, $58 million deal*, Greenville News, Aug. 3, 2018, https://www.greenvilleonline.com/story/sports/college/clemson/2018/08/03/clemson-nike-extend-partnership-10-year-58-million-deal/897267002.

[73] Georgie Silvarole, *Clemson University student senators sit for Pledge of Allegiance*, WCNC, Sept. 28, 2017, https://www.wcnc.com/article/news/local/clemson-university-student-senators-sit-for-pledge-of-allegiance/479410454.

[74] Matt Connolly, *Clemson ending this football gameday tradition for 2018*, The State, July 28, 2018, https://www.thestate.com/sports/college/acc/clemson-university/article215700140.html.

[75] E-mail from Jermaine D. Johnson, Assistant General Counsel, Clemson Univ., to Adam Steinbaugh, Director, Individual Rights Defense Program, Found. for Indiv. Rights in Educ. (Dec. 21, 2018, 10:12 PM), *available at* https://www.documentcloud.org/documents/6394391-Clemson-University-Social-Media-Survey-Response.html.

[76] Invisible Children, Kony 2012, https://invisiblechildren.com/kony-2012 (last visited Apr. 15, 2020).

[77] Robbie Brown, *Ole Miss Shelves Mascot Fraught With Baggage*, N.Y. Times, Sept. 19, 2019, https://www.nytimes.com/2010/09/20/us/20mascot.html.

**Oklahoma State University** blocks mentions of its rival football team, including the phrases "boomer sooner" (OU's fight song), "university of oklahoma," and "sooners."

- Not to be outdone by its rival, the **University of Oklahoma** blocks an emoji: 🖕 .[78]

- The **University of Central Florida** blocks the words "terrorist" and "sexual."

- **Oakland Community College** in Michigan blocks mentions of the name of a disgruntled former professor.

- **Mississippi State University** blocks the term "fail state," a play on its "Hail State" motto.[79]

- A number of institutions, including **Portland State University**, **Oklahoma State University**, the **University of Arizona**, the **University of North Carolina at Chapel Hill**, blocked the names of political candidates, such as "Trump," "Bernie," or "Hillary." Others, such as **Arizona State University**, restrict pejorative versions of their names or supporters, such as "Trumptards" and "NObama."

- **West Virginia University** blocks mentions of "couch burning," a tradition long disfavored by the university's administration and Morgantown residents.[80]

These lists were largely generated before 2020. While some institutions have since modified their blacklists to remove some terms, it is also likely that some have added new terms to limit expression concerning more recent controversies or political events. FIRE encourages student journalists to use the sample public records request in Appendix C to ask their own (or other) institutions for updated records.

**C. Not just words: Public universities block thousands of Facebook and Twitter users.**

FIRE's records requests reveal that of the 198 public colleges and universities that responded to FIRE's survey, 173 (or

87%) blocked users on Facebook or Twitter. Together, these institutions blocked 13,197 Facebook users and 4,065 Twitter users from interacting with their posts, pages, or tweets. Accordingly, an institution that blocks at least one user blocks an average of 76 Facebook users and 23.5 Twitter users.



87% of public colleges and universities that responded to FIRE's survey blocked users on Facebook or Twitter.

87%

Because Facebook and Twitter do not keep records of the reason for blocking a particular account, and because institutions' records reveal only the name of the blocked user (not what they posted), it's unclear how many of these users were blocked for viewpoint-discriminatory reasons. It's possible many were blocked for violating constitutionally-defensible regulations.

However, government actors cannot restrict access to a public forum based on an objection to the viewpoint of the speaker. Many blocked accounts relate to political, social, or religious movements, including many critical of the institution, raising the possibility that they were blocked for advocating a particular viewpoint.

For example:

- The **University of Kansas** blocks "Boycott Koch Industries," a Facebook account referencing America's second-largest privately-held company,[81] which is based in Kansas and is a major donor to the university.[82] On Twitter, the university blocks accounts

[78] Extending the middle finger is expression protected by the First Amendment. Swartz v. Insogna, 704 F.3d 105, 111 (2d Cir. 2013).

[79] Jason Kirk, *Some moron spray-painted 'Fail State,' 'Go Rebs,' and more on Mississippi State's campus*, SBNATION, Dec. 17, 2016, https://www.sbnation.com/college-football/2016/12/17/13994290/mississippi-state-stadium-vandalized-spraypaint.

[80] Jesse Wright, *With Hopes to Curb Couch Burning, Morgantown Passes Outdoor Furniture Ban*, W.VA. PUB. BROAD., Apr. 7, 2015, https://www.wvpublic.org/post/hopes-curb-couch-burning-morgantown-passes-outdoor-furniture-ban.

[81] *America's Largest Private Companies*, FORBES, https://www.forbes.com/largest-private-companies/list (last visited Apr. 15, 2020).

[82] Press Release, *Koch Industries Gift of $1M Establishes Business, Engineering Scholarship Funds*, UNIV. OF KAN. (Sept. 8, 2016), https://news.ku.edu/2016/09/08/koch-industries-gift-1m-establishes-business-engineering-scholarship-funds. FIRE also receives funding from the Charles Koch Foundation. FIRE does not accept money from donors who seek to alter our mission or interfere with our case work.

**App.301**

related to the Westboro Baptist Church, which had pledged to picket the university's graduation.

- **Georgia State University** blocked a "Georgia for Bernie" Twitter account. The university also complained to Twitter about a tweet from the account criticizing the university's police because the tweet listed the public contact information of the university's president and police chief.

- The **University of New Hampshire** blocked a Twitter account belonging to "UNH Students for Gary Johnson," a Libertarian Party presidential candidate, and blocked the Twitter account of Breitbart News—and other Twitter critics—after the outlet wrote about professors who called for the expulsion of counter-protesters who dressed as Harambe and Richard Nixon.[83] Other accounts appear to have been blocked because they criticized the university for employing Seth Abramson, whose Twitter criticisms of President Trump have gone viral.

- The **University of Montana** blocked a Twitter account, @UMRape, which was being used to follow "the #UMRape crisis that has been plaguing" the university.

- **Mississippi State University** blocks "Legalize Marijuana in Mississippi."

- A number of universities block accounts supporting the "Occupy" movement. For example, **Ball State University** blocks "Occupy Indiana," **Ivy Tech Community College** in Indiana blocks "Occupy Richmond Indiana," the **University of Maryland-College Park** blocks "Occupy Baltimore," and the **University of North Carolina** blocks "Occupy Raleigh" on Facebook.

- **Idaho State University** blocked a Facebook page critical of a university employee whose photographs of big game hunting in South Africa went viral.[84]

- The **University of Mississippi**, which blocks mentions

of its former "Colonel Reb" mascot on its Facebook page, also blocks a "Colonel Reb" Twitter account operated by an organization (which also has a registered student chapter at the university) that advocates for the mascot's return.[85]

- The **University of Utah** blocks animal rights activists, including PETA, former University of Utah student Jeremy Beckham, and "Animal Welfare News." Activists, including PETA and Beckham, have criticized research conducted at the university's labs.[86]

- The **University of Alaska Anchorage** blocked an "Alaskans4Trump" account that had disparaged activist Shaun King in response to a tweet announcing that King would be speaking at the university.[87]

The reason users have been blocked is not always clear from the records produced to FIRE. (The **University of North Dakota**, for example, blocks a Facebook group entitled "Dog Enthusiasts of North Dakota, no posers, only real dog lovers.") Most institutions block only a handful of users, blocking an average of 76 Facebook users and 23.5 Twitter users. Others wield the tool more liberally. **Indiana University** blocks the most Facebook users (1488), trailed closely by the **University of Washington** (1162), with the **University of California, Los Angeles** in a distant third (691). When it comes to blocked Twitter users, **Portland State University** blocks the most users (883), more than double that of **Central Connecticut State University** (307) and **Arizona State University** (253).

## D. The extent of manual removal of posts and comments is unknown.

FIRE's survey did not reveal information about the extent to which institutions utilize their ability to manually hide individual Facebook posts or comments after they've been posted. However, if institutions are utilizing tools to prevent content from being posted, it is certain that they are also removing content after it has been posted. Recall, for example, that at Ohio's **Wright State University**, a public records request revealed that administrators hid hundreds

[83] Katherine Rodriguez, *University of New Hampshire Professors Call for Trump Supporters to Be Expelled*, Breitbart, Nov. 21, 2016, https://www.breitbart.com/politics/2016/11/21/university-new-hampshire-professors-call-trump-supporters-expelled.

[84] Michael H. O'Donnell, *ISU accountant on safari becomes social media target*, Idaho St. J., Aug. 5, 2015, https://www.idahostatejournal.com/members/isu-accountant-on-safari-becomes-social-media-target/article_f46ff95c-3b87-11e5-9f24-93c2ba7f4656.html.

[85] Colonel Reb Found., About Us, http://www.colonelreb.org/saving-colonel-reb (last visited Apr. 15, 2020); *see also* Univ. of Miss., Colonel Reb Found., https://olemiss.campuslabs.com/engage/organization/colonel-reb-foundation (recognized student organization webpage) (last visited Apr. 15, 2020).

[86] Courtney Tanner, *University of Utah can't charge PETA a $5K 'prepayment' for records on lab animal deaths, committee rules*, Salt Lake Trib., Nov. 14, 2018, https://www.sltrib.com/news/education/2018/11/14/university-utah-cant.

[87] @Alaskans4Trump, Twitter (Feb. 7, 2017, 1:30 AM), https://twitter.com/Alaskans4Trump/status/828913792993988608.

of posts concerning an ongoing faculty union strike.[88] Unfortunately, this type of content removal is difficult to detect through broad public records requests.

## HOW PRIVATE AND GOVERNMENT ACTORS CAN MITIGATE THE RISK OF CENSORING SPEECH ON SOCIAL MEDIA

Government actors and social media companies navigating the application of the First Amendment to the digital realm can both take steps to avoid infringing on fundamental civil liberties.

### A. Public actors and private colleges must avoid censoring speech on social media.

For administrators and staff at public universities and colleges—as well as at private institutions that promise freedom of expression to students and faculty—there are a variety of ways to reduce the risk of censorship.

For example:

- **Don't filter.** Turn off Facebook's filters.

- **Don't block users.** Don't block users based on their viewpoint. If they repeatedly violate a policy, document it and give them an opportunity to contest any limits on their access.

- **Craft clear, publicly available policies.** Be clear about the purpose of your social media pages. Is your page open for comments only from students or faculty, or is it open to the public? If you place limits on the content of speech, make sure they're published, reasonable, narrow, and objective. A vague policy that leaves your staff with a wide range of discretion is a recipe for trouble. Some universities have begun to formulate new policies.[89]

- **Consistently enforce policies once in place.** A failure to enforce policies consistently may lead to First Amendment liability even if the policy itself is clear, objective, and reasonable. Selective enforcement will

lead to the appearance of bias, and may demonstrate unlawful viewpoint discrimination.[90] Further, at least one court has determined that, because policies were inconsistently enforced, a Facebook page was a *designated* public forum, not a limited public forum, meaning that it was subject to a stricter First Amendment analysis.[91]

- **Train staff on First Amendment principles.** Make sure your staff members tasked with regulating and responding to online speech know what they can and can't do, and make sure they ask for help when they're not sure.[92]

- **Keep records.** If you block a user for posting the same comment repeatedly, or for using unprotected speech, keep a record of it. This will facilitate supervision and correction if a user is blocked for an improper reason.

### B. Social media companies can discourage government actors from abusing tools to censor online speech.

Social media companies can also take steps to discourage government actors from misusing or purposely abusing their moderation tools to effectuate unlawful censorship.

For example:

- **Distinguish between government and non-government accounts.** If a user identifies themselves as a government actor, make that information public, and require government officials to designate themselves as such in order to create verified pages or accounts.

- **Require government actors to establish public-facing policies.** Restrict government actors' moderation tools unless they have created a public policy concerning user content.

- **Keep filters "off" by default**, and only permit their use if the government actor has established a public-facing content policy.

---

[88] Greg Harold Greubel, *Public records reveal Wright State used unconstitutional Facebook page policy to censor pro-union speech during historic faculty strike*, Found. for Indiv. Rights in Educ., Jan. 24, 2020, https://www.thefire.org/public-records-reveal-wright-state-used-unconstitutional-facebook-page-policy-to-censor-pro-union-speech-during-historic-faculty-strike.

[89] *See, e.g.*, Northern Arizona University and the University of North Carolina at Chapel Hill.

[90] Thomas v. Chi. Park Dist., 534 U.S. 316, 325 (2002) (granting "waivers to favored speakers" or "denying them to disfavored speakers" would "of course be unconstitutional"); *see, e.g.*, Business Leaders in Christ v. Univ. of Iowa, 360 F.Supp.3d 885, 907 (S.D. Iowa 2019) (disparate enforcement of nondiscrimination policy violated the First Amendment).

[91] Garnier v. Poway Unified Sch. Dist., No. 17-cv-2215-W (JLB), U.S. Dist. LEXIS 167247, at *20 (S.D. Cal. Sept. 26, 2019), ECF No. 42.

[92] To its credit, Wayne State University started training its social media staff after receiving a records request from FIRE.

**App.303**

- **Alert users when their comment has been filtered on a government actor's page.** If a user does not know that their speech has been hidden, they cannot remedy that censorship.

- **Make public the words contained on the profanity filters.** Government actors should not be able to make use of a list of forbidden words hidden from the public.

- **Provide tools and reminders for government accounts.** If an account is designated as belonging to a government actor, provide warnings alongside filtering or blocking tools that their use may have ramifications under the First Amendment. If a government actor blocks a user, require them to set forth their reason for doing so.

## CONCLUSION

Freedom of expression is often one of the few tools available to people to defend themselves. As more of our public discourse takes place online, and not on the sidewalk or in the pages of newspapers, it is critical that public and private institutions alike vigorously defend expressive rights, and remain vigilant to the impact censorship will have on individuals, groups, and communities.

FIRE stands ready to assist students, student organizations, faculty members, and faculty organizations in defending their rights—online or off. If you believe your rights may be jeopardized, contact FIRE at https://thefire.org/alarm.

# Appendix A:

## Surveyed Institutions and Response Data

The following is a simplified version of our survey results data. A more comprehensive version of this data may be found at https://cutt.ly/firesms.

Institutions in **blue** provided adequate responses. Copies of the records are hyperlinked.

Institutions marked in **red** failed to produce sufficient documents for the reasons specified in the accompanying footnote or hyperlinked document.

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Off | Medium | Strong | Uses List | Entries | Facebook | Twitter |
| **TOTAL** | | **198** | **44** | **55** | **99** | **60** | **3389** | **13197** | **4065** |
| Percentages | | 88.39% | 22.2% | 27.8% | 50.0% | 30.30% | | 76.3% | 23.5% |
| University of Alaska, Anchorage | AK | Yes | | | Strong | No | 0 | 23 | 3 |
| University of Alaska, Fairbanks | AK | Yes | | | Strong | No | 0 | 18 | 5 |
| University of Alaska, Southeast | AK | Yes | | | Strong | Unknown | | 8 | |
| Kenai Peninsula College[1] | AK | No | | | | | | | |
| Ilisaġvik College[2] | AK | No | | | | | | | |
| University of Alabama[3] | AL | No | | | | | | | |
| Troy University[4] | AL | No | | | | | | | |
| Auburn University | AL | Yes | | | Strong | Yes | 6 | 289 | 29 |
| Calhoun Comm'ty College[5] | AL | No | | | | | | | |
| Jefferson State Comm'ty College[6] | AL | No | | | | | | | |
| Arizona State University | AZ | Yes | | | Strong | Yes | 76 | 136 | 253 |
| Northern Arizona University | AZ | Yes | | | Strong | No | 0 | 14 | 42 |
| University of Arizona | AZ | Yes | | | Strong | Yes | 17 | 347 | 79 |
| Pima Comm'ty College | AZ | Yes | | | Strong | No | 0 | 0 | 1 |
| Mesa Comm'ty College | AZ | Yes | | | Strong | Yes | 5 | 1 | 2 |
| University of California, Los Angeles | CA | Yes | | | Strong | Yes | 46 | 691 | 10 |
| California State University, Fullerton | CA | Yes | | Medium | | No | 0 | 6 | 25 |
| University of California, Berkeley | CA | Yes | | | Strong | No | 0 | 0 | 0 |
| Santa Monica College | CA | Yes | | | Strong | Yes | 9 | 7 | 4 |
| American River College | CA | Yes | | | Strong | Yes | 308 | 62 | 0 |
| University of Colorado, Boulder | CO | Yes | | | Strong | No | 0 | 27 | 3 |
| University of Colorado, Denver | CO | Yes | Off | | | No | 0 | 94 | 2 |

---

[1] Surveyed in October 2019. Failed to respond.

[2] Surveyed in October 2019. Failed to respond.

[3] Refused: records only open to Alabama citizens.

[4] Failed to respond.

[5] Refused: records only open to Alabama citizens.

[6] Refused: records only open to Alabama citizens.

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users | |
|------|-------|----------|------|------|------|------|------|------|------|
| Colorado State University | CO | Yes | | Medium | | No | 0 | 47 | 1 |
| Front Range Comm'ty College | CO | Yes | Off | | | No | 0 | 3 | 23 |
| Pikes Peak Comm'ty College | CO | Yes | | | Strong | No | 0 | 12 | 16 |
| Central Connecticut State University | CT | Yes | | | Strong | No | 0 | 29 | 307 |
| Southern Connecticut State University | CT | Yes | | | Strong | Yes | 2 | 13 | 4 |
| Gateway Comm'ty College | CT | Yes | Off | | | Yes | 9 | 29 | 6 |
| Manchester Comm'ty College | CT | Yes | Off | | | No | 0 | 17 | 4 |
| University of Connecticut | CT | Yes | Off | | | No | 0 | 71 | 18 |
| Delaware State University[7] | DE | No | | | | | | | |
| University of Delaware[8] | DE | No | | | | | | | |
| Delaware Technical Comm'ty College | DE | Yes | | | Strong | No | 0 | 3 | 4 |
| University of Central Florida | FL | Yes | | | Strong | Yes | 43 | 381 | 14 |
| Florida International University | FL | Yes | | | Strong | Yes | 4 | 231 | 9 |
| University of Florida | FL | Yes | | | Strong | No | 0 | 0 | 0 |
| Miami Dade College | FL | Yes | Off | | | No | 0 | 62 | 4 |
| Broward College | FL | Yes | | | Strong | No | 0 | 64 | 10 |
| Georgia State University | GA | Yes | | | Strong | No | 0 | 32 | 24 |
| University of Georgia | GA | Yes | | | Strong | Yes | 2 | 433 | 3 |
| Kennesaw State University | GA | Yes | | | Strong | Yes | 25 | 19 | 3 |
| Central Georgia Technical College | GA | Yes | | | Strong | No | 0 | 1 | 1 |
| Chattahoochee Technical College | GA | Yes | | | Strong | No | 0 | 71 | 4 |
| University of Hawai'i at Manoa[9] | HI | No | | | | | | | |
| University of Hawai'i at Hilo[10] | HI | No | | | | | | | |
| University of Hawai'i Maui College[11] | HI | No | | | | | | | |
| Kapi'olani Comm'ty College[12] | HI | No | | | | | | | |
| Leeward Comm'ty College[13] | HI | No | | | | | | | |
| Idaho State University | ID | Yes | | Medium | | No | 0 | 48 | 10 |
| University of Idaho | ID | Yes | | Medium | | No | 0 | 28 | 10 |
| Boise State University | ID | Yes | | | Strong | No | 0 | 12 | 33 |
| College of Southern Idaho | ID | Yes | | | Strong | No | 0 | 5 | 4 |
| College of Western Idaho | ID | Yes | | | Strong | No | 0 | 1 | 3 |
| University of Iowa | IA | Yes | | Medium | | Yes | 5 | 0 | 0 |
| University of Northern Iowa | IA | Yes | | Medium | | No | 0 | 330 | 0 |
| Des Moines Area Comm'ty College | IA | Yes | | | Strong | No | 0 | 6 | 229 |

---

[7] Refused: Delaware State University exempt from Delaware's FOIA.

[8] Refused: Delaware FOIA is limited to records relating to expenditures of public funds.

[9] Provided only partial records.

[10] Provided only partial records.

[11] Provided only partial records.

[12] Provided only partial records.

[13] Failed to respond.

**App.306**

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users | |
|---|---|---|---|---|---|---|---|---|---|
| Kirkwood Comm'ty College[14] | IA | No | | | | | | | |
| University of Illinois, Urbana-Champaign | IL | Yes | | | Strong | Yes | 21 | 517 | 5 |
| University of Illinois, Chicago | IL | Yes | | | Strong | No | 0 | 137 | 54 |
| Northern Illinois University | IL | Yes | | | Strong | Yes | 5 | 78 | 39 |
| College of DuPage | IL | Yes | | | Strong | No | 0 | 0 | 6 |
| College of Lake County | IL | Yes | | | Strong | No | 0 | 11 | 6 |
| Purdue University | IN | Yes | Off | | | No | 0 | 435 | 12 |
| Indiana University | IN | Yes | Off | | | No | 0 | 1488 | 197 |
| Ball State University | IN | Yes | | | Strong | No | 0 | 78 | 2 |
| Ivy Tech Comm'ty College | IN | Yes | | | Strong | Yes | 145 | 319 | 2 |
| Vincennes University[15] | IN | Yes | | | Strong | Yes | 6 | 13 | 2 |
| University of Kansas | KS | Yes | | | Strong | Yes | 14 | 621 | 8 |
| Kansas State University[16] | KS | Yes | | Medium | | Yes | 53 | 0 | 0 |
| Wichita State University | KS | Yes | Off | | | No | 0 | 13 | 1 |
| Johnson County Comm'ty College | KS | Yes | | | Strong | No | 0 | 2 | 0 |
| Barton County Comm'ty College[17] | KS | No | | | | | | | |
| University of Kentucky | KY | Yes | Off | | | Yes | 4 | 82 | 3 |
| Western Kentucky University | KY | Yes | | Medium | | No | 0 | 69 | 4 |
| University of Louisville[18] | KY | Yes | | | Strong | Yes | 7 | 0 | 0 |
| Jefferson Comm'ty and Technical College | KY | Yes | Off | | | No | 0 | 1 | 36 |
| Bluegrass Comm'ty and Technical College | KY | Yes | | | Strong | No | 0 | 4 | 5 |
| University of Louisiana, Lafayette | LA | Yes | | | Strong | No | 0 | 234 | 17 |
| Southeastern Louisiana University | LA | Yes | | | Strong | No | 0 | 33 | 0 |
| Louisiana Tech University | LA | Yes | | Medium | | No | 0 | 100 | 54 |
| Delgado Comm'ty College | LA | Yes | | | Strong | Yes | 5 | 21 | 0 |
| Baton Rouge Comm'ty College | LA | Yes | | | Strong | No | 0 | 0 | 15 |
| University of Massachusetts, Amherst | MA | Yes | | | Strong | No | 0 | 73 | 12 |
| University of Massachusetts, Lowell | MA | Yes | Off | | | No | 0 | 15 | 9 |
| University of Massachusetts, Boston | MA | Yes | | | Strong | Yes | 3 | 20 | 5 |
| Bunker Hill Comm'ty College | MA | Yes | Off | | | No | 0 | 3 | 0 |
| Middlesex Comm'ty College | MA | Yes | | Medium | | No | 0 | 10 | 0 |
| University of Maryland, University College | MD | Yes | | | Strong | No | 0 | 0 | 0 |
| University of Maryland, College Park | MD | Yes | | Medium | | Yes | 43 | 105 | 5 |
| Towson University | MD | Yes | | | Strong | No | 0 | 24 | 5 |
| Montgomery College | MD | Yes | | | Strong | No | 0 | 15 | 3 |
| Comm'ty College of Baltimore County[19] | MD | No | | | | | | | |

[14] Requested $80.00.

[15] A copy of these records was sent via mail but cannot be located at this time because the author's office is inaccessible due to COVID-19.

[16] Requested $12.50.

[17] Failed to produce records after acknowledging request.

[18] Requested $5.00.

[19] Failed to produce records after acknowledging request.

**App.307**

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users |
|---|---|---|---|---|---|---|---|---|
| University of Maine | ME | Yes | | Medium | | No | 0 | 3 | 1 |
| University of Southern Maine | ME | Yes | | | Strong | No | 0 | 18 | 13 |
| University of Maine at Augusta | ME | Yes | | | Strong | No | 0 | 6 | 1 |
| Southern Maine Comm'ty College | ME | Yes | Off | | | No | 0 | 5 | 1 |
| Eastern Maine Comm'ty College | ME | Yes | | Medium | | No | 0 | 2 | 0 |
| Michigan State University[20] | MI | No | | | | | | |
| University of Michigan, Ann Arbor | MI | Yes | | Medium | | No | 0 | 352 | 0 |
| Wayne State University | MI | Yes | Off | | | No | 0 | 21 | 203 |
| Oakland Comm'ty College | MI | Yes | | | Strong | Yes | 15 | 23 | 6 |
| Macomb Comm'ty College | MI | Yes | Off | | | No | 0 | 36 | 30 |
| University of Minnesota, Twin Cities | MN | Yes | Off | | | Yes | 2 | 37 | 15 |
| St. Cloud State University | MN | Yes | | | Strong | No | 0 | 48 | 31 |
| Minnesota State University, Mankato | MN | Yes | | Medium | | | | 42 | 1 |
| Normandale Comm'ty College[21] | MN | No | | | | | | |
| Century College | MN | Yes | Off | | | No | 0 | 0 | 0 |
| Missouri State University, Springfield | MO | Yes | | Medium | | No | 0 | 0 | 4 |
| University of Missouri, Columbia[22] | MO | No | | | | | | |
| University of Missouri, St. Louis[23] | MO | No | | | | | | |
| St. Louis Comm'ty College | MO | Yes | | Medium | | No | 0 | 9 | 24 |
| Metropolitan Comm'ty College, Kansas City | MO | Yes | | | Strong | No | 0 | 3 | 4 |
| University of Mississippi | MS | Yes | | | Strong | Yes | 11 | 100 | 65 |
| Mississippi State University | MS | Yes | | Medium | | Yes | 430 | 87 | 5 |
| University of Southern Mississippi | MS | Yes | | | Strong | No | 0 | 16 | 3 |
| Hinds Comm'ty College | MS | Yes | | | Strong | No | 0 | 23 | 38 |
| Mississippi Gulf Coast Comm'ty College | MS | Yes | Off | | | No | 0 | 4 | 2 |
| Montana State University | MT | Yes | Off | | | No | 0 | 0 | 0 |
| Montana State University, Billings | MT | Yes | | | Strong | No | 0 | 5 | 0 |
| University of Montana | MT | Yes | | Medium | | No | 0 | 39 | 2 |
| Flathead Valley Comm'ty College[24] | MT | No | | | | | | |
| Great Falls College MSU | MT | Yes | Off | | | No | 0 | 4 | 0 |
| North Carolina State University, Raleigh | NC | Yes | | | Strong | No | 0 | 0 | 0 |
| University of North Carolina, Charlotte | NC | Yes | Off | | | No | 0 | 1 | 2 |
| University of North Carolina, Chapel Hill | NC | Yes | | | Strong | Yes | 46 | 156 | 16 |
| Central Piedmont Comm'ty College | NC | Yes | | Medium | | No | 0 | 1 | 5 |
| Wake Technical Comm'ty College | NC | Yes | | | Strong | Yes | 10 | 0 | 0 |
| University of North Dakota | ND | Yes | | | Strong | No | 0 | 71 | 103 |
| North Dakota State University | ND | Yes | Off | | | No | 0 | 34 | 0 |

[20] Refused, citing public safety and cybersecurity, and an exemption created in response to 9/11.

[21] Failed to produce records after acknowledging request.

[22] Refused: claimed producing records would amount to "creating" a document.

[23] Refused: claimed producing records would amount to "creating" a document.

[24] Requested $20 for records.

**App.308**

| Name | State | Response | Profanity Filter | | Custom Blacklist | | Blocked Users | |
|---|---|---|---|---|---|---|---|---|
| Bismarck State College | ND | Yes | Medium | | No | 0 | 8 | 0 |
| North Dakota State College of Science | ND | Yes | | Strong | Yes | 438 | 9 | 2 |
| Lake Region State College | ND | Yes | Medium | | No | 0 | 0 | 0 |
| University of Nebraska, Lincoln[25] | NE | No | | | | | | |
| University of Nebraska, Omaha[26] | NE | No | | | | | | |
| University of Nebraska, Kearney[27] | NE | No | | | | | | |
| Metropolitan Comm'ty College[28] | NE | No | | | | | | |
| Southeast Comm'ty College[29] | NE | No | | | | | | |
| University of New Hampshire | NH | Yes | Medium | | Yes | 4 | 122 | 76 |
| Plymouth State University | NH | Yes | Medium | | No | 0 | 0 | 6 |
| Keene State College | NH | Yes | Off | | No | 0 | 49 | 12 |
| NHTI, Concord's Comm'ty College | NH | Yes | | Strong | No | 0 | 4 | 0 |
| Manchester Comm'ty College | NH | Yes | Off | | No | 0 | 7 | 0 |
| Thomas Edison State College | NJ | Yes | Medium | | No | | | 0 |
| Rowan University | NJ | Yes | Medium | | Yes | 5 | 20 | 21 |
| Montclair State University | NJ | Yes | Off | | No | 0 | 11 | 2 |
| Bergen Comm'ty College | NJ | Yes | Off | | Yes | 12 | 27 | 0 |
| Brookdale Comm'ty College | NJ | Yes | Off | | Yes | 3 | 9 | 5 |
| New Mexico State University | NM | Yes | Medium | | No | 0 | 52 | 39 |
| Eastern New Mexico University | NM | Yes | | Strong | No | 0 | 3 | 1 |
| University of New Mexico | NM | Yes | Medium | | No | 0 | 49 | 9 |
| San Juan College | NM | Yes | | Strong | No | 0 | 8 | 1 |
| Central New Mexico Comm'ty College | NM | Yes | Medium | | No | 0 | 24 | 3 |
| Western Nevada College | NV | Yes | | Strong | No | 0 | 0 | 0 |
| University of Nevada, Las Vegas | NV | Yes | | Strong | Yes | 1 | 16 | 10 |
| University of Nevada, Reno | NV | Yes | | Strong | No | 0 | 53 | 92 |
| Truckee Meadows Comm'ty College | NV | Yes | Medium | | No | 0 | 16 | 39 |
| College of Southern Nevada | NV | Yes | | Strong | No | 0 | 0 | 0 |
| University at Buffalo | NY | Yes | | Strong | No | 0 | 27 | 0 |
| CUNY Hunter College | NY | Yes | Medium | | Yes | 422 | 28 | 6 |
| Stony Brook University | NY | Yes | Medium | | Yes | 4 | 33 | 5 |
| Suffolk County Comm'ty College | NY | Yes | | Strong | Yes | 81 | 0 | 47 |
| Nassau Comm'ty College | NY | Yes | | Strong | No | 0 | 390 | 0 |
| The Ohio State University | OH | Yes | Medium | | Yes | 9 | 1 | 3 |
| University of Cincinnati | OH | Yes | | Strong | No | 0 | 28 | 3 |
| Kent State University | OH | Yes | Medium | | Yes | 10 | 126 | 1 |
| Columbus State Comm'ty College | OH | Yes | | Strong | No | 0 | 0 | 0 |

[25] Same as the University of Nebraska, Kearney. Response here.

[26] Same as the University of Nebraska, Kearney. Response here.

[27] Refused: claimed "settings information is design or setup information" and "not a record." Produced incomplete records, limited to some blocked users.

[28] Refused: claimed social media account information does not belong to the college.

[29] Refused: claimed producing records would amount to "creating" a document.

App.309

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Off | Medium | Strong | | | | |
| Cuyahoga Comm'ty College | OH | Yes | Off | | | No | 0 | 12 | 2 |
| University of Oklahoma | OK | Yes | | Medium | | Yes | 1 | 543 | 18 |
| Oklahoma State University | OK | Yes | | Medium | | Yes | 8 | 189 | 39 |
| University of Central Oklahoma[30] | OK | No | | | | | | | |
| Tulsa Comm'ty College | OK | Yes | | | Strong | No | 0 | 1 | 0 |
| Oklahoma City Comm'ty College | OK | Yes | Off | | | No | 0 | 12 | 1 |
| Portland State University[31] | OR | Yes | | | Strong | Yes | 9 | 17 | 883 |
| Oregon State University | OR | Yes | Off | | | No | 0 | 0 | 0 |
| University of Oregon | OR | Yes | | | Strong | Yes | 96 | 99 | 0 |
| Portland Comm'ty College | OR | Yes | | Medium | | Yes | 10 | 11 | 0 |
| Chemeketa Comm'ty College | OR | Yes | Off | | | No | 0 | 4 | 0 |
| Comm'ty College of Allegheny County | PA | Yes | | | Strong | No | 0 | 1 | 0 |
| Harrisburg Area Comm'ty College | PA | Yes | Off | | | No | 0 | 3 | 16 |
| Rhode Island College | RI | Yes | Off | | | No | 0 | 22 | 5 |
| University of Rhode Island | RI | Yes | Off | | | No | 0 | 0 | 3 |
| Comm'ty College of Rhode Island | RI | Yes | | | Strong | | | 11 | 1 |
| Clemson University | SC | Yes | | | Strong | Yes | 44 | 48 | 5 |
| College of Charleston | SC | Yes | | Medium | | No | 0 | 0 | 0 |
| Coastal Carolina University | SC | Yes | | Medium | | No | 0 | 20 | 5 |
| Trident Technical College | SC | Yes | | Medium | | No | 0 | 28 | 2 |
| Greenville Technical College | SC | Yes | | Medium | | No | 0 | 12 | 5 |
| South Dakota State University | SD | Yes | | | Strong | No | 0 | 20 | 1 |
| University of South Dakota | SD | Yes | | | Strong | No | 0 | 7 | 3 |
| Black Hills State University | SD | Yes | Off | | | No | 0 | 21 | 1 |
| Southeast Technical Institute | SD | Yes | Off | | | No | 0 | 5 | 1 |
| Lake Area Technical Institute | SD | Yes | | Medium | | No | 0 | 4 | 2 |
| University of Texas, Austin | TX | Yes | | Medium | | Yes | 1 | 18 | 40 |
| University of Texas, Arlington | TX | Yes | Off | | | No | 0 | 4 | 3 |
| Texas A&M University[32] | TX | Yes | | Medium | | Yes | 31 | | 82 |
| Lone Star College System | TX | Yes | | Medium | | Yes | 3 | 3 | 2 |
| Houston Comm'ty College | TX | Yes | | | Strong | No | 0 | 0 | 2 |
| University of Utah | UT | Yes | Off | | | No | 0 | 307 | 17 |
| Utah State University | UT | Yes | | | Strong | Yes | 6 | 20 | 1 |
| Weber State University[33] | UT | No | | | | | | | |
| Snow College | UT | Yes | | Medium | | No | 0 | 0 | 3 |
| Salt Lake Comm'ty College | UT | Yes | | Medium | | No | 0 | 1 | 1 |
| University of Vermont | VT | Yes | Off | | | No | 0 | 8 | 13 |
| Castleton State College | VT | Yes | | | Strong | Yes | 6 | 8 | 7 |

[30] Produced incomplete records.

[31] First requested $1,331.18 for records. Ultimately charged $49.76 to provide a list with all individuals' names redacted.

[32] Refused to produce records identifying who is blocked from the university's Facebook page, as that issue was then being litigated.

[33] Refused: claimed producing records would "require us to create a custom record" and was not required to produce a record that "does not already exist."

**App.310**

| Name | State | Response | Profanity Filter | | | Custom Blacklist | | Blocked Users | |
|---|---|---|---|---|---|---|---|---|---|
| Northern Vermont University, Johnson | VT | Yes | Off | | | No | 0 | 10 | 0 |
| Comm'ty College of Vermont | VT | Yes | | Medium | | No | 0 | 4 | 10 |
| Vermont Technical College | VT | Yes | | Medium | | No | 0 | 8 | 0 |
| University of Washington | WA | Yes | | Medium | | Yes | 31 | 1162 | 64 |
| Washington State University | WA | Yes | | | Strong | Yes | 4 | 0 | 0 |
| Bellevue College | WA | Yes | | | Strong | No | 0 | 1 | 0 |
| Everett Comm'ty College | WA | Yes | | Medium | | No | 0 | 12 | 17 |
| Edmonds Comm'ty College | WA | Yes | | Medium | | Yes | 6 | 3 | 44 |
| University of Wisconsin, Milwaukee | WI | Yes | | | Strong | Yes | 8 | 7 | 62 |
| University of Wisconsin, Oshkosh | WI | Yes | | Medium | | No | 0 | 6 | 11 |
| University of Wisconsin, Madison | WI | Yes | | | Strong | No | 0 | 0 | 0 |
| Madison Area Technical College | WI | Yes | | | Strong | Yes | 3 | 0 | 0 |
| Milwaukee Area Technical College | WI | Yes | | | Strong | No | 0 | 5 | 5 |
| West Virginia University | WV | Yes | | | Strong | Yes | 25 | 0 | 0 |
| Marshall University | WV | Yes | | Medium | | No | 0 | 13 | 11 |
| Fairmont State University | WV | Yes | Off | | | No | 0 | 8 | 1 |
| Blue Ridge Comm'ty and Technical College | WV | Yes | | | Strong | Yes | 731 | 0 | 0 |
| Pierpont Comm'ty and Technical College | WV | Yes | | | Strong | No | 0 | 0 | 0 |
| University of Wyoming | WY | Yes | Off | | | No | 0 | 33 | 1 |
| Laramie County Comm'ty College | WY | Yes | | Medium | | No | 0 | 1 | 7 |
| Sheridan College | WY | Yes | Off | | | No | 0 | 0 | 0 |
| University of the District of Columbia | DC | Yes | | | Strong | No | 0 | 7 | 12 |

**App.311**

# Appendix B:

## Exceptions to Survey Methodology

The survey sought to cover two sets of institutions within each state, plus the District of Columbia: the three four-year institutions with the highest enrollment and the two two-year institutions with the highest enrollment. This would amount to 255 institutions, but not every state has qualifying institutions, some states' public records laws do not extend to those institutions, and some institutions cannot be surveyed due to a legal conflict. What follows is a list of states or institutions falling under an exception or conflict:

- **Arkansas:** Public records law limited to citizens of Arkansas. (-5 institutions).

- **California:** East Los Angeles College could not be contacted due to litigation conflict. Replaced by American River College.

- **Delaware:**

- Only two four-year institutions, and only one two-year institution qualified. (-2 institutions).

- The qualifying four-year institutions (Delaware State University and the University of Delaware) are largely exempt from Delaware's public records law. (-2 institutions).

- **Iowa:** Iowa State University could not be contacted due to litigation conflict. Cannot be replaced by another four-year institution because there are only three public four-year institutions in Iowa. (-1 institution).

- **Louisiana:** Louisiana State University could not be contacted due to litigation conflict. Replaced by Louisiana Tech.

- **New Jersey:** Rutgers University could not be contacted due to possibility of litigation conflict. Replaced with Rowan University.

- **Pennsylvania:** The Right to Know law largely exempts four-year institutions, but does not exempt two-year institutions. (-3 institutions).

- **Rhode Island:**

- The Naval War College was not surveyed because its relationship with the armed services may change the First Amendment calculus. It was not replaced because there are only three, four-year institutions in the state. (-1 institution).

- Rhode Island only has one two-year institution. (-1 institution).

- **South Carolina:** The University of South Carolina could not be surveyed due to litigation conflict. Replaced by Coastal Carolina University.

- **Tennessee:** FOIA limited to citizens of Tennessee. (-5 institutions).

- **Virginia:** FOIA limited to citizens of Virginia. (-5 institutions).

- **Washington, D.C.:**

- There's only one public, four-year institution in Washington, D.C., that is not affiliated with the military. (-2 institutions).

- There are no public two-year institutions. (-2 institutions).

- **Wyoming:** There is only one public, four-year institution. (-2 institutions).

# Appendix C:

**The following is a lightly edited version of the request sent to Michigan State University:**
This is a request for records pursuant to the Michigan Freedom of Information Act (Mich. Comp. Laws Ann. §§ 15.231 et seq.). If you are not the records custodian for MSU, please identify the correct person to contact.

This request seeks records relating to restrictions and settings concerning the official Facebook and Twitter accounts for MSU, and should be directed to the person responsible for operating those accounts.

## RECORDS REQUESTED

I request the following records:

**1.**. A copy of the settings for the Facebook page maintained by Michigan State University (available at https://www.facebook.com/spartans.msu). This list is accessible by (A) logging into the Facebook page as an administrator, and then (B) clicking "Settings" at the top of the official page. The URL should look like: https://www.facebook.com/spartans.msu/settings/?tab=settings.

**2.**. A copy of the list of people or pages banned from the Facebook page referenced above. This list is accessible by: (A) logging into the Facebook page as an administrator, (B) clicking "Settings" at the top of the official page, (C) clicking "People and Other Pages" in the left column, and (D) selecting "Banned People and Pages" from the drop-down menu. The final URL should look like: https://www.facebook.com/spartans.msu/settings/?tab=people_and_other_pages.

**3.**. A list of the "blocked accounts" by the Twitter account maintained by Michigan State University (available at https://twitter.com/michiganstateu). This list is accessible by navigating to this URL while logged into the account: https://twitter.com/settings/blocked.

**Fee waiver request:** This request concerns a matter of public interest. The social media restrictions imposed by public institutions and officials — including the president, governors, and public universities — have been challenged on First Amendment grounds. This survey seeks to explore the extent to which public colleges and universities have similar restrictions.

The public interest would be well-served by granting a fee waiver. The request is not being sought for a commercial purpose, but is instead sought by a nonprofit organization to provide the public with information concerning the conduct of government actors as that conduct pertains to civil liberties in higher education.

If a fee waiver is not granted, please apprise me if the estimated costs will exceed $10.

**Request for expedited processing:** Completion of this survey depends on the institution with the slowest response time. We request that Michigan State University produce responsive records on an expedited basis. As you may be aware, a public body has five business days to respond. (Mich. Comp. Laws. Ann § 15.235(2)).

**Appeal information:** If you deny any portion, or all, of this request, please provide me with a written explanation of the reason(s) for your denial, including a citation to each specific statutory exemption you believe justifies the refusal to release the information and notify me of the appeal procedures available to me under the law. If you conclude that portions of the records that I request are exempt from disclosure, please release the remainder of such records for inspection and

**App.313**

# Appendix D:

## Customized Blocked Words

The surveyed institutions blocked the following unique words using Facebook's customizable blacklist. Duplicates were removed.

| | | |
|---|---|---|
| 100 | appleguru | assrammer |
| 9/11 | applelovers | asswipe |
| 9-11 | applemusiclist | asswipes |
| :)) | apps | attention |
| @$$ | aramark | auto |
| #cocksoutforharambe | areola | awaay |
| #dicksoutforharambe | areole | awayy |
| ←-- ♥ us ♥ | arian | ayir |
| 👌 | arrrrr | azazel |
| $ | arschloch | azz |
| $hit | arse | azzhole |
| 2's!!! | artificially generated stampede | b-s |
| 2004toyota 4runner | awareness foundation | b!+ch |
| 5g | aryan | b!tch |
| 5t | ash0le | b*tch |
| a$$ | asholes | b00bs |
| a55 | asl | b17ch |
| a55hole | asla | b1tch |
| abcreports | ass | b1tches |
| abuse | ass hole | babe |
| abusers | ass monkey | babes |
| accident | assault | baboon |
| aeolus | assbang | bad |
| africant | assbanged | balloon |
| aggy | assbangs | balloonsblow |
| agsaf | asses | balls |
| ahole | assface | ballsack |
| ahuja | assfuck | baloons |
| alert | assfucker | bammer |
| amazing | assh0le | bammers |
| amcik | assh0lez | ban |
| ame law | asshat | bang |
| americanadvantagelawgroup@ | assho1e | banger |
| lawyer.com | asshoel | banned |
| anal | asshole | barf |
| analprobe | assholery | bart |
| andskota | assholes | bassterds |
| anilingus | assholz | bastard |
| annoying | asskisser | bastards |
| anthem | asslick | bastardz |
| anus | asslicker | basterds |
| apartment | asslickers | basterdz |
| apologize | asslicks | bawdy |
| apple | assmaster | bdsm |
| | assmunch | beaner |

| | | | | |
|---|---|---|---|---|
| bearded clam | bloody | browntown | call | cntz |
| beardedclam | blow | bruins | camel jockey | cobia |
| beastial | blow job | bs | camelfucker | cocain |
| beastiality | blowjob | buceta | cameljockey | cocaine |
| beastility | blowjobs | bucket bull bullshit | cameltoe | cock |
| beat-off | blue waffle | bug | cancel | cock sucker |
| beatch | bod | bugger | canceled | cock-head |
| beater | bodily | bukkake | cancelled | cock-sucker |
| beating beat sucking | boffing | bull shit | cannooot | cock-sucking |
| beating-off | boink | bull-shit | canoe | cockblock |
| beatoff | boiolas | bullsh*t | carpet muncher | cockhead |
| beaver | bollock | bullshit | carpetmuncher | cockholster |
| beavers | bollocks | bullshits | cashcars | cockknocker |
| beavs | bollok | bullshitted | cawk | cocks |
| beecher | bone | bullturds | cawks | cocksauce |
| beer | boned | bullying | cazzo | cocksmoker |
| beeyotch | bonehead | bum | centsy | cocksoutforharambe |
| before | boner | bung | cervix | cocksuck |
| believee | boners | bung hole | change org | cocksucked |
| belly whacker | bong | burt | cheap | cocksucker |
| beotch | boob | business | check this out | cocksucking |
| bernie | boobies | busty | chegg | cocksucks |
| bert | boobs | butch | chicken | coital |
| bestial | booby | butt | chickens | col |
| bestiality | booger | butt breath | chilango | col. |
| bfd | bookie | butt fuck | chinc | col. reb |
| bi+ch | boomer | butt-pirate | chincs | colonel mascot |
| bi7ch | boomer sooner | buttface | chink | commie |
| biatch | bootee | buttfuck | chode | condom |
| biche | bootie | buttfucker | chodes | coochi |
| big beoyotch | booty | butthead | chola | coon |
| big tits | booze | butthole | cholo | coons |
| bigleaguepolitics.com | boozer | butthurt | chraa | cooter |
| bigtits | boozy | button | chuj | corksucker |
| bimbo | bort | buttpicker | cialis | cost-free |
| bing | bosom | buttplug | cipa | couch burning |
| bings | bosomy | buttwipe | circle jerk | coug |
| birds | boss | buy online | citylife | cougars |
| birt | bowel | byob | cl1t | cougs |
| bitcard | bowels | bytch | class | cowfuck |
| bitch | boycott | c-0-c-k | cleared | cowfucker |
| bitchass | bra | c-o-c-k | click on advertisement | cowfuckers |
| bitched | brassiere | c-u-n-t | climax | crabs |
| bitcher | breast | c.0.c.k | clinton | crack |
| bitchers | breasts | c.o.c.k. | clit | cracker |
| bitches | britney sprays video | c.u.n.t | clitoris | crackwhore |
| bitchin | broken | c0ck | clitorus | crap |
| bitching | brokenn | c0cks | clits | crappy |
| bitchs | brokeon | c0k | clittie | crash |
| bitchy | brokken | ca-ca | clitty | crs |
| blizzard | brother dean | cabron | close | cruel |
| blocked | brown eye | caca | closed | csc |
| blondehot videos | browneye | cahone | cnts | cuck |

**App.315**

cuckservative
cum
cum stain
cumdumpster
cummer
cummin
cumming
cums
cumshot
cumshots
cumslut
cumstain
cunilingus
cunillingus
cunnilingus
cunny
cunt
cuntface
cunthunter
cuntlick
cuntlicker
cuntlicking
cuntpunch
cuntpuncher
cunts
cuntsucker
cunty
cuntz
cya
cyberfuc
cyberfuck
cyberfucked
cyberfucker
cyberfuckers
cyberfucking
d's
d0ng
d0uch3
d0uche
d1ck
d1ld0
d1ldo
d4mn
dago
dagos
damage
dammit
damn
damned
damnit
dangerous
dawgie-style
daygo

death
deez
defriended
dego
delay
derka
deserve youtube
deviant
diaper double d
dic
dick
dick-ish
dickbag
dickdipper
dickface
dickflipper
dickhead
dickheads
dickish
dickless
dickripper
dicks
dicksipper
dickwad
dickweed
dickwhipper
dickzipper
diddle
die
dies
dike
dild0
dild0s
dildo
dildos
diligaf
dilld0
dilld0s
dillweed
dilweed
dimwit
dingle
dingleberry
dining services
dink
dinks
dipship
dipshit
dirsa
disckwad
discount
disgrace
diversity room

dkendrick
doggie dirty sanchez
doggie-style
doggy style
doggy-style
doingg
doinng
dominatricks
dominatrics
dominatrix
dong
doofus
doosh
dope
dopey
dotard
douch3
douche
douche bag
douchebag
douchebags
douchecanoe
douches
douchey
drive
drumpf
drunk
ducks
dumass
dumbass
dumbasses
dummy
dupa
durka
dyke
dykes
dyko
dziwka
eff
effin
effs
ejakulate
ejactulated
ejaculate
ejaculates
ejaculating
ejaculatings
ejaculation
ejakulate
ekrem
ekto
embarassing
embarrassing

emergency
enculer
enema
enlargement
enter to win
erect
erection
erotic
error
esad
essohbee
extacy
extasy
f u c k
f-u-c-k
f.u.c.k
f**cking
f**k
f**king
f*cking< f*ck
facebook.com
fack
faen
fag
fag1t
faget
fagg
fagg1t
fagged
fagget
fagging
faggit
faggot
faggots
faggott
faggotty
faggoty
faggs
faggy
fagit
fagot
fagots
fags
fagz
faig
faigs
faigt
fail state
failstate
fairy
fanculo
fanny
fannybandit

fart
farted
farting
fartknocker
farts
farty
fat
fat fatass
fatso
fcuk
feces
feck
feg
felatio
felch
felcher
felching
fellate
fellatio
feltch
feltcher
feltching
feminazi
ficken
filthy
fingerfuck
fingerfucked
fingerfucker
fingerfuckers
fingerfucking
fingerfucks
fire
fishbucket
fisted
fistfuck
fistfucked
fistfucker
fistfuckers
fistfucking
fistfuckings
fistfucks
fisting
fisty
fitt
flange
flikker
flipping bird
floozy
foad
foag
fondle
foobar
food

**App.316**

forefreedelivered
foreskin
fotze
fournier
free
freee
freeed
freeee
freex
friedcatz
frigg
frigga
fu
fu(
fu*k
fubar
fuck
fuck-tard
fuckass
fucked
fucker
fuckers
fuckface
fuckin
fucking
fuckings
fuckme
fucknugget
fucknut
fucko
fuckoff
fuckos
fucks
fucktard
fuckup
fuckwad
fuckwit
fudge packer
fudge-packer
fudge-packing
fudgepacker
fudgepacking
fuk
fukah
fuken
fuker
fukin
fukk
fukkah
fukken
fukker
fukkin
fuks

furburger
fuskies
futkretzn
fux0r
fvck
fxck
g-spot
g00k
gae
gag reflex
gai
gamesplaystoplay.co.cc
gamesplaytoplay
gangbang
gangbanged
gangbanger
gangbangers
gangbangs
ganja
gay
gay sex
gayboy
gayest
gaygirl
gays
gaysex
gayz
gazongers
gey
gfy
ghay
ghey
giftcard
gigolo
gina
gink
giving
givingg
givng
givving
glans
glitch
glitching
glory god goddamn
goatse
God damn
God Goddamn
god-damned
godamn
godamnit
goddam
goddammit
goddamn

goldenshower
gonad
gonads
goo.gl
gook
gooks
gooo
g0p
gorilla
gorillalivesmatter
gorunner
gov
govgrantmoney
goyfa
grades
greaser
greee
grinder
gringo
grooniu
grooniu?zcgshpndpzruqjcyurch
groonsiu
gspot
gtfo
guido
guiena
guinne
gypsies
gypsy
h.c.c.
h00r
h0ar
h0m0
h0mo
h0r
h0re
h4x0r
haaha
haha
hahahahha
hahatodayfbs.net.tc
hair
hand fudge packer
hand-job
handjob
harambe
harambe!
harass
hard on
hardcoresex
hardee
harmbe
haughwout

**App.317**

haunt
hcc
he11
hebe
heeb
heil
heimey
hell
hells
helme
helvete
hemp
heree
heroin
herp
herpes
herpy
hershey highway
hey
hey there university
hick
hicks
hiddenpicz
hillary
himey
hitler
hiv
hoar
hobag
hoer
holocaust
hom0
homey
homo
homoey
homophobic
homos
honkey
honkie
honky
hooch
hood rat
hoodrat
hook
hookah
hookem
hooker
hoor
hoore
hootch
hooter
hooters
hore

horniest
horny
horrendous
horseshit
hotsex
housatonic
houston   community
college
http
http://apps.facebook.
com
https
h t t p s : / /
s o u n d c l o u d . c o m /
allnentertainmentt
huevon
hui
hump
humped
humping
hurry
hussy
hymen
i padds
i-paaaad
i-paaaadd
i-paaadd
ice
icrazy
idiocy
idiot
idiots
ifree
igiveaway
iipaaaad
iipaaaadd
iipaaaaddd
iipaaaadddtwos
iipaaaaddtwos
iipaaad
iipaaadd
iipaaadd2s
iipaaaddtwo's
iipaad
iipad
iipad 2's
iipad2
iipad2s
iipad2ss
iipads
iipads2
iippaaaaad2
ike likeeeeee

illuminati
im
inbred
incest
injun
insurance
intercourse
ipaaaad
ipaaad
ipaaad twooooosss
ipaaadd
ipaaadd2
ipaaaddd
ipaad
ipaad2
ipaad2's
ipaads
ipad
ipad2
ipad2entry
ipad2s
ipadd
ipads
ipadss
iphon5
iphone
iphone 5
iphone5
iphones
ippaaaadtwoo
ippaad
ippad
ippads
iq
iq score
irresponsible
isis
j3rk0ff
jack
jack off
jack-off
jackass
jackhole
jacking jackoff
jackoff
jambo
jap
japs
jerk
jerk jerkoff
jerk-off
jerk0ff
jerked

jerkoff
jersey
jersey store
jetblue
jewpidily
jigaboo
jihad
jisim
jism
jiss
jiz
jizm
jizz
jizzed
junkie
junky
k e r
kaffer
kaffir
kanker
kawk
kido
kike
kikes
kill
killary
kills
kinky
kkk
klan
klootzak
kma
kmia
knijnenburg
knob
knob end
knobend
knobs
knobz
knulle
Kock
kondum
kondums
kony
kooch
kooches
kootch
kracker
kraut
kuk
kuksuger
kum
kummer

kumming
kums
kunilingus
kunt
kunts
kuntz
kurac
kurwa
kusi
kyke
kyrpa
l3i+ch
l3itch
laate
lab
labia
lame
lampshade
late
latee
lech
leper
leppo
lesbian
lesbians
lesbo
lesbos
lez
lezbian
lezbians
lezbo
lezbos
lezzian
lezzie
lezzies
lezzy
libtard
libtards
life
like
like pls. :)
linthead
lipshits
lipshitz
listofapples
lmao
lmbo
lmfao
loin
loins
lube
lucky
lusty

**App.318**

| | | | | |
|---|---|---|---|---|
| m-fucking | motehrfucking | napalm | oral | peenus |
| Mafucka | motha mother-fucker | nappy | orally | peepee |
| mamhoon | mothafuck | nastt | orangeman | peinus |
| mams | mothafucka | naugatuck | organ | pen1s |
| manigger | mothafuckas | nazi | orgasim | penas |
| marijuana | mothafuckaz | nazis | orgasims | penetrate |
| masochits | mothafucked | nazism | orgasm | penetration |
| masokist | mothafucker | neel | orgasmic | penial |
| massa | mothafuckers | negro | orgasms | penile |
| massterbait | mothafuckin | negroes | orgasum | penis |
| masstrbait | mothafucking | nepesaurio | orgies | penis-breath |
| masstrbate | mothafuckings | ner | orgy | penises |
| masterbaiter | mothafucks | newinbox | oriface | penus |
| masterbat | mother fucker | news | orifice | penuus |
| masterbat3 | motherfuck | newsfeedz | orifiss | perse |
| masterbate | motherfucka | newzfeed | orospu | perversion |
| masterbates | motherfucked | nfw | ou | peta |
| masterbating | motherfucker | nice share | ovary | petition |
| masterbation | motherfuckers | nig | ovum | peyote |
| masturbat | motherfuckin | nigga | ovums | phalli |
| masturbate | motherfucking | niggah | p.u.s.s.y. | phallic |
| masturbating | motherfuckings | niggas | p0rn | phone phonesex |
| masturbation | motherfucks | niggaz | packi | phuc |
| maxi | motos | nigger | packie | phuck |
| md | motss | niggers | packing | phuk |
| mears | mouliewop | niggle | packy | phuked |
| menses | mountainqueer | niggs | pad | phuker |
| menstruate | mountainqueers | night | paddy | phuking |
| menstruation | ms | niglet | page | phukked |
| merd | msu dining | nigs | pagee | phukker |
| merde | mtherfucker | nigur | paki | phukking |
| messing | mthrfucker | niiger | pakie | phuks |
| messng | mthrfucking | niigr | paky | phuq |
| messsin | muff | nike | pantie | picka |
| messsing | muffdiver | nimrod | panties | picture |
| meth | muie | ninny | panty | pierdol |
| mexcrement | mulkku | nipple | park | piicture |
| mexican't | murder | nobama | parking | pillow biter |
| mexicant | muschi | nooky | partyvid | pillow-biter |
| mibun | mutha n1gr | notmanyleft | paska | pillowbiter |
| mick | muthafuckaz | nowayjoesez | pastie | pillu |
| middlesex | muthafucker | nutsack | pasty | pimmel |
| migger | mutherfucker | nutz | pcp | pimp |
| minee | mutherfucking | nvcc | pecker | pimpis |
| mofo | muthrfucking | nympho | pedo | pinko |
| molest | my erotic videoos | odumbo | pedobear | piss |
| money | myn | offer | pedophile | piss-off |
| monkleigh | myne | omg | pedophilia | pissed |
| moolie | n'er | oout | pedophiliac | pissers |
| moron | nad | open | pedos | pisses |
| morons | nads | opiate | pee | pissin |
| moshky | nagur | opium | peeenus | pissing |
| moss | naked | orafis | peeenuss | pissoff |

<div align="center">**App.319**</div>

| | | | | |
|---|---|---|---|---|
| pissrr | puta | rofll | semen | silent sam |
| pita | puto | roflmao | senators | sissy |
| pizda | puuke | rotflmaotid | sendng | site |
| pjaavpietrab | puuker | rotflolapmp | sex | sitee |
| pledge | qahbeh | rtard | sexual | skag |
| plow | queaf | rtfm | sexy | skanck |
| plssss | queef | rtwfq | sh!+ | skank |
| plug | queefs | rum | sh!t | skankee |
| pmp | queer | rump | sh*t | skankey |
| pms | queero | rumprammer | sh1t | skanks |
| polac | queers | ruski | sh1ter | skanky |
| polack | queerz | s hit | sh1ts | skeet |
| polak | quicky | s-h-1-t | sh1tter | skittle |
| pollock | quim | s-h-i-t | sh1tz | skittles |
| poon | qweers | s-o-b | shamedame | skrib |
| poonani | qweerz | s.h.i.t. | sharmuta | skype |
| poontang | qweir | s.o.b | sharmute | skypes |
| poontsee | r-tard | s.o.b. | sheister | slags |
| poop | racy | s0b | shemale | slave |
| poor | rag head | sadism | shi+ | sleaze |
| porn | raghead | sadist | shipal | sleazy |
| porno | ragheads | sale | shit | slip |
| pornography | rape | sales | shit face | slut |
| pos | rapeculture | sandnigger | shite | slutdumper |
| pot | raped | scag | shiteater | slutkiss |
| potty | raper | scank | shited | sluts |
| ppictureeee | rapist | scantily | shitface | slutty |
| ppiicctureeee | rapists | scared | shitfucker | smart |
| pr0n | raunch | scat | shitfull | smegma |
| pr1c | rautenberg | schaffer | shithead | smut |
| pr1ck | really | scheiss | shithold | smuts |
| pr1k | rebel | schizo | shithole | smutty |
| preteen | recieved | schlampe | shithouse | snatch |
| prick | recktum | schlong | shiting | snigger |
| pricks | rectal | schmuck | shitings | sniper |
| prig | rectum | screw | shits | snow |
| profile | rectus | screwed | shitshow | snowflake |
| prostitute | redneck | screwin | shitt | snowflakes |
| prude | rednecks | screwing | shitted | snuff |
| pube | reefer | scrog | shitter | sodom |
| pubic | reetard | scrot | shitters | sol |
| pubis | reich | scrote | shittin | son-of-a-bitch |
| pula | republican | scrotum | shitting | sooners |
| pule | resign | scrud | shittings | sorry |
| punkass | retard | scrwing | shitty | souse |
| punky | retarded | scum | shity | soused |
| puss | retards | seaman | shitz | sperm |
| pusse | revue | seamen | shiz | spic |
| pussee | rim-job | seduce | shot | spick |
| pussies | rimjob | seks | shyt | spik |
| pussy | rimming | self | shyte | spiks |
| pussypounder | ritard | sell | shytty | splooge |
| pussys | roads | selling | shyty | spooge |

**App.320**

| | | | | |
|---|---|---|---|---|
| sprays | titslut | urine | weewee | zcgshpndpzruqjcyurch |
| spraysvideo!!!!.. | titt | uterus | weiner | zeeb |
| spunk | tittiefucker | uyuo | weirdo | zigaboo |
| stalker | titties | uzi | wench | zoophile |
| steamy | titty | v1agra | weree | |
| stfu | tittyfuck | va1jina | wetback | |
| stiffy | tittyfucker | vag | wh00r | |
| stoned | toe | vag1na | wh0re | |
| street | toke | vagiina | wh0reface | |
| strip | tomorrow | vagina | whack titties | |
| stroke | toots | vaginas | whack-off | |
| stupid | top10 unviersities | vaj1na | whatt | |
| suck | tosser | vajina | whipping | |
| sucked | towel-head | valium | white boy | |
| sucking | towelhead | viagra | whitey | |
| sucks | towhead | victoria's secret | whiz | |
| sucky | tragedy | video watch | whoar | |
| sumofabiatch | tramp | video!!!! | whoralicious | |
| sumshots | trannsy | videoo | whore | |
| sutz | tranny | videooo | whorealicious | |
| t1t | transsexual | videoooo | whored | |
| taint | trashy | videooooo | whoreface | |
| tampon | trevillian | videos pls | whorehopper | |
| tard | truck | virgin | whorehouse | |
| tards | truebloodx | vixen | whores | |
| tawdry | trump | vodka | whoring | |
| teabagging | trumptards | vomit | wigger | |
| teat | tubgirl | voyeur | womb | |
| teets | turd | vulgar | woody | |
| teez | turtle | vullva | wop | |
| terd | turtles | vulva | wowreallly | |
| terrible | tush | vvideoo | wtf | |
| terroists | twat | vviideoo | wtfiyp | |
| terrorism | twats | w00se | wth | |
| terrorist | twink | w0p | wut | |
| teste | two | wad | www.bruinslist.com | |
| testee | two's | walkways | www.bruinspokerclub. | |
| testes | twoo's | wang | com | |
| testical | twoos. | wank | x-rated | |
| testicle | twos!! | wanker | xrated | |
| testis | ugly | watt | xxx | |
| the colonel | um | wazoo | xxxx | |
| theyre | umm | weathe | yabbo | |
| thisi | ummm | web | yabbos | |
| thiss | ummmm | webpage | yahoo | |
| thisss | undies | webpagee | yahoos | |
| thrust | undrgrndsound | website is messing up | yaun | |
| thug | university of oklahoma | right now | ybya | |
| tinkle | unwed | websitee | ybysa | |
| tit | up | wedgie | yeasty | |
| titfuck | update | weeabo | ykyarw | |
| titi | upp | weed | yobbo | |
| tits | urinal | weenie | you | |

**App.321**



**510 Walnut Street, Suite 1250**
**Philadelphia, PA 19106**
T: **215.717.3473**   F: **215.717.3440**
**www.thefire.org**

 @thefireorg

# Exhibit 9



↗ OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/)   Quicklinks / Search

**APPLY(HTTPS://GO.OKSTATE.EDU/APPLY/)**

STUDENT
# AFFAIRS(/)

WHO WE ARE(/WHO-WE-ARE/INDEX.HTML)     STUDENTS(/STUDENTS/INDEX.HTML)     STRATEGIC PLANNING ⌄

GIVE(/GIVE/INDEX.HTML)     INFO FOR ⌄

Student Affairs(https://studentaffairs.okstate.edu/)  /  Students(https://studentaffairs.okstate.edu/students/)  /
Bias Incident Response(bias-incident-response.html)

# Oklahoma State Bias Incident Response

Oklahoma State University respects and values the diversity of individual beliefs and opinions. The Bias Incident Response Team aims to support individuals that have experienced a bias incident.

# What is bias?

Bias is a disproportionate weight in favor of or against an idea or thing, usually in a way that is closed-minded, prejudicial, or unfair.  Biases can be innate or learned. People may develop biases for or against an individual, a group, or a belief.

# What is bias incident?

A bias incident involves actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics.

The University urges anyone who has experienced or witnessed a bias incident to report it.

**REPORT HERE (HTTPS://CM.MAXIENT.COM/REPORTINGFORM.PHP? OKLAHOMASTATEUNIV&LAYOUT_ID=20)**

## Contact

**Office of Vice President for Student Affairs** **(/who-we-are/index.html)**
201 Whitehurst Oklahoma State University
Stillwater, OK 74078
**(405) 744-5328(tel:4057445328)**
**vpsao@okstate.edu(mailto:vpsao@okstate.edu)**

For all reports containing contact information, a member of the Bias Incident Response Team will contact the reporting person and if desired, offer a meeting to discuss the incident in detail to explore a plan for resolution. During this meeting, the reporting person can expect to obtain information about related University policies, procedures, and resources.

The Bias Response Team will:
•     Review all reports with due diligence
•     Create a space for students/employees to process their experiences
•     Aim to reassure students or employees that their feelings are valid
•     Ensure reported bias incidents are properly recorded so that they may assess the campus climate on an ongoing basis
•     Coach students/employees through difficult conversations and/or written correspondence
•     Provide follow-up training and educational opportunities
•     Collaborate with the reporter to explore options for informal resolution

The Bias Incident Response Team is not an investigative or disciplinary body. The committee will brainstorm viable solutions to all incidents. Suggestions for redress made by the reporter will be considered to the fullest extent of the committee's authority. In the case where disciplinary or corrective action is a possibility the reporter will be referred to Human Resources or Student Conduct. The Bias Incident Response Team will receive incoming reports to review for action steps necessary on the information submitted. Extended team members will listen to students and employees concerns, offer resources, and assist in responding to the concerns.

To talk to someone about the team please contact:
•     **Aleigha Mariott(mailto:aleigh.marriot@okstate.edu)**, Ph.D. Director of Student Support & Conduct, **(405) 744-5470(tel:4057445470)**
•     **Clyde Wilson(mailto:clyde.wilson@okstate.edu)**, Ph.D. Assistant Vice President/Director of TRIO programs, **(405) 744-5288(tel:4057445288)**
•     **Jackson Landrum(mailto:jackson.landrum@okstate.edu)**, Director of Equal Opportunity, **(405) 744-9153(tel:4057449153)**

# STUDENT AFFAIRS

## Follow US

**News** | **Events** | **Newsletter Signup**
**Social Media Directory (https://social.okstate.edu)**

**(https://www.facebook.com/pages/Oklahoma-State-University/39013362306)**



**Office of Vice President for Student Affairs (/)**

201 Whitehurst
Oklahoma State University
Stillwater, OK 74078
**(map) (https://map.okstate.edu/? id=1842#!m/522177)**
**(405) 744-5328 (tel:4057445328)** |
**Contact Us (mailto:vpsao@okstate.edu? subject=)**

---

 **(Https://Go.okstate.edu/)**   ↗ **OKLAHOMA STATE UNIVERSITY(HTTPS://GO.OKSTATE.EDU/)**

**Campus & Parking Maps     All OSU Institutions     Careers @ OSU     Hire OSU Grads**

©(Https://A.cms.omniupdate.com/11/?Skin=Okstate&Account=Okstate&Site=Studentaffairs-V2&Action=De&Path=/Students/Bias-Incident-Response.pcf) 2023 Oklahoma State University. All rights reserved.

Accessibility  |  Campus Safety  |  Diversity  |  EEO Statement  |  Ethics Point  |  Privacy Notice  |  Terms Of Service  |  Trademarks

**App.326**

# Exhibit 10



# Bias Incident Report

Oklahoma State University respects and values the diversity of individual beliefs and opinions. The University urges anyone who has experienced or witnessed a bias incident to report it.

Do not use this form to report events presenting an immediate threat to life or property. Reports submitted through this form may not receive an immediate response. If you require emergency assistance, please contact the police by dialing 911.

You can submit this report anonymously but understand that this could limit the university's ability to respond to the reported concerns. For all reports containing contact information, a member of the Bias Incident Response Team will contact the reporting person and if desired, offer a meeting to discuss the incident in detail to explore a plan for resolution. During this meeting, the reporting person can expect to obtain information about related University policies, procedures, and resources.

The Bias Incident Response Team is not an investigative or disciplinary body. The committee will brainstorm viable solutions to all incidents. Suggestions for redress made by the reporter will be considered to the fullest extent of the committee's authority. In the case where disciplinary or corrective action is a possibility, the reporter will be referred to Human Resources or Student Conduct.

## Background Information

Enable additional features by logging in. ☐ (https://cm.maxient.com/reportingform.php?
OklahomaStateUniv&layout_id=20&promptforauth=true)

Your full name:

Your position/title:

Your phone number:

Your email address:

Date of incident (Required):

**App.329**

01/04/2023

Time of incident:

Location of incident (Required):

Please select a location ...

Specific location:

## Involved Parties

Name or Organization

ID Number

Phone number

Email address

**App.330**

**Add another party**

# Report

Nature of the Incident: Again, please check all types of conduct involved in the incident. Please also be sure to fully describe the incident in the section below. (Required)

☐ Comment in Class or Assignment Comment in Person

☐ Comment in Writing

☐ Comment on the Internet/Social Media

☐ Comment via Email

☐ Comment via Text Message

☐ Comment via Phone/Voicemail

☐ Harassment

☐ Hazing

☐ Incorrect name or pronoun usage

☐ Intimidation

☐ Offensive Picture or Image

☐ Physical Assault

☐ Property Damage/Destruction

☐ Pursuit/Chase

☐ Theft of Property

☐ Threat(s)

☐ Vandalism or Graffiti

**App.331**

☐ Verbal Assault

☐ Other

Description/Narrative: Please provide a detailed description of the incident/concern using specific, concise, objective language.  (Required)

Person completing this form: How were you involved?  (Required)

☐ Target of behavior

☐ Witness to the incident

☐ Friend/Family/Partner of the target

☐ University employee

Was the incident reported to a police agency?  (Required)

○ Yes

○ No

## Supporting Documentation

Photos, video, email, and other supporting documents may be attached below. 5GB maximum total size.

**Attachments require time to upload, so please be patient after submitting this**

**App.332**

**form.**

| Choose files to upload | **Choose Files** |
|---|---|

☐ Email me a copy of this report

**Submit report**

Privacy · Terms

**App.333**

# Exhibit 11





**2022**

# FREE SPEECH IN THE CROSSHAIRS:
## BIAS REPORTING ON COLLEGE CAMPUSES

# TABLE OF CONTENTS

**ABOUT SPEECH FIRST**      **2**

**LETTER FROM THE EXECUTIVE DIRECTOR**      **2**

**EXECUTIVE SUMMARY**      **3**

**WHAT ARE BIAS REPORTING SYSTEMS?**      **5**

**THE DANGERS OF BRSs**      **6**

**METHODOLOGY**      **8**

**RESULTS**      **9**

**WHAT CAN BE DONE**      **12**

**APPENDIX OF UNIVERSITIES WITH BRSs**      **15**

**ENDNOTES**      **19**

# ABOUT SPEECH FIRST

Speech First is a membership association of students, parents, faculty, alumni, and concerned citizens committed to restoring the freedom of speech on college campuses through advocacy, education, and litigation. Launched in 2018, Speech First is dedicated to preserving the free and open discourse essential to a comprehensive education and counteracting the increasingly toxic censorship culture on college campuses.

# LETTER FROM THE EXECUTIVE DIRECTOR

Colleges and universities routinely threaten their students' speech rights. Those who fight back are met with open hostility from campus administrators, professors, and peers. As a result, students across campus are often denied the opportunity to express their views in open debate.

One increasingly popular method of quelling campus speech and enforcing ideological uniformity is the adoption of Bias Reporting Systems (BRSs), which schools often create under the guise of "Diversity, Equity, and Inclusion." BRSs actively chill student speech through fear and intimidation. Sadly, the students themselves often anonymously report their peers for alleged infractions. By creating a tattle-tale culture, students are empowered to enforce agendas on others.

I could give you countless examples of brave students who stand up for what they believe in. But the prospect of standing up to a college or university can be overwhelming, expensive, and time-consuming (not to mention awkward, since the student still wants a diploma at the end of the day). That's why many students stay silent.

The prospect of speaking freely looks less daunting when students are supported by like-minded individuals from all over the country and have the partnership and support of an organization with the resources to fight back. That's why Speech First exists. We've created a nationwide community of free speech supporters so that students won't have to go at it alone. We provide support every step of the way: on campus, in the media, and in court.

Speech First is restoring the freedom of speech on college campuses because when students are exposed to different and challenging ideas, they emerge stronger, smarter, and more resilient. That's the point of education, after all. And that's why we're putting colleges and universities on notice that we'll be there whenever they censor, shut down, or unjustly punish speech.

We hope you'll join us.

*Cherise Trump*

Executive Director, Speech First

# EXECUTIVE SUMMARY

Free speech is under attack. Today, higher education is ground zero for testing out dangerous forms of censorship that instill fear, propel viewpoint discrimination, and restrict vital academic discourse.

One increasingly popular tactic is the Bias Reporting System (BRS). These elaborate schemes are designed to silence dissenters, stifle open dialogue, and encourage students to report speech they deem unacceptable. Two federal courts of appeals have already recognized the chilling effect of BRSs. In 2019 the Sixth Circuit stated that BRSs impose an "objective chill" on speech because they "act by way of implicit threat of punishment and intimidation to quell speech."[1] Similarly, in 2020, the Fifth Circuit agreed, stressing that BRSs "represent the clenched fist in the velvet glove of student speech regulation."[2]

This 2022 Report, 'Free Speech in the Crosshairs: Bias Reporting on College Campuses,' is the first comprehensive report covering these issues in nearly five years. Speech First's report provides updated data, trends, and reflections in order to provide new insights into the rapid growth of bias reporting systems.



**456 BIAS REPORTING SYSTEMS**

We evaluated 824 institutions of higher education and found that the **majority** of them (56%) have Bias Reporting Systems. In total, we identified **456 Bias Reporting Systems** (BRSs)[3] at public and private institutions of higher education across the country. Of these, **249** were found in *public* institutions – and **207** in *private* institutions – and 53% of the most egregious forms[4] of BRSs were housed in Diversity, Equity, and Inclusion (DEI) offices.

Before this Report, the primary data available on this issue was the 2017 report from the Foundation for Individual Rights in Education (FIRE),[5] which identified **232 Bias Reporting Systems** (BRSs) on American college campuses. The FIRE report predicted that this number would "grow rapidly."[6] FIRE's prediction turned out to be correct. In this report, Speech First identifies **456 BRSs**, **twice as many** as identified by FIRE just five years ago. Moreover, this report is largely based on information that universities publicly report. It is very likely that some BRSs are not publicized, and so these reporting systems are far more pervasive than we know.

In short, our data shows that Bias Reporting Systems have been spreading rapidly. Our report outlines the scope of this problem and includes an <u>appendix of all the schools we found with identified BRSs</u>.

Tackling BRSs will require some combination of the following:
- *Legal action* – Hold universities accountable for their bad policies in the court of law.
- *Public pressure* – Parents, students, and alumni should inform state and national legislators as well as the media about these free speech concerns on their campuses.
- *Engage alumni and donors* – Donors should demand transparency from the universities they give to.
- *Use state and federal funding to apply pressure* – Tax-payer funded institutions are beholden to the people.
- *Empower students* – Students should know their rights and recognize when those rights are being violated.



"For the people to rule wisely, they must be free to think and speak without fear of reprisal."

James Madison

# WHAT ARE BIAS REPORTING SYSTEMS?

FIRE's 2017 Report defined a bias reporting system 'as any system identified as such, or that provides':[7]

1. a formal or explicit process for or solicitation of
2. reports from students, faculty, staff, or the community
3. concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Bias Reporting Systems are university teams or procedures that are specifically designated to solicit, receive, investigate, and respond to reports of "bias incidents" or other similar speech at their institutions. Typically, BRSs invite students and faculty to report speech that is "biased" on the basis of some protected characteristic such as race, religion, sex, sexual orientation, gender identity/expression, age, disability.[8] Many even include "bias" against someone's "political affiliation."[9]

Students, faculty, and staff who believe they have experienced or witnessed a "bias incident" can usually report the incident to their college or university through an online reporting form. In most of these forms, the reporter can choose to remain anonymous.

BRSs are typically staffed by the university's senior faculty and staff. And some include a police officer on the team itself—a literal speech police.

After receiving a complaint about an alleged "bias incident," the BRS reviews the incident report and will either conduct an "educational intervention"[10] with the accused student or forward the complaint to another university department for further review. Some BRSs maintain a public log of reported bias incidents, sometimes with enough detail that others on campus can deduce who was involved. And virtually all universities claim that these processes are designed to assess the campus climate and monitor "patterns" of hate and bias to help the university improve its trainings, programs, or policies. Students reported to these systems do not know whether or not the university is keeping records—records that could follow them well beyond college and into their professional careers.

The University of Maryland's description of its BRS is emblematic:

> The primary role of the Hate-Bias Response Team is to review hate-bias incidents, to provide appropriate responses based on the nature of the incident and to work collaboratively to provide educational outreach to the campus ... Bias Incident Support Services (BISS) is charged with addressing hate-bias incidents targeting UMD students, faculty and staff. The program responds, educates and reports to the campus community about bias, its impact, as well as protocols related to bias ... [BISS] is committed to holistically addressing hate-bias incidents that target UMD community members by focusing on incident response and support, proactive training and education initiatives, and data collection and distribution ... BISS staff collects and analyzes data related to hate-bias incidents which allows for the evaluation of trends, the assessment of training needs and strategizing of prevention efforts.

Similarly, the University of Tennessee at Knoxville describes its BRS (what it calls the "Bias Education and Response Team," or BERT) as using the following protocol:

> The team members will review incident reports and meet with affected students to facilitate services such as counseling, health services, or other referrals as needed to address safety concerns and to provide assistance and comfort to those impacted ... [and] develop an appropriate plan to initiate communication with the broader community and make referrals to the Office of Student Conduct and Community Standards, Office of Equity and Diversity, or the University of Tennessee Police Department if the incident appears to violate a university policy or state/federal law ... Any student found to

SPEECH FIRST   |   2022 FREE SPEECH IN THE CROSSHAIRS: BIAS REPORTING ON COLLEGE CAMPUSES   |   PAGE 5

be responsible for an act of bias, which violates university Standards of Conduct or criminal law, will be subject to disciplinary sanctions up to and including permanent dismissal from the university.

BRSs frequently define "bias incidents" in vague and overbroad terms, making them difficult for students to interpret and easy for administrators to employ at their discretion. Nevertheless, all of the definitions make one thing clear: they apply to student speech. As a result, students often self-censor to avoid running afoul of these

teams.  Recent data shows that only 32% of college students feel that it is very or extremely clear that their college administration protects free speech on campus.[11]

Apart from the reporting teams described above, BRSs can often arise as vague online systems embedded within other boards or committees already established on campus — systems soliciting reports of incidents concerning speech that is biased, offensive, unwanted, discriminatory, hateful, or a "microaggression."

# THE DANGERS OF BRSs

BRSs intimidate and silence students whose viewpoints do not conform to the dominant social, political, and cultural narratives on campus. By design, these teams create an environment of fear that chills speech and dialogue between students of diverse beliefs and perspectives, ultimately silencing speech through self-censorship. This chilling effect was confirmed by a 2021 joint study conducted by FIRE, College Pulse, and RealClearPolitics, which found that more than **80%** of college students in the U.S. self-censor.[12] The result of this climate of intimidation and self-censorship is a campus environment that fosters fearful silence instead of a healthy back-and-forth in the classroom, in dorms, at club events, and in social settings.

The broad definition of "bias" allows universities to burden a broad range of constitutionally protected expression. And a lack of clear and meaningful standards opens the door to arbitrary or discriminatory enforcement.

The definition of a "bias incident" at most universities is so broad that it encompasses even political speech. Common definitions include speech that is "motivated by a bias against a person in part because of that person's … *political affiliation … or intellectual perspective*" (the University of Mississippi), or biased expressions "based on … pe*rceived political ideas*" (Eastern Mennonite University). But students must be able

to speak freely and offer their perspectives on historical and current events and ideas. As Speech First warned in its case against the University of Michigan, "[u]nder the plain text of [the BRS's] definitions, a student may be deemed to have acted with 'bias' if, for example, she gives a speech sharply criticizing the Catholic Church and its adherents for not allowing women to become priests; this student has expressed a 'negative opinion' or 'attitude' about a certain group of people based on their 'cultural experience' of religion."[13] Such rich and valuable discourse should not be discouraged through university intimidation.

BRSs also frequently combine immense power with a lack of oversight or accountability. Many BRSs can either initiate disciplinary actions against students or refer allegations to other university departments with disciplinary authority. But even when a BRS disclaims any formal disciplinary authority, the mere presence of a team consisting of senior administrators responsible for monitoring student expression inevitably chills speech. The simple fear of being anonymously reported to university authorities and subjected to process-is-punishment investigations (which often include university officials and law enforcement), diversity and anti-bias trainings, and public stigmatization is a present and powerful force on campuses across the country.



**Bias reporting systems "represent the clenched fist in the velvet glove of student speech regulation."**

Fifth Circuit Court Opinion
in *Speech First, Inc. v. Fenves* (2020)

With these powerful, unaccountable systems and broad definitions in place, universities solicit complaints from students about their classmates' speech. Put differently, they ask students to report one another simply for expressing disagreement with or an alternative perspective from the dominant social, political, or cultural narrative on campus.

BRSs ultimately contribute to a culture on campus that prevents students from voicing unpopular beliefs about the most important issues of the day — topics like racial inequality, abortion, gender identity, gun control, or contemporary socio-political phenomena like the George Floyd protests.[14]

That's why these policies undermine the very foundational purpose of our educational institutions. As Amna Khalid and Jeff Snyder, professors of History and Educational Studies at Carleton College, have warned, BRSs "degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important — and controversial — topics across all academic disciplines. They are inherently anti-intellectual enterprises, fundamentally at odds with the mission of higher education."[15]

Paradoxically, BRSs undermine the very diversity that the proponents of BRSs claim to seek. Diversity of all kinds, including diversity of thought, is central to educational excellence. As a result, BRSs present a formidable threat to educational excellence. As Khalid and Snyder correctly feared, bias response systems:

> undermine a bedrock principle of the modern university: that more diversity leads to better learning … [D]iversity works its magic only through meaningful contact between people with varying 'identity characteristics.' Contact, by definition, will sometimes lead to conflict. Imagine a conversation between an evangelical student and a gay student on same-sex marriage, or a discussion about U.S. drone policy between a dove and a hawk. Such conversations are invaluable. But without the space to debate and argue, students won't ever be forced to confront the underlying assumptions framing their worldviews. BRTs threaten to drive students into their own corners with peers who look and think like them, reducing the potency of diversity to a glib slogan on admissions brochures.[16]

# METHODOLOGY

### The Colleges and Universities in this Report

We evaluated the leading four-year colleges and universities in every state, generating a significant pool of both private and public schools. Ultimately, our study covered 444 private schools (which represent 23%[17] of all private four-year colleges in the U.S.), and 380 public schools (which represent 49%[18] of all public four-year colleges in the U.S.), for a total of 824 institutions.

In 2016, FIRE defined a Bias Reporting System as "any system identified as such, or that provides a formal or explicit process for or solicitation of reports from students, faculty, staff, or the community concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom."[19] Similarly, in Speech First's report, an institution is deemed to have a Bias Reporting System if it houses an established system (a devoted incident report form and adjudicating team/council/board) that explicitly solicits reports of speech that is:

- Biased
- Offensive
- Unwanted
- Discriminatory
- Hate/hateful
- A microaggression

# RESULTS

We found **456 Bias Reporting Systems** at four-year public and private institutions of higher education across the country (56% of the total 824 schools examined in our report). Of these, **207** were found in private institutions and **249** in public institutions (46% of all private schools and 66% of all public schools examined in our report thus have a BRS).

Our report thus found **230%** more BRSs at private universities and **175%** more BRSs at public universities than FIRE did just five years ago (FIRE found 89 and 143 BRSs, respectively). Considering our report only examined 49% of public four-year colleges and 23% of private four-year colleges, the number of BRSs would swell if we were to examine every university.

Nearly every reporting system allows for anonymous reporting, and 53% of the most expansive forms[20] of these systems were housed in Diversity, Equity, and Inclusion (DEI) offices.

In total, we identified **twice as many** BRSs as FIRE did in 2017 (**456** identified in our report, versus **232** identified in FIRE's 2017 survey).

An appendix of all 456 schools with BRSs can be found in our Appendix of Universities with BRSs on p. 15.



# INSTITUTIONS WITH BIAS REPORTING SYSTEMS



BRSs FOUND IN 2017 [21]

BRSs FOUND IN 2022



"Students across the nation are self-censoring for fear of being suspended, failing to be hired for a job, or being ostracized from society. We see this because practical policy ideas are often turned into these outrageous questions of good and evil – if someone disagrees with you politically, you do not just disagree, but you are now a bad person."

Emma Blair, Grand Canyon University

# WHAT CAN BE DONE

Since our nation's founding, Americans have placed a high value on the fundamental freedoms to speak, inquire, and learn, freedoms enshrined in the First Amendment. These freedoms not only infuse the spirit of the liberal arts, but are also essential to the continued health and existence of our nation. Central to liberal democracy and the republican form of government is a spirit of political participation that requires curious, engaged citizens who can speak and think freely with one another. As is a basic tolerance for opposing viewpoints and a vigilance against tyranny in all of its obvious and subtle forms.

The dangerous effects of BRSs must be confronted and addressed. It's not just about defending essential freedoms, but also about creating and sustaining a society in which we can exercise them. These policies do not cultivate a space of inclusion and diversity. Instead, they compromise students' fundamental rights to free speech and inquiry, profoundly weaken the academy, and threaten our constitutional republic and our relentless pursuit of a more perfect union.

Several steps can and should be taken, in conjunction, to address BRSs.

**Take legal action.** Speech First holds universities accountable for their actions. We have been on the front lines of the fight against bias reporting policies from the beginning, and many of our cases have involved the activities of BRSs and their chilling effects on student speech. To date, Speech First is the only organization to prevail in litigation against a bias reporting system, effectively ending the systems at the University of Michigan and University of Texas. If you're interested in taking action on your own campus to stop a BRS from censoring student speech, you should reach out to Speech First or other public-interest groups who protect students' First Amendment rights.

**Monitor and revoke state and federal funding for universities that violate students' First Amendment rights.** Public universities are taxpayer-funded institutions and are thus answerable to the people. Even private universities receive state and federal grants and, as a condition of receiving those funds, must comply with the applicable regulations to the same degree as public universities.[22] At the federal level, the Department of Education needs to monitor the campus speech policies of schools that receive federal funding. Moreover, if a university applying for a federal grant has policies that appear to facially restrict student speech, its application should be paused for further investigation.

State governments can also play an important role. They can enact legislation to enhance transparency at state universities and provide oversight to ensure that public institutions comply with those requirements. State legislatures could, for example, require public universities to conduct annual student surveys evaluating the free speech climates on their campuses. States could mandate that freshmen orientations include courses on the First Amendment and exercising free speech. Additionally, because most BRSs are housed in university DEI departments, state legislators could mandate increased disclosures from DEI departments about their BRS procedures. A recent report from the Idaho Freedom Foundation[23] lists several additional ways lawmakers can reform college campuses, such as designating all outdoor areas on public universities as public forums open to free speech and requiring colleges and universities to disclose how their policies protect free speech on their campuses. These types of policies incentivize transparency and encourage universities to aim for open discourse and free speech on their campuses.

**Apply public pressure.** Parents, students, and alumni should regularly engage with their state legislators, congressional representatives and staff, and university boards of trustees. Public pressure can not only alert policymakers to the gravity of the issue but also inspire them to champion campus free speech issues. Lawmakers often don't see a spirited push about student free speech



rights from their constituents, but the more that constituents emphasize this issue, the greater the pressure to take action will become. Alumni must also emphasize to university boards of trustees that initiatives like BRSs will damage the prestige of their institutions and weaken their academic reputations.

**Engage alumni donors.** Alumni should exert pressure on their alma maters. Major donors should take a closer look at how the universities they love and support have changed from when they were last on campus. Millions of dollars of alumni donations are being spent on DEI departments and other misguided efforts that lead to speech restrictions on campus.[24]

**Empower students.** Finally, students must recognize the responsibility they have to themselves. Self-censorship, avoiding discussions and debates, and other forms of complacency will not lead to more open discourse on campus. Instead, it will embolden those who wish to eliminate dissenting voices. Students must know their constitutional rights, federal and state laws, and campus policies. Students should note any red flags when reading student handbooks and reach out to organizations like Speech First when they encounter policies that chill speech on campus. Because Speech First will be there every step of the way, students can have the courage to speak whenever and wherever campus administrators,

faculty, and peers try to shut down speech. Finally, students who support free speech on campus should consider running for Student Government, founding or joining clubs that advocate for the First Amendment, or writing for the campus paper or other news and media outlets.

Below is advice from students who are on campuses now and facing similar challenges:

*"The best advice I can give to the next generation of college students is to stand firm in your values and don't allow yourself to be silenced."* – Olivia Gallegos, Wichita State

*"The biggest piece of advice I would offer is to become so extraordinarily educated on your beliefs and opinions that you become confident enough to speak up and out against those silencing you. And when you are met with opposition and the stifling of your speech, fight back with facts."* – Adam Fairchild, University of Colorado- Boulder

*"My best advice to college students and beyond is to always remember that the Constitution is on your side. We need more students who are willing to stand up in their classrooms, challenge colleges and universities when they attempt to silence them and encourage their peers to do the same."*– Kiara Kincaid, University of Oklahoma



"The best advice
I can give to the
next generation of
college students is
to stand firm in your
values and don't
allow yourself to
be silenced."

Olivia Gallegos, Wichita State

# APPENDIX OF UNIVERSITIES WITH BRSs

This appendix lists every university in our report that maintains a BRS and links to their respective webpages. As outlined in the What are Bias Reporting Systems? section on p. 5, these systems use a wide array of language and procedures, but they all have one thing in common—unnecessarily chilling speech student speech that is outside of the mainstream.

## Alabama
Auburn University
Birmingham-Southern College
Huntingdon College
Jacksonville State University
Spring Hill College
University of Alabama
University of South Alabama

## Arizona
University of Arizona

## Arkansas
Henderson State University
University of Central Arkansas

## California
California Polytechnic State University
California State University, Chico
California State University, East Bay
California State University, Northridge
California State University, Sacramento
California State University, San Marcos
Harvey Mudd College
Humboldt State University
Pomona College
San Francisco State University
San Jose State University
Santa Clara University
Scripps College
Stanford University
Sonoma State University
UC, Berkeley
UC, Davis
UC, Irvine
UC, Los Angeles
UC, Merced
UC, Riverside

UC, San Diego
UC, San Francisco
UC, Santa Barbara
UC, Santa Cruz
University of Southern California

## Colorado
Colorado Mesa University
Colorado School of Mines
Colorado State University
Colorado State University, Pueblo
Regis University
University of Colorado Boulder
University of Denver

## Connecticut
Central Connecticut State University
Connecticut College
Fairfield University
Sacred Heart University
Southern Connecticut State University
Trinity College - Connecticut
University of Connecticut
University of New Haven
University of Saint Joseph
Wesleyan University
Yale University

## Florida
Florida A&M University
Florida Gulf Coast University
Florida International University
Florida State University
Rollins College
Stetson University
University of Central Florida
University of Florida
University of Miami
University of North Florida
University of Tampa

## Georgia
Agnes Scott College
Berry College
Emory University
Georgia Institute of Technology
University of West Georgia

## Hawaii
Brigham Young University - Hawaii
University of Hawaii at Hilo

## Idaho
Boise State University
The College of Idaho
University of Idaho

## Illinois
Augustana College - Illinois
Eastern Illinois University
Illinois Institute of Technology
Illinois State University
Illinois Wesleyan University
Lake Forest College
Loyola University Chicago
Northern Illinois University
Northwestern University
Southern Illinois University at Carbondale
Southern Illinois University at Edwardsville
University of Chicago
University of Illinois at Chicago
Wheaton College - Illinois

## Indiana
Ball State University
Butler University
Depauw University
Earlham College
Hanover College
Indiana State University
Indiana University, Bloomington

Indiana University, East
Indiana University, Kokomo
Indiana University, Northwest
Indiana University - Purdue University Indianapolis
Indiana University, South Bend
Indiana University, Southeast
Purdue University
Purdue University Fort Wayne/Indiana University Fort Wayne
University of Evansville
University of Notre Dame
University of Southern Indiana
Valparaiso University
Wabash College

## Iowa
Coe College
Cornell College
Drake University
Grinnell College
Iowa State University
Luther College
University of Iowa
University of Northern Iowa

## Kansas
Baker University
Friends University
Pittsburg State University
Sterling College
Wichita State University

## Kentucky
Bellarmine University
Centre College
Eastern Kentucky University
Morehead State University
Northern Kentucky University
Transylvania University
University of Kentucky
University of Louisville
Western Kentucky University

## Louisiana
Centenary College of Louisiana
Dillard University
Grambling State University
Louisiana State University
Loyola University New Orleans
Southeastern Louisiana University

Tulane University
University of New Orleans
Xavier University of Louisiana

## Maine
Bates College
Bowdoin College
Colby College
Husson University
University of Maine
University of New England
University of Southern Maine

## Maryland
Frostburg State University
Goucher College
Hood College
Johns Hopkins University
Loyola University Maryland
McDaniel College
Stevenson University
Towson University
University of Maryland
Washington College

## Massachusetts
Amherst College
Babson College
Boston College
Boston University
College of the Holy Cross
Fitchburg State University
Framingham State University
Harvard University
Massachusetts Institute of Technology
Massachusetts Maritime Academy
Northeastern University
Salem State University
Tufts University
University of Massachusetts - Amherst
University of Massachusetts Dartmouth
University of Massachusetts at Lowell
Wellesley College
Westfield State University
Williams College
Worcester State University

## Michigan
Albion College
Andrews University
Aquinas College - Michigan
Calvin University
Central Michigan University
College for Creative Studies
Grand Valley State University
Hope College
Kalamazoo College
Lawrence Technological University
Michigan State University
Michigan Technological University
Saginaw Valley State University
Spring Arbor University
University of Michigan - Ann Arbor
University of Michigan - Dearborn
University of Michigan - Flint
Western Michigan University

## Minnesota
Bemidji State University
Carleton College
Concordia College
Gustavus Adolphus College
Macalester College
Minnesota State University, Mankato
Minnesota State University, Moorhead
North Central University
Saint Cloud State University
St. Catherine University
St. Olaf College
University of Minnesota - Morris
University of Minnesota - Twin Cities
University of St. Thomas - Minnesota

## Mississippi
Jackson State University
Mississippi College
Mississippi State University
University of Mississippi

## Missouri
Drury University

Fontbonne University
Maryville University
Missouri State University
Missouri University of Science and Technology
Saint Louis University
Southeast Missouri State University
University of Missouri - Columbia
University of Missouri – Kansas City
University of Missouri - Rolla
University of Missouri - St. Louis
Washington University in St. Louis
William Jewell College

## Montana
Carroll College

## Nebraska
Bellevue University
Creighton University
Doane University
Hastings College
Nebraska Wesleyan University
University of Nebraska - Lincoln
University of Nebraska Omaha

## Nevada
University of Nevada, Reno

## New Hampshire
Colby-Sawyer College
Dartmouth College
Franklin Pierce University
Southern New Hampshire University
University of New Hampshire

## New Jersey
Drew University
Kean University
Monmouth University
Montclair State University
New Jersey Institute of Technology
Princeton University
Rider University
Rowan University
Rutgers University – New Brunswick
Seton Hall University

Stevens Institute of Technology
Stockton University
The College of New Jersey
William Paterson University

## New Mexico
University of New Mexico

## New York
City College of New York
Colgate University
College of Staten Island
Columbia University
Cornell University
CUNY, Hunter College
Hamilton College
New York University
Skidmore College
Stony Brook University
SUNY Albany
SUNY Binghamton
SUNY Brockport
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Environmental Science and Forestry
SUNY Empire
SUNY Fredonia
SUNY Geneseo
SUNY Morrisville
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Plattsburgh
SUNY Potsdam
University of Rochester
Vassar College

## North Carolina
Appalachian State University
Davidson College
Duke University
Elizabeth City State University
Elon University
Fayetteville State University
High Point University
North Carolina State University
University of North Carolina – Asheville

University of North Carolina - Chapel Hill
University of North Carolina – Charlotte
University of North Carolina - Greensboro
Wake Forest University
Western Carolina University

## North Dakota
North Dakota State University
University of North Dakota

## Ohio
Bowling Green State University
Cleveland State University
Case Western Reserve University
College of Wooster
Denison University
John Carroll University
Keene State College
Miami University of Ohio
Oberlin College
Ohio University
The Ohio State University
University of Cincinnati
University of Dayton
Wright State University
Youngstown State University

## Oklahoma
Oklahoma State University
University of Central Oklahoma
University of Oklahoma

## Oregon
George Fox University
Lewis & Clark College
Linfield University
Oregon Institute of Technology
Oregon State University
Pacific University Oregon
Portland State University
Reed College
Southern Oregon University
University of Oregon
University of Portland specifically School of Nursing
Western Oregon University
Willamette University

## Pennsylvania

Bryn Mawr College
Bucknell University
California University of Pennsylvania
Carnegie Mellon University
Cheyney University of Pennsylvania
Clarion University of Pennsylvania
East Stroudsburg University of Pennsylvania
Edinboro University of Pennsylvania (Linked with Clarion)
Franklin & Marshall College
Indiana University of Pennsylvania
Kutztown University of Pennsylvania
Lafayette College
Lehigh University
Lock Haven University of Pennsylvania
Mansfield University of Pennsylvania
Millersville University of Pennsylvania
Pennsylvania State University - University Park
Shippensburg University of Pennsylvania
Swarthmore College
University of Pennsylvania
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania

## Rhode Island

Brown University
Bryant University
Providence College
Rhode Island College
Rhode Island School of Design
Roger Williams University
University of Rhode Island

## South Carolina

Clemson University
Coastal Carolina University
College of Charleston
Furman University
Presbyterian College
University of South Carolina
Winthrop University
Wofford College

## South Dakota

Augustana University
South Dakota State University

## Tennessee

East Tennessee State University
Lipscomb University
Middle Tennessee State University
Rhodes College
Sewanee - The University of the South
Union University
University of Tennessee - Knoxville

## Texas

Baylor University
Rice University
Southern Methodist University
Tarleton State University
Texas A&M University
Texas Christian University
Texas State University
Texas Tech University
Texas Woman's University
Trinity University
University of Texas at San Antonio

## Utah

Southern Utah University
University of Utah
Utah Valley University
Weber State University
Westminster College - Utah

## Vermont

Champlain College
Middlebury College
Saint Michael's College
Sterling College - Vermont
University of Vermont

## Virginia

Eastern Mennonite University
George Mason University
James Madison University
Liberty University
Longwood University
Norfolk State University
Radford University
Roanoke College
Shenandoah University
The College of William and Mary
The University of Virginia's College at Wise
University of Mary Washington
University of Richmond
University of Virginia
Virginia Polytechnic Institute and State University
Washington and Lee University

## Washington

Central Washington University
Eastern Washington University
Evergreen State College
Gonzaga University
Pacific Lutheran University
Saint Martin's University
Seattle Pacific University
Seattle University
University of Puget Sound
University of Washington
University of Washington Bothell
Western Washington University
Whitworth University
Whitman College

## Washington D.C.

American University
Georgetown University
George Washington University

## West Virginia

Bethany College - West Virginia
Davis & Elkins College

## Wisconsin

Alverno College
Beloit College
Concordia University - Wisconsin
Lawrence University
Marquette University
Milwaukee Institute of Art and Design
Mount Mary University
St. Norbert College

University of Wisconsin – Eau Claire

University of Wisconsin - Green Bay

University of Wisconsin - La Crosse

University of Wisconsin – Madison

University of Wisconsin - Milwaukee

University of Wisconsin - Oshkosh

University of Wisconsin – Platteville

University of Wisconsin - River Falls

University of Wisconsin – Stevens Point

University of Wisconsin – Stout

University of Wisconsin - Whitewater

**Wyoming**

University of Wyoming

# ENDNOTES

**1**  This was in reference to the University of Michigan's BRS, in Speech First, Inc. v. Schlissel, 939 F.3d 756, 765 (6th Cir.2019). https://speechfirst.org/wp-content/uploads/2019/10/Michigan-Decision.pdf

**2**  This was in reference to the University of Texas's BRS, in Speech First, Inc. v. Fenves, 979 F.3d 319, 338 (5th Cir. 2020). https://speechfirst.org/wp-content/uploads/2020/10/UT-opinion.pdf

**3**  We define a BRS as any system that solicits reports of incidents concerning speech protected by the First Amendment, such as speech that is "biased," "offensive," "unwanted," "discriminatory," "hateful," or "microaggressive."

**4**  These BRSs are formalized, coherent teams explicitly devoted to the solicitation and review of bias incident reports by a designated group of cross-departmental members, university officials and often campus security or law enforcement.

**5**  "2017 Report on Bias Reporting Systems." FIRE. Accessed September 30, 2021. www.thefire.org/research/publications/bias response-team-report-2017/report-on-bias-reporting-systems-2017

**6**  Ibid.

**7**  Ibid.

**8**  Ibid.

**9**  Ibid.

**10**  https://www.thefire.org/speech-code-of-the-month-university-of-vermont/

**11**  FIRE. "The 2021 College Free Speech Rankings."

**12**  Ibid.

**13**  https://legalinsurrection.com/wp-content/uploads/2018/05/Speech-First-v.-U.-Michigan-Complaint.pdf

**14**  These are, according to the FIRE/CollegePulse/RealClearPolitics 2021 report, the most difficult topics of discussion on campuses today.

**15**  Snyder, Jeffrey Aaron, and Amna Khalid. "The Rise of 'Bias Response Teams' on Campus." The New Republic, March 30, 2016. https://newrepublic.com/article/132195/rise-bias-response-teams-campus.

**16**  Ibid.

**17**  "Digest of Education Statistics, 2020." National Center for Education Statistics (NCES) Home Page, a Part of the U.S. Department of Education. Accessed November 23, 2021. https://nces.ed.gov/programs/digest/d20/tables/dt20_317.20.asp.

**18**  Ibid.

**19**  "2017 Report on Bias Reporting Systems." FIRE.

**20**  These BRSs are formalized, coherent teams explicitly devoted to the solicitation and review of bias incident reports by a designated group of cross-departmental members, university officials and often campus security or law enforcement.

**21**  Data from FIRE's 2017 Report on Bias Reporting Systems

**22**  See Department of Education, Free inquiry Rule, 85 Fed. Reg. 59916 (Sept. 23, 2020), https://bit.ly/3iROiq8.

**23**  "Social Justice in Idaho Higher Education, University of Idaho - Idaho Freedom." Accessed February 4, 2022. https://idahofreedom.org/research/social-justice-in-idaho-higher-education-university-of-idaho/.

**24**  "Greene, Jay P. "Diversity University: DEI Bloat in the Academy." The Heritage Foundation. Accessed February 4, 2022. https://www.heritage.org/education/report/diversity-university-dei-bloat-the-academy.

# Exhibit 12

Case 5:23-cv-00029-J  Document 32-17  Filed 03/24/23  Page 2 of 10
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression          3/23/23, 4:13 PM
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 143

**BOARD OF REGENTS** for the
Oklahoma Agricultural & Mechanical
Colleges

Search...

HOME (/INDEX.HTML)          ABOUT US ▼          UPCOMING MEETINGS (/MEETINGS/INDEX.HTML)

MINUTES (/MINUTES/INDEX.HTML)          POLICY MANUAL (/POLICY-MANUAL/INDEX.HTML)

STAFF ▼          CONTACT US (/CONTACT-US.HTML)

CONNORS STATE
COLLEGE
(HTTPS://CONNORSSTATE.EDU/)

LANGSTON
UNIVERSITY
(HTTPS://WWW.LANGSTON.EDU/)

NEO A&M
COLLEGE
(HTTP://WWW.NEO.EDU/)

OK PANHANDLE
STATE
UNIVERSITY
(HTTP://WWW.OPSU.EDU/)

OKLAHOMA          ▼
STATE
UNIVERSITY
(HTTPS://GO.OKSTATE.EDU/)

# EXTRACURRICULAR USE OF INSTITUTIONAL FACILITIES, AREAS OR MEDIA FOR THE PURPOSE OF EXPRESSION

3.13

1. Philosophy and Scope

    A. Philosophy

        i. A goal of the faculty, students, administration, staff and Board is for the institutions governed by the Board to be superior educational centers for the preservation, transmission and discovery of knowledge. The wide variety of Extracurricular activities at the institutions governed by the Board represent one way this goal is achieved. Therefore, these activities are an integral part of the total educational mission of the Board's institutions.

App.356

ii. The Board and its institutions recognize and protect free inquiry and free Expression as indispensable components of the critical examination of philosophies and ideas. Given the unique mission of public educational institutions in a democratic society, this inquiry should be open and vigorous, and should consequently have greater protection than in society at large, provided that such inquiry does not infringe upon the rights of others. Commitment to free inquiry and Expression creates a strong presumption against prohibition of Expression based upon its content. This philosophy is intended to apply to all forms of Expression occurring at the Board's institutions and any uncertainty regarding the application or operation of this Policy shall be resolved in a manner consistent with this philosophy.

B. Scope

i. This Policy shall be applicable only to the Extracurricular use of any institutional-controlled facility, area or medium used as a forum generally open to members of the institutional community and others for the purpose of Expression. Institutional affiliated newspapers, radio stations or cable television channels are not presently subject to this Policy.

ii. Any institutional policy providing for conditions or limitations on Extracurricular Expression shall be consistent with this Policy.

iii. The procedures in this Policy apply only to scheduling the Extracurricular use of institutional-controlled facilities or areas for the purpose of Expression.

2. Definitions

Case 5:23-cv-00029-J  Document 32-17  Filed 03/24/23  Page 4 of 10       3/23/23, 4:13 PM
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression
Appellate Case: 23-6054     Document: 010110864065     Date Filed: 05/23/2023     Page: 145

A.  <u>Authorized Designee.</u>  Each institution is expected to designate a person or persons who have the authority to schedule the use of a particular institutional facility or area.

B.  <u>Campus Community.</u>  Students, administrators, faculty and staff at the institution and their invited guests.

C.  <u>Expression.</u>  Any communication, discussion, acquisition, manifestation, representation or indication, whether clear or unclear, ambiguous or unambiguous, of attitudes, information, ideals, beliefs, opinions or ideas on any subject by any student, faculty or other member of the academic community, outside speaker or act, process or instance of representation in any media. The media of expression may include, but shall not be limited to, speech, publications, literature or documents, art, cinema, theater or music, electronic emissions, audio or visual recording in any medium or media, or recordings in any medium or media that combine audible, visible or other sensory expression, whether expressed, transmitted, presented or sponsored individually or by a group.

D.  <u>Extracurricular.</u>  All activities outside the institution's instruction, research, extension and related academic functions.

E.  <u>Harassment.</u>  Expression that is unwelcome, so severe, pervasive and subjectively and objectively offensive that a student is effectively denied equal access to educational opportunities or benefits provided by the institution.

F.  <u>Materially and Substantially Disrupts.</u>  When a person, with the intent to or with knowledge of doing so, significantly hinders another person's or group's expressive activity, prevents the communication of the message or prevents the transaction of the business of a lawful meeting, gather or procession by:

Case 5:23-cv-00029-J Document 32-17 Filed 03/24/23 Page 5 of 10    3/23/23, 4:13 PM
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 146

    i.  Engaging in fighting, violent or other unlawful behavior, or

    ii.  Physically blocking or using threats of violence to prevent any person from attending, listening to, viewing or otherwise participating in an expressive activity.

Conduct that "materially disrupts" shall not include conduct protected under the Oklahoma Constitution or the United States Constitution.

Protected conduct includes, but is not limited to, lawful protests in the outdoor areas of campus generally accessible to the members of the public, except during times when those areas have been reserved in advance for other events, or minor, brief or fleeting nonviolent disruptions of events that are isolated and short in duration.

G.  Outdoor Areas of Campus.  The generally accessible outside areas of campus where members of the campus community are commonly allowed, such as grassy areas, walkways or other similar common areas.  Outdoor Areas of Campus does not include outdoor areas where access is restricted from a majority of the campus community.

3.  Public Forum

All Outdoor Areas of Campuses as defined herein are deemed public forums for the Campus Community.  Institutions may maintain and enforce reasonable time, place, and manner restrictions narrowly tailored in service of a significant institutional interest only when such restrictions employ clear, published, content- and viewpoint-neutral criteria and provide for ample alternative means of expression.

4.  Time, Place or Manner Considerations

A.  Expression may be limited or restricted with respect to time, place or manner only as provided for in this Policy and other related statements of policy, such as the Student Code of Conduct:  Student Rights and Responsibilities Governing Student Behavior.  For Outdoor Areas of Campus, such limitations shall be narrowly tailored to serve a significant interest (such as avoiding disruption of regular classes, prohibiting conduct that Materially and Substantially Disrupts another person's or group's expressive activity, prohibiting Harassment, avoiding the scheduling of two events at the same time in the same facility and the protection of the public order) and to assure compliance with applicable local, state and federal laws. Any limitations must be both reasonable and content-neutral, the latter term meaning that they shall be applied without regard to the content of the Expression or the purpose of the assembly.

B.  Limitations may include requiring scheduling and planning with the appropriate Authorized Designee, restricting or prohibiting the use of certain areas (i.e., ingress and egress areas, instructional classrooms, laboratories, etc.), limiting amplification within a certain distance of academic buildings when classes are in session, and reimbursing the institution for any costs and damages associated with the use of a facility, area or medium.

5.  Content Considerations

The First Amendment of the Constitution protects and guarantees freedom of speech by prohibiting any law that would serve to deny or limit Expression. Through the Fourteenth Amendment, this prohibition is extended to all actions of state government, including those of publicly-supported institutions. Expression may not be

App.360

Case 5:23-cv-00029-J   Document 32-17   Filed 03/24/23   Page 7 of 10
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression                                          3/23/23, 4:13 PM
Appellate Case: 23-6054     Document: 010110864065     Date Filed: 05/23/2023     Page: 148

denied or limited, based upon content, unless it has been determined in state or federal court precedent that such speech or Expression is not protected by the Constitution.

6. Disclaimer Regarding Expression

   A. Given the wide diversity of Expression that occurs at higher education institutions, the use of any institutionally-controlled facility, area or medium for any Expression shall not constitute or suggest endorsement by the Board, the institution, its administration, staff, faculty, student body or any individual member of these constituencies.

   B. Individuals and groups utilizing institutional property shall assume full responsibility for any violation of law they commit while on institutional property.

7. Procedure for Scheduling Institutional Areas or Facilities for Extracurricular Expression

   A. Requests for the Use of a Scheduled Institutional Facility or Area

      i. The Extracurricular use of any scheduled institutional-controlled facility or area for the purpose of Expression shall be preceded by a request made to an Authorized Designee. A request shall contain the name of the requestor and how he/she can be contacted; the proposed date, time and location for the contemplated activity; the expected size of the audience; and any other information that may be necessary to accommodate the needs associated with the activity.

      ii. The request should be made as far in advance as possible to provide for orderly scheduling of facilities or areas. Barring extraordinary circumstances, the Authorized Designee shall take one of the following actions:

Case 5:23-cv-00029-J   Document 32-17   Filed 03/24/23   Page 8 of 10   3/23/23, 4:13 PM
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression
Appellate Case: 23-6054      Document: 010110864065      Date Filed: 05/23/2023      Page: 149

a. Grant the request. This will be the routine action taken on the vast majority of requests. The Authorized Designee should work with the requestor in preparing or revising a request so that it may be granted. If the Authorized Designee has any question about whether to grant the request, he/she should consult with his/her administrative supervisor(s). When a request has been granted, such action shall be final and the requestor shall be promptly notified.

b. Deny/Limit the Request. An Authorized Designee may recommend that a request be denied if it is determined after appropriate inquiry (including consultation with the Board's Office of Legal Counsel) that the proposed Expression is unprotected. For protected Expression, an Authorized Designee may recommend that a request be limited based on Time, Place or Manner Considerations pursuant to Paragraph (3) above. In determining whether to make such recommendations, full and adequate consideration should be given to the educational mission of the institution and specifically the responsibility of the institution and its officials to actively encourage free and open inquiry by avoiding and resisting limitations of Expression. Any recommendation to deny or limit a request, and the reasons upon which it is based, shall be stated in writing.

iii. No final arrangements or advertising should be made for the proposed use of the facility or area prior to the granting of the request for the use of the facility or area.

B. Limitations based upon Time, Place or Manner Considerations

i. If a request is limited based on time, place or manner

App.362

considerations (see (4) above), the requestor shall be promptly informed of such decision. A written statement of the reasons for the limitation shall be provided upon request.

ii. The requestor may appeal denials or limitations by filing a written statement with the President of the institution or his/her designee. The statement shall set forth the reason(s) for appealing the denial or limitation. A final decision should be made in time to allow the requestor to carry out final arrangements for the proposed Expression in the event the President, or his/her designee, reverses the Authorized Designee and grants the request.

8. Availability and Training on Expression Policies

A. Each institution shall make its policies related to Expression available to the public and their students.

B. Each institution shall provide materials to and conduct training for employees with responsibility for discipline or education of students on the institution's policies related to Expression.

9. Compliance with State Law. Each institution shall post on its website and submit annually to the Governor and the Legislature a report in compliance with the provisions of Oklahoma State law.

**Amended Date:**
June 22, 2018
September 13, 2019

Case 5:23-cv-00029-J   Document 32-17   Filed 03/24/23   Page 10 of 10
Extracurricular Use of Institutional Facilities, Areas or Media for the Purpose of Expression    3/23/23, 4:13 PM
Appellate Case: 23-6054     Document: 010110864065     Date Filed: 05/23/2023     Page: 151

**© (https://a.cms.omniupdate.com/11/?skin=okstate&account=okstate&site=regents&action=de&path=/policy-manual/section-3/policy-manual-extracurricular-use-institutional-facilities-areas-or-media-purpose-expression.pcf)**

2019 | ALL RIGHTS RESERVED.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES

900 N. Portland Avenue

Oklahoma City, OK 73107

ph: 405-945-3263

fax: 405-945-3345

email: **board@okstate.edu (mailto:board@okstate.edu)**

**Ethics Point (https://secure.ethicspoint.com/domain/media/en/gui/10933/index.html)**

**App.364**

# Exhibit 13

| INTERIM TITLE IX - SEXUAL MISCONDUCT POLICY | NEW POLICY NUMBER GENERAL UNIVERSITY June 2020 |
|---|---|

## OVERVIEW

Oklahoma State University is committed to providing an educational, living and working environment that is free from Sexual Misconduct, as defined herein, for all members of its community to include students, faculty, staff, contractors, and visitors.

The purpose of this Policy is to provide the OSU community with a clearly articulated set of behavioral standards, common understanding of definitions and key concepts, and descriptions and examples of prohibited conduct, including sexual harassment, sexual violence, stalking, and domestic and dating violence. All members of the community are expected to adhere to the requirements of this Policy and to the standards of the University's community. It is intended to guide students, faculty, staff and other OSU employees who have been affected by sexual harassment or misconduct, whether as a Complainant, Respondent, or a third party.

This Policy prohibits Sexual Misconduct, as defined herein, including all forms of sexual or sex-based harassment, discrimination, sexual violence, sexual assault, and stalking. Misconduct of this nature is contrary to the University's institutional values and prohibited by state and federal law, as referenced by Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 and its implementing regulations.

The University will review this Policy periodically in order to ensure compliance with legal requirements and improve the institutional response, including support services and resources. Additionally, the University may modify this Policy and the procedures set forth herein at any time as deemed appropriate for compliance with federal, state, and local law and/or applicable guidance.

In the event this Policy conflicts with any other policy or procedure, this Policy shall control.

## POLICY

### 1.01    APPLICABILITY

This Policy applies to all campus community members, including students, faculty, staff, contractors, and visitors within the University's control. It applies to conduct that occurs on University-owned or controlled premises, in an educational program or activity, including University sponsored or supported events, in buildings owned or controlled by student organizations officially recognized by the University, or off-campus when the conduct potentially affects a person's education or employment with the University or potentially poses a risk to the safety of other members of the University community. This Policy applies regardless of the sex, gender, gender identity, or sexual orientation of the parties. In accordance with regulations issued by the United States Department of Education, this Policy does not apply to conduct occurring against a person outside the United States or conduct that is not specifically addressed herein.

Alleged conduct reported pursuant to this Policy, whether or not the conduct constitutes a violation of this Policy, may violate other University policies. The University reserves the right to take disciplinary action for conduct reported under this Policy that constitutes a violation of any other University Policy.

**1.02    DEFINITIONS**[1]

a.    **Advisor** – both the Complainant and Respondent are entitled to be accompanied to any meeting or hearing under this Policy by an Advisor of their choice, who may, but need not be, an attorney. If a Complainant or Respondent does not select an Advisor for a hearing under this Policy, the University will provide the party with an Advisor, at no cost to the party, for the sole purpose of conducting cross-examination at the hearing.

b.    **Complainant** – the individual who is alleged to be the victim of any prohibited conduct under this Policy, or, in limited circumstances, the University.

c.    **Consent** – effective consent is informed, freely and actively given, using mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. Initiators of sexual activity are responsible for obtaining effective consent. Silence or passivity is not effective consent. The use of intimidation, coercion, threats, force, or violence negates any consent obtained. Consent is not effective if obtained from an individual who is incapable of giving consent due to lack of consciousness, age, mental disability, or incapacitation due to the use of drugs or alcohol.

d.    **Dating Violence** – dating violence is committed by a person who is or has been in a social relationship of a romantic or intimate nature with another person. The existence of such a relationship shall be determined based on consideration of the following factors:

i.    The length of relationship;
ii.    The type of relationship;
iii.    The frequency of interaction between the persons involved in the relationship.

Dating Violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating Violence does not include acts that meet the definition of domestic violence. **Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting.**

---

[1]  The definitions provided in this Policy are the definitions adopted by the University. State law definitions, as applicable, are included in Appendix A for the Oklahoma statutory definition. In the event a criminal investigation is conducted by law enforcement, the state law definition will apply.

e.      **Decision-Maker** – the individual(s) charged with determining whether or not a Respondent violated this Policy.

f.      **Domestic Violence –** domestic violence is felony or misdemeanor crime of violence committed by a:

    i.   current or former spouse or intimate partner of the victim;
    ii.  person with whom the victim shares a child in common;
    iii. person who is cohabitating with or has cohabited with the victim as a spouse or intimate partner;
    iv.  person similarly situated to a spouse of the victim under the domestic or family violence laws of Oklahoma;
    v.   any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of Oklahoma.

Domestic violence is a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner. Domestic violence can be physical, sexual, emotional, economic, or psychological actions, or threat of actions that influence another person. Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting.

g.      **Formal Complaint** – a document filed by a Complainant or signed by the Title IX Coordinator or Deputy Title IX Coordinator alleging sexual harassment against a Respondent and requesting the University investigate the allegation of sexual harassment.

h.      **Incapacity/Incapacitation** – occurs when an individual is incapable, temporarily or permanently, to give cosent because the individual is mentally and/or physically helpless, either volnarly or involuntarily, or the individual is unconscious, asleep, or othrwise unaware that the sexual activity is occurring. An individual may be incapacitated if they are unaware at the time of the incident of where they are, how they got there, or why or how they became engaged in a sexual interaction.

i.      **Indecent Exposure** – the act of intentionally exposing one's genitals in public or in front of others, for the purpose of sexual gratification or causing offense. Allegations of Indecent Exposure will be evaluated to determine if the meet the severe, pervasive and objectively offensive standard required to meet the definition of Sexual Harassment.

j.      **Preponderance of the Evidence** – the standard of evidence to be used in making a determination as to whether a violation of this Policy occurred is Preponderance of the Evidence. Under this standard, the burden of proof is met when evidence exists or is presented that establishes that it is "more likely than not" that a violation occurred. This standard is often described as requiring a showing that there is a greater than fifty percent (50%) chance that the claim is true.

k      **Respondent** – an individual who has been reported to be the perpetrator of conduct that could constitute a violation of this Policy.

l.     **Sexual Assault** – an offense that meets the definition of rape, fondling, incest, or statutory rape:

  i.   *Rape* – the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim;

  ii.  *Fondling* – the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity;

  iii. *Incest* – sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law;

  iv.  *Statutory Rape* – sexual intercourse with a person who is under the statutory age of consent.

m.     **Sex Discrimination** – occurs when an individual is treated less favorably on the basis of that person's sex (including gender), which may also include on the basis of sexual orientation, gender identity or expression, pregnancy or pregnancy-related condition, or a sex stereotype. Sexual harassment, as defined in this Policy, is a form of Sex Discrimination.

n.     **Sexual Exploitation** – conduct where an individual takes non-consensual or abusive sexual advantage of another for their own benefit, or to benefit anyone other than the one being exploited. Examples of sexual exploitation include, but are not limited to, engaging in voyeurism; sharing of pornographic or other sexually inappropriate material; the intentional removal of a condom or other contraceptive barrier during sexual activity without the consent of a sexual partner; and any activity that goes beyond the boundaries of consent, such as recording of sexual activity, letting others watch consensual sex, or knowingly transmitting a sexually transmitted disease (STD) to another. Allegations of Sexual Exploitation will be evaluated to determine if the meet the severe, pervasive and objectively offensive standard required to meet the definition of Sexual Harassment.

o.     **Sexual Harassment** – conduct on the basis of sex that satisfies one or more of the following:

  i.   A person acting on behalf of the University in a position of authority conditioning the provision of any aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct (quid pro quo);

**App.369**

   ii. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity;

   iii. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct that explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment;

   iv. Sexual assault as defined herein;

   v. Dating violence as defined herein;

   vi. Domestic violence as defined herein; or

   vii. Stalking as defined herein.

Subsections (i) and (iii)-(vii) in this definition are not evaluated for severity, pervasiveness, offensiveness, because such conduct is sufficiently severe to deny access to the University's education program or activities. Any instance of quid pro quo sexual harassment, sexual assault, dating violence, or stalking are considered Sexual Harassment under this Policy.

p.    **Sexual Misconduct** – the term used to encompass Sex Discrimination, Sexual Harassment, Domestic Violence, Indecent Exposure, Sexual Assault, Sexual Exploitation, and Stalking.

q.    **Stalking** – refers to one who engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress.

   i. **Course of conduct** means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

   ii. **Reasonable person** means a person under similar circumstances and with similar identities to the victim.

   iii. **Substantial emotional distress** means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

r.    **Supportive Measures** – non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or the Respondent before or after the filing of a Formal Complaint or where no Formal Complaint has been filed. Such measures are designed to restore or preserve equal access to the University's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the University's educational environment, or deter Sexual Harassment. Supportive Measures may include counseling,

extensions of deadlines or other course-related adjustments, modifications of work
or class schedules, campus escort services, mutual restrictions on contact between
the parties, changes in work or housing locations, leaves of absence, increased
security and monitoring of certain areas of the campus, and other similar measures.

## REPORTING INCIDENTS AND/OR FILING A FORMAL COMPLAINT

### 2.01    DISTINCTION BETWEEN REPORT AND FORMAL COMPLAINT

This Policy distinguishes between reporting incidents of Sexual Harassment and filing a
Formal Complaint regarding an incident of Sexual Harassment. Reporting incidents of
Sexual Harassment informs the University of the incident, allowing the University to
provide Supportive Measures to the Complainant and does not necessarily result in the
initiation of the grievance process (as described in Section 4.03 of this Policy).
Complainants who report incidents of Sexual Harassment will be offered individualized
Supportive Measures. If a Complainant wishes to initiate the grievance process, they
should file a Formal Complaint.

### 2.02    REPORTING

All forms of Sexual Misconduct should be reported to the University, no matter the
severity. Oklahoma State University's primary concern is safety; therefore, individuals
should not be deterred from reporting for any reason, even if the use of alcohol or other
drugs was involved. The University encourages those impacted by Sexual Misconduct to
talk to someone about what happened so they can receive support and the University can
respond appropriately. The University offers both confidential services and non-
confidential reporting options, as outlined below.

a.    **Reporting to the University**

i.    **Confidential Reporting Options** – Confidential service options provide
students and employees with the ability to confidentially share and discuss
an incident of Sexual Misconduct without the reporting party's information
being shared with the University. Please be aware that reporting to
confidential services limits the University's ability to respond to incidents.
While these individuals are not required to report to the University, they
may have reporting or other obligations under state law, such as mandatory
reporting to law enforcement in cases involving minors, imminent harm to
self or others, or requirements to testify if subpoenaed in a criminal case.

a.    **Professional Counselors** – Professional and licensed counselors who
provide mental-health counseling (including those who act in that role
under the supervision of a licensed counselor) are not required to report
any information. Included in this category are counselors at the
University Counseling Center, Psychological Services Clinic and those
provided by the Employee Assistance Plan.

b. **OSU Victim Advocates** – Individuals may visit with a Victim Advocate to learn about resources available on campus. A Victim Advocate is not required to report any information about an incident to the Title IX Coordinator or the Deputy Title IX Coordinator unless the victim provides permission. However, the Victim Advocate will report incidents, without personally identifiable information, to the OSU Police for the purpose of compliance with the Clery Act. Contact information for the Victim Advocates is available at http://1is2many.okstate.edu.

c. **University Health Providers** – University Health service providers are a confidential service option. University Health Services can be contacted at 1202 W. Farm Road or by phone at 405-744-7665.

ii. **Non-Confidential Reporting Options –** Any person may report an incident, whether or not the individual reporting is the person alleged to be the victim of the incident. Reports may be verbal or in writing to the Title IX Coordinator or Deputy Title IX Coordinator:

> Title IX Coordinator
> Office of Equal Opportunity
> 419-A General Academic Building (GAB)
> 405-744-9153
> Email: eeo@okstate.edu
>
> Deputy Title IX Coordinator
> Office of Student Conduct
> 328 Student Union
> 405-744-5470
> Email: student.conduct@okstate.edu

a. **Campus Security Authorities –** In compliance with the Clery Act, some employees are identified as a Campus Security Authority ("CSA"). CSAs are identified through the Clery Act and outlined in the University's Annual Safety Report, available on the University's website. These individuals are required to report instances of Sexual Misconduct, along with other misconduct, to OSU Police for statistical purposes. CSAs must report all relevant details about the allegations shared by the victim, including names, date, time, and specific location of the alleged incident to the OSU Police and to the Title IX Coordinator or the Deputy Title IX Coordinator.

b. **Responsible Employees** – Responsible Employees are those who are mandated to report to the Title IX Coordinator or the Deputy Title IX Coordinator when they become aware of an incident of Sexual

<div align="center">**App.372**</div>

Misconduct.   University employees in a supervisory role over employees or students are considered Responsible Employees. Employees with supervisory authority include, but are not limited to: unit heads, academic administrators, faculty members engaged in supervising student workers, intercollegiate athletic administrators and coaching staff members. Responsible Employees who become aware of developing situations, or who desire assistance in appropriately responding to such situations, may seek assistance from the Title IX Coordinator or the Deputy Title IX Coordinator. Failure by a Responsible Employee to promptly report or seek assistance regarding Sexual Misconduct may result in corrective action.

c. **All Employees** – When an incident of Sexual Misconduct is reported to any employee, the employee is strongly encouraged, if not required, to report the incident to the Title IX Coordinator or the Deputy Title IX Coordinator.

b. **Reporting to Law Enforcement –** The University strongly encourages individuals to report Sexual Misconduct that may be a criminal offense, and any other criminal offenses, to the police. Reporting to the police does not commit a victim to proceed with prosecution, but will allow the gathering of information and evidence, which can preserve future options regarding criminal prosecution, University conduct/grievance actions, and/or civil actions against the perpetrator.

On-campus incidents should be reported to the OSU Police Department, 104 USDA Building (224 North Orchard Street), or by phone to 405-744-6523. If the incident occurred elsewhere in Stillwater, it can be reported to the Stillwater Police Department at 723 S. Lewis or by phone at 405-372-4171. If the incident happened anywhere else, it can be reported to local law enforcement with jurisdiction in the location where it occurred.

c. **Reporting to External Entities –** Individuals who have experienced or are experiencing sex-based harassment or discrimination also have the right to file a formal grievance with government authorities:

| | |
|---|---|
| Office for Civil Rights (OCR) | U.S. Department of Justice, Civil |
| One Petticoat Lane | Rights Division |
| 1010 Walnut Street, Suite 320 | 950 Pennsylvania Avenue, N.W. |
| Kansas City, MO 64106 | Educational Opportunities Section, PHB |
| Phone: (816) 268-0559 | Washington, D.C. 20530 |
| Facsimile: (816) 268-0559 | Email: education@usdoj.gov |
| TTY: (800) 877-8339 | Phone: (202) 514-4092 |
| Email: OCR.KansasCity@ed.gov | Toll-Free: (877) 292-3804 |
| Web: http://www.ed.gov/ocr | Facsimile: (202) 514-8337 |

## 2.03   FILING A FORMAL COMPLAINT

Complainants may file a Formal Complaint with the Title IX Coordinator or the Deputy Title IX Coordinator. In order for corrective or disciplinary action to be taken against a University employee or student, it may be necessary for a signed Formal Complaint to be filed and for the Complainant to cooperate with the University's investigative process. However, even without filing a Formal Complaint, a Complainant will be offered individualized Supportive Measures. A signed Formal Complaint can be provided to the Title IX Coordinator or Deputy Title IX Coordinator by mail, email or in person. The Formal Complaint must include the specific allegations and name of the Respondent(s).

## SUPPORTIVE MEASURES

**3.01**   OSU offers Supportive Measures for students and employees impacted by an occurrence of sex-based misconduct. A Formal Complaint does not need to be submitted for Supportive Measures to be put in place. The University will maintain confidentiality to the extent possible. Supportive Measures are non-disciplinary and non-punitive measures that do not unreasonably burden the other party. Supportive Measures may include, but are not limited to:

- **Assistance in reporting**: Support in filing a complaint with the University and/or the appropriate law enforcement agencies.
- **Emergency Protective Order**: Support in filing for an Emergency Protective Order in court with Wings of Hope. This is a court-ordered petition that prohibits contact between the Complainant and Respondent.
- **No contact order**: A no contact order can be put into place between the Complainant and the Respondent, to prohibit contact or limit contact between both parties through any means of communication, as well as prohibit others from making contact on their behalf.
- **Safety measures**: Coordination of any reasonable arrangements that are necessary for ongoing safety. This includes transportation arrangements or providing an escort.
- **Work schedule adjustments**: Assistance in changing on-campus work schedules, work assignments, supervisor responsibilities, or other work arrangements.
- **Leaves of absence**: A pre-approved defined period away from the work environment. (employees only)
- **Living arrangements**: Assistance in changing on-campus living arrangements to ensure a comfortable living situation.
- **Academic arrangements**: Assistance in adjusting academic schedules as well providing access to academic support services. (students only)
- **Other supportive measures**: Coordination of other reasonable arrangements to address the effects of the Sexual Misconduct, including connecting individuals with counseling or health care.

## FORMAL COMPLAINT PROCESS

**4.01   REPORTING**

Oklahoma State University is obliged to act when it receives "actual knowledge" of allegations of Sexual Harassment. Persons who believe they have been subject to prohibited Sex Discrimination or Sexual Harassment are encouraged to seek assistance, to directly report such conduct to appropriate supervisors, or to directly report such conduct to the Title IX Coordinator or Deputy Title IX Coordinator. In instances involving alleged violations of this Policy engaged in by students, the Title IX Coordinator will refer such matters to the Deputy Title IX Coordinator for review and other processing.

## 4.03   EMERGENCY REMOVALS

Applicable only to students, an emergency removal is a removal, either partially or entirely, of a student from the University and its activities on an emergency basis when an individualized safety and risk analysis has determined an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies removal. The individualized risk assessment will be conducted by the Deputy Title IX Coordinator, in conjunction with the Behavioral Consultation Team using its standard risk assessment procedures. A removed student will receive a written notice of the decision, which notice will include information about how the student may challenge the removal decision.

## 4.04   INITIAL ASSESSMENT

Upon receiving a Formal Complaint, the Title IX Coordinator (in cases involving a faculty or staff Respondent) or Deputy Title IX Coordinator (in cases involving a student Respondent) will conduct an initial assessment and provide information about Supportive Measures. At the conclusion of the preliminary inquiry, the Title IX Coordinator will provide the Complainant with information regarding the appropriate procedural process. The Complainant will be advised if the information discovered during the preliminary inquiry warrants proceeding with the grievance process as outlined in this Policy or if the allegations, if true, may constitute a violation of another University Policy. If the information does not warrant proceeding under this Policy, the case will be dismissed under this Policy (see Section 4.07 for more information on dismissals).

## 4.05   INVESTIGATION NOTICE

If it is determined there is sufficient evidence to proceed with an investigation, a written notice and copy of the grievance procedure will be provided to the Complainant and Respondent. The notice will detail the allegations, to include, if known, the identities of the parties, the date and location of the incident, and the specific alleged Policy violation(s). The notice will also state the Respondent is presumed not to be responsible until a determination. The notice will advise both parties of their right to have an Advisor of their own choosing. Finally, the notice will include information related to the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges Policy 3.06, Non-Retaliation.

a. **Employee Respondents** – When the Respondent is an employee, the notice will also be provided to the Respondent's supervisor and the appropriate senior administrator, with sensitivity to protect the privacy of the Complainant and Respondent.

## 4.06   INVESTIGATION

A trained investigator, or multiple trained investigators if necessary, will be assigned. The investigator(s) will conduct a fair, thorough and impartial investigation. The Respondent is entitled to a presumption of innocence unless a finding is determined. Both parties will have an equal opportunity to present facts, witnesses and evidence to support their positions, with no restrictions on the parties' ability to discuss the investigation. Both parties will have an equal opportunity to attend any proceedings, along with their Advisor. Reasonable efforts will be made to conduct interviews with all parties and relevant witnesses in a timely fashion.

a. **Delaying Investigation –** When a law enforcement agency is conducting its own investigation into the alleged conduct, the University's investigation may be delayed temporarily to meet the specific needs of the criminal investigation.

b. **Investigation Notice –** A notice will be sent to the parties prior to each investigation meeting. In all instances, the University, not the Complainant, will bear the responsibility for investigating and taking appropriate action, including the decision to seek disciplinary action against a Respondent.

c. **Amended Notice** – In the event new allegations or potential violations of Policy arise during the investigation that were not included in the initial investigation notice, an amended notice will be sent to the parties outlining the additional allegations.

d. **Role of the Advisor –** During participation in the investigative process, the Complainant and Respondent may have their own Advisor of choice. The Advisor's role is to assist the Complainant and Respondent in understanding and navigating through the investigative process. An Advisor may not be a witness in the same investigation, or whose participation will create a conflict of interest. The Advisor will not speak, act, or answer questions on behalf of the Complainant or Respondent or impede or act in a manner that obstructs or disrupts the investigative process.

## 4.07   INVESTIGATION REPORT

Upon conclusion of the investigation, the investigator will prepare a report summarizing their findings. The investigation report will be provided to the Complainant and Respondent. To confirm accuracy, both the Complainant and Respondent will have ten (10) business days to review the investigation report and provide feedback to the investigator about their account of information.

## 4.08   DISMISSAL PRIOR TO HEARING

During the initial assessment or during the course of an investigation, a determination may be made that issues surrounding the case do not rise to a violation of this Policy.

a.  Pursuant to applicable law, the Complaint must be dismissed in the following circumstances:

   i.   The conduct alleged does not meet the definition of any prohibited conduct under this Policy;
   iii.  The alleged conduct did not occur on University-owned or controlled premises;
   iv.  The alleged conduct did not occur in the University's education program or activity;
   v.   The alleged conduct did not occur against a person in the United States; or
   vi.  If at the time of a Formal Complaint, the Complainant is not participating in or attempting to participate in the University's education program or activity.

b.  At the discretion of the Title IX Coordinator or Deputy Title IX Coordinator the following are additional grounds for dismissal:

   i.   If the Complainant requests in writing to dismiss a Formal Complaint or any allegations therein;
   ii.  The Respondent is no longer enrolled in or employed by the University; or
   iii.  Any specific circumstances exist which prevent the University from gathering evidence sufficient to reach a determination as to the Formal Complaint or any allegations therein; or

c.  If a Formal Complaint is dismissed for any of the above reasons, the Complainant and Respondent will be provided a written notice of the dismissal and the reason(s) for dismissal. In addition, if the alleged misconduct may be addressed by another University Policy or process, that information will be included in the written notice of dismissal.

   i.   **For Employee Respondents –** If a Formal Complaint against an employee Respondent is closed, the Title IX investigation will be closed administratively, and all parties, including the appropriate supervisor or Department Head and Administrator, will be notified in writing of the administrative closure. The findings and determination as to any non-Title IX Policy violation will be forwarded to Human Resources Consultant Services for review and subsequent actions.

   ii.  **For Student Respondents –** A Formal Complaint being dismissed under this Policy does not preclude it from being addressed through the Student Code of Conduct.

d.  A Complainant or Respondent may appeal a dismissal by following the procedures outlined in Section 6.

## HEARING PROCEDURES

**5.01   TITLE IX HEARING (EMPLOYEE RESPONDENT)**

Upon the conclusion of an investigation involving a non-student University employee as a Respondent, the Complainant and Respondent will be notified in writing with the name and contact information of a trained Decision Maker assigned to conduct a live hearing that will be recorded by audio or audio visual means. The Complainant and Respondent will be provided the scheduled date, time and location of the hearing, as well as written information regarding the hearing process. Within ten (10) business days of receipt of the notification, both parties may provide the Decision Maker with the name and contact information of their Advisor for the hearing, supporting evidence and a list of witnesses. If either the Complainant or Respondent is unable or chooses not to name an Advisor, one will be provided by the University. At any time during the process, requests for extensions to provide information or to reschedule hearings may be made and approved by the Decision Maker in their sole discretion. Any request for an extension must be in writing, no later than two (2) days prior to the applicable due date. All parties and Advisors will be notified of approved extensions in writing.

a.   **Title IX Hearing Location** – The privacy of both parties is taken into consideration when determining the location of the hearing. A request by either party may be made that both parties will participate in the hearing from separate rooms. The designated rooms will be furnished with audio and visual equipment to allow both parties to see and hear each other during the hearing process.

b.   **Attendance at Title IX Hearing** – While information from the Complainant, Respondent, and witnesses to the incident may be included in the Investigation Report, if a party or witness does not appear at the Title IX Hearing to be available for cross-examination, the Decision Maker cannot rely on any statement of that party or witness in reaching a determination regarding responsibility. The Decision Maker also may not draw an inference about the determination regarding responsibility based solely on the absence of a party or witness. It is the responsibility of the parties to arrange for the attendance of any witnesses; the University cannot compel or mandate attendance at the Title IX Hearing.

c.   **Title IX Hearing Process –** At the beginning of the hearing, the Decision Maker shall set forth the rules of procedure for the hearing.  Each party is allowed a reasonable time to present their opening statement. The Complainant will present their case first in all phases of the hearing.

Each party is allowed to ask relevant questions of their respective witnesses, followed by cross-examination by the other party's Advisor. Cross-examination must be conducted by the other party's Advisor. The parties may not under any circumstances conduct cross-examination. If necessary, a party will be allowed additional time for follow-up questions of their witness, followed by additional time for cross-examination by the other party's Advisor. The Decision Maker will determine whether questions asked during cross-examination by an Advisor are relevant.

The Decision Maker may also ask questions of the parties and witnesses for clarification.

The process will be repeated until all testimony is concluded.

The party's Advisor may only participate to the extent set forth above.

d.   **Standard of Evidence** – The standard of evidence to be used to make a determination is Preponderance of the Evidence.

e.   **Title IX Hearing Determination** – Following the hearing, the Decision Maker will issue a written determination, generally within five (5) business days. In the event circumstances require more time to issue a written determination, the Decision Maker will notify the parties. This document will include the following elements:

   i.   the allegations made against the Respondent;
   ii.  a description of the procedural steps undertaken, including notifications to parties, interviews and site visits, methods used to gather evidence, and hearings;
   iii. findings of fact that support the determination;
   iv.  an explanation regarding the result of each allegation, including a determination as to whether the Respondent did or did not violate this Policy as to each allegation;
   v.   any disciplinary actions/sanctions against the Respondent, and any remedies to be provided to the Complainant; and
   vi.  procedures and bases for appeal.

f.   **Effect of Hearing Determination** – The determination will become final one (1) day after the appeal deadline set in Section 6.01. The Title IX Coordinator will coordinate the implementation of any remedies. Copies of the written determination will be provided to both parties, and their respective department heads to include the Deans, the Provost's office, and/or Vice Presidents.

**5.02   TITLE IX HEARING PROCEDURE (STUDENT RESPONDENT)**

**App.379**

All cases involving a student Respondent will follow the procedures set forth in the Student Code of Conduct, available at https://studentconduct.okstate.edu/code, with the following additions:

    a.   **Advisor** – The Complainant and Respondent may have their own Advisor of choice. If either the Complainant or Respondent is unable or chooses not to name an Advisor, the University will provide an Advisor. During the hearing, questions asked to the other party must be asked through the participant's Advisor. If the participant's Advisor does not act in accordance of the hearing and the Advisor's privileges are withdrawn or they are barred from the hearing, Student Conduct Education and Administration will appoint an Advisor to assist in asking questions to other participants.

## 5.03   VIOLATION OF POLICY

If the Decision Maker determines by a Preponderance of the Evidence that Respondent has engaged in Sexual Misconduct as defined in this Policy, Respondent will be deemed responsible for a Title IX violation.

## <u>APPEALS</u>

## 6.01   APPEALS INVOLVING EMPLOYEE RESPONDENTS

    a.   **Time for Appeal** – A Complainant or Respondent may appeal in writing either a dismissal of a Formal Complaint or the Title IX Hearing Determination within ten (10) days of notification of such determination on the grounds set forth in Section 6.01(b).

    b.   **Grounds for Appeal** – A Complainant or Respondent may appeal either a dismissal of a Formal Complaint or the Title IX Hearing Determination for the following reasons:

       i.  A procedural irregularity occurred that affected the outcome of the matter;
      ii.  New evidence that was not reasonably available at the time the Title IX Hearing Determination or dismissal was made, that could affect the outcome of the matter; or,
     iii.  The Title IX Coordinator, Deputy Title IX Coordinator, investigator(s), or Decision Maker had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent that affected the outcome of the matter.

    c.   **Appeal Process** – Upon receiving a written appeal, the Title IX Coordinator or Deputy Title IX Coordinator will notify the other party. The non-appealing party will have seven (7) days from the notification of appeal to submit a

written response. An Appellate Officer, who is not the same person as the Title IX Coordinator, investigator(s), or Decision Maker in the Title IX Hearing, will be assigned. The Appellate Officer will consider the appeal, any response submitted, and the record of the Title IX Hearing and make a written determination within ten (10) days, which determination will be sent to both parties and will be final.

i.     If the Appellate Officer finds there is no merit to any of the grounds cited in the appeal, it will issue a finding as such and that decision will be final.

ii.    If the Appellate Officer finds there was a procedural irregularity that affected the outcome of the matter, the matter may be remanded to a new Title IX Hearing.

iii.   If the Appellate Officer finds new evidence exists that was not reasonably available that could affect the outcome, the matter may be remanded to the original Title IX Hearing Decision Maker.

iv.    If the Appellate Officer finds that the Title IX Coordinator, investigator(s), or Decision Maker had a conflict of interest or bias for or against the parties (generally, or specifically in this matter) that affected the outcome of the matter, the case may be remanded to a new Title IX Hearing.

## 6.02   APPEALS INVOLVING STUDENT RESPONDENTS

a.     **Time for Appeal** – A Complainant or Respondent may appeal in writing either a dismissal of a Formal Complaint or the Title IX Hearing Determination within seven (7) days of notification of such determination on the grounds set forth in Section 6.02(b).

b.     **Grounds for Appeal** – A Complainant or Respondent may appeal either a dismissal of a Formal Complaint or the Title IX Hearing Determination for the following reasons:

i.     A procedural irregularity occurred that affected the outcome of the matter;

ii.    New evidence that was not reasonably available at the time the Title IX Hearing Determination or dismissal was made, that could affect the outcome of the matter;

iii.   The Title IX Coordinator, Deputy Title IX Coordinator, investigator(s), or Decision Maker had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent that affected the outcome of the matter; or

iv.    The sanction is not appropriate for the violation. This provision is intended to be utilized when a determined sanction is inherently inconsistent with University procedures or precedent.   Simple

dissatisfaction is not grounds for overturning a sanction under this provision.

## RETALIATION

**7.01   RETALIATION**

Retaliation is any adverse action taken against a person because of that person's participation in protected activity. In accordance with the Oklahoma Agricultural and Mechanical Colleges Policy 3.06, Non-Retaliation, the University strictly prohibits retaliation against any person for making any good faith report of discrimination, harassment, or sexual misconduct or for filing, testifying, assisting, or participating in any investigation or proceeding involving allegations of discrimination, harassment, or sexual misconduct. Any person who engages in such retaliation shall be subject to disciplinary action, up to and including termination, in accordance with applicable procedures. Any person who believes they have been subjected to retaliation is encouraged to promptly notify the Title IX Coordinator. The University will promptly investigate all claims of retaliation.

## RECORDKEEPING

**8.01   RECORDS**

In implementing this Policy, records of all complaints, investigations, and resolutions will be kept by the Title IX Coordinator (or designee) depending on the nature of the complaint. The records will be kept for a minimum of seven (7) years following final resolution.

**8.02   OSU ANNUAL SECURITY REPORTS**

Oklahoma State University disseminates a public annual security report Annual Security Report (ASR) to employees and students every October 1st. The ASR includes statistics of campus crime for the preceding 3 calendar years, plus details about efforts taken to improve campus safety. The report includes:  definitions of sexual harassment, what to do if you are victimized, support services, on and off campus resources, preventive measures and the sex offender registration. Additionally, there are Policy statements regarding crime reporting, campus facility security and access, incidence of alcohol and drug use, and the prevention of/response to sexual assault, domestic and dating violence, and stalking. The OSU Annual Security Report can be located at: https://police.okstate.edu/annual-security-reports.

## TRAINING

**9.01   TRAINING**

Oklahoma State University will ensure the Title IX Coordinator, Deputy Title IX Coordinator, Title IX Investigators, and Decision Makers do not have conflicts of interest

or any bias for or against the Complainant or Respondent. Each person will receive mandatory training on the topics of sexual harassment, and Sexual Misconduct, to include how to conduct investigations, how to conduct hearings and appeals, and how to remain impartial throughout the process. Title IX and Title VII training is mandatory for all University administrators, faculty and staff.

Appendix A
State Law Definitions

**Consent**: The term "consent" means the affirmative, unambiguous and voluntary agreement to engage in a specific sexual activity during a sexual encounter which can be revoked at any time. Consent cannot be:

1.    Given by an individual who:
    a.    is asleep or is mentally or physically incapacitated either through the effect of drugs or alcohol or for any other reason, or
    b.    is under duress, threat, coercion or force; or
2.    Inferred under circumstances in which consent is not clear including, but not limited to:
    a.    the absence of an individual saying "no" or "stop", or
    b.    the existence of a prior or current relationship or sexual activity.

21 Okla. Stat. § 113

**Dating violence** is not defined by the state of Oklahoma; however, violence against a person with whom the perpetrator is in a dating relationship is considered domestic violence, defined below. A **dating relationship** is defined as: an intimate association, primarily characterized by affectionate or sexual involvement. For purposes of this act, a casual acquaintance or ordinary fraternization between persons in a business or social context shall not constitute a dating relationship.

22 Okla. Stat. § 60.1.

**Domestic violence** is not defined in Oklahoma law. However, the criminal definition of **domestic abuse** is defined as: Any act of physical harm, or the threat of imminent physical harm which is committed by an adult, emancipated minor, or minor child thirteen (13) years of age or older against another adult, emancipated minor or minor child who is currently or was previously an intimate partner or family or household member. "Family or household members" means: (a) parents, including grandparents, stepparents, adoptive parents and foster parents, (b) children, including grandchildren, stepchildren, adopted children and foster children, and (c) persons otherwise related by blood or marriage living in the same household. "Intimate partner" means: (a) current or former spouses, (b) persons who are or were in a dating relationship, (c) persons who are the biological parents of the same child, regardless of their marital status or whether they have lived together at any time, and (d) persons who currently or formerly lived together in an intimate way, primarily characterized by affectionate or sexual involvement. A sexual relationship may be an indicator that a person is an intimate partner, but is never a necessary condition.

22 Okla. Stat. § 60.1.

**Sexual assault**:

a.    rape, or rape by instrumentation, as defined in Sections 1111, 1111.1 and 1114 of [Title 21], or

b. forcible sodomy, as defined in Section 888 of [Title 21].
21 Okla. Stat. § 142.20.

***Rape (as used in the definition for "sexual assault")***:

A. Rape is an act of sexual intercourse involving vaginal or anal penetration accomplished with a male or female who is not the spouse of the perpetrator and who may be of the same or the opposite sex as the perpetrator under any of the following circumstances:

1. Where the victim is under sixteen (16) years of age;
2. Where the victim is incapable through mental illness or any other unsoundness of mind, whether temporary or permanent, of giving legal consent;
3. Where force or violence is used or threatened, accompanied by apparent power of execution to the victim or to another person;
4. Where the victim is intoxicated by a narcotic or anesthetic agent, administered by or with the privity of the accused as a means of forcing the victim to submit;
5. Where the victim is at the time unconscious of the nature of the act and this fact is known to the accused;
6. Where the victim submits to sexual intercourse under the belief that the person committing the act is a spouse, and this belief is induced by artifice, pretense, or concealment practiced by the accused or by the accused in collusion with the spouse with intent to induce that belief. In all cases of collusion between the accused and the spouse to accomplish such act, both the spouse and the accused, upon conviction, shall be deemed guilty of rape;
7. Where the victim is under the legal custody or supervision of a state agency, a federal agency, a county, a municipality or a political subdivision and engages in sexual intercourse with a state, federal, county, municipal or political subdivision employee or an employee of a contractor of the state, the federal government, a county, a municipality or a political subdivision that exercises authority over the victim; or the subcontractor or employee of a subcontractor of the state or federal government, a county, a municipality or a political subdivision that exercises authority over the victim;
8. Where the victim is at least sixteen (16) years of age and is less than twenty (20) years of age and is a student, or under the legal custody or supervision of any public or private elementary or secondary school, junior high or high school, or public vocational school, and engages in sexual intercourse with a person who is eighteen (18) years of age or older and is an employee of the same school system; or
9. Where the victim is nineteen (19) years of age or younger and is in the legal custody of a state agency, federal agency or tribal court and engages in sexual intercourse with a foster parent or foster parent applicant.

B. Rape is an act of sexual intercourse accomplished with a male or female who is the spouse of the perpetrator if force or violence is used or threatened, accompanied by apparent power of execution to the victim or to another person.

21 Okla. Stat. § 1111

**App.385**

***Rape by instrumentation (as used in the definition of "sexual assault"):***

Rape by instrumentation is an act within or without the bonds of matrimony in which any inanimate object or any part of the human body, not amounting to sexual intercourse is used in the carnal knowledge of another person without his or her consent and penetration of the anus or vagina occurs to that person. Provided, further, that at least one of the circumstances specified in Section 1111 of this title has been met; further, where the victim is at least sixteen (16) years of age and is less than twenty (20) years of age and is a student, or under the legal custody or supervision of any public or private elementary or secondary school, junior high or high school, or public vocational school, and engages in conduct prohibited by this section of law with a person who is eighteen (18) years of age or older and is an employee of the same school system, or where the victim is under the legal custody or supervision of a state or federal agency, county, municipal or a political subdivision and engages in conduct prohibited by this section of law with a federal, state, county, municipal or political subdivision employee or an employee of a contractor of the state, the federal government, a county, a municipality or a political subdivision that exercises authority over the victim, consent shall not be an element of the crime. Provided, further, that at least one of the circumstances described in Section 1111 of this title has been met; further, where the victim is nineteen (19) years of age or younger and in the legal custody of a state agency, federal agency or tribal court and engages in conduct prohibited by this section of law with a foster parent or foster parent applicant.  Except for persons sentenced to life or life without parole, any person sentenced to imprisonment for two (2) years or more for a violation of this section shall be required to serve a term of post-imprisonment supervision pursuant to subparagraph f of paragraph 1 of subsection A of Section 991a of Title 22 of the Oklahoma Statutes under conditions determined by the Department of Corrections. The jury shall be advised that the mandatory post-imprisonment supervision shall be in addition to the actual imprisonment.

21 Okla. Stat. § 1111.1.

***Forcible sodomy (as used in the definition of "sexual assault"):***

A.  Any person who forces another person to engage in the detestable and abominable crime against nature, pursuant to Section 886 of this title, upon conviction, is guilty of a felony punishable by imprisonment in the custody of the Department of Corrections for a period of not more than twenty (20) years. Except for persons sentenced to life or life without parole, any person sentenced to imprisonment for two (2) years or more for a violation of this subsection shall be required to serve a term of post-imprisonment supervision pursuant to subparagraph f of paragraph 1 of subsection A of Section 991a of Title 22 of the Oklahoma Statutes under conditions determined by the Department of Corrections. The jury shall be advised that the mandatory post-imprisonment supervision shall be in addition to the actual imprisonment. Any person convicted of a second violation of this section, where the victim of the second offense is a person under sixteen (16) years of age, shall not be eligible for probation, suspended or deferred sentence. Any person convicted of a third or subsequent violation of this section, where the victim of the third or subsequent offense is a person under sixteen (16) years of age, shall be punished by imprisonment in the custody of the Department of Corrections for a term of life or life without parole, in the discretion of the jury, or in case the jury fails or refuses to fix punishment then the same

**App.386**

shall be pronounced by the court. Any person convicted of a violation of this subsection after having been twice convicted of a violation of subsection A of Section 1114 of this title, a violation of Section 1123 of this title or sexual abuse of a child pursuant to Section 843.5 of this title, or of any attempt to commit any of these offenses or any combination of the offenses, shall be punished by imprisonment in the custody of the Department of Corrections for a term of life or life without parole.

B.  The crime of forcible sodomy shall include:

1.  Sodomy committed by a person over eighteen (18) years of age upon a person under sixteen (16) years of age;

2.  Sodomy committed upon a person incapable through mental illness or any unsoundness of mind of giving legal consent regardless of the age of the person committing the crime;

3.  Sodomy accomplished with any person by means of force, violence, or threats of force or violence accompanied by apparent power of execution regardless of the age of the victim or the person committing the crime;

4.  Sodomy committed by a state, county, municipal or political subdivision employee or a contractor or an employee of a contractor of the state, a county, a municipality or political subdivision of this state upon a person who is under the legal custody, supervision or authority of a state agency, a county, a municipality or a political subdivision of this state; or the subcontractor or employee of a subcontractor of the contractor of the state or federal government, a county, a municipality or a political subdivision of this state;

5.  Sodomy committed upon a person who is at least sixteen (16) years of age but less than twenty (20) years of age and is a student of any public or private secondary school, junior high or high school, or public vocational school, with a person who is eighteen (18) years of age or older and is employed by the same school system;

6.  Sodomy committed upon a person who is at the time unconscious of the nature of the act, and this fact should be known to the accused; or

7.  Sodomy committed upon a person where the person is intoxicated by a narcotic or anesthetic agent administered by or with the privity of the accused as a means of forcing the person to submit.

8.  Sodomy committed upon a person who is at least sixteen (16) years of age but less than eighteen (18) years of age by a person responsible for the child's health, safety or welfare.  "person responsible for a child's health, safety or welfare" shall include, but not be limited to: (a) a parent, (b) a legal guardian, (c) a custodian, (d) a foster parent, (e) a person eighteen (18) years of age or older with whom the child's parent cohabitates, (f) any other adult residing in the hold of the child, (g) an agent or employee of a public or private residential home, institution, facility or day treatment program as defined in Section 175.2 of Title 10 of the Oklahoma Statutes, or (h) an owner, operator or employee of a child care facility, as defined by Section 402 of Title 10 of the Oklahoma Statutes.

21 Okla. Stat. § 888 (effective June 6, 2016).

***Stalking:***

Any person who willfully, maliciously, and repeatedly follows or harasses another person in a manner that:

1. Would cause a reasonable person or a member of the immediate family of that person as defined in subsection F of this section to feel frightened, intimidated, threatened, harassed, or molested; and
2. Actually causes the person being followed or harassed to feel terrorized, frightened, intimidated, threatened, harassed, or molested, shall, upon conviction, be guilty of the crime of stalking, which is a misdemeanor punishable by imprisonment in a county jail for not more than one (1) year or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment

F. For purposes of this section:

1. "Harasses" means a pattern or course of conduct directed toward another individual that includes, but is not limited to, repeated or continuing unconsented contact, that would cause a reasonable person to suffer emotional distress, and that actually causes emotional distress to the victim. Harassment shall include harassing or obscene phone calls as prohibited by Section 1172 of this title and conduct prohibited by Section 850 of this title. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose;
2. "Course of conduct" means a pattern of conduct composed of a series of two or more separate acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct";
3. "Emotional distress" means significant mental suffering or distress that may, but does not necessarily require, medical or other professional treatment or counseling;
4. "Unconsented contact" means any contact with another individual that is initiated or continued without the consent of the individual, or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Constitutionally protected activity is not included within the meaning of unconsented contact. Unconsented contact includes but is not limited to any of the following:

   a. following or appearing within the sight of that individual,
   b. approaching or confronting that individual in a public place or on private property,
   c. appearing at the workplace or residence of that individual,
   d. entering onto or remaining on property owned, leased, or occupied by that individual,
   e. contacting that individual by telephone,
   f. sending mail or electronic communications to that individual, and
   g. placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.

**App.388**

5. "Member of the immediate family," for the purposes of this section, means any spouse, parent, child, person related within the third degree of consanguinity or affinity or any other person who regularly resides in the household or who regularly resided in the household within the prior six (6) months.

6. "Following" shall include the tracking of the movement or location of an individual through the use of a Global Positioning System (GPS) device or other monitoring device by a person, or person who acts on behalf of another, without the consent of the individual whose movement or location is being tracked; provided, this shall not apply to the lawful use of a GPS device or other monitoring device or to the use by a new or used motor vehicle dealer or other motor vehicle creditor of a GPS device or other monitoring technology, including a device containing technology used to remotely disable the ignition of a motor vehicle, in connection with lawful action after default of the terms of a motor vehicle credit sale, loan or lease, and with the express written consent of the owner or lessee of the motor vehicle.

21 Okla. Stat. § 1173.

# Exhibit 14

Spotlight on

# SPEECH CODES
# 2021

The State of Free Speech
on Our Nation's Campuses

FIG. 1

56

312

102

FIG. 2

FIG. 3

FIG. 4

# TABLE OF CONTENTS

**1** Executive Summary

**3** Methodology

**5** Findings

**9** Discussion

**23** What Can Be Done

**25** Spotlight On: New Title IX Regulations

**27** Appendices

# EXECUTIVE SUMMARY

For the thirteenth year in a row, the percentage of red light schools has declined.



Most college students in the United States should be able to expect that freedom of expression will be upheld on their campuses. After all, public institutions are legally bound by the First Amendment, and the vast majority of private colleges and universities promise their students commensurate free speech rights.

In spite of this legal landscape, far too many colleges across the country fail to live up to their free speech obligations in policy and in practice. Often, this occurs through the implementation of speech codes: university policies that restrict expression protected by the First Amendment.

For our 2021 report, FIRE surveyed the written policies of 478 colleges and universities, evaluating their compliance with First Amendment standards. Overall, 21.3% of surveyed colleges maintained at least one severely restrictive policy that earned FIRE's worst, "red light" rating, meaning that the policy both clearly and substantially restricts protected speech. This is the thirteenth year in a row that the percentage of schools earning a red light rating has gone down; last year, 24.2% of schools earned a red light rating.

The majority of institutions surveyed (65.3%) earned an overall "yellow light" rating, meaning they maintained at least one yellow light policy. Yellow light policies are either clear restrictions on a narrower range of expression or policies that, by virtue of vague wording, could too easily be applied to restrict protected expression. While the steady decline in red light institutions is cause for optimism, FIRE will continue to work with colleges and universities to ensure that yellow light institutions improve to earn our highest, "green light" rating.

A green light rating indicates that none of a university's written policies seriously imperil protected expression. A total of 56 colleges and universities (11.7% of those surveyed) earned an overall green light rating, up from 50 schools as of last year's report.

In further good news, more and more colleges and universities are adopting policy statements in support of free speech modeled after the "Report of the Committee on Freedom of Expression" at the University of Chicago (the "Chicago Statement"). As of this writing, 76 universities, university systems, or faculty bodies have endorsed a version of the "Chicago Statement," with six adoptions since last year's report.

Though these improvements in policy are heartening, free speech on campus remains under threat. Demands for censorship of student and faculty speech—whether originating on or off campus—are common, and universities continue to investigate and punish students and faculty over protected expression. FIRE surveyed 478 schools and found 21.3% maintain red light policies.

This year, schools across the country moved classes online and set forth new regulations in response to the COVID-19 pandemic, presenting a new set of challenges for campus free speech advocates.[1] These new challenges, combined with an increase in social justice protests and anti-racism activism on campuses, resulted in FIRE's busiest summer ever. Indeed, in the month of June, FIRE's Individual Rights Defense Program reviewed 287 cases of alleged violations of student and faculty rights, while the previous two years saw an average of just 49 cases each June.[2]

It is imperative that those who care about free speech on campus stay vigilant. The decrease in restrictive speech codes and the proliferation of free speech policy statements are the result of the tireless work of free speech advocates at FIRE and elsewhere. But we must ensure that new national and global challenges do not result in such progress being lost. We must continue to work to ensure that students have the opportunity to pursue their education, and that faculty are able to teach with the greatest possible foundation for free expression in place.

**FIRE surveyed 478 schools and found 21.3% maintain red light policies**



The State of Free Speech on Our Nation's Campuses

---

[1] See FIRE statement on COVID-19 restrictions on expressive and associational rights, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (Sept. 8, 2020), thefire.org/fire-statement-on-covid-19-restrictions-on-expressive-and-associational-rights.
[2] Adam Steinbaugh, This has been FIRE's busiest summer ever. What happened?, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (Sept. 14, 2020), thefire.org/this-has-been-fires-busiest-summer-ever-what-happened.

# METHODOLOGY

FIRE believes that free speech is not only a moral imperative, but an essential element of a college education.

For this report, FIRE surveyed publicly available policies at 372 four-year public institutions and 106 of the nation's most prestigious private institutions. Our research focuses in particular on public universities because, as explained in detail below, public universities are legally bound to protect students' right to free speech and can be successfully sued in court when they do not.

FIRE rates colleges and universities as "red light," "yellow light," or "green light" institutions based on how much, if any, protected expression their written policies governing student conduct restrict. The speech code ratings do not take into account a university's "as-applied" violations of student speech rights or other cases of censorship, student- or faculty-led calls for punishment of protected speech, and related incidents and controversies. Monitoring and rating such incidents consistently across 478 institutions with accuracy is not feasible and is beyond the scope of this report.

The speech code ratings are defined as follows:

 **Red Light:** A red light institution maintains at least one policy both clearly and substantially restricting freedom of speech, or bars public access to its speech-related policies by requiring a university login and password for access.

A "clear" restriction unambiguously infringes on protected expression. In other words, the threat to free speech at a red light institution is obvious on the face of the policy and does not depend on how the policy is applied. A "substantial" restriction on free speech is one that is broadly applicable to campus expression. For example, a ban on "offensive speech" would be a clear violation (in that it is unambiguous) as well as a substantial violation (in that it covers a great deal of what is protected under First Amendment standards). Such a policy would earn a university a red light.

When a university restricts access to its speech-related policies by requiring a login and password, it denies prospective students and their parents the ability to weigh this crucial information prior to matriculation. At FIRE, we consider this denial to be so deceptive and serious that it alone warrants an overall red light rating.

 **Yellow Light:** A yellow light institution maintains policies that could be interpreted to suppress protected speech or policies that, while clearly restricting freedom of speech, restrict relatively narrow categories of speech.

For example, a policy banning "verbal abuse" has broad applicability and poses a substantial threat to free speech, but it is not a clear violation because "abuse" might refer to unprotected speech and conduct, such as threats of violence or unlawful harassment. Similarly, while a policy banning "profanity on residence hall door whiteboards" clearly restricts speech, it is relatively limited in scope. Yellow light policies are typically unconstitutional when maintained by public universities,[3] and a rating of yellow light rather than red light in no way means that FIRE condones a university's restrictions on speech. Rather, it means that in FIRE's judgment, those restrictions do not clearly and substantially restrict speech in the manner necessary to warrant a red light rating.

 **Green Light:** If FIRE finds that a university's policies do not seriously threaten campus expression, that college or university receives a green light rating. A green light rating does not necessarily indicate that a school actively supports free expression in practice; it simply means that the school's written policies do not pose a serious threat to free speech.

 **Warning:** FIRE believes that free speech is not only a moral imperative, but an essential element of a college education. However, private universities, as private associations, possess their own right to free association, which allows them to prioritize other values above the right to free speech if they wish to do so. Therefore, when a private university clearly and consistently states that it holds a certain set of values above a commitment to freedom of speech, FIRE gives it a Warning rating in order to warn prospective students and faculty members of this fact.[4] Eight schools surveyed for this report meet these criteria.[5]

The State of Free Speech on Our Nation's Campuses

---

[3] *See, e.g.*, Gooding v. Wilson, 405 U.S. 518, 519, 528 (1972) (holding that a Georgia statute prohibiting "opprobrious words or abusive language" was unconstitutional because those terms, as commonly understood, encompass speech protected by the First Amendment). Under this and related precedents, a public university maintaining a ban on "verbal abuse" and similar expression would be constitutionally deficient.

[4] For example, Brigham Young University's "*Church Educational System Honor Code*" provides: "Brigham Young University and other Church Educational System institutions exist to provide an education in an atmosphere consistent with the ideals and principles of The Church of Jesus Christ of Latter-day Saints. . . . By accepting appointment, continuing in employment, being admitted, or continuing class enrollment, each member of the BYU community personally commits to observe these Honor Code standards approved by the Board of Trustees . . . including the avoidance of profane and vulgar language." *Church Educational System Honor Code*, Brigham Young Univ., policy.byu.edu/view/index.php?p=26 (last visited Oct. 7, 2020). It would be clear to any reasonable person reading this policy that students are not entitled to unfettered free speech at BYU.

[5] FIRE has designated the following colleges and universities as "Warning" schools: Baylor University, Brigham Young University, Pepperdine University, Saint Louis University, the United States Military Academy, the United States Naval Academy, Vassar College, and Yeshiva University.

# FINDINGS

The number of green light institutions has continued to increase this year, from 50 to 56.



Of the 478 schools reviewed by FIRE, 102, or 21.3%, received a red light rating. 312 schools received a yellow light rating (65.3%), and 56 received a green light rating (11.7%). Eight schools earned a Warning rating (1.7%).[6]

This marks the thirteenth year in a row that the percentage of universities with an overall red light rating has fallen, this year from 24.2% to 21.3%. The continued reduction in red light institutions is encouraging: Just over a decade ago, red light schools encompassed about 75% of the report's findings.[7]

However, this year's numbers also reveal an increase in yellow light institutions, as 63.9% of schools earned an overall yellow light last year, compared to 65.3% this year. While yellow light policies are not as clearly and substantially restrictive as red light policies on their face, they nevertheless impose impermissible restrictions on expression.

The number of green light institutions has continued to rise this year, from 50 institutions last year to 56 now.[8] At 11.7%, the percentage of green light schools is at an all-time high, with more than one million students across the country enrolled at green light colleges and universities.[9]

In total, 27 schools improved their overall ratings this year.[10]



FIRE reviewed policies at 478 colleges and universities.



**RED LIGHT**

21.3%



**YELLOW LIGHT**

65.3%



**GREEN LIGHT**

11.7%



**WARNING**

1.7%

[6] See Appendix A for a full list of schools by rating.
[7] The 2009 report and all other past Spotlight on Speech Codes reports are available at thefire.org/spotlight/reports.
[8] Colorado Mesa University, Fayetteville State University, Florida State University, Jackson State University, and the University of Colorado Boulder all joined the ranks of green light schools since last year's report. Emory University, which went from an overall green light rating to an overall red light rating last year by password-protecting certain policies, resolved this issue over the past year, restoring its green light status.
[9] Press Release, Found. for Individual Rights in Educ., One million students now attend colleges with FIRE's highest free speech rating (Feb. 26, 2019), thefire.org/one-million-students-now-attend-colleges-with-fires-highest-free-speech-rating.
[10] See Appendix B for a full list of rating changes over the 2019–20 academic year.
[11] The remaining 0.5% of public institutions in the database earn FIRE's Warning rating. The Warning rating is typically reserved for private universities that clearly prioritize other values above students' free speech, such that students do not have a reasonable expectation of free speech rights. However, despite their public status as federal service academies, the United States Military Academy and the United States Naval Academy earn the Warning rating because they place other institutional priorities above free speech.

**App.399**

## PUBLIC COLLEGES AND UNIVERSITIES

The percentage of public schools with a red light rating dropped again, from 18.3% last year to 14.5% this year. Overall, of the 372 public universities reviewed for this report, 54 received a red light rating (14.5%), 264 received a yellow light rating (71%), and 52 received a green light rating (14%). As a result, public colleges and universities will soon reach a significant turning point: There are nearly the same number of public green light schools as public red light schools. As just nine public schools earned the green light rating a decade ago, this milestone reveals significant progress.

This year, FIRE was pleased to welcome Colorado Mesa University, Fayetteville State University, Florida State University, Jackson State University, and the University of Colorado Boulder to the list of green light institutions.

Notably, Florida State University and the University of Colorado Boulder bring more than 30,000 students each to the green light list. Both are flagship institutions in their state, a status we hope to leverage into further policy reform with other schools in their respective university systems.

In the coming year, FIRE will continue to work strategically to reform policies at public university systems across the country.

**All of the four-year public universities in Arizona now earn FIRE's highest rating, making Arizona the only state able to claim this distinction.**



LAST YEAR          THIS YEAR

Red light ratings of public schools dropped from 18.3% to 14.5% this year.

Foundation for Individual Rights in Education

**App.400**

## Private Colleges and Universities

Of the 106 private colleges and universities reviewed, 47 received a red light rating (44.3%). 49 received a yellow light rating (46.2%), four received a green light rating (3.8%), and six earned a Warning rating (5.7%).

The percentage of private universities earning a red light rating, which stood at 44.8% last year, continued to decrease, coming in at 44.3% this year. This progress, albeit slight, is hard-earned given that private universities are not legally bound by the First Amendment, which regulates only government actors. For this reason, it is gratifying that these colleges are closer to fulfilling their institutional commitments to free expression.

FIRE will continue to work with private colleges and universities to improve policies so that they better meet institutional commitments to protecting students' free speech rights.

**Of the 106 private schools reviewed by FIRE, 47 received a red light rating, 49 received a yellow light rating, 4 received a green light rating, and 6 earned a Warning rating.**



# DISCUSSION

## Speech Codes on Campus: Background and Legal Challenges

Speech codes—university regulations prohibiting expression that would be constitutionally protected in society at large—gained popularity with college administrators in the 1980s and 1990s. As discriminatory barriers to education declined, female and minority enrollment increased. Concerned that these changes would cause tension and that students who finally had full educational access would arrive at institutions only to be offended by other students, college administrators enacted speech codes.

In the mid-1990s, the phenomenon of campus speech codes converged with the expansion of Title IX, the federal law prohibiting sex discrimination in educational institutions receiving federal funds.[12] Under the rationale of the obligation to prohibit discriminatory harassment, unconstitutionally overbroad harassment policies banning subjectively offensive conduct proliferated. (This Title IX enforcement history is covered in further detail in this report's "Spotlight on: New Title IX Regulations" feature.)

In enacting speech codes, administrators ignored or did not fully consider the philosophical, social, and legal ramifications of placing restrictions on speech, particularly at public universities. As a result, federal courts have overturned speech codes at numerous colleges and universities over the past several decades.[13]

Despite the overwhelming weight of legal authority against speech codes, a large number of institutions—including some of those that have been successfully sued on First Amendment grounds—still maintain unconstitutional and illiberal speech codes. It is with this unfortunate fact in mind that we turn to a more detailed discussion of the ways in which campus speech codes violate individual rights and what can be done to challenge them.



[12] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See generally* Jacob E. Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 CAL. L. REV (2016) (discussing evolution of Title IX requirements).

[13] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Am. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip op.); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989). In addition, numerous institutions have voluntarily modified their speech codes as part of settlement agreements. See, e.g., Press Release, Found. for Individual Rights in Educ., VICTORY: Speech rights of 150,000 students to be restored as Los Angeles Community College District settles lawsuit, will abandon Pierce College's tiny free speech zone (Dec. 13, 2018), thefire.org/victory-speech-rights-of-150000-students-to-be-restored-as-los-angeles-community-college-district-settles-lawsuit-will-abandon-pierce-colleges-tiny-free-speech-zone [hereinafter Pierce College Press Release]; Press Release, Found. for Individual Rights in Educ., VICTORY: Student detained for passing out political flyers settles lawsuit with Illinois College (Apr. 18, 2018), thefire.org/victory-student-detained-for-passing-out-political-flyers-settles-lawsuit-with-illinois-college; Press Release, Found. for Individual Rights in Educ., Victory: Texas College Settles Free Speech Lawsuit After Telling Student that Gun Rights Sign Needs 'Special Permission' (May 4, 2017), thefire.org/victory-texas-college-settles-free-speech-lawsuit-after-telling-student-that-gun-rights-sign-needs-special-

## Public Universities vs. Private Universities

With limited, narrowly defined exceptions, the First Amendment prohibits the government—including governmental entities such as state universities—from restricting freedom of speech. A good rule of thumb is that if a state law would be declared unconstitutional for violating the First Amendment, a similar regulation at a state college or university is likewise unconstitutional.

The guarantees of the First Amendment generally do not apply to students at private colleges because the First Amendment regulates only government conduct.[14] Moreover, although acceptance of federal funding does confer some obligations upon private colleges (such as compliance with federal anti-discrimination laws), compliance with the First Amendment is not one of them.

This does not mean, however, that students and faculty at all private schools are not entitled to free expression. In fact, most private universities explicitly promise freedom of speech and academic freedom in their official policy materials.

Middlebury College, for example, states in its student handbook that it "recognizes and affirms that free intellectual inquiry, debate, and constructive dialogue are vital to Middlebury's academic mission and must be protected even when the views expressed are unpopular or controversial."[15] Likewise, Princeton University, echoing the Chicago Statement, "guarantees all members of the University community the broadest possible latitude to speak, write, listen, challenge, and learn" and explains that "it is not the proper role of the University to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive."[16] Yet both of these institutions, along with most other private colleges and universities, maintain policies that prohibit the very speech they promise to protect.[17]

This year, both private and public institutions, including statewide systems, have continued to adopt policy statements in support of free speech modeled after the one produced in January 2015 by the Committee on Freedom of Expression at the University of Chicago.[18] Since our last report, six more institutions have adopted policy statements in support of free speech modeled after the "Chicago Statement." Notably, Colorado Mesa University adopted the Chicago Statement in conjunction with revising all of its speech codes to earn an overall green light rating, further underscoring its commitment to free speech.[19]

> **The First Amendment prohibits the government—including governmental entities such as state universities—from restricting freedom of speech.**

FIRE will continue to encourage institutions, private and public alike, to adopt a similar policy statement over the course of the next year.



<div style="writing-mode: vertical">Foundation for Individual Rights in Education</div>

permission; Press Release, Found. for Individual Rights in Educ., *Victory: Lawsuit Settlement Restores Free Speech Rights at Dixie State U. After Censorship of Bush, Obama, Che Flyers* (Sept. 17, 2015), thefire.org/victory-lawsuit-settlement-restores-free-speech-rights-at-dixie-state-u-after-censorship-of-bush-obama-che-flyers.

[14] California maintains a law that applies the protections of the First Amendment to private, nonsectarian institutions of higher education in the state. Section 94367 of the California Education Code—the so-called "Leonard Law"—provides: "No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution." The code further provides that the law "does not apply to a private postsecondary educational institution that is controlled by a religious organization, to the extent that the application of this section would not be consistent with the religious tenets of the organization." Cal. Educ. Code § 94367(a).

[15] *B.1.b. Non-Discrimination Investigations & Resolutions Procedure*, Middlebury Handbook, http://www.middlebury.edu/about/handbook/policies-for-all/non-discrim-policies/anti-harassment-discrimin (last visited Oct. 23, 2020).

[16] *Statement on Freedom of Expression*, Princeton Univ. Rights, Rules, Responsibilities 2020,         iversity#comp113 (last visited Oct. 15, 2020).

**App.404**

## What Exactly Is "Free Speech," and How Do Universities Curtail It?

What does FIRE mean when we say that a university restricts "free speech"? Do people have the right to say absolutely anything, or are certain types of expression unprotected?

Simply put, the overwhelming majority of speech is protected by the First Amendment. Over the years, the Supreme Court has carved out a limited number of narrow exceptions to the First Amendment, including speech that incites reasonable people to immediate violence; so-called "fighting words" (face-to-face confrontations that lead to physical altercations); harassment; true threats and intimidation; obscenity; and defamation. If the speech in question does not fall within one of these exceptions, it most likely is protected.

**The exceptions are often misapplied and abused by universities to punish constitutionally protected speech.**

The exceptions are often misapplied and abused by universities to punish constitutionally protected speech. There are instances where the written policy at issue may be constitutional—for example, a prohibition on "incitement"—but its application may not be. In other instances, a written policy will purport to be a legitimate ban on a category of unprotected speech like harassment or true threats, but (either deliberately or through poor drafting) will encompass protected speech as well. Therefore, it is important to understand what these narrow exceptions to free speech actually mean in order to recognize when they are being misapplied.

<div style="text-align: right">The State of Free Speech on Our Nation's Campuses</div>



PROTECTED             NOT
                     PROTECTED

---

[17] Middlebury College and Princeton University both earn overall red light ratings. *See* School Spotlight: Middlebury College, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., thefire.org/schools/middlebury-college (last visited Oct. 16, 2020); School Spotlight: Princeton University, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., thefire.org/schools/princeton-university (last visited Oct. 16, 2020).
[18] Committee on Freedom of Expression at the University of Chicago, *Report of the Committee on Freedom of Expression*, *available at* provost.uchicago.edu/FOECommitteeReport.pdf. For a complete list of institutions that have adopted a version of the Chicago Statement, *see* thefire.org/chicago-statement-university-and-faculty-body-support.
[19] Press Release, Found. for Individual Rights in Educ., Colorado Mesa University earns nation's top free speech rating for colleges (Sept. 30, 2020), thefire.org/colorado-mesa-university-earns-nations-top-free-speech-rating-for-colleges.

<div style="text-align: center">**App.405**</div>

## Threats and Intimidation

Foundation for Individual Rights in Education

The Supreme Court has defined "true threats" as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."[20] The Court also has defined "intimidation," of the type not protected by the First Amendment, as a "type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." [21]

Neither term would encompass, for example, a vaguely worded statement that is not directed at anyone in particular. Nevertheless, far too many institutions fail to properly define these legal standards in their written policies.

For example:

- California State University – Monterey Bay defines threats as "[a]ny threat or action of physical, emotional, or verbal harm in any form."[22]

- Southern Illinois University at Carbondale's student conduct code defines intimidation as "[i]mplied threats or acts that cause a reasonable fear of harm in another."[23]

- Southern Oregon University bans "[t]hreatening communication," defined as "[t]hreats made online or through electronic communication with sufficient content such that it causes fear of injury or other harm."[24]

Further, universities frequently misapply policies prohibiting threats and intimidation so as to infringe on protected speech, citing generalized concerns about safety with no regard to the boundaries of protected speech.

This year, Fordham University placed a student on probation over two social media posts, finding his actions constituted a violation of its "Threats / Intimidation" policy.[25] The student's first post was a photo of retired St. Louis Police captain David Dorn, a police officer killed by looters during unrest following the killing of George Floyd, with the caption "Y'all a bunch of hypocrites." In the second post, on the anniversary of the massacre at Tiananmen Square, he posted a photo of himself holding a gun in his backyard with the caption, "Don't tread on me."

In a letter to Fordham, FIRE explained that his conduct did not approach the actual legal standards for a true threat or intimidation:

> It appears that Tong's discipline is based on his benign photo of himself holding of a firearm and his apparent criticism of protests for racial justice in his post about David Dorn. However, neither of his Instagram posts approximate a threat of any sort. Neither post was directed at a specific individual or group of individuals, and neither post on its face or in context indicates Tong intended to engage in any form of violence. Fordham's consideration of Tong's social media post of him holding a gun and his comment on David Dorn to be a "threat" demonstrates an abandonment of any reasonable or fair understanding of the term.[26]

Tong sued Fordham, and the university argued in response that it has the "prerogative to limit a student's free expression rights,"[27] despite repeatedly promising to protect students' free speech in its policies.[28] As a result, the Department of Education sent a letter notifying Fordham that it is investigating whether the university has misrepresented its commitment to the protection of students' expression.[29]



As Fordham's treatment of Tong demonstrates, universities that are bound by the First Amendment or that promise their students free speech must revise their policies so that they track the applicable First Amendment legal standards, and must enforce the policies accordingly.

[20] Virginia v. Black, 538 U.S. 343, 359 (2003).

[21] Id. at 360.

[22] Behavioral Health, and/or Safety of Self/Others, Student Housing & Residential Life Community Standards and Conduct Process Overview, d2jtc9c99zuy7w.cloudfront.net/TJ9un1suS7ZVzs2WsSuw_SHRL%20Community%20Standards%204.12.19.pdf (last visited Oct. 17, 2020).

[23] Threatening Behaviors, Southern Illinois Univ. Carbondale Student Conduct Code at 66 (updated Aug. 14, 2020), srr.siu.edu/_common/Student_Conduct_Code.pdf.

[24] Threatening Conduct, Code of Student Conduct at 21 (updated Sept. 18, 2020), inside.sou.edu/assets/policies/Code_of_Student_Conduct_091820.pdf.

[25] Austin Tong Sanction Letter, Found. for Individual Rights in Educ. (July 17, 2020), thefire.org/austin-tong-sanction-letter-july-14-2020.

[26] See Letter from Lindsie Rank, Program Officer, Individual Rights Defense Program, Found. for Individual Rights in Educ., to Father Joseph M. McShane, S.J., President, Fordham Univ. (July 17, 2020), d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2020/07/17105352/FIRE-letter-to-Fordham-University-July-17-2020.pdf.

[27] Adam Goldstein, Analysis: Department of Education investigates Fordham over broken speech promises, Found. for Individual Rights in Educ. (Aug. 25, 2020), thefire.org/analysis-department-of-education-

**App. 406**

## Incitement

There is also a propensity among universities to restrict speech that offends other students on the basis that it constitutes "incitement." The basic concept, as administrators too often see it, is that offensive or provocative speech will anger those who disagree with it, perhaps so much so that it moves them to violence. While preventing violence is necessary, this is an impermissible misapplication of the incitement doctrine.



Incitement, in the legal sense, does not refer to speech that may lead to violence on the part of those opposed to or angered by it, but rather to speech that will lead those who agree with it to commit immediate violence. In other words, the danger is that certain speech will convince sympathetic, willing listeners to take immediate unlawful action.

The paradigmatic example of incitement is a person standing on the steps of a courthouse in front of a torch-wielding mob and urging that mob to burn down the courthouse immediately. Misapplying the doctrine to encompass an opposing party's reaction to speech they dislike converts the doctrine into an impermissible "heckler's veto," where violence threatened by those angry about particular speech is used as a reason to censor that speech. As the Supreme Court has observed, speech cannot be prohibited because it "might offend a hostile mob" or because it may prove "unpopular with bottle throwers."[30]

The legal standard for incitement was announced in the Supreme Court's decision in Brandenburg v. Ohio.[31] There, the Court held that the state may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[32] This is an exacting standard, as evidenced by its application in subsequent cases.

For instance, in Hess v. Indiana, the Supreme Court held that a man who had loudly stated "We'll take the fucking street later" during an anti-war demonstration did not intend to incite or produce immediate lawless action.[33] The Court found that "at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time," and that the man could therefore not be convicted under a state disorderly conduct statute.[34] The fact that the Court ruled in favor of the speaker despite the use of such strong and unequivocal language underscores the narrow construction that has traditionally been given to the incitement doctrine, and its dual requirements of likelihood and immediacy. Nonetheless, college administrations have been all too willing to abuse or ignore this jurisprudence, often using the term in policies in a colloquial manner.

For example:

- The University of California system's "intolerance report form" encourages students to report instances of "hate speech," defined as "any speech, gesture or conduct, writing, or display that may incite violence or prejudicial action against someone" based on their actual or perceived personal characteristic.[35]

- Western Illinois University bans public decorations in the residence halls that "are deemed to be racist, sexist, indecent, scandalous, illegal, inciting, or in any way oppressive in nature."[36]

- Indiana State University explains that prohibited harassment can be expressed or implied, "creating and/or inciting a foreseeable hostile environment."[37]

**Nonetheless, college administrations have been all too willing to abuse or ignore this jurisprudence.**

The State of Free Speech on Our Nation's Campuses

investigates-fordham-over-broken-speech-promises-in-austin-tong-case.
[18] *See, e.g., Mission Statement*, FORDHAM UNIV. (Apr. 28, 2005), fordham.edu/info/20057/about/2997/mission_statement ("Fordham strives for excellence in research and teaching, and guarantees the freedom of inquiry required by rigorous thinking and the quest for truth."); *Demonstration Policy*, FORDHAM UNIV. STUDENT HANDBOOK, fordham.edu/info/21684/university_regulations/3709/demonstration_policy (last visited Oct. 29, 2020) ("Each member of the University has a right to freely express their positions and to work for their acceptance whether they assent to or dissent from existing situations in the University or society."); *Bias-Related Incidents and/or Hate Crimes*, FORDHAM UNIV. STUDENT HANDBOOK, fordham.edu/ info/21684/university_regulations/6566/bias-related_incidents_andor_hate_crimes (last visited Oct. 29, 2020) ("[T]he University values freedom of expression and the open exchange of ideas. The expression of controversial ideas and differing views is a vital part of University discourse.").
[29] Goldstein, *supra* note 27.
[30] Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 134–35 (1992).
[31] 395 U.S. 444 (1969).
[32] *Id.* at 447 (emphasis in original).

## Obscenity

The Supreme Court has held that obscene expression, to fall outside of the protection of the First Amendment, must "depict or describe sexual conduct" and must be "limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."[38]

This is a narrow standard applicable only to certain highly graphic sexual material. It does not encompass profanity, even though profane words are often colloquially referred to as "obscenities." In fact, the Supreme Court has explicitly held that profanity is constitutionally protected. In Cohen v. California, the defendant, Paul Robert Cohen, was convicted in California for wearing a jacket bearing the words "Fuck the Draft" in a courthouse.[39] The Supreme Court overturned Cohen's conviction, holding that the message on his jacket, however vulgar, was protected speech.



Similarly, in Papish v. Board of Curators of the University of Missouri, the Court determined that a student's expulsion for distributing a student newspaper containing an article titled "Motherfucker Acquitted" violated the First Amendment.[40] The Court wrote that

"the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"[41]

Nonetheless, many colleges erroneously believe that they may lawfully prohibit profanity and vulgar expression. For example:

- Alabama A&M University bans "[i]ndecent, obscene, immoral behavior and/or profanity," including "the use of obscene gestures" and "vulgar language."[42]

- The University of Louisiana at Lafayette's conduct code prohibits "[p]ublic [p]rofanity," defined as "[p]rofanity or abusive or foul language directed toward a person or persons."[43]

- Frostburg State University prohibits the placement of flyers in the residence halls "containing content that would be considered offensive to a reasonable person (e.g. nudity, obscenities, etc.)."[44]

Foundation for Individual Rights in Education

---

[33] 414 U.S. 105 (1973).
[34] Id. at 108–09.
[35] Campus Climate, Univ. of California, ucsystems.ethicspointvp.com/custom/ucs_ccc/default.asp (last visited Oct. 17, 2020).
[36] Decorating Your Room, Residence Hall Student Handbook at 18, wiu.edu/student_services/housing/living_on_campus/pdf/ResidenceHallHandbook2020.pdf (last visited Oct. 17, 2020).
[37] Misconduct against Persons, Code of Student Conduct, indstate.edu/code-of-student-conduct/prohibited-conduct/against-persons (last visited Oct. 17, 2020).
[38] Miller v. California, 413 U.S. 15, 24 (1973).
[39] 403 U.S. 15 (1971).
[40] 410 U.S. 667 (1973).
[41] Id. at 670.
[42] Code of Conduct Offenses and Sanctions, Ala. A&M Univ. Student Handbook (revised 2019), aamu.edu/administrative-offices/student-affairs/student-handbook/_documents/aamu-student-handbook.pdf.

**App. 408**

## Harassment

Hostile environment harassment, properly defined, is not protected by the First Amendment. In the educational context, the Supreme Court has defined student-on-student (or peer) harassment as discriminatory, unwelcome, and targeted conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[45]

This is not simply expression; it is conduct far beyond the protected speech that is too often deemed "harassment" on today's college campus. For example, in Davis, the conduct found by the Court to constitute harassment was a months-long pattern of conduct including repeated attempts to touch the victim's breasts and genitals, together with repeated sexually explicit comments directed at and about the victim.

For decades now, however, many colleges and universities have maintained policies defining harassment too broadly and prohibiting constitutionally protected speech. Years of Title IX enforcement by the Department of Education's Office for Civil Rights (OCR) that neglected to fully protect First Amendment rights, including an unconstitutionally broad definition of sexual harassment promulgated by OCR itself,[46] led numerous colleges and universities to enact overly restrictive harassment policies in an effort to avoid an OCR investigation.

On May 6, 2020, the Department of Education published new Title IX regulations that adopted the Supreme Court's peer harassment standard from Davis, taking effect August 14, 2020. The regulations and emerging trends in universities' compliance are discussed in further detail in this report's "Spotlight on: New Title IX Regulations" feature.

Although the full impact of the regulations remains to be seen as of this writing, we expect university policies on harassment to generally improve. However, even where policies reasonably track the Supreme Court's standard from Davis, problems remain. Many policies define harassment narrowly, then proceed to provide a list of examples of prohibited conduct that do not necessarily meet that standard when standing alone. Others provide multiple definitions of harassment, resulting in a policy scheme that is confusing for students and likely to have a chilling effect on expression.

Here are just a few examples of overly broad harassment policies:

• Northwestern University's harassment policy states: "Examples of harassment include offensive jokes related to a protected class; . . . name calling related to a protected class," and "mockery connected to a protected class."[47]

• Portland State University's policy defines sexual harassment as "unwelcome conduct of a sexual nature," before labeling "sexual or derogatory comments" and "sending letters, notes, cartoons, emails, text or audio messages of a sexually suggestive nature" as examples of "inappropriate behavior."[48]

• Furman University goes so far as to warn students that the university "may address conduct that, although it does not rise to the level of constituting Sexual Misconduct as defined by this Policy, is nevertheless offensive and/or unwanted conduct of a sexual nature."[49]

These examples, along with many others, demonstrate that colleges and universities often fail to limit themselves to the narrow definition of harassment that is outside the realm of constitutional protection. Instead, they expand the term to prohibit broad categories of speech that do not even approach actionable harassment, despite similar policies having been struck down by federal courts years earlier.[50]

Having discussed the most common ways in which universities misuse the narrow exceptions to the First Amendment to prohibit protected expression, we now turn to the innumerable other types of university regulations that restrict free speech on their face. Such restrictions are generally found in several distinct types of policies.

The State of Free Speech on Our Nation's Campuses

43 Code of Student Conduct, Univ. of Louisiana at Lafayette at 16 (last updated August 18, 2020), studentrights.louisiana.edu/sites/studentrights/files/Code%20of%20Student%20Conduct%20Sept.20.pdf.
44 Residence Life Office Residence Hall Posting Guidelines, Frostburg St. Univ. frostburg.edu/student-life/residence-life/residence-life-office/rlo-posting-policy.pdf (last visited Oct. 13, 2020).
45 Davis v. Monroe County Board of Education, 526 U.S. 629, 633 (1999).
46 See Letter from Shaheena Simons and Damon Martinez, U.S. Dep't of Justice to Robert G. Frank, President, Univ. of N.M. (Apr. 22, 2016), available at justice.gov/opa/file/843901/download; Letter from Anurima Bhargava, Chief, Civil Rights Div., U.S. Dep't of Justice, and Gary Jackson, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Royce Engstrom, President, Univ. of Mont. and Lucy France, Univ. Counsel, Univ. of Mont. (May 9, 2013), available at justice.gov/opa/documents/um-ltr-findings.pdf.
47 Policy on Discrimination & Harassment, Northwestern Univ. (Sept. 1, 2019), northwestern.edu/equity/documents/discrimination-harassment-policy-resources-procedures-final.pdf.
48 Prohibited Discrimination & Harassment Policy, Portland St. Univ. (Sept. 28, 2017), docs.google.com/document/d/e/2PACX-1vRBvO64ghsJ4GeuDWaEvzmv9r95jMzJDuIEP9Jqx3LwdRjcb9DVWRVtC3QA6W8Jenhp-txbfpxCRWg/pub.
49 Sexual Misconduct Policy, Furman Univ. at 4 (Aug. 14, 2020), furman.edu/title-ix/wp-content/uploads/sites/728/2020/08/Furman-2020-21-Sexual-Misconduct-Policy-8.14.20.pdf.
50 See, e.g., DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008) (holding that Temple University's sexual harassment policy was unconstitutionally overbroad); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989) (holding that

Case 5:23-cv-00029-J    Document 32-19    Filed 03/24/23    Page 21 of 41
Appellate Case: 23-6054    Document: 010110864065    Date Filed: 05/23/2023    Page: 197

## Anti-Bullying Policies

Over the past decade, FIRE has found that numerous colleges and universities have adopted policies on "bullying" and "cyberbullying." On October 26, 2010, OCR issued a letter on the topic of bullying, reminding educational institutions that they must address actionable harassment, but also acknowledging that "[s]ome conduct alleged to be harassment may implicate the First Amendment rights to free speech or expression." For such situations, OCR's letter refers readers back to the 2003 "Dear Colleague" letter stating that harassment is conduct that goes far beyond merely offensive speech and expression. However, because it is primarily focused on bullying in the K–12 setting, the 2010 letter also urges an in loco parentis approach that is inappropriate in the college setting, where students are overwhelmingly adults.[53]

Court decisions and other guidance regarding student speech in the K–12 setting often "trickle up" to the collegiate setting, and indeed, FIRE has come across numerous university policies prohibiting bullying in a problematic manner. For example:

- Western Michigan University defines bullying as "[r]epeated and/or severe aggressive behavior likely to intimidate or intentionally hurt, control or diminish another person, physically or mentally."[54] The policy goes on to list as examples of bullying "creating web pages with a negative focus; posting insults on social networking sites; and/or spreading rumors with malicious intent."[55]

- Howard University's student handbook defines bullying as "[u]nwanted, aggressive and/or hostile behavior" that involves a power imbalance and is "intended to humiliate" another individual or group. The policy makes clear that bullying "can be one single act" and states that examples include "spreading rumors" and "marginalizing and/or excluding someone from a group, event or activity."[57]

- At Towson University, "[c]yberbullying" is defined as conduct that has the effect of "intimidating; humiliating; harassing; harming; embarrassing; or damaging person(s) or organization(s)."[58]

But as courts have held in rulings spanning decades, speech cannot be prohibited simply because someone else finds it offensive, even deeply so.[59] Offensive speech, if it does not rise to the level of harassment or one of the other narrow categories of unprotected speech and conduct, is entitled to constitutional protection (and, accordingly, to protection at private institutions that claim to uphold the right to free speech).

**FIRE has come across numerous university policies prohibiting bullying in a problematic manner.**



University of Michigan's discriminatory harassment policy was unconstitutionally broad); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998) (holding that Northern Kentucky University's sexual harassment policy was unconstitutionally broad). The United States Court of Appeals for the Fifth Circuit recently questioned whether purely speech harassment claims could ever meet the *Davis* standard, stating: "Whether *Davis* may constitutionally support purely verbal harassment claims, much less speech-related proscriptions outside Title IX protected categories has not been decided by the Supreme Court or this court and seems self-evidently dubious." Speech First, Inc. v. Fenves, No. 19-50529, n. 16 at 29" (5th Cir. 2020).

[51] "Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Oct. 26, 2010), *available at* ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

[52] "In the place of parents."

[53] *See generally* McCauley v. Univ. of the V.I., 618 F.3d 243–44 (3d Cir. 2010) ("[T]he pedagogical missions of public universities and public elementary and high schools are undeniably different. While both seek to impart knowledge, the former encourages inquiry and challenging priori assumptions whereas the latter prioritizes the inculcation of societal values. . . . The idea that public universities exercise strict control over students via an *in loco parentis* relationship has decayed to the point of irrelevance.").

[54] *Student Code,* WESTERN MICHIGAN UNIV. at 15 (last updated Sept. 2020), wmich.edu/sites/default/files/attachments/u560/2020/Student%20Code%20October%202020.pdf.

**App.410**

Foundation for Individual Rights in Education

## Policies on Tolerance, Respect, and Civility

Many schools invoke laudable goals like respect and civility to justify policies that violate students' free speech rights. While a university has every right to promote a tolerant and respectful atmosphere on campus, a university that claims to respect free speech must not limit discourse to only the inoffensive and respectful. And although pleas for civility and respect are often initially framed as requests, many schools have speech codes that effectively turn those requests into requirements.



For example:

- Boston College's information technology use policy states: "Communications from members of the University community are to reflect mutual respect, civility, and other moral standards." The policy specifically bans "[t]he use of obscene or intolerant language, and the use of similarly offensive graphic or video images," and notes that "[t]he determination of what is obscene, offensive, or intolerant is within the sole discretion of the University."[60]

- At Boise State University, students are informed that "[m]embership in the campus community is a privilege and requires its members to conduct themselves ethically with integrity and civility," which includes "adhere[nce] to the principles of civil discourse."[61]

- Georgetown University bans "[i]ncivility," broadly defined as "[e]ngaging in behavior, either through language or actions, which disrespects another individual."[62]

While respect and civility may seem uncontroversial, most uncivil or disrespectful speech is protected by the First Amendment,[63] and is indeed sometimes of great political and social significance. Some of the expression employed in the civil rights movement of the 1950s and '60s, for example, would violate campus civility codes today. Colleges and universities may encourage civility, but public universities—and those private universities that purport to respect students' fundamental free speech rights—may not require it or threaten mere incivility with disciplinary action.

## Internet Usage Policies

University policies regulating online expression, while perhaps appearing to be narrow, can have a significant impact on students' and faculty members' free speech rights, given the prevalence of online communication on today's college campuses.

Examples of impermissibly restrictive Internet usage policies include the following:

- Drexel University calls the use of "offensive language" an abuse of email privileges that could result in "de-activation of the account (for minor first offenses) through university judicial action or referral to law enforcement authorities."[64]

- At Carleton College, students are prohibited from "distributing material which is demeaning."[65] Carleton's policy also bans using information technology resources for "political purposes."

- The College of the Holy Cross informs students that "[o]bscene or intolerant language, as well as offensive images" are prohibited, and makes clear "[t]he determination of what is obscene, offensive or intolerant is within the sole discretion of the College."[67]

The State of Free Speech on Our Nation's Campuses

[55] *Id.*
[56] *Howard University Student Handbook*, HOWARD UNIV., studentaffairs.howard.edu/sites/studentaffairs.howard.edu/files/2020-07/howard-university-student-handbook-2019-2020-REM.pdf (last visited Oct. 13, 2020).
[57] *Id.*
[58] *Code of Student Conduct*, TOWSON UNIV. at 4 (Aug. 12, 2020), towson.edu/studentaffairs/policies/documents/code_of_student_conduct.pdf.
[59] *See* Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *see also* Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 (3d Cir. 2001) (holding that there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive. . . . "); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003) ("[R]egulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in the public high school and university settings"); Doe v. Univ. of Mich., 721 F. Supp. 852, 863 (E.D. Mich. 1989) ("Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people").
[60] *Use of University Technological and Information Resources*, BOSTON COLLEGE POLICIES AND PROCEDURES at 4 (last updated Mar. 30, 2004), bc.edu/content/dam/files/offices/policies/pdf/policies/I/1-100-025.pdf.
[61] *Statement of Shared Values*, BOISE ST. UNIV. OFFICE OF THE PRESIDENT, boisestate.edu/president/values-statement/shared-values (last visited Oct. 16, 2020).

**App.411**

18

Foundation for Individual Rights in Education

As campuses shifted to online learning during the COVID-19 pandemic this year, the concerns presented by problematic speech codes governing online expression were amplified. Indeed, FIRE recently released a report focusing on the recent surge in online censorship.[68]

To take one recent example, at Stockton University, a student faced a litany of charges, including "Disruptive Behavior," "Discrimination," and "Harassment," over using a photograph of President Donald Trump as his Zoom background and posting a political message on Facebook.[69] Stockton's incident report explained that the background made members of his class feel "offended, disrespected, and taunted."[70]

Just as speech that occurs in the public square may not be sanctioned merely because it has made others feel "offended, disrespected, and taunted," online speech may not be restricted on those bases alone.

## Policies on Bias and Hate Speech

In recent years, colleges and universities around the country have instituted policies and procedures specifically aimed at eliminating "bias" and "hate speech" on campus.[71] These sets of policies and procedures, frequently termed "Bias Reporting Protocols" or "Bias Incident Protocols," often include bans on protected expression. For example:

- Grinnell College defines a "bias-motivated incident" as "an expression of hostility toward, a person, group, or property thereof" because of an individual or group's identifying or perceived characteristic. The College warns: "Since these behaviors are not reflective of our Community Standards, student(s) found responsible for bias-related charges may face outcomes up to and including suspension, dismissal or degree withdrawal."[72]

- Bates College lists the following as examples of bias incidents: "hate speech," "sexist jokes or cartoons," and "disparaging remarks on social media sites." Students are told to report

such incidents in order to assist the college in "addressing behaviors that are antithetical to our community values."[73]

- DePauw University states: "Not all bias incidents constitute harassment under these policies. However, even if a bias incident does not constitute harassment, we can and will respond to address hurtful behavior and to support the targeted individual or group."[74]

While speech or expression that is based on a speaker's bias may be subjectively offensive, it is protected under First Amendment standards unless it rises to the level of unlawful conduct like harassment. Some bias reporting policies acknowledge the distinction between unlawful conduct, like hate crimes or harassment, and bias-related incidents. However, many of these policies nonetheless encourage students to report such broadly defined bias incidents, and reserve the right to take action against incidents that do not constitute unlawful behavior or unprotected speech.



Bias incident protocols also often infringe on students' right to due process by allowing for anonymous reporting that denies students the right to confront their accusers. Moreover, universities are often heavily invested in these bias incident policies, having set up extensive regulatory frameworks and response protocols devoted solely to addressing them.

Although some bias incident protocols do not include a separate enforcement mechanism, the mere threat

62 *Code of Student Conduct*, Georgetown Univ. Division of Student Affairs at 13 (last updated fall 2018), studentconduct.georgetown.edu/code-of-student-conduct.
63 *See, e.g.*, Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005, at 23* (N.D. Cal. 2007) (enjoining enforcement of university civility policy because "there is a substantial risk that the civility requirement will inhibit or deter use of the forms and means of communication that, to many speakers in circumstances of the greatest First Amendment sensitivity, will be the most valued and the most effective.").
64 *Email Policy*, Drexel Univ. Information Technology (last revised July 1, 2014), drexel.edu/it/about/policies/policies/07-Email.
65 *Academic User Agreement*, Information Technology Services (last updated Apr. 13, 2020), apps.carleton.edu/campus/its/policies/agreement.
66 *Id.*
67 *Use of Information Technology Services*, College of the Holy Cross Policies and Procedures Manual (Dec. 16, 2015), holycross.edu/sites/default/files/files/policyprocedure/its/350000-002_use_of_information_technology_services_2015_accepted.pdf.
68 *Memory-holed: Universities and Internet Speech*, Found. for Individual Rights in Educ., thefire.org/ research/publications/miscellaneous-publications/memory-holed-universities-and-internet-speech.
69 *See* Letter from Zachary Greenberg, Program Officer, Individual Rights Defense Program, Found. for Individual Rights in Educ., to Harvey Kesselman, President, Stockton Univ. (Aug. 7, 2020), thefire.org/fire-letter-to-stockton-

of a bias investigation will likely be sufficient to chill speech on controversial issues. Indeed, the United States Court of Appeals for the Sixth Circuit recently held that, even though it lacked the power to punish students independently, the University of Michigan's former "Bias Response Team" policy was likely to chill the speech of students because "the invitation from the Response Team to meet could carry an implicit threat of consequence should a student decline the invitation."[75] As a part of a settlement agreement,[76] the university replaced its Bias Response Team with a "Campus Climate Support" program. The new policy makes its purpose—to provide support, rather than to investigate or punish protected speech—clear: "CCS is not a disciplinary body, cannot impose discipline, and does not require participation in any aspect of CCS's work."[77]

Overbroad bias reporting policies must be revised so that they narrowly target unlawful conduct, or to make clear they exist for purposes of providing support for affected individuals.

## Policies Governing Speakers, Demonstrations, and Rallies

Universities may enact reasonable, narrowly tailored "time, place, and manner" restrictions that prevent demonstrations and other expressive activities from unduly interfering with the educational process.[78] They may not, however, regulate speakers and demonstrations on the basis of content or viewpoint, nor may they maintain regulations that burden substantially more speech than is necessary to maintain an environment conducive to education. Such regulations can take several forms, as discussed in the sections below.

## Security Fee Policies

In recent years, FIRE has seen a number of colleges and universities hamper—whether intentionally or just through a misunderstanding of the law—the invitation

of controversial campus speakers by levying additional security costs on the sponsoring student organizations.

The Supreme Court addressed a very similar issue in *Forsyth County v. Nationalist Movement*, where it struck down an ordinance in Georgia that permitted the local government to set varying fees for events based upon how much police protection the event would need.[79] Invalidating the ordinance, the Court wrote that "[t]he fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit."[80] Deciding that such a determination required county administrators to "examine the content of the message that is conveyed," the Court wrote that "[l]isteners' reaction to speech is not a content-neutral basis for regulation. . . . Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."[81]

Despite this precedent, the impermissible use of security fees to burden controversial speech is all too common on university campuses:

- At Evergreen State College, factors that are considered in evaluating risk and determining security needs include the "topic" of the event and the "history of the performer."[82] If extra security is deemed necessary by the university, "this additional cost will be the responsibility of the event sponsor."[83]

- Bridgewater State University informs students that users of facilities will be billed for "extraordinary staff support needs arising from the particular nature of the event."[84]

- The State University of New York – New Paltz chillingly states: "Where a controversial speaker is likely to engender demonstrations from other student groups, the sponsoring organization must recognize the rights of other groups and consider the impact of inviting each speaker on the orderly and lawful functioning of the College."

The State of Free Speech on Our Nation's Campuses

---

university-august-7-2020.

[70] *Id.*

[71] *See generally Bias Response Team Report 2017*, Found. for Individual Rights in Educ., thefire.org/research/publications/bias-response-team-report-2017.

[72] *Campus Life Policies*, Grinnell College 2019-2020 Student Handbook, catalog.grinnell.edu/content.php?catoid=12&navoid=2536#Hate_Crimes_and_Bias-Motivated_Incidents_Policy (last visited Oct. 16, 2020).

[73] *Bias Incidents & Hate Crimes*, Bates Office of Equity and Inclusion, bates.edu/equity-inclusion/bias-incidents-hate-crimes (last visited Oct. 16, 2020).

[74] *What is a Bias Incident?*, DePauw Univ. Bias Incident Resources, depauw.edu/studentacademiclife/campus-safety/bias-incident-resources/investigation-follow-up (last visited Oct. 16, 2020).

[75] *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). Quoting *Schlissel*, the United States Court of Appeals for the Fifth Circuit recently found a university bias reporting team's practice of making referrals to university disciplinary bodies "sufficiently proscriptive to objectively chill student speech." Speech First, Inc. v. Fenves, No. 19-50529, at 22* (5th Cir. 2020).

[76] *Speech First v. U of M; Settlement Agreement*, Speech First – Univ. of Michigan Case (Oct. 28, 2019), speechfirst.org/court-battles/speech-first-v-u-of-m-settlement-agreement.

[77] *Campus Climate Support*, Univ. of Michigan Dean of Students, deanofstudents.umich.edu/campus-climate-support (last visited Oct. 29, 2020).

**App. 413**

## Prior Restraints

The Supreme Court has held that "[i]t is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." Yet many colleges and universities enforce prior restraints, requiring students and student organizations to register their expressive activities well in advance and, often, to obtain administrative approval for those activities. For example:

- Virginia State University's student handbook prohibits "[u]nauthorized assembly, demonstrations, or acts of picketing of any kind" as "Disorderly Conduct," explaining that all "assemblies, demonstrations, and similar acts must have prior approval and be registered."[86]

- Students wishing to conduct a demonstration at Rensselaer Polytechnic Institute must submit an application to the dean of students' office "at least seven (7) days prior to the proposed demonstration date" for approval.[87]

- Students on Kean University's campus can't even hand out flyers without "submitting a formal request online . . . at least five (5) business days prior to the requested use."[88]

## Free Speech Zone Policies

Of the 478 schools surveyed for this report, 34 institutions (7.1%) enforce "free speech zone" policies—policies limiting student demonstrations and other expressive activities to small and often out-of-the-way areas on campus.[89] This number represents a significant improvement over the course of the past decade: a 2013 FIRE survey of the institutions covered in this report found that 16.4%—over double the percentage today—maintained such policies.[90] This positive shift can be traced in large part to FIRE's litigation and legislative efforts.

Over the past several years, free speech zones have

repeatedly been struck down by courts or voluntarily revised by colleges as part of settlements to lawsuits brought by students. FIRE's Stand Up For Speech Litigation Project has mounted successful challenges to free speech zone policies at eight colleges.[91] Most recently, the Los Angeles Community College District agreed to settle a lawsuit brought after an administrator told a student his rights were restricted to a tiny free speech zone on the Los Angeles Pierce College campus. As the largest community college district in the country, this victory for the Stand Up For Speech Litigation Project restored free speech rights to roughly 150,000 students.[92]

Additionally, state legislatures have continued to take action to prohibit public colleges and universities from maintaining free speech zones. Currently, seventeen states have enacted laws prohibiting these restrictive policies: Virginia, Missouri, Arizona, Kentucky, Colorado, Utah, North Carolina, Tennessee, Florida, Georgia, Louisiana, Arkansas, South Dakota, Iowa, Alabama, Oklahoma, and Texas. In doing so, several states utilized FIRE's model legislation.

Due to FIRE's efforts in litigation and legislation, as well as our continued policy reform work, free speech zones have declined dramatically over the past decade. In spite of this progress, too many universities still maintain free speech zones. Despite being inconsistent with the First Amendment, free speech zones are more common at public universities than at private universities: 8.1% of public universities surveyed maintain free speech zones, while just 3.8% of private universities that promise their students free speech rights do.

Examples of current free speech zone policies include the following:

- Eastern Illinois University restricts the distribution of written materials to a single area on campus, which it accurately and candidly calls the "Free Speech Zone."[93] The policy also provides that the university and registered student organizations may reserve this area for events, presenting the

78 *See* Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).
79 Forsyth, 505 U.S. 123.
80 *Id.* at 134.
81 *Id.* at 134–35 (emphasis added).
82 *Id.*
83 *Event Security and Safety*, Evergreen St. College Policies and Procedures, evergreen.edu/policy/eventsecurityandsafety (last visited Oct. 13, 2020).
84 *Free Speech and Demonstration Policy*, Bridgewater St. Univ. (reviewed Sept. 2017), handbook.bridgew.edu/sites/handbook/files/2019-08/BSU_Free_Speech_and_Demonstration_Policy_Revised_2017.pdf.
85 Watchtower Bible and Tract Society of NY, Inc. v. Village of Stratton, 536 U.S. 150, 165–66 (2002).
86 *Disorderly Conduct*, Virginia St. Univ. Student Handbook at 88, vsu.edu/files/docs/student-activities/student-handbook.pdf (last visited Oct. 16, 2020).
87 *Rules for Maintenance of Public Order*, Rensselaer Handbook of Student Rights and Responsibilities at 88 (last rev. Aug. 21, 2020), rpi.app.box.com/s/3f1cl3wlt1mq8gq1a68v6uk3vh1c19f.
88 *Distribution of Literature Policy*, Kean Univ. Policies, kean.edu/offices/policies/distribution-literature (last visited Oct. 16, 2020).

**App.414**

concern that other students wishing to hand out flyers may not be able to do so if this area has been previously reserved.[94]

• The University of California – Riverside provides that all persons may use "[a]reas open to the public generally" for expressive activity, but those areas are defined exceedingly narrowly as "the outdoor paved walkways on the campus."[95] If an activity is "pre-advertised" or can be expected to attract a crowd of over 25 people, it is limited to either "the Tower Mall or Speaker's Mound area."[96]

• At Vanderbilt University, students may only hand out written materials "on Rand Terrace or outside the building in which a meeting has been scheduled by another organization, if the distributors position themselves twenty feet from the entrance and so as to avoid restricting access."[97]

Although free speech zone policies are indeed being steadily revised across the country, they continue to pose problems for students' expressive activities. country, they continue to pose problems for students' expressive activities.

THE STATE OF FREE SPEECH ON OUR NATION'S CAMPUSES

---

[89] See Appendix D for a full list of schools with free speech zone policies.
[90] *Infographic: Free Speech Zones on America's Campuses* (2013), thefire.org/infographic-free-speech-zones-on-americas-campuses-2.
[91] For more information about FIRE's Stand Up for Speech Litigation Project and Million Voices campaign, *see* standupforspeech.com.
[92] Pierce College Press Release, *supra* note 13.
[93] *#138.1 - Posting and Distribution of Materials*, Eastern Illinois Univ. Internal Governing Policies (July 27, 2020), castle.eiu.edu/~auditing/138_1.php.
[94] *Id.*
[95] *Speech and Advocacy*, Univ. of California Riverside (Sept. 15, 1992), fboapps.ucr.edu/policies/index.php?path=printPolicies.php&policy~700-70.
[96] *Id.*
[97] *Freedom of Expression*, Vanderbilt Univ. Student Handbook, vanderbilt.edu/student_handbook/student-engagement/#freedom-of-expression (last visited Oct. 13, 2020).

**App.415**

Appellate Case: 23-6054   Document: 010110864065   Date Filed: 05/23/2023   Page: 203

# WHAT CAN BE DONE?

The good news is that the types of restrictions discussed in this report can be reformed. Students and faculty members can be tremendously effective advocates for change when they are aware of their expressive rights and willing to engage administrators in their defense. FIRE provides a number of resources to assist advocates and administrators in revising speech codes, including our Model Code of Student Conduct.[98] The Model Code includes provisions regarding prohibited conduct that would all earn green light ratings, as well as student conduct procedures and procedural safeguards that comply with the Department of Education's recent Title IX regulations.

Unconstitutional policies also can be defeated in court, especially at public universities, where speech codes have been struck down in federal courts across the country. Many more such policies have been revised in favor of free speech as the result of legal settlements.

Any speech code in force at a public university is vulnerable to a constitutional challenge. Moreover, as speech codes are consistently defeated in court, administrators cannot credibly argue that they are unaware of the law, which means that they may be held personally liable when they are responsible for their schools' violations of constitutional rights.[99]

The suppression of free speech at institutions of higher education is a matter of national concern. But, by working together with universities to revise restrictive speech codes and to reaffirm commitments to free expression, we can continue to make strides toward campuses that truly embody the "marketplace of ideas" that such institutions are meant to be in our society.

> **Public exposure is also critical to defeating speech codes, since universities are often unwilling to defend their speech codes in the face of public criticism.**



The State of Free Speech on Our Nation's Campuses

---

[98] *Model Code*, Found. for Individual Rights in Educ. (May 28, 2020), thefire.org/legal/procedural-advocacy/model-code. For other resources regarding policy reform, see thefire.org/resources/fires-speech-code-resources.
[99] *See, e.g.,* Marieke Tuthill Beck-Coon, *FIRE lawsuit against Iowa State University administrators ends with nearly $1 million in damages and fees,* Found. for Individual Rights in Educ. (Mar. 23, 2018) thefire.org/fire-lawsuit-against-iowa-state-university-administrators-ends-with-nearly-1-million-in-damages-and-fees. *See also* Azhar Majeed, *Putting Their Money Where Their Mouth Is: The Case for Denying Qualified Immunity to University Administrators for Violating Students' Speech Rights,* 8 Cardozo Pub. L., Pol'y & Ethics J. 3, 515 (2010).

**App.417**

# Spotlight On:
# New Title IX Regulations

Conduct that constitutes hostile environment harassment, as legally defined, isn't protected by the First Amendment, but colleges all too often miss the mark when drafting harassment policies. In fact, harassment policies earn FIRE's worst, red light rating more frequently than any other type of policy in the Spotlight database, with 68 schools currently maintaining a policy that earns the rating.[100]

In Davis v. Monroe County Board of Education, the Supreme Court defined student-on-student (or peer) harassment in the educational setting as discriminatory, unwelcome conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[101] In other words, harassment is extreme and repetitive behavior—behavior so serious that it would interfere with a reasonable person's ability to receive their education. However, most colleges have adopted a broader standard, putting protected speech at risk of punishment.

To understand why universities so commonly fail to define harassment properly, it helps to take a look back through the past decade of Title IX enforcement.

In 2013, the U.S. Department of Education's Office for Civil Rights (OCR) and the Department of Justice issued a joint findings letter announcing a resolution agreement with the University of Montana, following an investigation into the university's Title IX policies and practices.[102] The letter described this agreement as "a blueprint for colleges and universities throughout the country to protect students from sexual harassment and assault," and defined sexual harassment as "any unwelcome conduct of a sexual nature," including "verbal conduct."[103]

Under this broad, "blueprint" definition of sexual harassment, which fails to incorporate the critical

"severe, pervasive, and objectively offensive" components from the Davis standard, a single instance of subjectively offensive verbal conduct (i.e., speech, such as an off-color joke) could be considered punishable harassment.

OCR later backed away from the term "blueprint" in a letter to FIRE, in which it explained that "the agreement in the Montana case represents the resolution of that particular case and not OCR or DOJ policy,"[104] but the damage caused by the promotion of this definition had already been done. Many universities across the country had adopted it as their controlling standard for peer harassment, or had added it to existing policies, presenting students with a confusing array of definitions at a single school.

After years of pushback from FIRE and other civil liberties groups, OCR finally reversed course. On May 6, 2020, the agency announced new regulations that, among other important reforms regarding procedural safeguards, adopt the standard from Davis for Title IX sexual harassment. Those regulations took effect August 14, 2020.[105]

The colleges and universities analyzed in this report were reviewed incrementally over the course of the past year, from October 2019 to September 2020. Thus, we have only seen the impact of the regulations on schools that were updated since they went into effect. However, we have already identified a few trends in how schools have responded to the regulations.

First, some schools have missed the effective date of the regulations entirely. For example, Murray State University notes that the revision of its "Sexual Harassment Policy" is pending final approval in December 2020 by its board of regents.[106] Most universities have a process for expediting the adoption of a policy on an interim basis, but evidently 100 days

Foundation for Individual Rights in Education

---

[100] FIRE's Spotlight Database Search Results, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., thefire.org/resources/spotlight/?x=&speech_code=Red&y=&institution_type=&speech_code_advanced=Red&y_advanced=&statement%5B%5D=804#search-results (last visited Oct. 29, 2020).
[101] 526 U.S. 629, 633 (1999).
[102] Id.
[102] U.S. Dep't of Educ., Dear Colleague Letter from Gerald A. Reynolds, Assistant Sec'y for Civil Rights (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html.
[103] Id.
[104] Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, U.S. Department of Education, to Greg Lukianoff, President, Foundation for Individual Rights in Education (Nov. 14, 2013), available at thefire.org/letter-from-department-of-education-office-for-civil-rights-assistant-secretary-catherine-e-lhamon-to-fire.
[105] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106).
[106] Sexual Harassment Policy, MURRAY ST. UNIV. (last updated May 1, 2017), murraystate.edu/headermenu/administration/OfficeOfInstitutionalDiversityEquityandAccess/pdf/sexualharassmentpolicy.pdf.
[105] See Title IX, OFFICE OF INSTITUTIONAL DIVERSITY, EQUITY AND ACCESS, murraystate.edu/headermenu/administration/titleix/index.aspx (last visited Oct. 20, 2020).
[108] The regulations note that "inappropriate or illegal behavior may be addressed by a recipient even if the conduct clearly does not meet the Davis standard or otherwise constitute sexual harassment under § 106.30, either under a recipient's own code of conduct or under criminal laws in a recipient's jurisdiction (e.g., with respect to a commenter's example of drugging at a dorm party)." Nondiscrimination, supra note 105. However, developing two entirely separate definitions of sexual harassment with correspondingly distinct procedural protections gives administrators the power to decide which definition and procedures to apply to each case (and even to conduct concurrent

**App.418**

(from May 6, when the regulations were released, to the effective date on August 14) was not sufficient for Murray State. Instead, the university will wait a total of 209 days before revising its policy. In the interim, Murray State has not added the definition of harassment from the regulations to its Title IX webpage or any other location on its website.[107]

The majority of schools, however, have unfortunately adopted what FIRE is calling a "dual-track approach" to reaching policy compliance. While these schools adopted the regulations' definition of sexual harassment for Title IX cases, they also maintain a broader sexual harassment definition for other types of cases.[108]

For example, the State University of New York at Fredonia adopted a "Title IX Grievance Policy" that incorporates the definition from the regulations. However, the policy also provides that "SUNY Fredonia remains committed to addressing any violations of its policies, even those not meeting the narrow standards defined under the Title IX Final Rule," and that "the institution retains authority to investigate and adjudicate the allegations under the policies and procedures defined within the Code of Conduct through a separate grievance proceeding.'"[109]

This "Code of Conduct" policy in turn references the university's "Sexual Harassment Policy," which provides the "blueprint" definition of sexual harassment discussed earlier.[110] Thus, with both the speech-protective definition from the regulations and this broader definition in place, students at SUNY Fredonia are still at risk of being punished for engaging in protected speech.

The results thus far are not all negative. Some schools have adopted the definition of sexual harassment from the regulations in their policies across the board. For example, West Virginia University previously banned "severe or pervasive" conduct in defining hostile environment harassment, rather than requiring that conduct be both "severe" and "pervasive," as per the standard from Davis.[111] Now, that hostile environment definition has been revised to fully track the regulations, requiring both severity and pervasiveness in not only

Title IX cases, but also cases of hostile environment harassment based on other protected characteristics.[112]

And even where schools haven't adopted the Davis standard across all policies, revising policies pursuant to the regulations has resulted in significant improvements. Wichita State University, for one, improved from an overall red light rating to an overall yellow light rating by removing its blueprint sexual harassment policy and replacing it with one that adopts the definition from the regulations.[113] The university still maintains a harassment provision in its student code of conduct that defines harassment more broadly than the regulations, but the removal of the blueprint definition is an important victory for free speech rights.[114]

At the time of this writing, it is difficult to be sure of the future of the Department of Education's regulations. Thus, civil liberties advocates must continue to be diligent in identifying threats to free expression presented by overbroad harassment policies.

Whether or not the Title IX regulations remain in place, schools will need to be urged into compliance, watched to make sure they don't adopt additional, conflicting policies, and monitored to ensure that the application of such policies does not infringe on student rights. FIRE will continue to do so, regardless of what the future holds for these regulations.



<div style="writing-mode: vertical">The State of Free Speech on Our Nation's Campuses</div>

proceedings), a scenario that invites administrative abuse and puts free speech and due process rights at risk. As a federal district court recently explained: "Such disregard for the inevitable administrative headaches of a multi-procedure approach certainly qualifies as evidence of an irregular adjudicative process." Doe v. Rensselaer Polytechnic Institute, No. 1:20-cv-1185, at 13" (N.D.N.Y. Oct. 16, 2020). The court found that a school's "conscious and voluntary choice to afford a plaintiff, over his objection, a lesser standard of due process protections when that school has in place a process which affords greater protections, qualifies as an adverse action." *Id.*

[109] *Title IX Grievance Policy*, SUNY FREDONIA at 5, fredonia.edu/sites/default/files/section/about/diversity-inclusion/SUNY%20Fredonia%20Title%20IX%20Policy.pdf (last visited Oct. 20, 2020).
[110] *Sexual Harassment Policy*, UNIV. POLICIES FOR STUDENTS, fredonia.edu/student-life/student-conduct/policies#SexualDiscrimination (last visited Oct. 20, 2020).
[111] *Archive: BOG Policy 44 - Policy Regarding Discrimination, Harassment, Sexual Harassment, Sexual & Domestic Misconduct, Stalking, and Retaliation*, WEST VIRGINIA UNIV. RULES, POLICIES, AND PROCEDURES (repealed Aug. 14, 2020), policies.wvu.edu/archives/bog-policy-44-policy-regarding-discrimination-harassment-sexual-harassment-sexual-domestic-misconduct-stalking-and-retaliation.
[112] *BOG Governance Rule 1.6 - Rule Regarding Discrimination, Harassment, Sexual Harassment, Sexual Misconduct, Domestic Misconduct, Stalking, Retaliation, and Relationships*, WEST VIRGINIA UNIV. RULES, POLICIES, AND PROCEDURES (Aug. 14, 2020), policies.wvu.edu/finalized-bog-rules/bog-governance-rule-1-6-rule.
[113] *Sexual Harassment, Discrimination and Retaliation for Employees, Students and Visitors*, WSU POLICIES AND PROCEDURES (last revised Aug. 13, 2020), wichita.edu/about/policy/ch_03/ch3_06.php.
[114] *Student Code of Conduct Handbook*, WSU POLICIES AND PROCEDURES (last revised June 24, 2020), wichita.edu/about/student_conduct/student-code-of-conduct-handbook.php.

<div style="text-align: center">**App.419**</div>

# APPENDICES

## Appendix A: Schools by Rating



**RED LIGHT**



**RED LIGHT**

Adams State University
Alabama A&M University
Barnard College
Bates College
Boston College
Boston University
California State University - Dominguez Hills
California State University – Fresno
California State University - Monterey Bay
Carleton College
Case Western Reserve University
Cheyney University of Pennsylvania
Chicago State University
Clark University
Clemson University
Coastal Carolina University
Colby College
Colgate University
College of the Holy Cross
Connecticut College
Dakota State University
Davidson College
Delaware State University
DePauw University
Dickinson College
Drexel University
Eastern Illinois University
Evergreen State College
Fordham University
Fort Lewis College
Framingham State University
Furman University
Georgetown University
Grinnell College
Harvard University
Harvey Mudd College
Howard University
Johns Hopkins University
Kean University
Lafayette College
Lake Superior State University
Lehigh University
Lewis-Clark State College
Lincoln University
Louisiana State University - Baton Rouge

Macalester College
Marquette University
Middlebury College
Mount Holyoke College
Murray State University
Northeastern University
Northern Vermont University
Northwestern University
Portland State University
Princeton University
Reed College
Rensselaer Polytechnic Institute
Rice University
Santa Clara University
Shawnee State University
Southern Illinois University at Carbondale
Southern Illinois University Edwardsville
Southern Oregon University
St. Olaf College
State University of New York - Fredonia
State University of New York - New Paltz
Stevens Institute of Technology
Tennessee State University
The College of New Jersey
Troy University
Tufts University
Tulane University
Union College
University of Alaska Anchorage
University of Alaska Fairbanks
University of Central Missouri
University of Central Oklahoma
University of Colorado Denver
University of Houston
University of Houston-Downtown
University of Illinois at Chicago
University of Louisiana Lafayette
University of Massachusetts at Dartmouth
University of Massachusetts at Lowell
University of Miami
University of Notre Dame
University of Southern California
University of Texas at Arlington
University of Texas at Austin
University of Texas at Dallas
University of Tulsa
University of Wisconsin - Oshkosh
University of Wyoming
Utah State University
Valdosta State University
Villanova University

The State of Free Speech on Our Nation's Campuses



**RED LIGHT**

Virginia State University
Western Illinois University
Western Michigan University
William Paterson University
Winston-Salem State University
Worcester Polytechnic Institute



**YELLOW LIGHT**

Central Michigan University
Central Washington University
Centre College
Christopher Newport University
Clarion University of Pennsylvania
College of Charleston
Colorado College
Colorado School of Mines
Colorado State University
Colorado State University Pueblo
Columbia University
Cornell University
Dartmouth College
East Stroudsburg University of Pennsylvania
East Tennessee State University
Eastern Michigan University
Eastern New Mexico University
Eastern Washington University
Elizabeth City State University
Ferris State University
Fitchburg State University
Florida A&M University
Florida Atlantic University
Florida Gulf Coast University
Florida International University
Fort Hays State University
Franklin & Marshall College
Frostburg State University
George Washington University
Georgia Gwinnett College
Georgia Institute of Technology
Georgia Southern University
Georgia State University
Gettysburg College
Governors State University
Grambling State University
Grand Valley State University
Hamilton College
Haverford College
Henderson State University
Humboldt State University
Hunter College, City University of New York
Idaho State University
Illinois State University
Indiana State University
Indiana University - Bloomington
Indiana University - Kokomo
Indiana University - Purdue University Columbus
Indiana University - Purdue University Indianapolis
Indiana University of Pennsylvania
Indiana University South Bend



**YELLOW LIGHT**

Alabama State University
American University
Angelo State University
Arkansas State University
Athens State University
Auburn University Montgomery
Ball State University
Bard College
Baruch College
Bemidji State University
Black Hills State University
Bloomsburg University of Pennsylvania
Boise State University
Bowdoin College
Bowling Green State University
Brandeis University
Bridgewater State University
Brooklyn College, City University of New York
Brown University
Bryn Mawr College
Bucknell University
California Institute of Technology
California Maritime Academy
California Polytechnic State University
California State Polytechnic University, Pomona
California State University - Bakersfield
California State University - Channel Islands
California State University - Chico
California State University - East Bay
California State University - Fullerton
California State University - Long Beach
California State University - Los Angeles
California State University - Northridge
California State University - Sacramento
California State University - San Bernardino
California State University - San Marcos
California State University - Stanislaus
California University of Pennsylvania
Cameron University
Carnegie Mellon University
Central Connecticut State University

Foundation for Individual Rights in Education

**App.422**



**YELLOW LIGHT**

Indiana University, East
Indiana University, Northwest
Indiana University, Southeast
Iowa State University
Jacksonville State University
James Madison University
Kennesaw State University
Kent State University
Kentucky State University
Kenyon College
Kutztown University of Pennsylvania
Lock Haven University of Pennsylvania
Longwood University
Louisiana Tech University
Mansfield University of Pennsylvania
Marshall University
Massachusetts College of Liberal Arts
Massachusetts Institute of Technology
Metropolitan State University
Metropolitan State University of Denver
Miami University of Ohio
Michigan State University
Middle Georgia State University
Middle Tennessee State University
Millersville University of Pennsylvania
Missouri State University
Missouri University of Science & Technology
Montana State University
Montana Tech of the University of Montana
Montclair State University
Morehead State University
New College of Florida
New Jersey Institute of Technology
New Mexico State University
New York University
Nicholls State University
Norfolk State University
North Carolina A&T State University
North Dakota State University
Northeastern Illinois University
Northern Illinois University
Northern Kentucky University
Northern Michigan University
Northwestern Oklahoma State University
Northwestern State University
Oakland University
Oberlin College
Occidental College
Ohio University
Oklahoma State University - Stillwater
Old Dominion University



**YELLOW LIGHT**

Pennsylvania State University - University Park
Pittsburg State University
Pitzer College
Pomona College
Radford University
Rhode Island College
Rogers State University
Rowan University
Rutgers University - New Brunswick
Saginaw Valley State University
Saint Cloud State University
Salem State University
Sam Houston State University
San Diego State University
San Francisco State University
San Jose State University
Scripps College
Sewanee, The University of the South
Skidmore College
Slippery Rock University of Pennsylvania
Smith College
Sonoma State University
South Dakota State University
Southeast Missouri State University
Southeastern Louisiana University
Southern Connecticut State University
Southern Methodist University
Southern Utah University
Southwest Minnesota State University
Stanford University
State University of New York - Binghamton
State University of New York - Oswego
State University of New York - Albany
State University of New York - University at Buffalo
State University of New York College of Environmental Science and Forestry
Stockton University
Stony Brook University
Swarthmore College
Syracuse University
Tarleton State University
Temple University
Tennessee Technological University
Texas Southern University
Texas State University - San Marcos
Texas Tech University
Texas Woman's University
The City College of New York
The Ohio State University
The University of Virginia's College at Wise
Towson University

The State of Free Speech on Our Nation's Campuses

**App.423**

**YELLOW LIGHT**

Trinity College
University of Akron
University of Alabama
University of Alabama at Birmingham
University of Alabama in Huntsville
University of Alaska Southeast
University of Arkansas - Fayetteville
University of California Berkeley
University of California Davis
University of California Irvine
University of California Merced
University of California Riverside
University of California San Diego
University of California Santa Barbara
University of California Santa Cruz
University of Central Arkansas
University of Central Florida
University of Cincinnati
University of Connecticut
University of Delaware
University of Denver
University of Georgia
University of Hawaii at Manoa
University of Hawaii Hilo
University of Idaho
University of Illinois at Springfield
University of Illinois at Urbana-Champaign
University of Iowa
University of Kansas
University of Kentucky
University of Maine
University of Maine at Fort Kent
University of Maine Presque Isle
University of Mary Washington
University of Massachusetts - Amherst
University of Massachusetts - Boston
University of Memphis
University of Michigan - Ann Arbor
University of Michigan - Dearborn
University of Michigan - Flint
University of Minnesota - Morris
University of Minnesota - Twin Cities
University of Missouri - Columbia
University of Missouri-Kansas City
University of Missouri-St. Louis
University of Montana
University of Montana Western
University of Montevallo
University of Nebraska - Lincoln
University of Nebraska Omaha
University of Nevada, Las Vegas

**YELLOW LIGHT**

University of Nevada, Reno
University of New Mexico
University of New Orleans
University of North Alabama
University of North Carolina at Asheville
University of North Carolina School of the Arts
University of North Georgia
University of North Texas
University of Northern Colorado
University of Northern Iowa
University of Oklahoma
University of Oregon
University of Pennsylvania
University of Pittsburgh
University of Rhode Island
University of Richmond
University of Rochester
University of South Alabama
University of South Carolina Columbia
University of South Dakota
University of South Florida
University of South Florida at Saint Petersburg
University of Southern Indiana
University of Southern Maine
University of Texas at El Paso
University of Texas at San Antonio
University of Texas at Tyler
University of Texas Rio Grande Valley
University of Toledo
University of Utah
University of Vermont
University of Washington
University of West Alabama
University of West Florida
University of West Georgia
University of Wisconsin - Eau Claire
University of Wisconsin - Green Bay
University of Wisconsin - La Crosse
University of Wisconsin - Madison
University of Wisconsin - Stout
University of Wisconsin Milwaukee
Utah Valley University
Vanderbilt University
Virginia Commonwealth University
Virginia Polytechnic Institute and State University
Wake Forest University
Washington & Lee University
Washington State University
Washington University in St. Louis
Wayne State University
Weber State University

Foundation for Individual Rights in Education

**App.424**



**YELLOW LIGHT**

- Wellesley College
- Wesleyan University
- West Chester University of Pennsylvania
- West Virginia University
- Western Kentucky University
- Western Oregon University
- Western Washington University
- Westfield State University
- Whitman College
- Wichita State University
- Williams College
- Winona State University
- Worcester State University
- Wright State University
- Yale University
- Youngstown State University



**GREEN LIGHT**

- Alcorn State University
- Appalachian State University
- Arizona State University
- Auburn University
- Claremont McKenna College
- Cleveland State University
- Colorado Mesa University
- Delta State University
- Duke University
- East Carolina University
- Eastern Kentucky University
- Edinboro University of Pennsylvania
- Emory University
- Fayetteville State University
- Florida State University
- George Mason University
- Jackson State University
- Kansas State University
- Keene State College
- McNeese State University
- Michigan Technological University
- Mississippi State University
- North Carolina Central University
- North Carolina State University
- Northern Arizona University
- Oregon State University
- Plymouth State University
- Purdue University
- Purdue University Fort Wayne
- Purdue University Northwest
- Shippensburg University

- State University of New York - Brockport
- State University of New York - Plattsburgh
- Texas A&M University
- The College of William & Mary
- University of Arizona
- University of California Los Angeles
- University of Chicago
- University of Colorado at Boulder
- University of Florida
- University of Louisville
- University of Maryland - College Park
- University of Mississippi
- University of New Hampshire
- University of North Carolina - Pembroke
- University of North Carolina Chapel Hill
- University of North Carolina Charlotte
- University of North Carolina Greensboro
- University of North Carolina Wilmington
- University of North Dakota
- University of North Florida
- University of Southern Mississippi
- University of Tennessee Knoxville
- University of Virginia
- Western Carolina University
- Western Colorado University



**WARNING SCHOOLS**

- Baylor University
- Brigham Young University
- Pepperdine University
- Saint Louis University
- United States Military Academy
- United States Naval Academy
- Vassar College
- Yeshiva University

The State of Free Speech on Our Nation's Campuses

**App.425**

## APPENDIX B: Rating Changes, 2019–2020 Academic Year

| SCHOOL NAME | 2018–2019 RATING | | 2019–2020 RATING | |
|---|:---:|---|:---:|---|
| Boise State University | 🔴 | Red | 🟡 | Yellow |
| College of Charleston | 🔴 | Red | 🟡 | Yellow |
| Colorado Mesa University | 🟡 | Yellow | 🟢 | Green |
| Dartmouth College | 🔴 | Red | 🟡 | Yellow |
| Emory University | 🔴 | Red | 🟢 | Green |
| Fayetteville State University | 🟡 | Yellow | 🟢 | Green |
| Florida State University | 🔴 | Red | 🟢 | Green |
| Georgia Southern University | 🔴 | Red | 🟡 | Yellow |
| Governors State University | 🔴 | Red | 🟡 | Yellow |
| Harvey Mudd College | 🟡 | Yellow | 🔴 | Red |
| Idaho State University | 🔴 | Red | 🟡 | Yellow |
| Jackson State University | 🟡 | Yellow | 🟢 | Green |
| Morehead State University | 🔴 | Red | 🟡 | Yellow |
| New Jersey Institute of Technology | 🔴 | Red | 🟡 | Yellow |
| Northern Illinois University | 🔴 | Red | 🟡 | Yellow |
| Northwestern University | 🟡 | Yellow | 🔴 | Red |
| Oklahoma State University - Stillwater | 🔴 | Red | 🟡 | Yellow |
| Rice University | 🟡 | Yellow | 🔴 | Red |
| Shawnee State University | 🟡 | Yellow | 🔴 | Red |
| Southeastern Louisiana University | 🔴 | Red | 🟡 | Yellow |
| Southern Utah University | 🔴 | Red | 🟡 | Yellow |
| State University of New York - Albany | 🔴 | Red | 🟡 | Yellow |
| Syracuse University | 🔴 | Red | 🟡 | Yellow |
| University of Alabama at Birmingham | 🔴 | Red | 🟡 | Yellow |
| University of Colorado at Boulder | 🟡 | Yellow | 🟢 | Green |

Foundation for Individual Rights in Education

**App.426**

| SCHOOL NAME | 2018-2019 RATING | 2019-2020 RATING |
|---|---|---|
| University of Montana | 🔴 Red | 🟡 Yellow |
| University of New Orleans | 🔴 Red | 🟡 Yellow |
| University of North Texas | 🔴 Red | 🟡 Yellow |
| University of South Carolina Columbia | 🔴 Red | 🟡 Yellow |
| University of Texas at Arlington | 🟡 Yellow | 🔴 Red |
| Valdosta State University | 🟡 Yellow | 🔴 Red |
| Western Michigan University | 🟡 Yellow | 🔴 Red |
| Whitman College | 🔴 Red | 🟡 Yellow |
| Wichita State University | 🔴 Red | 🟡 Yellow |
| Winston-Salem State University | 🟡 Yellow | 🔴 Red |

The State of Free Speech on Our Nation's Campuses

## APPENDIX C: Schools at Which a Faculty or Administrative Body Has Adopted a Version of the 'Chicago Statement'

Adrian College*
American University
Amherst College
Appalachian State University
Arizona State University
Ashland University*
Ball State University
Board of Regents, State of Iowa
Brandeis University
California State University – Channel Islands
Case Western Reserve University
Chapman University*
Christopher Newport University
Claremont McKenna College
Clark University
Cleveland State University
Colgate University
Colorado Mesa University
Columbia University
Denison University*
Eckerd College*
Franklin & Marshall College
George Mason University
Georgetown University
Gettysburg College
Jacksonville State University
Johns Hopkins University
Joliet Junior College*
Kansas State University
Kenyon College
Kettering University*
Louisiana State University System
Miami University of Ohio
Michigan State University
Middle Tennessee State University
Nevada System of Higher Education
Northern Illinois University
Ohio University
Ohio Wesleyan University*
Princeton University
Purdue University
Ranger College*
Smith College
Snow College*
South Dakota University System

State University of New York – University at Buffalo
State University System of Florida
Stetson University*
Suffolk University*
Tennessee Technological University
The Citadel*
The City University of New York
University of Alabama System
University of Arizona
University of Arkansas at Little Rock*
University of Colorado System
University of Denver
University of Louisiana System
University of Maine System
University of Maryland
University of Minnesota
University of Missouri System
University of Montana
University of Nebraska
University of North Carolina – Chapel Hill
University of Southern Indiana
University of Texas at San Antonio
University of Toledo
University of Virginia College at Wise
University of Wisconsin System
Utica College*
Vanderbilt University
Washington and Lee University
Washington University in St. Louis
Winston-Salem State University
Winthrop University*

**NOTE: Some of the institutions on this list are not rated as a part of the Spotlight database at this time and thus do not fall within this report's speech code analysis. However, they have been included here in order to provide a full list of the institutions at which either the administration or a faculty body has adopted a version of the Chicago Statement. Such institutions are denoted with an asterisk.**

Foundation for Individual Rights in Education

**App.428**

## APPENDIX D: Schools with "Free Speech Zones"

Auburn University Montgomery
Ball State University
Bemidji State University
Bridgewater State University
California State University - Dominguez Hills
California State University - Los Angeles
California State University – Sacramento
East Tennessee State University
Eastern Illinois University
Elizabeth City State University
Grambling State University
Kentucky State University
Montclair State University
Morehead State University
Northwestern State University
Occidental College
Rutgers University - New Brunswick
Saint Cloud State University
Southern Illinois University at Carbondale
Stanford University
Texas Southern University
The College of New Jersey
Tulane University
University of Alabama in Huntsville
University of California Riverside
University of Illinois at Urbana-Champaign
University of Iowa
University of Massachusetts at Dartmouth
University of Nebraska - Lincoln
University of North Carolina School of the Arts
University of South Carolina Columbia
University of Southern Indiana
University of West Alabama
Vanderbilt University

The State of Free Speech on Our Nation's Campuses



**510 Walnut Street, Suite 1250**
**Philadelphia, PA 19106**
**T:** 215.717.3473   **F:** 215.717.3440
**E:** speechcodes@thefire.org
**www.thefire.org**

 @thefireorg